1  [*Submitting Counsel on Signature Page*]

2

3

4

5

6

7

8

9

10

11  **UNITED STATES DISTRICT COURT**

12  **NORTHERN DISTRICT OF CALIFORNIA**

13

14  **IN RE: JUUL LABS, INC. MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION**

**Case No. 19-md-02913-WHO**

15

16  THIS DOCUMENT RELATES TO:
*MSAD 15 v. JUUL Labs, Inc., et al.*

**COMPLAINT**

17  **REDACTED**

JURY TRIAL DEMANDED

18

19  **Civil Case No.: 3:22-cv-00713**

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................1

II.   JURISDICTION AND VENUE ............................................................5

III.  PARTIES ..............................................................................................6

IV.   GENERAL FACTUAL ALLEGATIONS..............................................11

    A.    Each Defendant Was Instrumental in Seeking to Develop and
        Market the Blockbuster Sequel to Combustible Cigarettes, the
        "Most Successful Consumer Product of All Time."........................11

    B.    Defendants' Strategy Was to Create a Nicotine Product That
        Would Maximize Profits Through Addiction. ..................................18

        1.    Defendants Understood that the "Magic" Behind
            Cigarettes' Stratospheric Commercial Success Was
            Nicotine Addiction................................................................18

        2.    Following the Cigarette Industry Playbook, Defendants
            Sought to Market a Product that would Create and Sustain
            Nicotine Addiction, but Without the Stigma Associated
            with Cigarettes ......................................................................21

        3.    Defendants Sought to Position JLI for Acquisition by a
            Major Cigarette Company.....................................................26

    C.    JLI and Bowen Designed a Nicotine Delivery Device Intended to
        Create and Sustain Addiction..........................................................33

        1.    JLI and Bowen Made Highly Addictive E-Cigarettes Easy
            for Young People and Non-Smokers to Inhale. ...................34

        2.    JLI's Initial Experiments Measured Non-Smokers' "Buzz"
            Levels and Perceptions of Throat Harshness. ......................35

        3.    JUULs Rapidly Deliver Substantially Higher Doses of
            Nicotine than Cigarettes.......................................................37

        4.    JLI and the Management Defendants Knew That JUUL was
            Unnecessarily Addictive Because It Delivered More
            Nicotine Than Smokers Needed or Wanted.........................43

        5.    JUUL's Design Did Not Look Like a Cigarette, Making it
            Attractive to Non-Smokers and Easy for Young People to
            Use Without Detection..........................................................45

COMPLAINT

6.  JLI Enticed Newcomers to Nicotine with Kid-Friendly Flavors Without Ensuring the Flavoring Additives Were Safe for Inhalation...................................................50

    a.  JIL Develops Flavored JUUL Products That Would Appeal to Youth...............................................50

    b.  Defendants Developed and Promoted the Mint Flavor and Sought to Preserve its Market.....................54

        (i)  JLI Manipulates Chemistry of Mint JUUL Pods..........................................................55

    c.  JLI's Youth Surveillance Programs Confirmed that Mint JUUL Pods are Preferred by Teens.................56

D.  Defendants Developed and Implemented a Marketing Scheme to Mislead Users into Believing that JUUL Products Contained Less Nicotine Than They Actually Do and Were Healthy and Safe.....................59

    1.  The Defendants Knowingly Made False and Misleading Statements and Omissions Concerning JUUL's Nicotine Content.................................................59

    2.  JLI, the Management Defendants, and Altria Transmitted, Promoted and Utilized Statements Concerning JUUL's Nicotine Content that They Knew Was False and Misleading...............................................65

    3.  Defendants Used Food and Coffee Themes to Give False Impression that JUUL Products Were Safe and Healthy.....................69

    4.  JLI's "Make the Switch" Campaign Intentionally Misled and Deceived Users to Believe that JUUL Is a Cessation Device.................................................72

    5.  JLI, Altria, and Others in the E-Cigarette Industry Coordinated with Third-Party Groups to Mislead the Public About the Harms and Benefits of E-Cigarettes...................83

        a.  The American Vaping Association.........................84

        b.  Vaping360..............................................86

        c.  Foundation for a Smoke-Free World ....................88

        d.  Vapor Technology Association...........................89

        e.  Retailer Lobbying ...................................89

ii

6.    Altria Falsely Stated That It Intended to Use Its Expertise
      in "Underage Prevention" Issues to JLI.............................................90

E.    Defendants Targeted the Youth Market.............................................91

      1.    JLI Emulated the Marketing of Cigarette Companies. .......................92

      2.    The Management Defendants Intentionally Marketed JUUL
            to Young People...................................................................94

      3.    JLI Advertising Exploited Young People's Psychological
            Vulnerabilities....................................................................97

      4.    JLI Pushed the Vaporized Campaign Into Youth Targeted
            Channels...........................................................................102

            a.    JLI Placed Its Vaporized Ads on Youth Oriented
                  Websites and Media...................................................102

            b.    JLI Used Influencers and Affiliates to Amplify Its
                  Message to a Teenage Audience......................................104

            c.    JLI Used Viral Marketing Techniques Known to
                  Reach Young People...................................................107

      5.    JLI Targeted Youth Retail Locations..................................110

      6.    JLI Hosted Parties to Create a Youthful Brand and Gave
            Away Free Products to Get New Users Hooked..............................112

      7.    The Management Defendants' Direction of and
            Participation in JLI and in the Youth Marketing Schemes. ...............116

            a.    The Management Defendants, and in particular
                  Pritzker, Valani, and Huh, controlled JLI's Board at
                  relevant times. .......................................................116

            b.    Pritzker, Huh, and Valani were active, involved
                  board members.........................................................118

            c.    The Management Defendants, and in particular
                  Bowen, Monsees, Pritzker, Valani, and Huh,
                  oversaw and directed the youth marketing scheme. .............119

            d.    Pritzker, Huh, and Valani Were Able to Direct and
                  Participate in the Youth Marketing Because They
                  Seized Control of the JLI Board of Directors. ...................126

iii

8.   Pritzker, Valani, and Huh continued to exercise control over and direct the affairs of JLI even after a new CEO was appointed. .......................................................................130

9.   Pritzker and Valani directed and controlled JLI's negotiations with Altria .................................................133

10.  JLI and the Management Defendants Knew Their Efforts Were Wildly Successful in Building a Youth Market and Took Coordinated Action to Ensure That Youth Could Purchase JUUL Products. ...............................................135

     a.   JLI's Strategy Worked. ........................................135

     b.   JLI Closely Tracked Its Progress in Reaching Young Customers through Social Media and Online Marketing ............................................................137

11.  JLI Worked with Veratad Technologies To Expand Youth Access to JUUL Products. ..............................................140

12.  JLI Engaged in a Sham "Youth Prevention" Campaign ...................149

13.  The FDA Warned JUUL and Others That Their Conduct is Unlawful ...........................................................152

14.  In Response to Regulatory Scrutiny, Defendants Misled the Public, Regulators, and Congress that JLI Did Not Target Youth. ..................................................................154

F.   Altria Provided Services to JLI to Expand JUUL Sales and Maintain JUUL's Position as the Dominant E-Cigarette. .............................159

1.   Before Altria's Investment in JLI, Altria Knew JLI Was Targeting Youth. ....................................................159

2.   Altria Worked with Pritzker and Valani to Secure Control of JLI and to Exploit JLI for Their Mutual Benefit. ..........................161

3.   Altria Participated in and Directed the Fraudulent Acts of JLI Designed to Protect the Youth Market for JUUL .......................172

     a.   Altria Participated in and Directed JLI's Make the Switch Campaign. ..................................................172

     b.   Altria Participated in and Directed JLI's Fraudulent Scheme to Keep Mint on the Market. ...................................173

4.   JLI, the Management Defendants and Altria Coordinated to Market JUUL in Highly-Visible Retail Locations ..........................174

iv

5. Altria Works with the Management Defendants to Direct JLI's Affairs and Commit Fraud.........................175

   a. Altria Installs Its Own Executives into Leadership Positions to Direct the Affairs of JLI...................177

   b. Altria Furthered the JLI Enterprise by Participating in and Directing the Marketing and Distribution of JUUL Products.......................182

G. JLI, Altria, and Others Have Successfully Caused More Young People to Start Using E-Cigarettes, Creating a Youth E-Cigarette Epidemic and Public Health Crisis. ..............................191

   1. Defendants' Scheme Caused Users, Including Minors, to be Misled into Believing that JUUL was Safe and Healthy. ................191

   2. Use of JUUL by Minors Has Skyrocketed .......................193

H. JLI Thrived Due to Extensive Efforts to Delay Meaningful Regulation of its Products.................................198

   1. E-Cigarette Manufacturers Successfully Blocked the Types of Regulations that Reduced Cigarette Sales, Creating the Perfect Opportunity for JLI.................................198

   2. JLI, the Management Defendants, and Altria Defendants Successfully Shielded the Popular Mint Flavor from Regulation. .......................201

   3. In Response to the Public Health Crisis Created by JUUL, the FDA Belatedly Tried to Slow the Epidemic. .............................210

   4. The Government's Efforts to Address the JUUL Crisis Were Too Late and the Damage Has Already Been Done ...............211

V. GOVERNMENT ENTITY FACTUAL ALLEGATIONS .......................212

A. E-cigarette Use in Schools ...........................212

B. Impact of the Youth E-Cigarette Crisis on Plaintiff MSAD 15...................223

C. No Federal Agency Action, Including by the FDA, Can Provide the Relief Plaintiff Seeks Here.......................228

VI. CAUSES OF ACTION .......................229

COUNT ONE — VIOLATIONS OF PUBLIC NUISANCE LAW.......................229

COMPLAINT
CASE NO. 19-MD-02913-WHO

COUNT TWO — VIOLATIONS OF THE RACKETEER INFLUENCED AND
        CORRUPT ORGANIZATIONS ACT ("RICO").........................................234

        1.      Violation of 18 U.S.C. § 1962(c)........................................234

                a.      JLI is an Enterprise Engaged in, or its Activities
                        Affect, Interstate or Foreign Commerce ...............................235

                b.      "Conduct or Participate, Directly or Indirectly, in
                        the Conduct of Such Enterprise's Affairs" ...........................236

                c.      Pritzker, Huh, and Valani Exercised Control and
                        Direction Over the JLI Enterprise...........................................240

                d.      Bowen, Monsees, Pritzker, Huh and Valani
                        Exercised a Firm Grip over JLI ..............................................241

                e.      In 2017, Altria Conspired with Pritzker and Valani
                        to Influence and Indirectly Exercise Control Over
                        JLI. .......................................................................................242

                f.      Altria Directly Exercises Control and Participates in
                        of the JLI Enterprise................................................................243

                g.      "Pattern of Racketeering Activity" .......................................251

                h.      Plaintiff Has Been Damaged by the Enterprise
                        Defendants' RICO Violations.................................................262

        2.      Violations of 18 U.S.C. § 1962(d) .................................................264

COUNT THREE — NEGLIGENCE.............................................................267

COUNT FOUR — GROSS NEGLIGENCE ..................................................272

VII.    PRAYER FOR RELIEF ...........................................................................278

VIII.   JURY TRIAL DEMANDED .....................................................................279

COMPLAINT
CASE NO. 19-MD-02913-WHO

## I.     INTRODUCTION

1.      The battle to end nicotine addiction and its associated diseases and death has consumed our nation's public health resources for more than half a century. After five decades of tireless efforts by public health advocates, litigators, and regulators, the war on tobacco was on the path to victory. By 2014, rates of smoking and nicotine addiction in this country were finally at an all-time low, particularly among teenagers. Until now. The United States, closer than ever to consigning the nicotine industry to the dustbin of history, now faces a youth nicotine epidemic of historic proportions.

2.      JUUL products are rampant in the nation's schools, with the percentage of 12th graders who reported consuming nicotine almost doubling between 2017 and 2018. In 2019, more than five million middle and high school students reported current use of e-cigarettes, including more than one in every four high schoolers. Consistent with this national trend, youth e-cigarette consumption rates in MSAD 15 ("MSAD" or "Plaintiff") continue to climb. The Surgeon General has warned that this new "epidemic of youth e-cigarette use" could condemn a generation to "a lifetime of nicotine addiction and associated health risks." The swift rise in a new generation of nicotine addicts has overwhelmed parents, schools, and the medical community (including county public health departments) on the front lines dealing with this crisis, drawing governmental intervention at nearly every level—but it's too little, too late.

3.      This public health crisis is no accident. What had been lauded as progress in curbing cigarette use, JUUL Labs Inc.'s (JLI) co-founders Adam Bowen and James Monsees viewed as opportunity.  Seizing on the decline in cigarette consumption and the lax regulatory environment for e-cigarettes, Bowen, Monsees, and investors in their company sought to introduce nicotine to a whole new generation, with JLI as the dominant supplier.  To achieve that common purpose, they knew they would need to create and market a product that would make nicotine cool again, without any of the stigma associated with cigarettes. With help from their early investors and board members, who include Nicholas Pritzker, Riaz Valani, and Hoyoung Huh (together, the "Management Defendants"), they succeeded in hooking millions of youth, and, of course, earning billions of dollars in profits.

4.      Every step of the way, JLI, by calculated intention, adopted the cigarette industry's playbook, in coordination with one of that industry's innovators, cigarette giant Altria. JLI was created in the image of the iconic American cigarette companies, which JLI founders praised for creating "the most successful consumer product of all time. . . . an amazing product." The secret to that "amazing product"? Nicotine, a chemical that has deleterious effects on developing young brains, is the fundamental reason that people persist in using tobacco products even though they can cause pulmonary injuries, cardiovascular disease and other serious, often fatal, conditions. Through careful study of decades of cigarette industry documents, JLI knew that the key to developing and sustaining addiction was the amount and the efficiency of the nicotine delivery.

5.      Three tactics were central to decades of cigarette industry market dominance: product design to maximize addiction; mass deception; and targeting of youth. JLI and its co-conspirators adopted and mastered them all. First, JLI and Bowen designed JUUL products to create and sustain addiction, not break it. JLI and Bowen were the first to design an e-cigarette that could compete with combustible cigarettes on the speed and strength of nicotine delivery. Indeed, JUUL products use nicotine formulas and delivery methods much stronger than combustible cigarettes, confirming that what JLI and Bowen designed was a starter product designed for youth, not a cessation or cigarette replacement product. JLI and Bowen also innovated by making an e-cigarette that was smooth and easy to inhale, practically eliminating the harsh "throat hit," which otherwise deters nicotine consumption, especially among nicotine "learners," as R.J. Reynolds' chemist Claude Teague called new addicts, primarily young people.

6.      *Second*, JLI and the Management Defendants, just like cigarette companies before them, targeted kids as their customer base. One of JLI's "key needs" was the need to "own the 'cool kid' equity." JUUL products were designed to appear slick and high-tech like a cool gadget, including video-game-like features like "party mode." JLI offered kid-friendly flavors like mango and cool mint, and partnered with Altria to create and preserve the market for mint-flavored products—all because Defendants knew that flavors get young people hooked. Under

the guise of youth smoking prevention, JLI sent representatives directly to schools to study teenager

e-cigarette preferences.

7.    *Third,* JLI, the Management Defendants and Altria engaged in a campaign of deceit, through sophisticated mass media and social media communications, advertisements and otherwise, about the purpose and dangers of JUUL products. JUUL products' packaging and advertising grossly understates the nicotine content in its products. Advertising campaigns featured JUUL paired with food and coffee, positioning JUUL as part of a healthy meal, a normal part of a daily routine, and as safe as caffeine. In partnership with Altria, JLI adopted a "Make the Switch" campaign to mislead the public into thinking that JLI products were benign smoking cessation devices, even though JUUL was never designed to break addictions. JLI, the Management Defendants, and Altria also concealed the results of studies that revealed that JUUL products were far more powerfully addictive than was disclosed. JLI's deceptive marketing scheme was carried out across the country through broad distribution channels: veteran cigarette industry wholesalers, distributors and retailers ensured that JUUL products would become widely available to a new market of nicotine-newcomers, especially youth. JLI and the Management Defendants joined with these veteran cigarette industry marketers to secure premium shelf space for vivid displays at convenience stores, like 7-11, and gas stations, including Chevron, that would lure e-cigarette users, particularly young people, who would become long-term customers. These marketing efforts have been resounding successes—when JUUL products were climbing in sales, most youth—and their parents—believed that e-cigarettes did not contain nicotine at all.

8.    JLI and the Management Defendants reached their intended demographic through a diabolical pairing of notorious cigarette company advertising techniques (long banned for cigarettes because they cause young people to start smoking) with cutting-edge viral marketing campaigns and social media.  They hired young models and advertised using bright, "fun" themes, including on media long barred to the cigarette industry, such as billboards, on children's websites such as "Nick Junior" and Cartoon Network, and on websites providing games and

educational tools to students in middle school and high school. JLI and the Management Defendants also employed young social-media "influencers" and celebrities popular with teenagers. When the public, regulators, and Congress caught onto JLI's relentless focus on children, JLI and the Management Defendants simply lied, even though they knew well that they had purposefully targeted youth in their marketing and those efforts had been breathtakingly successful.

9.      It should come as little surprise that JLI and the Management Defendants' misconduct, expressly patterned after decades of cigarette company practices, could not have been carried out without the involvement and expertise of an actual cigarette company. In December 2018, Altria paid $12.8 billion to acquire a 35% stake in JLI. Nicholas Pritzker and Riaz Valani led the negotiations for JLI and worked closely with Altria's executives to secure Altria's agreement to pull its own competing e-cigarette product off the market and instead throw its vast resources and cigarette industry knowledge behind JUUL. Altria thus supported and ultimately directed JLI, working to ensure its continued success despite Altria's knowledge that JLI and the Management Defendants' had misled the public and targeted youth. JUUL's market dominance was established, positioning Altria and the Management Defendants to share in JLI's profits. Defendants' conduct prompted the Federal Trade Commission to sue JLI and Altria on April 1, 2020 alleging violations of the antitrust laws and seeking to unwind the JLI/Altria transaction. But even well before Altria announced its investment in JLI, the connections between the two companies ran deep. With the assistance and direction of the Management Defendants, Altria collaborated with JLI to maintain and grow JUUL sales, despite its knowledge that JUUL was being marketed fraudulently to all consumers and targeted to youth, including by sharing data and information and coordinating marketing activities, including acquisition of key shelf space next to top-selling Marlboro cigarettes. Altria's investment in JLI is not merely a financial proposition, but a key element of Defendants' plan to stave off regulation and public outcry and keep their most potent and popular products on the market. JLI (and the Management Defendants) have benefitted from Altria's expertise in designing and marketing addictive products, and in thwarting regulation.

10.    There is no doubt about it—JLI, the Management Defendants, Altria, and their co-Defendants have created this public health crisis.  At the heart of this disastrous epidemic are the concerted efforts of JLI, its co-conspirators, and all those in JUUL's supply and distribution chain to continuously expand their market share and profits by preying upon a vulnerable young population and deceiving the public about the true nature of the products they were selling. Nicotine is not benign like coffee, contrary to what many JUUL users believe. Nor is the aerosol as harmless as puffing room air.   Worse, the flavors in JUUL products are themselves toxic and dangerous, and have never been adequately tested to ensure they are safe for inhalation. According to the most recent scientific literature, JUUL products cause acute and chronic pulmonary injuries, cardiovascular conditions, and seizures. Yet JUUL products and advertising contain no health risk warnings at all. And a generation of kids is now hooked, ensuring long-term survival of the nicotine industry because, today just as in the 1950s, 90% of smokers start as children.

## II.    JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's racketeering claim arises under the laws of the United States, 18 U.S.C. § 1961 *et seq.*, and pursuant to 28 U.S.C. § 1332(a) because: (i) the amount in controversy exceeds $75,000, exclusive of interests and costs, and (ii) the plaintiff and defendants are citizens of different states. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

12.    The Court has personal jurisdiction over Defendants because they do business in the Northern District of California and have sufficient minimum contacts with the District. Defendants intentionally avail themselves of the markets in this State through the promotion, marketing, and sale of the products at issue in this lawsuit in California, and by retaining the profits and proceeds from these activities, to render the exercise of jurisdiction by this Court permissible under California law and the U.S. Constitution.

13.    In addition, Defendants Monsees, Bowen, Pritzker, and Valani reside within the Northern District of California, making them subject to the general jurisdiction of this Court.

Defendant Huh resided in the Northern District of California when he engaged in the conduct alleged herein.

14.    All Defendants have materially participated in conduct that had intended and foreseeable effects on Plaintiff such that the forum Court could exercise personal jurisdiction over defendants. Defendants' conduct was purposefully directed at Plaintiff and similarly situated plaintiffs throughout the United States and in each forum.

15.    The Court also has personal jurisdiction over JLI, the Management Defendants, and Altria under 18 U.S.C. § 1965, because at least one of these Defendants has sufficient minimum contacts with the District.

16.    Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391 (b)(2) and (3) because a substantial part of the events or omissions giving rise to the claims at issue in this Complaint arose in this District and Defendants are subject to the Court's personal jurisdiction with respect to this action.

### III.    PARTIES

**Plaintiff**

17.    Plaintiff MSAD is a unified school district organized and operating pursuant to the laws of the State of Maine.  Plaintiff's offices are located at 14 Shaker Road in Gray, Maine.

**JUUL Labs, Inc.**

18.    Defendant JUUL Labs, Inc. ("JLI") is a Delaware corporation, having its principal place of business in San Francisco, California. Ploom, Inc., a predecessor company to JLI, was incorporated in Delaware on March 12, 2007. In 2015, Ploom, Inc. changed its name to PAX Labs, Inc. In April 2017, PAX Labs, Inc. changed its name to JUUL Labs, Inc., and formed a new subsidiary corporation with its old name, PAX Labs, Inc. That new subsidiary, PAX Labs, Inc. ("PAX"), was incorporated in Delaware on April 21, 2017 and has its principal place of business in San Francisco, California.

19.    JLI designs, manufactures, sells, markets, advertises, promotes and distributes JUUL e-cigarettes devices, JUUL pods and accessories (collectively "JUUL" or "JUUL products"). Prior to the formation of separate entities PAX Labs, Inc. and JLI in or around April

2017, JUUL designed, manufactured, sold, marketed, advertised, promoted, and distributed JUUL under the name PAX Labs, Inc.

20.    Together with its predecessors, JUUL Labs, Inc is referred to herein as "JLI."

**Altria Defendants**

21.    Defendant Altria Group, Inc., ("Altria" or "Altria Group" or together with its wholly owned subsidiaries and their predecessors, "Altria" or together with Defendants Philip Morris USA, Inc., Altria Client Services LLC, and Altria Group Distribution Company, the "Altria Defendants") is a Virginia corporation, having its principal place of business in Richmond, Virginia. Altria is one of the world's largest producers and marketers of tobacco products, manufacturing and selling combustible cigarettes for more than a century.

22.    Defendant Philip Morris USA, Inc. ("Philip Morris"), is a wholly-owned subsidiary of Altria. Philip Morris is also a Virginia corporation that has its principal place of business in Richmond, Virginia. Philip Morris is engaged in the manufacture and sale of cigarettes in the United States. Philip Morris is the largest cigarette company in the United States. Marlboro, the principal cigarette brand of Philip Morris, has been the largest selling cigarette brand in the United States for over 40 years.

23.    On December 20, 2018, Altria Group and Altria Enterprises LLC purchased a 35% stake in JLI. Altria and JLI executed a Services Agreement that provides that Altria, through its subsidiaries, Philip Morris, Altria Client Services LLC, and Altria Group Distribution Company, would assist JLI in the selling, marketing, promoting, and distributing of JUUL, among other things.

24.    Defendant Altria Client Services LLC ("Altria Client Services" or "ACS") is a Virginia limited liability company with its principal place of business in Richmond, Virginia. Altria Client Services provides Altria Group, Inc. and its companies with services in many areas including digital marketing, packaging design & innovation, product development, and safety, health, and environmental affairs. Pursuant to Altria's Relationship Agreement with JLI, Altria Client Services assists JLI in the sale, marketing, promotion and distribution of JUUL

products.[1] Such services include database support, direct marketing support, and premarket product application support.[2] On September 25, 2019, the former senior vice president and chief growth

officer of Altria Client Services, K.C. Crosthwaite, became the new chief executive officer of JLI.

25. Defendant Altria Group Distribution Company ("AGDC") is a Virginia corporation and wholly owned subsidiary of Altria Group, Inc. with its principal place of business in Richmond, Virginia. Altria Group Distribution Company provides sales, distribution and consumer engagement services to Altria's tobacco companies. Altria Group Distribution Company performs services under the Relationship Agreement to assist JLI in the sale, marketing, promotion and distribution of JLI. Such services include JUUL-distribution support, the removal by Altria Group Distribution Company of Nu Mark products (such as Green Smoke or MarkTen) and fixtures in retail stores and replacing them with JUUL products and fixtures, and sales support services.

26. While Plaintiff has attempted to identify the specific Altria defendant which undertook certain acts alleged in this Complaint, it was not always able to do so due to ambiguities in Altria's and JLI's own documents. References in these internal documents to "Altria" without further detail are common. In other words, Defendants do not always specify which entity is involved in particular activities in their own internal documentation. Moreover, key employees moved freely between Altria Group, Inc. and its various operating subsidiaries, including defendants Altria Client Services, Altria Group Distribution Company, and Philip Morris USA Inc – each of which is a wholly owned subsidiary of Altria Group, Inc. For example, K.C. Crosthwaite (who would later become CEO of JLI) was at various points from 2017 through 2019 employed by Altria Client Services, Philip Morris, and Altria Group. And in its own annual reports to Shareholders, when identifying the "Executive Officers" of Altria Group, Altria states that the "officers have been employed by Altria *or its subsidiaries* in various capacities

---

[1] Altria Group, Inc., *Relationship Agreement by and among JUUL Labs, Inc., Altria Group, Inc., and Altria Enterprises LLC* ("Relationship Agreement") (Form 8-K), Ex. 2.2 (Dec. 20, 2018), https://www.sec.gov/Archives/edgar/data/764180/000119312518353970/d660871dex22.htm.
[2] *Id*.

COMPLAINT
Case No. 19-md-02913-WHO

during the past five years."[3]

27.     Notably, Altria Group directs the activities of its varying operating companies, including defendants Altria Client Services, AGDC, and Philip Morris. For this reason, and unless otherwise specified, the term "Altria" refers to Altria Group Inc. as the responsible entity, by virtue of its control over its various operating subsidiaries. To the extent such an assumption is incorrect, the knowledge of which Altria Group Inc. subsidiary is responsible for specific conduct is knowledge solely within the possession of the Altria Defendants.

**Management Defendants**

28.     Defendant James Monsees is a resident of the San Francisco Bay area, California. In 2007, he co-founded Ploom with Adam Bowen. He served as Chief Executive Officer of JLI until October 2015. Since October 2015, he has been Chief Product Officer of JLI. At all relevant times, he has been a member of the Board of Directors of JLI until he stepped down in March 2020.

29.     Defendant Adam Bowen is a resident of the San Francisco Bay area, California. In 2007, he co-founded Ploom with Defendant Monsees. At all relevant times, he has been Chief Technology Officer and a member of the Board of Directors of JLI.

30.     Defendant Nicholas Pritzker is a resident of San Francisco, California, and a member of the Pritzker family, which owned the chewing-tobacco giant Conwood before selling it to Reynolds American, Inc., a subsidiary of British American Tobacco. Pritzker received a J.D. from the University of Chicago. He served as president of the Hyatt Hotels Corporation and was a member of its Board of Directors from 1980 to 2007. More recently, he co-founded Tao Capital, an early investor in, among other companies, Tesla Motors and Uber. In 2011, he invested in JLI.[4] He has been on the Board of Directors of JLI since at least August 2013.[5] At least from October 2015 to August 2016, he was on the Executive Committee in the Board of Directors and served as Co-Chairman. He controlled two of JLI's seven maximum Board seats

---

[3] Altria Group, Inc., *2018 Altria Group, Inc. Annual Report* at 98, *available at* http://investor.altria.com/file/4087349/Index?KeyFile=1001250956 (emphasis added)
[4] Ainsley Harris, *How JUUL went from a Stanford thesis to $16 billion startup*, Fast Co. (Mar. 8, 2020), https://www.fastcompany.com/90263212/how-JUUL-went-from-a-stanford-thesis-to-16-billion-startup.
[5] JLI01426164.

COMPLAINT
Case No. 19-md-02913-WHO

(the second of which was occupied at relevant times by Alexander Asseily and Zachary Frankel).[6]

31.    Defendant Hoyoung Huh currently lives in Florida. During most of the relevant time period, he lived and worked in the Silicon Valley area, California. He holds an M.D. from Cornell and a Ph.D. in Genetics/Cell Biology from Cornell/Sloan-Kettering. He has been CEO or a Board member of numerous biotechnology businesses, including Geron Corporation. Huh has been on the Board of Directors of JLI since at least June 2015. At least from October 2015 to August 2016, he was on the Executive Committee in the Board of Directors. Huh occupied the Board seat appointed by a majority of the JLI Board.[7] Huh resigned from JLI's board in May 2018.[8]

32.    Defendant Riaz Valani lives near San Jose, California and is a general partner at Global Asset Capital, a San Francisco-based private equity investment firm. He first invested in JLI in 2007, and has been on the Board of Directors of JLI since at least 2007.[9] At least from October 2015 to August 2016, he was on the Executive Committee in the Board of Directors. HeHe controlled two JLI's maximum seven Board seats.[10] Beginning around March 2015, Valani's second seat was occupied by Hank Handelsman; Zach Frankel may have occupied Valani's second seat starting in 2017, though Handelsman remained on the board.[11]

33.    Defendants Monsees, Bowen, Pritzker, Huh, and Valani are referred to collectively as the "Management Defendants."

34.    The Altria Defendants, Monsees, Bowen, Pritzker, Huh, and Valani are referred to collectively as the "RICO Defendants."

///

///

///

---

[6] JLI01356230; JLI01356237; JLI00417815 (same in February 2018); JLI01362388; JLI01439393; JLI01440776.
[7] *Id.*
[8] JLI01425022.
[9] JLI01437838; Ploom, Inc., Notice of Exempt Offering of Securities (Form D) (May 5, 2011), https://www.sec.gov/Archives/edgar/data/1520049/000152004911000001/xslFormDX01/primary_doc.xml.
[10] JLI01426710; JLI01365707; INREJUUL_00327603; JLI00417815.
[11] JLI01356230; JLI01356237; JLI00417815; JLI01365706; JLI01362388; JLI01439393; JLI01440776.

1

## IV.    GENERAL FACTUAL ALLEGATIONS

2

**A.    Each Defendant Was Instrumental in Seeking to Develop and Market the Blockbuster Sequel to Combustible Cigarettes, the "Most Successful Consumer Product of All Time."**

3

4        35.    JLI's co-founder James Monsees has described the cigarette as "the most

5  successful consumer product of all time . . . an amazing product."[12] This statement, which ignores

6  the fact that cigarettes have caused more deaths than any other human invention, contained a

7  kernel of truth. When U.S. smoking rates peaked in the mid-1960s, 42% of adults smoked

8  cigarettes. Cigarettes were everywhere; people smoked on airplanes, in movie theatres, at the

9  office, and at sports games. Movie stars and sports heroes smoked. Cigarette advertising

10  wallpapered

11  American life, glamorizing smoking as sophisticated, cool, and the thing to do.

12        36.    But in reality, of course, this "successful" product has long been the world's

13  leading cause of preventable death.

14        37.    Years of anti-smoking campaigns, including work by local government public

15  health departments and school-based anti-tobacco programs, have made great strides towards

16  denormalizing cigarette smoking. But where public health officials and schools saw progress,

17  others saw an opportunity.

18        38.    Citing "some problems" inherent in the cigarette, Monsees and JLI co-founder

19  Adam Bowen set out to "deliver[] solutions that refresh the magic and luxury of the tobacco

20  category."[13] Monsees saw "a huge opportunity for products that speak directly to those consumers

21  who aren't perfectly aligned with traditional tobacco products."[14] Successfully capitalizing on

22  this opportunity would mean not only billions of dollars in short-term revenue but lucrative

23  acquisition by a cigarette industry power player.

24        39.    Bowen and Monsees took the first major step toward realizing their vision by

25  deliberately creating an extremely potent nicotine product that looked nothing like a cigarette.

26

27  [12] Kathleen Chaykowski, Billionaires-to-be: Cigarette Breakers–James Monsees and Adam Bowen Have Cornered the US E-Cigarette Market with Juul. Up Next: The World, FORBES INDIA (Sept. 27, 2018), www.forbesindia.com/article/leaderboard/billionairestobe-cigarette-breakers/51425/1.

28  [13] Josh Mings, *Ploom Model Two Slays Smoking With Slick Design and Heated Tobacco Pods*, SOLID SMACK (Apr. 23, 2014), www.solidsmack.com/ design/ploom-modeltwo-slick-design-tobacco-pods.
[14] *Id.*

COMPLAINT
Case No. 19-md-02913-WHO

But achieving widespread adoption of their highly addictive product required resources and expertise beyond those possessed by Bowen, Monsees or others at JLI.

40.    When it became clear that Bowen and Monsees could not achieve vision of growing the number of nicotine-addicted e-cigarette users to ensure a base of customers for life through JLI by themselves, the Management Defendants planned a fundamental shift in roles to allow Pritzker, Huh, and Valani to direct and take control of JLI and use it to commit the Defendants' unlawful acts.

41.    Specifically, in October 2015, Monsees stepped down from his role as Chief Executive Officer of JLI (to become Chief Product Officer) and, in his stead, Pritzker, Valani, and Huh formed an Executive Committee of the JLI Board of Directors that would take charge of fraudulently marketing JUUL products, including to youth.

42.    Prior to the installation of Tyler Goldman as JLI's new CEO in August 2016, Defendants Pritzker, Valani, and Huh used their newly formed Executive Committee to expand the number of addicted e-cigarette users through fraudulent advertising and representations to the public. They overrode other board members' arguments that JLI's youth oriented marketing campaign should be abandoned or scaled back, directed the continuation of the marketing campaign that they knew was actively targeting youth, and cleaned house at JLI by "dismiss[ing] other senior leaders and effectively tak[ing] over the company."[15] Once their leadership was secure, defendants Pritzker, Valani, and Huh pressed for even "more aggressive rollout and [marketing]."[16]

43.    Defendants Bowen, Monsees, Pritzker, Valani, and Huh thus, and as further set forth in this complaint, controlled JLI and used it to make fraudulent misrepresentations or omissions regarding Juul's intentional addictiveness and method of nicotine delivery, combined with the intent, contrary to public statements, to grow the market for nicotine-addicted individuals for their own financial gain.

44.    And, as set forth in this complaint, Defendants Bowen, Monsees, Pritzker,

---

[15] Julie Creswell & Sheila Kaplan, *How Juul Hooked a Generation on Nicotine*, N.Y. TIMES (Nov. 23, 2019), https://www.nytimes.com/2019/11/23/health/juul-vaping-crisis.html.
[16] INREJUUL_00278359.

Huh, and Valani sought to personally profit from their unlawful acts, using their control of JLI to position the company for acquisition.

[17]

45.    By no later than August 2015, Defendants Bowen, Pritzker, Valani, and Huh joined in the discussions of a potential acquisition by a major cigarette company,[18]

46.    Unable to secure an early acquisition, the Management Defendants knew that their desire to monetize a massive new market for JUUL would be aided if they could convert Altria, a competitor through its e-cigarette subsidiary Nu Mark LLC and an experienced cigarette company with a history of marketing to youth and covering it up, into an ally and eventual purchaser. They began that effort as late as the Spring of 2017. While Defendants JLI, Bowen, Monsees, Valani, and Huh are relative newcomers to the tobacco industry, Altria has been manufacturing and selling "combustible" cigarettes for more than a century.

47.    Altria, for its part, desperately sought a replenishing customer base. Cigarette companies have long known that profitable growth requires a pipeline of "replacement" customers. After decades of tobacco litigation and regulation, Altria (including through its subsidiary Philip Morris) had little ability to recruit new smokers in the ways that had driven Philip Morris's success through most of the 1900s. In 2017, Altria's combustible cigarette products (sold through Philip Morris) were facing increasing regulatory pressures. In late July 2017, Altria's stock value plummeted shortly after the FDA announced that it would reduce the

---

[17] JLI01369437
[18] INREJUUL_00016386 (Stifel Presentation, Aug. 2015).

COMPLAINT
Case No. 19-md-02913-WHO

amount of nicotine allowed in cigarettes with an eye toward reaching non-addictive levels.[19] In late 2017, Altria, and other major cigarette companies, also finally complied with a consent decree from the 1990s tobacco litigation that required them to issue corrective advertising statements that highlighted the addictiveness and health impacts of smoking cigarettes.[20]

48.    Due in large part to this litigation and regulation, cigarette use has been declining in the United States in the last decade, especially among youth.[21] Altria estimates that the cigarette industry declined by 4% in 2017 and by 4.5% in 2018, and it predicted a continued 4% to 5% decline in the average annual U.S. cigarette industry volume for 2019 through 2023.[22] Altria later adjusted the estimated rate of decline to 4% to 6%, to reflect efforts to increase the legal age for cigarette smoking to 21.[23]

49.    In the face of this continued downward trend in the traditional cigarette market, Altria had undertaken its own efforts at marketing an e-cigarette product through its subsidiary Nu Mark LLC. Altria, through Nu Mark, had launched the MarkTen product nationwide in 2014 with an aggressive marketing campaign, eclipsing the advertising expenditures for the market leader at that time, blu e-cigarettes.[24] Of the $88.1 million spent on e-cigarette advertising in 2014, nearly 40% of that was Altria's MarkTen campaign, at $35 million.[25] Altria was clear in its intent to dominate the e-cigarette market as it has the combustible cigarette market: "We are the market leader today and we will continue to be," then-CEO Marty Barrington told investors at the time of MarkTen's launch.[26] The original MarkTen was a "cigalike," designed to mimic the look

---

[19] *See* Dan Caplinger, *Altria Group in 2017: The Year in Review*, The Motley Fool (Dec. 18, 2017), https://www.fool.com/investing/2017/12/18/altria-group-in-2017-the-year-in-review.aspx.
[20] https://www.law360.com/articles/1037281/tobacco-cos-settle-long-running-health-warning-dispute
[21] *Current Cigarette Smoking Among Adults In the United States*, CDC, https://www.cdc.gov/tobacco/data_statistics/fact_sheets/adult_data/cig_smoking/index.htm (last visited February 10, 2020); *Youth and Tobacco Use*, CDC, https://www.cdc.gov/tobacco/data_statistics/fact_sheets/youth_data/tobacco_use/index.htm (last visited February 10, 2020).
[22] *Altria's Fourth-Quarter 2018 Earnings Conference Call*, Altria (Jan. 31, 2019), http://investor.altria.com/Cache/1001247877.PDF?O=PDF&T=&Y=&D=&FID=1001247877&iid=4087349.
[23] *Altria Shares Slide As Cigarette Sales Continue to Decline*, Tobacco Bus. (July 31, 2019), https://tobaccobusiness.com/altria-shares-slide-as-cigarette-sales-continue-to-decline/.
[24] Jennifer Cantrell et al., *Rapid increase in e-cigarette advertising spending as Altria's MarkTen enters the marketplace*, Tobacco Control 25 (10) (2015), http://dx.doi.org/10.1136/tobaccocontrol-2015-052532.
[25] *Id*.
[26] Melissa Kress, *MarkTen National Rollout Hits 60,000 Stores*, Convenience Store News (July 22, 2014), https://csnews.com/markten-national-rollout-hits-60000-stores.

COMPLAINT
Case No. 19-md-02913-WHO

and feel of a combustible cigarette.

50.    Altria had also been acquiring small companies in the e-cigarette industry, starting in 2014 with Green Smoke, Inc., whose e-cigarettes were also the "cigalike" style, and were sold in flavors including "Vanilla Dreams" and "Smooth Chocolate."[27] In 2016, Altria acquired an e-cigarette product called Cync, from Vape Forward.[28] Cync is a small e-cigarette device that uses prefilled pods in a variety of flavors, similar to the JUUL.

51.    At the same time Altria was struggling to market a successful e-cigarette product through Nu Mark, it was carefully studying JUUL.

[29]

52.    In February 2017, Altria told investors at the 2017 Consumer Analyst Group of New York (CAGNY) Conference that over the past year, "Nu Mark LLC (Nu Mark) made excellent progress toward its long-term aspiration of becoming a leader in e-vapor."[30] In his remarks, Altria Group's current then-CEO, Howard A. Willard III, said, "Nu Mark, our e-vapor company, had a very strong year. It made excellent progress toward establishing MarkTen as a leading brand in the category, continued to improve its supply chain, and took the necessary steps to comply with the deeming regulations." He noted, however, that the estimated "total 2016 e-vapor consumer spending was roughly flat compared to the prior year at approximately $2.5

---

[27] Mike Esterl, *Altria To Launch MarkTen E-Cigarette Nationally*, Wall St. J. (Feb. 19, 2014), https://www.wsj.com/articles/altria-to-launch-markten-e-cigarette-nationally-1392832378; Senator Richard J. Durbin et al., *Gateway to Addiction? A Survey of Popular Electronic Cigarette Manufacturers and Targeted Marketing to Youth* at 12 (Apr. 14, 2014), https://www.durbin.senate.gov/imo/media/doc/Report%20-%20E-Cigarettes%20with%20Cover.pdf.
[28] Remarks by Jody Begley, 2017 Altria Investor Day (Nov. 2, 2017), http://media.corporate-ir.net/media_files/IROL/80/80855/2017InvestorDay/Remarks_and_Reconciliations.pdf.
[29] ALGAT0002577924.
[30] Remarks by Marty Barrington, Altria Group, Inc.'s (Altria) Chairman, CEO and President, and other members of Altria's senior management team 2017 Consumer Analyst Group of New York (CAGNY), (2017), http://investor.altria.com/Cache/IRCache/1ac8e46a-7eb4-5df2-843d-06673f29b6b0.PDF?O=PDF&T=&Y=&D=&FID=1ac8e46a-7eb4-5df2-843d-06673f29b6b0&iid=4087349.

1   billion."[31] In 2017, Altria's MarkTen e-cigarettes had a market share of only 13.7%, well behind
2   JLI's growing market share of 40%.[32] Thus, despite its public statements to the contrary, Altria
3   knew the popularity of JUUL stood in the way of Altria becoming the dominant force in the e-
4   cigarette market.

5       53.    With smoking on the decline, litigation and regulatory controls were ramping up
6   and threatening Altria's ability to attract new smokers, and JUUL outperforming Altria's products
7   in the market, Altria saw a solution in JLI, with its exponential growth and large youth market.
8   That youth market would be key to replacing Altria's lost profits for years to come. So, Altria
9   Group and Altria Client Services set out to court the leaders of JLI in an eighteen-month dance,
10  all the while signaling that a massive payout would await those leaders if they maintained JLI's
11  large youth market.

12      54.    Essential to maintaining JLI's large youth market, of course, was delaying or
13  preventing regulation or public outcry that could interfere with Altria's and the Management
14  Defendants' efforts. Altria, with its decades of experience doing just that, aided JLI and the
15  Management Defendants in these efforts along the way, ultimately attempting to deceive the
16  public and the FDA itself in order to defraud users when the specter of regulation threatened the
17  value of its impending investment in late 2018. Altria's best bet for maintaining its sales by
18  increasing the number of users, especially youth, addicted to nicotine was to partner with JLI's
19  leadership (1) to maintain or increase the number of users, especially youth, hooked on JUUL;
20  and (2) to delay and prevent regulation that could interfere with this first scheme.

21      55.    For those reasons and others, Altria began coordinating with the Management
22  Defendants in the Spring of 2017. And so, with Defendants Bowen, Monsees, Pritzker, Valani,
23  and Huh looking for a big payout, and Altria and Altria Client Services looking for new
24  customers, this group of Defendants began to work together, using JLI to further their unlawful
25  ends, in the Spring of 2017. Of course, these Defendants were not strangers to one another. Before
26  the Spring of 2017, Altria (through Altria Client Services) and JLI were members of at least one

27
28  ---
    [31] *Id.*
    [32] Richard Craver, *Vuse falls further behind Juul on e-cig sales*, Winston-Salem Journal (Dec. 14, 2017),
    https://www.journalnow.com/business/vuse-falls-further-behind-juul-on-e-cig-sales/article_ed14c6bc-5421-5806-
    9d32-bba0e8f86571.html.

industry group that shared information and coordinated public statements regarding vaping,[33] and Ploom's advisory committee included Altria's former growth officer. Howard Willard, Altria's CEO said, the company followed "JUUL's journey rather closely" from its early beginnings.[34]

56.     As discussed further below, Altria first contacted JLI's leadership, including Defendants Pritzker and Valani, about a partnership by early 2017, with "confidential discussions" beginning in the Spring of 2017.[35] JLI's pitch deck to investors at the time boasted that "Viral Marketing Wins," and that JUUL's super potent nicotine formulation was "cornering" the consumables market with the highest customer retention rate of any e-cigarette.[36]

57.     By the Fall of 2017, JLI, through its leadership including the Management Defendants, and Altria had agreed to and had taken coordinated actions to maintain and expand JUUL's market share, knowing that it was based on sales to youth and fraudulent and misleading advertising to users of all ages.

58.     The "confidential discussions" continued, with Altria's leadership meeting regularly with Pritzker and Valani for "a period of approximately 18 months."[37] Defendants Pritzker and Valani took the lead on these discussions (together with JLI CEO Kevin Burns), working to establish the formal JLI-Altria partnership. On August 1, 2018, Pritzker, Valani, and JLI's CEO Kevin Burns met Willard and William Gifford, Altria's CFO, at the Park Hyatt Hotel in Washington, D.C., to discuss their partnership and Altria's support of JUUL's mission.

59.     During the roughly 18-month negotiating period, Pritzker, Valani, and JLI's leadership communicated regularly with Altria as they all worked together to fraudulently growth and maintain JUUL's market share. Through their control of JLI, Bowen, Monsees and Huh remained critical to the success of these efforts. Without their control of the JLI Board of Directors and prior fraudulent conduct, the close coordination between JLI's leadership and Altria and Altria's investment in JLI to support JUUL's mission, would not have been possible.

---

[33] INREJUUL_00278740.
[34] Olivia Zaleski & Ellen Huet, *Juul Expects Skyrocketing Sales of $3.4 Billion, Despite Flavored Vape Restrictions*, Bloomberg (Feb. 22, 2019), https://www.bloomberg.com/news/articles/2019-02-22/juul-expects-skyrocketing-sales-of-3-4-billion-despite-flavored-vape-ban.
[35] Altria's October 14, 2019 letter to Senator Durbin, et. al., by Howard Willard III (2019).
[36] INREJUUL_00349529.
[37] *Id.*

COMPLAINT
Case No. 19-md-02913-WHO

60.    In December 2018, Altria decided to take the next step in its coordination with the Management Defendants and JLI's leadership by making a $12.8 billion equity investment in JLI, the largest equity investment in United States history. This arrangement was profitable for Altria, as well as enormously lucrative for Defendants Monsees, Bowen, Pritzker, Valani, and Huh, as detailed below.

61.    Both before and after Altria's investment, JLI, through its employees and officers, provided Altria with critical information regarding the design and nicotine content of the JUUL product, the labeling of the JUUL product, and related topics including advertising, retail distribution, online sales, age verification procedures, information on underage user's flavor preferences, and regulatory strategies. Altria, for its part, increasingly guided and directed JLI and the Management Defendants in these areas and helped them devise and execute schemes to preserve JLI's youth appeal and market, including by deceiving users of all ages and regulators.

62.    JLI, the Management Defendants, and Altria worked together to implement their shared goal of growing a youth market in the image of the combustible cigarette market through a multi-pronged strategy to: (1) create an highly addictive product that users would not associate with cigarettes and that would appeal to the lucrative youth market, (2) deceive the public into thinking the product was a fun and safe alternative to cigarettes that would also help smokers quit, (3) actively attract young users through targeted marketing, and (4) use a variety of tools, including false and deceptive statements to the public and regulators, to delay regulation of e-cigarettes. As detailed more fully throughout this Complaint, each of the Defendants played a critical role—at times overlapping and varying over time—in each of these strategies.

**B.    Defendants' Strategy Was to Create a Nicotine Product That Would Maximize Profits Through Addiction.**

**1.    Defendants Understood that the "Magic" Behind Cigarettes' Stratospheric Commercial Success Was Nicotine Addiction.**

63.    The first step in replicating the success of combustible cigarettes was to create a product that, like combustible cigarettes, was based on getting users addicted to the nicotine in the product. Nicotine is an alkaloid, a class of plant-derived nitrogenous compounds that is highly

addictive and the key ingredient that drives addiction to cigarettes. Nicotine's addictive properties are similar to heroin and cocaine.[38]

64.    Route of administration and speed of delivery are key to understanding nicotine's addictive potential. Dr. Neal Benowitz, Scientific Editor of the 1988 Surgeon General's Report on nicotine addiction, wrote: "After a puff, high levels of nicotine reach the brain in 10–20 s[econds], faster than with intravenous administration, producing rapid behavioral reinforcement. The rapidity of rise in nicotine levels permits the smoker to titrate the level of nicotine and related effects during smoking, and makes smoking the most reinforcing and dependence-producing form of nicotine administration."[39]

65.    Again, according to Dr. Benowitz, "The rapid rate of delivery of nicotine by smoking … results in high levels of nicotine in the central nervous system with little time for development of tolerance. The result is a more intense pharmacologic action. The short time interval between puffing and nicotine entering the brain also allows the smoker to titrate the dose of nicotine to a desired pharmacologic effect [often subconsciously], further reinforcing drug self-administration and facilitating the development of addiction."[40]

66.    Nicotine fosters addiction through the brain's "reward" pathway. Both a stimulant and a relaxant, nicotine affects the central nervous system; increases blood pressure, pulse, and metabolic rate; constricts blood vessels of the heart and skin; and causes muscle relaxation. Long-term exposure to nicotine causes upregulation—an increase in the number of these high-affinity nicotinic receptors in the brain. When nicotine binds to these receptors it triggers a series of physiological effects in the user that are perceived as a "buzz" that includes pleasure, happiness, arousal, and relaxation of stress and anxiety. With regular nicotine use, however, these feelings diminish, and the user must consume increasing amounts of nicotine to achieve the same effects.

67.    Kids are particularly vulnerable to nicotine addiction, as Defendants know well. As described by the United States Surgeon General, "Tobacco use is a pediatric

---

[38] *See e.g.,* U.S. Dep't of Health and Human Servs., *Nicotine Addiction: A Report of the Surgeon General*, DHHS Publication Number (CDC) 88-8406, (1988).
[39] Neal L. Benowitz et al., *Nicotine Chemistry, Metabolism, Kinetics and Biomarkers*, 192 HANDB. EXP. PHARMACOL. 29 (2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2953858/
[40] *Id.*

epidemic." Nine out of ten smokers begin by age 18 and 80% who begin as teens will smoke into adulthood.[41]

68.    The above statements apply equally, if not more so, to e-cigarettes. Further, the Surgeon General has explained how the nicotine in e-cigarettes affects the developing brain and can addict kids more easily than adults: "Until about age 25, the brain is still growing. Each time a new memory is created, or a new skill is learned, stronger connections—or synapses—are built between brain cells. Young people's brains build synapses faster than adult brains. Because addiction is a form of learning, adolescents can get addicted more easily than adults."[42] The effects of nicotine exposure on the brain of youth and young adults include not only addiction, priming for use of other addictive substances, but also reduced impulse control, deficits in attention and cognition, and mood disorders.[43] A highly addictive, psychoactive substance that targets brain areas involved in emotional and cognitive processing, nicotine poses a particularly potent threat to the adolescent brain, as it can "derange the normal course of brain maturation and have lasting consequences for cognitive ability, mental health, and even personality."[44]

69.    In 2014, the United States Surgeon General reported that nicotine addiction is the "fundamental reason" that individuals persist in using tobacco products, and this persistent tobacco use contributes to millions of needless deaths and many diseases, including diseases that affect the heart and blood vessels (cardiovascular disease), lung diseases (chronic obstructive pulmonary disease (COPD) and lung cancer), cancer almost anywhere in the body, and birth defects.[45]

70.    It took five decades of public health initiatives, government intervention,

---

[41] *Preventing Tobacco Use Among Youth and Adults, A Report of the Surgeon General* at 1 (2012), https://www.hhs.gov/surgeongeneral/reports-and-publications/tobacco/index.html.

[42] *Know The Risks: E-Cigarettes & Young People* (2019), https://e-cigarettes.surgeongeneral.gov/ knowtherisks.html.

[43] Menglu Yuan et al., *Nicotine and the Adolescent Brain*, 593 J. OF PHYSIOLOGY 3397 (2015), www.ncbi.nlm.nih.gov/pmc/articles/PMC4560573/; U.S. Surgeon General and U.S. Centers for Disease Control & Prevention, Office on Smoking and Health, *Know the Risks: E-Cigarettes and Young People* (2019), https://e-cigarettes.surgeongeneral.gov/.

[44] Natalia A. Goriounova & Huibert D. Mansvelder, *Short- and Long-Term Consequences of Nicotine Exposure During Adolescence for Prefrontal Cortex Neuronal Network Function*, 2 COLD SPRING HARBOR PERSP. MED. 12 (2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3543069/.

[45] U.S. Dep't of Health and Human Servs. *2014 Surgeon General's Report: The Health Consequences of Smoking—50 Years of Progress* (2014), https://www.cdc.gov/tobacco/data_statistics/sgr/50th-anniversary/index.htm#report.

COMPLAINT
Case No. 19-md-02913-WHO

impact litigation, consumer education and tobacco regulation to finally see a significant drop in cigarette smoking and nicotine addiction.

71.    By 2014, the number of adults that reported using cigarettes had dropped to 18%, and the number of adult smokers who reported quitting smoking increased from 50.8% in 2005 to 59% by 2016.[46] By 2014, teen smoking also hit a record low.[47] In June 2014, the Centers for Disease Control and Prevention ("CDC") reported that "in achieving a teen smoking rate of 15.7 percent, the United States has met its national Healthy People 2020 objective of reducing adolescent cigarette use to 16 percent or less."

72.    The United States Surgeon General reported in 2014 that: "We are at a historic moment in our fight to end the epidemic of tobacco use that continues to kill more of our citizens than any other preventable cause. The good news is that we know which strategies work best. By applying these strategies more fully and more aggressively, we can move closer to our goal of making the next generation tobacco-free."[48]

73.    Where the public health community saw progress in curbing the use of cigarettes and nicotine addiction, Defendants saw an opportunity.

**2.    Following the Cigarette Industry Playbook, Defendants Sought to Market a Product that would Create and Sustain Nicotine Addiction, but Without the Stigma Associated with Cigarettes**

74.    Seeking to build and dominate a new market for nicotine products without the baggage of combustible cigarettes (i.e. well-established link to death and disease), JLI engineered a cool-looking e-cigarette device capable of delivering more nicotine and fueling higher levels of consumer addiction than ever before. JLI marketed that highly-addictive device as healthy, safe, cool and available in kid-friendly flavors.

---

[46] Centers for Disease Control and Prevention, U.S. Dep't of Health and Human Services, *Trends in Cigarette Smoking Among High School Students—United States*, 1991-2001, 51 MORBIDITY & MORTALITY WKLY. REP. 409 (May 17, 2002), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm5119a1.htm; Teresa W. Wang et al., *Tobacco Product Use Among Adults—United States, 2017*, 67 MORBIDITY & MORTALITY WKLY. REP. 1225 (Nov. 9, 2018), https://www.cdc.gov/mmwr/volumes/67/wr/pdfs/mm6744a2-H.pdf; U.S. Dep't of Health and Human Servs. *2014 Surgeon General's Report: The Health Consequences of Smoking—50 Years of Progress* (2014), https://www.cdc.gov/tobacco/data_statistics/sgr/50th-anniversary/index.htm#report.

[47] Press Release, Centers for Disease Control and Prevention, *Cigarette smoking among U.S. high school students at lowest level in 22 years* (June 12, 2014), https://www.cdc.gov/media/releases/2014/p0612-YRBS.html.

[48] U.S. Dep't of Health and Human Servs. *Let's Make the Next Generation Tobacco-Free: Your Guide to the 50th Anniversary Surgeon General's Report on Smoking and Health* (2014), https://www.hhs.gov/sites/default/files/consequences-smoking-consumer-guide.pdf

75.     In doing so, JLI followed the cigarette industry's playbook. Monsees admitted that when creating JLI, he and Bowen carefully studied the marketing strategies, advertisements, and product design revealed in cigarette industry documents that were uncovered through litigation and made public under the November 1998 Master Settlement Agreement between the state Attorneys General of forty-six states, five U.S. territories, the District of Columbia and the four largest cigarette manufacturers in the United States. "[Cigarette industry documents] became a very intriguing space for us to investigate because we had so much information that you wouldn't normally be able to get in most industries. And we were able to catch up, right, to a huge, huge industry in no time. And then we started building prototypes."[49]

76.     In a thesis presentation Bowen and Monsees gave in 2004, Monsees candidly admitted, "The cigarette is actually a carefully engineered product for nicotine delivery and addiction."[50] JLI researched how cigarette companies engineered their products and chemically manipulated nicotine to maximize delivery: "We started looking at patent literature. We are pretty fluent in 'Patentese.' And we were able to deduce what had happened historically in the tobacco industry."[51] With access to the trove of documents made public to curb youth smoking and aid research to support tobacco control efforts, JLI was able to review literature on manipulating nicotine pH to maximize its delivery in a youth-friendly vapor with minimal "throat hit."

77.     Through studying industry documents, JLI learned that the cigarette industry had tried for years to figure out ways to create and sustain addiction by delivering more nicotine in way that would be easy to ingest—without the nausea, cough, or other aversive side effects that many new smokers experienced. In the 1970s, R.J. Reynolds scientists eventually found a solution: Combine the high-pH nicotine with a low-pH acid. The result was a neutralized compound referred to as nicotine salt. In a 1973 RJR memorandum titled "Cigarette concept to assure RJR a larger segment of the youth market," RJR highlighted that this chemical manipulation of the nicotine content was expected to give its cigarettes an "additional nicotine

---

[49] Gabriel Montoya, *Pax Labs: Origins with James Monsees*, SOCIAL UNDERGROUND, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/.
[50] Jordan Crook, *This is the Stanford Thesis Presentation That Launched Juul*, TECH CRUNCH (Feb. 27, 2019), https://techcrunch.com/2019/02/27/this-is-the-stanford-thesis-presentation-that-launched-juul/.
[51] *Id.*

COMPLAINT
Case No. 19-md-02913-WHO

'kick'" that would be more appealing and addictive. A young RJ Reynolds chemist, Thomas Perfetti, synthesized 30 different nicotine salt combinations, tested the salts' ability to dissolve into a liquid, and heated them in pursuit of the "maximum release of nicotine."[52] Perfetti published his results in a 1979 memo stamped "CONFIDENTIAL," which was found among the documents that the FDA obtained from JLI in 2018. Relying on cigarette industry research like this, and assistance from Perfetti himself, JLI developed a cartridge-based e-cigarette using nicotine salts. As described in herein, JLI's use of nicotine salts, pioneered by major combustible tobacco companies, was a critical tool for addicting non-smokers, including youth.

78.    JLI also engaged former cigarette industry researchers to consult on the design of their product. As Monsees noted in an interview with WIRED magazine: "The people who understood the science and were listed on previous patents from tobacco companies aren't at those companies anymore. If you go to Altria's R&D facility, it's empty."[53] The WIRED article stated that "[s]ome of those people are now on [PAX Lab, Inc.'s] team of advisers, helping develop J[UUL]."[54]

79.    One of the keys to JLI's success was its ability to fuse addiction and technology. The JUUL e-cigarette system is comprised of three parts: (1) the JUUL e-cigarette device (2) the JUUL pod (with e-liquid), and (3) the Universal Serial Bus [USB] charger (collectively referred to herein as "JUUL"). The JUUL e-cigarette device is a thin, sleek rectangular e-cigarette device consisting of an aluminum shell, a battery, a magnet (for the USB-charger), a circuit board, an LED light, and a pressure sensor. JLI manufactures and distributes JUUL pods that contain liquid that includes nicotine, flavoring and other additives. Each JUUL pod is a plastic enclosure containing 0.7 milliliters of JLI's patented nicotine liquid and a coil heater. When a sensor in the JUUL e-cigarette detects the movement of air caused by suction on the JUUL pod, the battery in the JUUL e-cigarette device activates the heating element, which in turn converts the nicotine solution in the JUUL pod into a vapor consisting of nicotine, benzoic acid, glycerin, and propylene

---

[52] Thomas A. Perfetti, *Smoking Satisfaction and Tar/Nicotine Control* (Dec. 7, 1978), https://ca-times.brightspotcdn.com/3a/12/a5ec27874843a56e26b4ecdfd221/nicotine-salts-investigation.pdf.

[53] David Pierce, *This Might Just Be the First Great E-Cig*, WIRED (Apr. 21, 2015), www.wired.com/2015/04/pax-juul-ecig/.

[54] *Id.*

COMPLAINT
                    Case No. 19-md-02913-WHO

glycol along with myriad chemical flavorings and other chemicals, many of which are recognized as toxic.[55]



80.     JLI sells the JUUL pods in packs of four or two pods, and until recently, in a variety of enticing flavors. Many of the flavors have no combustible cigarette analog, including "cool" cucumber, fruit medley, "cool" mint, and crème brûlée. Figure 1 shows the JLI device and a JLI "Starter Kit" with four flavored JUUL pods:

///

///

///

///

///

///

---

[55] King County & Seattle Public Health, *E-cigarettes and Vapor Products* (Dec. 30, 2019), https://www.kingcounty.gov/depts/health/tobacco/data/e-cigarettes.aspx.

COMPLAINT
Case No. 19-md-02913-WHO



**Figure 1**

81.     JLI attempted to distinguish JUUL products from the death and disease associated with cigarettes by deliberately providing a false assurance of safety. For example, on May 8, 2018, a document titled "Letter from the CEO" appeared on JUUL's website. The document stated: "[JUUL]'s simple and convenient system incorporates temperature regulation to heat nicotine liquid and deliver smokers the satisfaction that they want without the combustion and the harm associated with it."[56]

82.     JLI even took this message to ninth graders: in 2018, a representative from JLI spoke at a high school during a presentation for ninth graders, stating that JUUL "was much safer than cigarettes," that the JUUL was "totally safe," that the JUUL was a "safer alternative than smoking cigarettes," and that the "FDA was about to come out and say it [JUUL] was 99% safer than cigarettes . . . and that . . . would happen very soon."[57]

83.     This was not just a rogue employee. Internal messaging around JUUL, crafted

---

[56] Letter from U.S. Food & Drug Admin. to Kevin Burns, CEO of Juul Labs, Inc. (Sept. 9, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019.
[57] *Id.*

COMPLAINT
Case No. 19-md-02913-WHO

by the executives, emphasized that JUUL was safer than smoking. In a "Marketing Update" presentation dated March 26, 2015, a message from then-Chief Marketing Officer Scott Dunlap stated that "[v]aporization technology is fundamentally disruptive, because it is *safer*, faster, more effective and less intrusive than alternatives."[58] More than a year later, on April 28, 2016, Tim Danaher sent Tyler Goldman a slide deck aimed at investors which he said that "James [Monsees] owns" and "will pull / update the relevant slides."[59] The deck claimed that "PAX Labs' new delivery system is faster, *safer*, more effective and less intrusive than[,]" among other options, "[s]moking[.]"[60] The consistency of the wording in these presentations more than a year apart shows that this was standard company language.

84.    JLI's mission was not to improve public health. Rather, JLI sought to introduce a new generation of users to nicotine. JLI's business model was never about reducing addiction. As one JLI engineer put it: "We don't think a lot about addiction here because we're not trying to design a cessation product at all . . . anything about health is not on our mind."[61]

85.    JLI, Bowen, and Monsees achieved their vision. Pioneering a nicotine delivery technology that eliminated the harshness of traditional free-base nicotine, JLI's e-cigarette system provided users with palatable access to high-concentrations of nicotine like never before. Since the JUUL's launch in 2015, JLI has become the dominant e-cigarette manufacturer in the United States. Its revenues grew by 700 percent in 2017 alone. By 2019, JLI owned three-quarters of the e-cigarette market.[62]

**3.    Defendants Sought to Position JLI for Acquisition by a Major Cigarette Company.**

86.    JLI, along with the Management Defendants, worked together to maintain and expand the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base.

*///*

---

[58] INREJUUL_00441986 (emphasis added).
[59] JLI00373324.
[60] JLI00373328 (emphasis added).
[61] Kevin Roose, *Juul's Convenient Smoke Screen*, N.Y. TIMES (Jan. 11, 2019), https://www.nytimes.com/2019/01/11/technology/juul-cigarettes-marketing.html.
[62] Dick Durbin et al., *Durbin & Senators to JUUL: You are More Interested in Profits Than Public Health*, Durbin Newsroom (Apr. 8, 2019), https://www.durbin.senate.gov/newsroom/press-releases/durbin-and-senators-to-juul-you-are-more-interested-in-profits-than-public-health.

87.     That growing customer base was crucial to JLI's and the Management Defendants' long term objective—lucrative acquisition by another company. They recognized that JLI's product, with its potential to dominate the nicotine products market by hooking new users, would appeal to one segment of the economy in particular: the cigarette industry.

88.     JLI and the Management Defendants also recognized that their business goal—becoming part of the cigarette industry—was unlikely to endear them to the users that they needed to purchase their products. Years of anti-smoking campaigns have successfully stigmatized cigarette smoking. When Monsees and Bowen presented their thesis and product design to their classmates, they included a clip from a South Park episode showing the characters assembled at the Museum of Tolerance and shaming a smoker.[63]

89.     Monsees and Bowen needed to shape social norms such that the public attitude towards e-cigarettes would allow users to use their product without the stigma and self-consciousness smokers experienced. Monsees and Bowen saw a market opportunity in a generation of non-smoking users brought up on anti-smoking norms. In Monsees' words, they wanted to redesign the cigarette "to meet the needs of people who want to enjoy tobacco but don't self-identify with—or don't necessarily want to be associated with—cigarettes."[64]

90.     Part of this approach was consistently portraying JUUL as an enemy of the cigarette industry, with a publicly announced goal of eliminating the cigarette. In an interview, Bowen asserted that he and Monsees spent a lot of time talking about "the kind of typical thoughts of evil Big Tobacco companies like coming down and squashing you."[65] The "Mission Statement" on JLI's homepage proclaims:

> Our mission is to transition the world's billion adult smokers away from combustible cigarettes, eliminate their use, and combat underage usage of our products.

---

[63] Gabriel Montoya, *Pax Labs: Origins with James Monsees*, SOCIAL UNDERGROUND, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/.

[64] *Id.*; *see also*, INREJUUL_00064696 (May 28, 2015) (Slides describing JUUL's market overview and positioning as a "tech lifestyle product with a nicotine experience that satisfies, JUUL will appeal to regular ecig users and wealthy, tech savvy smokers – a significant portion of the market.")

[65] Alison Keeley, *Vice Made Nice? A High-tech Alternative to Cigarettes*, STANFORD MAGAZINE (2012), https://stanfordmag.org/contents/vice-made-nice.

COMPLAINT
Case No. 19-md-02913-WHO

> We envision a world where fewer adults use cigarettes, and where adults who smoke cigarettes have the tools to reduce or eliminate their consumption entirely, should they so desire.[66]

In fact, JLI's Chief Administrative Officer has publicly stated that the goal behind JLI is "eliminating cigarettes."[67]

91.     This public message of eliminating cigarettes and challenging tobacco companies stands in direct contrast with JLI's actual business and investment strategy, which involved replicating in JUUL's new market the tobacco companies' historical success in the market for cigarettes. From the beginning, Bowen and Monsees actively sought the investment and assistance of major cigarette companies. Bowen and Monsees' initial foray into the e-cigarette business, Ploom, launched its e-cigarette as the ModelOne in 2010, using pods of loose-leaf tobacco heated by butane. It did not catch on. Ploom only sold a few thousand devices. By then a company with a dozen employees, Ploom was faltering, in need of money, technological expertise, and marketing savvy.[68]

92.     Help came from Japan Tobacco International ("Japan Tobacco"), a division of Japan Tobacco Inc., the fourth-largest tobacco company in the world. In December 2011, Japan Tobacco and Ploom entered into a strategic agreement, which gave Japan Tobacco a minority stake in Ploom and made it a strategic partner. In a statement regarding the agreement, Monsees said, "We are very pleased to partner with [Japan Tobacco] as their deep expertise, global distribution networks and capital resources will enable us to enter our next phase of growth and capitalize on global expansion opportunities."[69] As Bowen explained in an interview, "We were

---

[66] JUUL Labs, *Our Mission* (2019), https://www.juul.com/mission-values.

[67] Ashley Gould, *JUUL Labs is Committed to Eliminating Cigarettes,* CAL MATTERS (March 18, 2019), https://calmatters.org/commentary/e-cigarette/.

[68] David H. Freedman, *How do you Sell a Product When You Really Can't Say What it Does?,* Inc., https://www.inc.com/magazine/201405/david-freedman/james-monsees-ploom-ecigarette-company-marketing-dilemma.html

[69] *Innovative P'ship for Ploom and Japan Tobacco Int'l JTI to Take Minority Share in Ploom*, JAPAN TOBACCO INT'L (Dec. 8, 2011), https://www.jti.com/sites/default/files/press-releases/documents/2011/innovative-partnership-for-ploom-and-japan-tobacco-international.pdf.

COMPLAINT
Case No. 19-md-02913-WHO

1  still doing a lot of our own internal product development, but now we had access to floors of

2  scientists at [Japan Tobacco]."[70]

3      93.    According to internal documents, JLI (then known as Pax) entered into a "strategic

4  partnership" with Japan Tobacco after it "evaluated all major tobacco industry companies."[71]

5  When JLI was getting ready to launch JUUL, its business plan called for a "massive distribution

6  for JUUL," to "be distributed by the four largest US tobacco distributors."[72] In addition, in 2015,

7  JLI counted among its advisors Charles Blixt, the former general counsel of Reynold American,

8  Chris Skillin, former director of corporate business development at Altria Group, Bryan

9  Stockdale, the former SVP/President & CEO of R.J. Reynolds / American Snuff Company, and

10  Chris Coggins, a toxicologist at Reynolds for 20 years.[73]

11      94.    JLI and the Management Defendants even retained the Investment Bank Stifel to

12  help JLI "establish strong international partnerships with leading tobacco companies ("LT") to

13  accelerate JUUL."[74] According to Stifel, "JUUL could be a multi-billion opportunity to LT

14  [leading tobacco companies] over time," and Stifel offered to manage a process that: "Identified

15  the best Partner(s) for JUUL"; "Best positions JUUL to each Partner"; "Creates a catalyst for

16  [leading tobacco company] decision making"; and "drives strong economic value and terms

17  through competition."[75] The end result of the process would be an exclusive agreement with the

18  cigarette industry that would "maximize JUUL Growth Trajectory."[76]

19      95.    Stifel's presentation to the JLI Board of Directors, which included each of the

20  Management Defendants, also emphasized both the stagnant and declining cigarette market, and

21  the sharply growing e-cigarette market:[77]

22  ///

23  ///

24

---

[70] David H. Freedman, *How do you Sell a Product When You Really Can't Say What it Does?*, INC. MAGAZINE (2014), https://www.inc.com/magazine/201405/david-freedman/james-monsees-ploom-ecigarette-company-marketing-dilemma.html.

[71] INREJUUL_00371423 (Pax Labs company overview, Feb. 2015).

[72] INREJUUL_00371447.

[73] INREJUUL_00371458-INREJUUL_00371459.

[74] INREJUUL_00016386 (Stifel Presentation, Aug. 2015).

[75] *Id*.

[76] *Id.*

[77] INREJUUL_0016399.

COMPLAINT
Case No. 19-md-02913-WHO



96.     According to Stifel, "[s]ince 2013 [leading tobacco companies] have aggressively but unprofitably entered the vape category . . . with products that are not compelling."[78] Stifel's conclusion was that in light of the leading cigarette companies' failures to develop an appealing e-cigarette product: "JUUL Presents a Prime Opportunity for [leading tobacco companies] to Compete with [vaporizers, tanks and mods] in Form Factor and Dominate the E-cig Experience Through Retail Channels that Leverage its Distribution Strengths."[79]

97.     Consistent with Stifel's presentation, and the profits it was forecasting, a draft December 7, 2015 presentation to the board of directors included as a "management committee recommendation" that JLI position itself for "strategic alternatives (including licensing or sale)":[80]

///

///

///

///

---

[78] INREJUUL_0016400-INREJUUL_0016401.
[79] INREJUUL_0016404.
[80] INREJUUL_00061757 (board meeting presentation, Dec. 7, 2015).

COMPLAINT
Case No. 19-md-02913-WHO

**JUUL**

**Position JUUL for strategic alternatives (including licensing or sale) by EOY by strengthening the core proposition**

- Improve IRI report traction through dollar contributions and ACV
- Continue to improve repeat rates by adding more pre-qualified consumer doors
- Significantly strengthen IP portfolio
- Continue to support pillar accounts as required to preserve a strong brand reputation

**Demonstrate a path towards positive JUUL margin contribution**

- Ensure COGS improvements are realized and future improvements are clearly attainable
- Increase same store sales by focusing on high ROI doors
- Improve BDF requirements, particularly at pillar accounts, by reducing POP costs and negotiating improved sell-in cost repayment schedules.
- Reduce brand awareness and identity building programs until positive ROI is proven

98.    The presentation also made clear that the "strategic alternative" for JLI envisioned by management was its acquisition by a large cigarette company:[81]

**JUUL sale considerations**

| Recent transactions | Description | Est. LTM multiple |
|---|---|---|
| Tobacco | • $600m BAT // TDR | • 3.4x |
| | • $350m JTI // Logic | • 5.8x |
| | • $5bn JT // Natural Spirits | • 34x |
| | • $130m Altria // GS | • 3.3x |
| | • £30m Victory // VIP | • 1.5x |
| | • $135m Lorillard // blu | • 4.5x |
| Non-SAAS consumer tech | • $3.2bn Google // Nest | • 28x (10x fwd) |
| | • $555m Google // Dropcam | • 18x (~9x fwd) |
| | • $2.4bn Canon // Axis | • 4.1x |
| | • $34m Logitech // UE | • TBD |
| | • $100-150m Intel // Basis | • TBD |

Tobacco multiples: ~3-6x
Non-SAAS consumer tech: 4-10x [TBC]

**Other considerations**

- **Big tobacco unfamiliarity buying tech IP** - may be difficult to achieve a technology-based acquisition multiple

- **Declining ecig category** - JUUL growth may drive additional interest

- **Significant big tobacco consolidation underway** - potentially limits further M&A appetite

- PLI may generate **significant non-financial benefits from JUUL sale** - singular focus on cannabis

---

[81] INREJUUL_00061833.

COMPLAINT
Case No. 19-md-02913-WHO

99.     This goal—acquisition by a major cigarette company—was a motive that the JLI and the Management Defendants would return to in making decisions about the manufacture and marketing of JUUL products. As an example, in a 2016 email exchange with JLI employees regarding potential partnerships with e-cigarette juice manufacturers, Defendant Bowen reminded the employees that "big tobacco is used to paying high multiples for brands and market share."[82] Bowen knew that to achieve the ultimate goal of acquisition, JLI and the Management Defendants would have to grow the market share of nicotine-addicted e-cigarette users, regardless of the human cost.

100.    JLI and the Management Defendants sought to grow the market share of nicotine-addicted e-cigarette users beginning by at least early 2015 through two related schemes: first, by designing an unsafe product with a high nicotine content that was intended to addict, or exacerbate the addiction of, its users; and, second, by marketing and misbranding that potent product to the broadest possible audience of potential customers, including young people whose addiction would last the longest and be the most profitable for the Defendants.

101.    These schemes were an overwhelming success. In December 2016, Monsees observed in an email to Valani that ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████"[83] By the close of 2017, according to Nielsen data, JLI had surpassed its competitors in capturing 32.9% of the e-cigarette market, with British American Tobacco at 27.4% and Altria at 15.2%.[84] The total e-cigarette market expanded 40% to $1.16 billion.[85]

102.    By 2018, JLI represented 76.1% of the national e-cigarette market,[86] and JLI's gross profit margins were 70%.[87] In a complaint it filed in November 2018 against 24 vape

---

[82] INREJUUL_00294198.
[83] JLI00380274.
[84] Ari Levy, *E-cigarette maker Juul is raising $150 million after spinning out of vaping company*, CNBC (Dec. 20, 2017), https://www.cnbc.com/2017/12/19/juul-labs-raising-150-million-in-debt-after-spinning-out-of-pax.html.
[85] *Id.*
[86] Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market* at 2, STAN. RES. INTO THE IMPACT OF TOBACCO ADVERT. (2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf.
[87] Dan Primack, *Scoop: The Numbers Behind Juul's Investor Appeal*, AXIOS (July 2, 2018), https://www.axios.com/numbers-juul-investor-appeal-vaping-22c0a2f9-beb1-4a48-acee-5da64e3e2f82.html.

COMPLAINT
Case No. 19-md-02913-WHO

companies for alleged patent infringement, JLI asserted that it was "now responsible for over 95% of the growth in the ENDS cartridge refill market in the United States" and included the following chart:[88]

**Appendix 5: U.S. ENDS Pod Market Retail Unit Sales Growth 2018**

4-Week Unit Sales by End Date

| | Nielsen | | | IRI | | |
|---|---|---|---|---|---|---|
| | Apr 21 | Sep 8 | Share of Growth | Apr 22 | Sep 9 | Share of Growth |
| Total Market | 36,002,645 | 55,773,039 | 100% | 29,546,883 | 50,793,955 | 100% |
| Juul | 22,618,886 | 41,501,172 | 95.5% | 14,964,158 | 35,166,120 | 95.1% |
| Vuse | 6,385,922 | 6,172,595 | -1.1% | 7,204,900 | 7,409,312 | 1.0% |
| MarkTen | 3,677,300 | 4,240,285 | 2.8% | 2,904,168 | 3,230,237 | 1.5% |
| Logic | 1,785,167 | 2,018,023 | 1.2% | 1,928,841 | 1,876,006 | -0.2% |
| Blu | 1,062,360 | 1,461,127 | 2.0% | 1,305,209 | 1,937,225 | 3.0% |
| Other | 473,010 | 379,837 | -0.5% | 1,239,607 | 1,175,055 | -0.3% |

103.    JLI shattered previous records for reaching decacorn status, reaching valuation of over $10 billion in a matter of months—four times faster than Facebook.[89] This all came just three years after its product launch.

**C.    JLI and Bowen Designed a Nicotine Delivery Device Intended to Create and Sustain Addiction.**

104.    JLI was well-aware from the historical cigarette industry documents that the future of any nicotine-delivery business depends on snaring kids before they age beyond the window of opportunity. One memo from a Lorillard marketing manager to the company's president put it most succinctly, "[t]he base of our business is the high school student."[90] It is no surprise, then, that the industry designed products specifically to attract and addict teen smokers. Claude Teague

---

[88] Verified Complaint Under Section 337 of the Tariff Act of 1930 at 6, *In the Matter of Certain Cartridges for Elec. Nicotine Delivery Sys. & Components Thereof*, Investigation No. 337-TA-1141 (USITC Nov. 19, 2018).

[89] Zack Guzman, *Juul Surpasses Facebook As Fastest Startup to Reach Decacorn Status*, YAHOO! FIN. (Oct. 9, 2018), https://finance.yahoo.com/news/juul-surpasses-facebook-fastest-startup-reach-decacorn-status-153728892.html.

[90] Internal Memo from T.L. Achey, Lorillard Tobacco Company, to Curtis Judge, Product Information (August 1978).

of R.J. Reynolds titled one internal memo "Research Planning Memorandum on Some Thoughts About New Brands of Cigarettes for the Youth Market." In it he frankly observed, "Realistically, if our Company is to survive and prosper, over the long term, we must get our share of the youth market. In my opinion this will require new brands tailored to the youth market."[91] Dr. Teague noted that "learning smokers" have a low tolerance for throat irritation so the smoke should be "as bland as possible," i.e., not harsh; and he specifically recommended an acidic smoke "by holding pH down, probably below 6." As seen below, JLI heeded Dr. Teague's advice.

1.    **JLI and Bowen Made Highly Addictive E-Cigarettes Easy for Young People and Non-Smokers to Inhale.**

105.    As combustible cigarettes were on the decline, e-cigarettes were introduced to the U.S. market beginning in 2007. Over time, e-cigarettes developed a small group of regular users, who were primarily current or former smokers. By 2014, the e-cigarette market in the U.S. was in decline.

106.    E-cigarettes struggled to compete with combustible cigarettes, because of the technical challenge of delivering enough aerosolized nicotine to satisfy a smoker's addiction in a palatable form.[92] Before JUUL, most e-cigarettes used an alkaline form of nicotine called free-base nicotine.[93] When aerosolized and inhaled, free-base nicotine is relatively bitter, irritates the throat, and is perceived as harsh by the user.[94] This experience is often referred to as a "throat hit." The higher the concentration of free-base nicotine, the more intense the "throat hit."[95] While some "harshness" would not have much impact on seasoned cigarette smokers, it would deter newcomers, or nicotine "learners," as Claude Teague at R.J. Reynolds called young non-smokers decades ago.

107.    Before 2015, most e-liquids on the market were between 1% and 2% concentration; 3% concentrations were marketed as appropriate for users who were accustomed

---

[91] Internal Memo from Claude Teague, R.J. Reynolds, *Research Planning Memorandum on Some Thoughts About New Brands of Cigarettes for the Youth Market* (Feb. 2, 1973).
[92] Robert K. Jackler & Divya Ramamurthi, *Nicotine Arms Race: JUUL and the High-nicotine Product Market*, 28 TOBACCO CONTROL 623 (2019).
[93] *Id*.
[94] *Id*.
[95] *Id*.

to smoking approximately forty cigarettes a day.[96] None of these e-liquids delivered as much nicotine as quickly as a combustible cigarette.

108.    Around 2013, JLI scientists developed new e-liquids and new devices to increase the amount of nicotine that e-cigarettes could deliver to users and to reduce the throat hit. JLI scientists focused on nicotine salts rather than free-base nicotine, and they tested their formulations in a variety of ways.

### 2.    JLI's Initial Experiments Measured Non-Smokers' "Buzz" Levels and Perceptions of Throat Harshness.

109.    JLI intentionally designed its product to minimize "throat hit" and maximize "buzz." JLI's first known testing of JUUL-related products occurred in 2013, when it conducted "buzz" experiments that included non-smoker participants and measured "buzz" and throat harshness. JLI officers and directors Adam Bowen, Ari Atkins, and Gal Cohen served as the initial subjects in the "buzz" experiments. These early tests were performed with the assistance of Thomas Perfetti, the same RJR chemist who had studied nicotine salt decades ago to help RJR palatably deliver more nicotine.

110.    In these early tests, JLI's goal was to develop a "buzz-effective e-cig formulation," which would principally turn on "effectiveness (buzz, harshness)," followed by shelf life and patentability.[97] The aim was to develop a nicotine salt formulation that maximized buzz, minimized harshness. "Employees tested new liquid-nicotine formulations on themselves or on strangers taking smoke breaks on the street. Sometimes, the mix packed too much punch – enough nicotine to make some testers' hands shake or send them to the bathroom to vomit . . . ."[98]

111.    The "buzz" experiments, which used heart rate as a qualitative measurement for buzz, showed that Bowen tested a 4% benzoate (nicotine salt) solution, which caused his resting heart rate to increase by about 70% in under 2 minutes, far exceeding all other formulations JLI was considering:[99]

---

[96] *Id.*
[97] INREJUUL_00002903.
[98] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, REUTERS (Nov. 5, 2019), https://www.reuters.com/investigates/special-report/juul-ecigarette/.
[99] INREJUUL_00002903.

COMPLAINT
Case No. 19-md-02913-WHO

112.    Because they personally consumed these formulations, Bowen, Cohen, and Atkins knew that the 4% benzoate solution delivered a strong buzz that matched or exceeded a cigarette but had minimal throat hit.

113.    A later study by Anna K. Duell et al., which examined 4% benzoate solutions—the basis for JUUL's subsequent commercial formulations—explains why there was so little throat hit. The Duell study determined that the fraction of free-base nicotine in JUUL's "Fruit Medley" flavor was 0.05 and in "Crème Brulee" was 0.07.[100] Given total nicotine content of 58 mg/ml and 56 mg/ml in each flavor, respectively, these flavors have roughly 3-4 mg/ml free-base nicotine. For comparison, "Zen" brand e-liquid contains 17 mg/ml of nicotine—less than one-third of the total nicotine content of JUUL's flavors—but has a free-base fraction of 0.84,[101] resulting in over 14 mg/ml of free-base nicotine. The Duell Study's authors found that the low free-base fraction in JUUL aerosols suggested a "decrease in the perceived harshness of the aerosol to the user and thus a greater abuse liability."[102]

114.    Dramatically reducing the throat hit is not necessary for a product that is aimed at smokers, who are accustomed to the harshness of cigarette smoke, but it very effectively appeals to nonsmokers, especially youths. The cigarette industry has long recognized this; a published study of industry documents concluded that "product design changes which make cigarettes more

---

[100] U.S. Patent No. 9,215, 895; Anna K. Duell et al., *Free-Base Nicotine Determination in Electronic Cigarette Liquids by H NMR Spectroscopy*, 31 CHEM. RES. TOXICOL. 431, 432 (Fig. 3).
[101] Anna K. Duell et al., *Free-Base Nicotine Determination in Electronic Cigarette Liquids by H NMR Spectroscopy*, 31 CHEM. RES. TOXICOL. 431 (*hereinafter* "Duell Study").
[102] *Id.* at 431–34.

COMPLAINT
Case No. 19-md-02913-WHO

palatable, easier to smoke, or more addictive are also likely to encourage greater uptake of smoking."[103] The Duell study concluded that JLI's use of nicotine salts "may well contribute to the current use prevalence of JUUL products among youth."[104]

115.     Reducing the harshness of nicotine also allows more frequent use of e-cigarettes, for longer periods of time, and masks the amount of nicotine being delivered. By removing the physiological drawbacks of inhaling traditional free-base nicotine, JLI's technology removes the principal barrier to nicotine consumption and addiction. The Duell study further concluded that JLI's creation of a non-irritating vapor that delivers unprecedented amounts of nicotine is "particularly problematic for public health."[105]

### 3.     JUULs Rapidly Deliver Substantially Higher Doses of Nicotine than Cigarettes.

116.     In 2014, after the "buzz" experiments, JLI engineers ran a pilot pharmacokinetic study in New Zealand, called the Phase 0 Clinical Study.[106] The participants in the study—Adam Bowen, Gal Cohen, and Ari Atkins[107]—had their blood drawn while vaping prototype JUUL aerosols. From these measurements, the scientists calculated key pharmacokinetic parameters, including maximum concentration of nicotine in the blood (Cmax) and total nicotine exposure (Area Under the Curve or AUC). JLI reported the results in U.S. Patent No. 9,215,895 (the '895 patent), for which JLI applied on October 10, 2014,[108] and which was granted in December 2015. The named inventors on the patent were Adam Bowen and Chenyue Xing

117.     Among the formulations was a 4% benzoate formulation, which was made with 3.8% benzoic acid and 5% nicotine, as well as propylene glycol and vegetable glycerin.[109] As a comparator, JLI also measured nicotine blood levels after smoking Pall Mall cigarettes. The Phase

---

[103] David A. Kessler, *Juul Says It Doesn't Target Kids. But Its E-Cigarettes Pull Them In*, N.Y. TIMES (July 31, 2019), https://www.nytimes.com/2019/07/31/opinion/juul-kids.html.
[104] Duell Study at 433 (citing J.G. Willett, et al., *Recognition, Use and Perceptions of JUUL Among Youth and Young Adults*, TOBACCO CONTROL 054273 (2018)).
[105] *Id.* at 431.
[106] INREJUUL_00350930.
[107] *Id.*
[108] This application was a continuation of U.S. Patent Application No. 14/271,071 (filed May 6, 2014), which claimed the benefit of U.S. Provisional Patent Application Serial No. 61/820,128, (filed May 6, 2014), and U.S. Provisional Patent Application Serial No. 61/912,507 (filed December 5, 2013).
[109] U.S. Patent No. 9,215,895, at 19:63-20:4 (filed Dec. 22, 2015).

1    0 study also tested a 2% benzoate formulation, which had a similar Cmax as a Pall Mall cigarette,

2    and a variety of other formulations.[110] The following graph shows the pharmacokinetic results of

3    the Phase 0 study:



14    118.    According to Table 1 in the patent, the Cmax (the maximum nicotine concentration

15    in blood) for Pall Mall cigarettes was 11.65 ng/mL, and for 4% benzoate it was 15.06 ng/mL,

16    which is nearly 30% higher. The total nicotine exposure (as measured by Area Under the Curve

17    or AUC) was 367.5 ng * min/mL for Pall Mall cigarettes and 400.2 ng * min/mL for 4% benzoate,

18    which is almost 9% higher. The 4% benzoate formulation had the highest Cmax and AUC of any

19    of the formulations measured.

20    119.    Describing these results, JLI's '895 patent all but brags that it surpassed a

21    commercially available combustible cigarette (Pall Mall) in maximum delivery and nearly rivaled

22    it in how soon it could deliver peak nicotine. According to the '895 patent, "certain nicotine salt

23    formulations [i.e., JLI's] provide satisfaction in an individual superior to that of free base nicotine,

24    and more comparable to the satisfaction in an individual smoking a traditional cigarette."[111] The

25    patent further explains that the "rate of nicotine uptake in the blood" is higher for some claimed

26    nicotine salt formulations "than for other nicotine salt formulations aerosolized by an electronic

27

28

---

[110] INREJUUL_00024437.
[111] U.S. Patent No. 9,215, 895, at 7:51-55 (filed Dec. 22, 2015) (emphasis added).

1    cigarette . . . and likewise higher than nicotine free-base formulations, while the peak nicotine

2    concentration in the blood and total amount of nicotine delivered appears comparable to a

3    traditional cigarette."[112]

4        120.    In other words, JLI distinguishes itself, and established the patentability of its e-

5    liquids, by reference to their superlative ability to deliver nicotine, both in terms of peak blood

6    concentration and total nicotine delivery. The rate of nicotine absorption is key to providing users

7    with the nicotine "kick"[113] that drives addiction and abuse.[114] Because "nicotine yield is strongly

8    correlated with tobacco consumption,"[115] a JUUL pod with more nicotine will strongly correlate

9    with higher rates of consumption of JUUL pods, generating more revenue for JUUL. For example,

10    a historic cigarette industry study that looked at smoker employees found that "the number of

11    cigarettes the employees smoked per day was directly correlated to the nicotine levels."[116] In

12    essence, JLI distinguished itself based on its e-liquids' extraordinary potential to addict.

13        121.    Another study corroborates the key result of the Phase 0 study that the 4% benzoate

14    solution delivers more nicotine than a combustible cigarette.[117] The Reilly study tested JUUL's

15    tobacco, crème brûlée, fruit medley, and mint flavors and found that a puff of JUUL delivered

16    $164 \pm 41$ micrograms of nicotine per 75 mL puff. By comparison, a 2014 study using larger 100

17    mL puffs found that a Marlboro cigarette delivered 152-193 μg/puff.[118] Correcting to account for

18    the different puff sizes between these two studies, this suggests that, at 75 mL/puff, a Marlboro

19    would deliver about 114-145 μg/puff. In other words, the Reilly study suggests that JUUL

20

21    ------

[112] *Id.* at 7:63-8:4.

22    [113] Internal Memo from Frank G. Colby, R.J. Reynolds, *Cigarette Concept to Assure RJR a Larger Segment of the Youth Market* (Dec. 4, 1973).

23    [114] As the National Institutes of Health has noted, the "amount and speed of nicotine delivery . . . plays a critical role in the potential for abuse of tobacco products." U.S. Dep't of Health & Human Servs., *How Tobacco Smoke*

24    *Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease, A Report of the Surgeon General* at 181 (2010), https://www.ncbi.nlm.nih.gov/books/NBK53017/pdf/Bookshelf_NBK53017.pdf.

25    [115] Martin J. Jarvis et al., *Nicotine Yield From Machine Smoked Cigarettes and Nicotine Intakes in Smokers: Evidence From a Representative Population Survey*, 93 Nt'l Cancer Inst. 134 (Jan. 17, 2001), https://academic.oup.com/jnci/article/93/2/134/2906355

26    [116] Letter from Peggy Martin to Study Participants, *Resume of Results from Eight-Week Smoking Study*, UCSF Library, 1003285443-5443 (Sept. 10, 1971).

27    [117] Samantha M. Reilly et al., *Free Radical, Carbonyl, and Nicotine Levels Produced by JUUL Electronic Cigarettes*, 21 Nicotine Tobacco Research 1274 (Aug. 19, 2019), https://www.ncbi.nlm.nih.gov/pubmed/30346584.

28    [118] Megan J. Schroeder & Allison C. Hoffman, *Electronic Cigarettes and Nicotine Clinical Pharmacology*, 23 Tobacco Control ii30 (May 23, 2014), www.ncbi.nlm.nih.gov/pmc/articles/PMC3995273/.

COMPLAINT
Case No. 19-md-02913-WHO



delivers more nicotine per puff than a Marlboro cigarette.

122.    Additionally, depending on how the product is used, an e-cigarette with the 4% benzoate solution is capable of delivering doses that are materially higher than those seen in the Phase 0 study. As a paper published by the European Union notes: "[A]n e-cigarette with a concentration of 20 mg/ml delivers approximately 1 milligram of nicotine in five minutes (the time needed to smoke a traditional cigarette, for which the maximum allowable delivery is 1 mg of nicotine)."[119] With at least 59 mg/ml of nicotine in a salt form that increases the rate and efficiency of uptake (and even with a lower mg/ml amount), a JUUL pod easily exceeds the nicotine dose of a combustible cigarette. Not surprisingly, the European Union has banned all e-cigarette products with a nicotine concentration of more than 20 mg/ml nicotine, and other countries have considered similar regulations.[120]

123.    Around 2014, JLI engineers designed the JUUL vaping device, which also was designed for addictiveness. On average, the JUUL was engineered to deliver between four to five milligrams of aerosol per puff, which is an unusually massive puff[121]:

---

[119] E-Cigarettes, European Comm'n,
    https://ec.europa.eu/health/sites/health/files/tobacco/docs/fs_ecigarettes_en.pdf (citing United Kingdom
    Medicines and Healthcare Products Regulatory Agency and industry reports).
[120] Charis Girvalaki et al., *Discrepancies in Reported Versus Measured Nicotine Content of E-cigarette Refill Liquids Across Nine European Countries Before and After the Implementation of the EU Tobacco Products Directive*, 55 EUR. RESPIR. J. 1900941 (2020), https://doi.org/10.1183/13993003.00941-2019.
[121] INREJUUL_00442040-INREJUUL_00442080; INREJUUL_00442064

124.    Given the concentration of nicotine in a JUUL pod, four to five milligrams of JUUL e-liquid contains about 200-250 micrograms (µg) of nicotine. As noted by Dan Myers, a JLI scientist, in an internal 2018 email to Adam Bowen and Ziad Rouag, a regulatory employee at JLI at the time, "much more nicotine than 150 per puff could be problematic" because, according to Myers, cigarettes deliver between around 100-150 µg of nicotine per puff.[122] In other words, JUUL's precisely calibrated nicotine delivery system was specifically engineered to aerosolize up to 2.5 times as much nicotine per puff as a cigarette. Myers also noted that "Adam put in his recommendation of ~4mg/puff as the target" for a pharmacokinetic study.[123]

125.    JLI scientists realized in 2014 that the amount of nicotine that JUUL e-cigarettes delivered could be problematic. Chenyue Xing stated that "[y]ou hope that they get what they want, and they stop," but JLI scientists were concerned that "a Juul—unlike a cigarette—never burns out," so the device gives no signal to the user to stop. According to Xing, JLI scientists "didn't want to introduce a new product with stronger addictive power."[124] For this reason, "the company's engineers explored features to stop users from ingesting too much of the drug, too quickly. JLI's founders applied for a patent in 2014 that described methods for alerting the user or disabling the device when the dose of a drug such as nicotine exceeds a certain threshold."[125] For example, "[o]ne idea was to shut down the device for a half-hour or more after a certain number of puffs[.]"[126] But upper management rejected the concerns that the scientists raised, and "[t]he company never produced an e-cigarette that limited nicotine intake."[127]

126.    As another option, JLI could have limited the duration of each puff to prevent the JUUL from delivering doses of nicotine exceeding those of a cigarette on a per-puff basis. Instead, it programmed the device to emit puffs for up to six seconds.[128] JUUL knew from the Phase 0 pharmacokinetic study in 2014 and the CH-1702 pharmacokinetic study in 2017 that puffs of

///

---

[122] INREJUUL_00347306.
[123] Id.
[124] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, REUTERS (Nov. 5, 2019), https://www.reuters.com/investigates/special-report/juul-ecigarette/.
[125] Id.
[126] Id.
[127] Id.
[128] INREJUUL_00431693

three seconds generate pharmacokinetic profiles matching that of a cigarette.[129]

127.   Further warnings about the addictive power of the JUUL e-cigarette—and its appeal to youths—came from consumer research that Ploom commissioned in 2014. Ploom hired the consumer research firm Tragon to do research with prototypes of the JUUL e-cigarette. On September 30, 2014, Lauren Collinsworth, a consumer researcher at Tragon, emailed Chelsea Kania, a marketing employee at Ploom, with some of the preliminary results from the studies. She stated that the testing showed that "the younger group is open to trying something new and liked J1 [the JUUL prototype] for being smart, new, techy, etc."[130] Ms. Collinsworth added that "the qualitative information suggests J1 could fit into the e-cig or vapor category for the younger group. The qualitative findings suggested *this product isn't going to fit as well with consumers who are looking to cut back on the cigarette intake*."[131]

128.   On October 1, 2014, Ms. Collinsworth followed up with additional comments. She stated that "[t]he delivery was almost too much for some smokers, especially those used to regular e-cigarettes. When they approached the product like they would a Blu or other inexpensive e-cig, they were floored by the delivery and didn't really know how to control it."[132]

129.   Survey responses showed that the least important product attribute for the adult smokers and non-smokers in that group was "buzz."[133] Comments from the study's subjects included "overwhelming when I first inhaled," "too much for me," "it was too strong," and "it caught me off-guard."[134] Comments on the device's style said JUUL "might manage to make smoking cool again"; others "thought it was a data storage device."[135]

130.   The final results from this consumer research were distributed to upper management, including to then-CEO James Monsees[136] and then-Chief Marketing Officer Richard Mumby.[137]

---

[129] INREJUUL_00351218; INREJUUL_00351239.
[130] JLI00365905.
[131] *Id*. (emphasis added).
[132] JLI00365709.
[133] JLI00365176.
[134] INREJUUL_00058345.
[135] *Id*.
[136] JLI00364678.
[137] JLI00364487.

COMPLAINT
Case No. 19-md-02913-WHO

131.    In late 2014, knowing the results of the buzz tests, the Phase 0 study and the consumer research, JLI executives, including Bowen, selected the 4% benzoate formulation to serve as the model for all formulations to be used in the JUUL product to be released in 2015. All JUUL formulations at launch used the same amount of nicotine and benzoic acid as did the formulation that resulted in the highest nicotine blood levels in the Phase 0 study. JUUL pods were foreseeably exceptionally addictive, particularly when used by persons without prior exposure to nicotine.

**4.     JLI and the Management Defendants Knew That JUUL was Unnecessarily Addictive Because It Delivered More Nicotine Than Smokers Needed or Wanted.**

132.    The JUUL e-cigarette launched in 2015. After the launch, JLI and the Management Defendants continued to collect information about the addictiveness of JUUL. This information confirmed what they already knew: JUUL was exceptionally dangerous because of its addictiveness.

133.    For example, on April 22, 2017, an e-cigarette retailer emailed Gal Cohen expressing concern about the addictiveness of JLI's products. He wrote:

> I am very concerned about the JLI products. People's addiction behavior is SEVERE with this JLI device. I don't think I can justify carrying this anymore.
>
> The Brooklyn store is run by someone else and he still wants to carry it. I am not really happy about this. It was a simple product for users who do not want to fill tanks and change atomizers and it was easy to sell, but I really don't feel good about selling it. I know we talked about this back a few years ago before we were carrying the product, but I am curious to know what is in the liquid. I know the nicotine salts are added but I would like to know what else is in it. Do you guys have a GCMS or ingredient listing for the liquid? Are there other additives? I want to feel more comfortable so I can keep carrying these, but **I have seen what it is doing to people and I am very uncomfortable with it**. Last year when the news came to me and wanted me to help them with the story that teens were using JLI I shut that story down by telling them it wasn't true. **It is true. kids are getting hooked on this thing and they don't even understand half the time that it has nicotine in it! Little kids.. like 14 and 15 year olds.** They try to come in my shop and we tell them it is 21 and over and get them out... but it is REALLY bad!
>
> I have kids calling and trying to order using delivery services as well. We will only allow pickup and delivery for regular customers whose ID we have already checked... but they TRY and that worries me.. because the smoke shops

and bodegas are NOT checking that the person they are picking up for is old enough to buy the product.

I agree that it is certainly less hazardous than smoking... **but to intentionally increase the addictiveness of nicotine seems really irresponsible and makes me feel like Big Tobacco pushing people onto a really addictive product.** I just don't think that it is necessary and I don't feel good about it.

Anyway... if there is any info you have that might make me feel better about selling it let me know... or if you could send me ingredient listing (I know Pax applied for the patent on the liquid with the nicotine salts so it should be ok to share now?) I would appreciate it.[138]

134.    Another example came just days later. On April 28, 2017, JLI held a science meeting discussing the scientific information in JLI's possession with outside scientists. Notes from the meeting state that "concern was raised that because the nicotine update [sic] is slightly faster the data could be interpreted as feeding an addiction faster. Given the current climate with addictions to OxyContin how the data is presented needs to be considered carefully."[139]

135.    Additionally, Dan Myers wrote to Adam Bowen in October 2017 that "single puff data from Juul suggests that a small number of puffs, at the beginning of the pod's lifetime, may contain 2-3X" the levels of nicotine in the puffs from the rest of the pod, "i.e., 200-300 [μ]g/puff."[140] This is consistent with a central goal of the product's design: capturing "users with the first hit."[141]

136.    None of this information was a surprise, nor did it cause JLI or the Management Defendants to change JLI's products or marketing. In fact, they embraced it. On November 3, 2017, Steven Hong, JLI's Director of Consumer Insights, described JUUL's "design and chemical formulation (fast acting nic salts)" as JLI's "ace in the hole" over the competition.[142]

137.    The following year, JLI and the Management Defendants obtained even more evidence that the amount of nicotine in JUULpods was needlessly high. By no later than May of 2018, JLI had completed Phase I of "Project Bears," a JLI study of smoker and vaper nicotine strength preferences. The results showed that "[a]cross the smoker segments, product liking is

---

COMPLAINT
                                    Case No. 19-md-02913-WHO

very similar[,]" and the "heaviest smokers (21+ cigs) like 1.7% more than higher strengths" such as 3% and 5%.[143] Similarly, "for those who evaluated the 5% pod, when given the choice of lower level pod strengths, at least half would choose a lower strength pods."[144]

138.   The same tests also showed that, contrary to JLI's expectations, smokers did not increase their use of the 1.7% formulation relative to the 5% formulation in order to achieve nicotine satisfaction. "Smoking volume does seem to be a driver of vaping volume, but this does not vary much by strength within a given smoker type."[145]

139.   Thus, Project Bears revealed that 5% JUULpods delivered more nicotine than necessary to satisfy cigarette smokers, even those characterized as "heavy" smokers.[146]

140.   At some point during the coordination between JLI, the Management Defendants, and Altria, but no later than the due-diligence period for Altria's investment in JLI, either JLI (through its employees) or one or more of Defendants Bowen, Monsees, Pritzker, Huh, and Valani provided Altria with a copy of the Project Bears findings.[147]

141.   Nonetheless, JLI, the Management Defendants, and Altria have maintained and promoted the 5% JUULpods as JLI's flagship offering of JUULpods although they knew that even current smokers prefer a *lower* nicotine content. They pushed the 5% JUULpod because it hooked users faster and kept them addicted to nicotine.[148]

142.   In addition to Project Bears, JLI and the Management Defendants (and potentially Altria) were aware of other internal studies that established that its 5% JUUL pod product would not be a successful cessation tool, as it was not attractive to an audience looking to reduce cigarette consumption.[149]

**5.    JUUL's Design Did Not Look Like a Cigarette, Making it Attractive to Non-Smokers and Easy for Young People to Use Without Detection.**

143.   Not only did JUUL contain high levels of nicotine that delivered a strong "buzz" from the first puff, JLI designed its product to look appealing to youth and non-smokers. In

---

[143] INREJUUL_00260068.
[144] INREJUUL_00260065.
[145] INREJUUL_00244200.
[146] *Id.*
[147] *Id.*
[148] *Id.*
[149] *Id.*

January 2015, six months before JUUL's launch, JLI's Marketing Director, Sarah Richardson, identified "key needs" for JUUL's PR strategy, including "Establish premium positioning to entice the "masses" to follow the trend setters; own the "early adopter" /"cool kid" equity as we build out volume", and highlighted that "JUUL deliberately doesn't resemble e-cigs or cigalikes" that are "awkward" and "douche-y".[150] Instead, JUUL is "elegant" and "cool".

144.    JLI's strategy to position a nicotine-delivery device as the cool thing to do is not new. Decades before, Dr. Teague from R.J. Reynolds observed: "pre-smokers" face "psychological pressure" to smoke if their peers are doing so, "a new brand aimed at a young smoker must somehow be the 'in' brand and its promotion should emphasize togetherness, belonging and group acceptance, while at the same time emphasizing 'doing one's own thing.'"[151] Again, JUUL followed the cigarette playbook verbatim.

145.    JLI knew that among its target audience, young people, cigarette smoking had become increasingly stigmatized. JLI wanted to create a product that would create "buzz" and excitement, totally different from the image of addicted cigarette smokers huddling outside their workplaces in the cold to get their nicotine fix.

146.    Unlike the distinct smell and odor emitted from combustible cigarettes, JUUL emits a reduced aerosol with a nearly undetectable scent. And unlike other e-cigarettes, the JUUL device does not produce large plumes of smoke. Instead, the vapor cloud is very small and dissipates very quickly, allowing for concealed use. As a result, young users can, and do, use JUUL—in class or at home—without detection.

147.    The JUUL device is also designed to be small and discrete. Fully assembled, the device is just over 9.5 cm in length and 1.5 cm wide. The JUUL device resembles a memory stick and can be charged in a computer's USB drive. This design allows the device to be concealed in plain sight, camouflaged as a thumb-drive, for use in public spaces, like schools and even charged in school computers. JLI has been so successful in emulating harmless technology that its small, rectangular devices are often mistaken for—or passed off as—flash drives. According to one high

---

[150] INREJUUL_00057291 et seq.
[151] Internal RJR Memo, Claude Teague, *Research Planning Memorandum on Some Thoughts About New Brands of Cigarettes for the Youth Market*,  (Feb. 2, 1973).

school senior, "that's what people tell the teachers a lot, too, if you charge it in class, they'll just say it's my flash drive."





148.    The ability to conceal a JUUL is part of the appeal for adolescents. The devices are small and slim, so they fit easily in a closed hand or a pocket. The ease and simplicity of use—there is nothing to light or unwrap, not even an on-off switch—also make it possible to covertly use a JUUL behind a turned back, which has become a trend in many schools. As a police officer told reporters, JUUL use is "incredibly prevalent in schools," including both high schools and middle schools, and that it is hard to catch kids in the act of using JUUL because the device does not produce a large vapor cloud. As the officer explained, students will "just take a little hit or puff off them and then can hold the vapor in their mouth for a little while . . . There's minimal vapor. They'll also just blow into their sleeve or into their hoodie."[152] Finding new ways to hide

---

[152] *Juuling at School*, KOMO News (2019), https://komonews.com/news/healthworks/dangerous-teen-trend-juuling-at-school.

the ever-concealable JUUL has spawned products designed just for that purpose, such as apparel that allows the wearer to use the device while it is concealed in the drawstring of a hoodie or the strap of a backpack.[153]

149.    Referred to as "the iPhone of e-cigarettes," JLI's design was also slick and high-tech, which made it appealing to youth. JLI co-founder Bowen drew on his experience as a design engineer at Apple Inc. to make JUUL resonate with Apple's popular aesthetics. This high-tech style made JUULs look "more like a cool gadget and less like a drug delivery device. This wasn't smoking or vaping, this was JUULing."[154] The evocation of technology makes JUUL familiar and desirable to the younger tech-savvy generation, particularly teenagers. According to a 19-year-old interviewed for the Vox series By Design, "our grandmas have iPhones now, normal kids have JUULs now. Because it looks so modern, we kind of trust modern stuff a little bit more so we're like, we can use it, we're not going to have any trouble with it because you can trust it."[155] A 16-year-old agreed, explaining that "the tech aspect definitely helps people get introduced to it and then once they're introduced to it, they're staying, because they are conditioned to like all these different products. And then this is another product. And it's just another product. Until you're addicted to nicotine."[156]

150.    JUUL's design also included an LED light, which allowed users to active "party mode," whereby the LED light would flash a rainbow of colors. "Party mode" is activated by the user by waving the JUUL device back and forth until the white LED light starts flashing multiple colors, so that the rainbow colors are visible while the person inhales from the JUUL device. "Party mode" can also be permanently activated on the JUUL by the user quickly and firmly slapping the JUUL against the palm of the hand, until the LED light starts flashing multiple colors permanently. Party mode on the JUUL is described by users to be "like an Easter egg in a video game" and allows for "some cool tricks that are going to drive [] friends crazy." [157] This feature

---

[153] Evie Blad, *'Juuling' and Teenagers: 3 Things Principals and Teachers Need to Know*, EDUC. WK. (July 18, 2018), https://www.edweek.org/ew/articles/2018/07/18/juuling-and-teenagers-3-things-principals-and.html.
[154] *How JUUL Made Nicotine Go Viral*, VOX (Aug. 10, 2018), https://www.youtube.com/watch?v=AFOpoKBUyok.
[155] *Id.*
[156] *Id.*
[157] Jon Hos, *Getting Your Juul Into Party Mode*, (Jul. 12, 2018), https://vapedrive.com/getting-your-juul-into-party-mode.

was another characteristic that set JUUL apart from other e-cigarettes on the market, and made it even more appealing and "cool" to young users.



151.    According to Dr. David Kessler, a former Commissioner of the FDA and current Professor of Pediatrics at the University of California, San Francisco, JUUL's "fundamental design appears to ease young people into using these e-cigarettes and ultimately, addiction."[158] Dr. Kessler emphasized the reduced harshness of JUUL's nicotine salt formulation, the high nicotine content, discreet vapor cloud, and use of flavors as design features that appeal to youth.[159] On April 24, 2018, the FDA sent JLI a letter, based on the FDA's concern "about the popularity of JUUL products among youth" and stated that this popularity may be related to "the product design."[160] As a result, the FDA requested documents related to product design, including its "shape or form," "nicotine salt formulation" and "nicotine concentration/content," "flavors," and "features such as: appearance, or lack thereof, or plume . . . [and] USB port rechargeability."

///

///

///

---

[158] David A. Kessler, *Juul Says It Doesn't Target Kids. But Its E-Cigarettes Pull Them In*, N.Y. TIMES (July 31, 2019), https://www.nytimes.com/2019/07/31/opinion/juul-kids.html.
[159] *Id.*
[160] Letter from Matthew R. Holman, Director of the Office of Science at the Center for Tobacco Products, to Ziad Rouag, Vice President of Regulatory & Clinical Affairs, JUUL Labs, Inc. (Apr. 24, 2018), https://www.fda.gov/media/112339/download.

COMPLAINT
Case No. 19-md-02913-WHO

**6.      JLI Enticed Newcomers to Nicotine with Kid-Friendly Flavors Without Ensuring the Flavoring Additives Were Safe for Inhalation.**

**a.      JIL Develops Flavored JUUL Products That Would Appeal to Youth.**

152.    Cigarette companies have known for decades that flavored products are key to getting young people to acclimate to nicotine. A 1972 Brown & Williamson memorandum: Youth Cigarette – New Concepts, specifically noted the "well known fact that teenagers like sweet products."[161] A 1979 Lorillard memorandum concluded that younger customers would be "attracted to products with 'less tobacco taste," and even proposed borrowing data from the "Life Savers" candy company to determine which flavors enjoyed the widest appeal among youth.[162]

153.    Altria's subsidiary U.S. Smokeless Tobacco Company (formerly called United States Tobacco Company) described the initiation of new customers through flavored products as "the graduation theory":

> New users of smokeless tobacco—attracted to the product for a variety of reasons—are most likely to begin with products that are milder tasting, more flavored, and/or easier to control in the mouth. After a period of time, there is a natural progression of product switching to brands that are more full-bodied, less flavored, have more concentrated "tobacco taste" than the entry brand.[163]

154.    A sales manager who worked at U.S. Tobacco in the 1980s told the Wall Street Journal that "They talked about graduation all the time—in sales meetings, memos and manuals for the college program. It was a mantra."[164]

155.    A 2004 study found that seventeen-year-old smokers were more than three times as likely as those over the age of twenty-five to smoke flavored cigarettes, and they

///

---

[161] Marketing Innovations, Inc., *Brown & Williamson Tobacco Corp. Project Report: Youth Cigarette—New Concepts*, U.C.S.F. Truth Tobacco Indus. Documents (Sept. 1972), https://www.industrydocuments.ucsf.edu/tobacco/docs/#id=hzpd0040.

[162] *Flavored Tobacco FAQs*, Students Working Against Tobacco, http://swatflorida.com/uploads/fightresource/Flavored%20Tobacco%20Industry%20Quotes%20and%20Facts.pdf (citing Sedgefield Idea Sessions 790606-790607 (June 8, 1979), Bates No. 81513681/3691) (last visited Mar. 27. 2020).

[163] G.N. Connolly, *The marketing of nicotine addiction by one oral snuff manufacturer*, 4 TOBACCO CONTROL 73-79 (1995), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1759392/pdf/v004p00073.pdf.

[164] Alix Freedman, *Juiced Up: How a Tobacco Giant Doctors Snuff Brands to Boost Their 'Kick,'* WALL ST. J. (Oct. 26, 1994), https://www.industrydocuments.ucsf.edu/tobacco/docs/#id=mlch0185.

COMPLAINT
Case No. 19-md-02913-WHO

viewed flavored cigarettes as safer.[165]

156.    In June 2015, JUUL came to market in four flavors including tabaac (later renamed tobacco), fruut (later renamed fruit medley), bruulé (later renamed crème brulee), and miint (later renamed mint).

 

157.    JUUL later offered other kid-friendly flavors, including cool mint, cucumber, and mango.

 

158.    In 2009, the FDA banned flavored cigarettes (other than menthol) as its first major anti-tobacco action pursuant to its authority under the Family Smoking Prevention and Tobacco Control Act of 2009. "Flavored cigarettes attract and allure kids into addiction," Health and Human Services Assistant Secretary Howard Koh, MD, MPH, said at a news conference held to announce the ban.[166] In January 2020, the FDA banned flavored e-cigarette pods, other than "Tobacco" and "Menthol" flavors, in response to "epidemic levels of youth use of

---

[165] Gardiner Harris, *Flavors Banned From Cigarettes to Deter Youth*, N.Y. TIMES (Sept. 22, 2009), https://www.nytimes.com/2009/09/23/health/policy/23fda.html.

[166] Daniel J. DeNoon, *FDA Bans Flavored Cigarettes: Ban Includes Cigarettes With Clove, Candy, and Fruit Flavors*, WebMD (Sept. 22, 2009), https://www.webmd.com/smoking-cessation/news/20090922/fda-bans-flavored-cigarettes#2.

COMPLAINT
Case No. 19-md-02913-WHO

e-cigarettes" because these products are "so appealing" to children."[167]

159.    The availability of e-liquids in flavors that appeal to youth increases rates of e-cigarette adoption by minors. A national survey found that that 81% of youth aged twelve to seventeen who had ever used e-cigarettes had used a flavored e-cigarette the first time they tried the product, and that 85.3% of current youth e-cigarette users had used a flavored e-cigarette in the past month. Moreover, 81.5% of current youth e-cigarette users said they used e-cigarettes "because they come in flavors I like."[168]

160.    Adding flavors to e-liquids foreseeably increases the risk of nicotine addiction by making it easier and more pleasant to ingest nicotine.[169] Research has shown that adolescents whose first tobacco product was flavored are more likely to continue using tobacco products than those whose first product was not flavored.

161.    In a recent study, 74% of youth surveyed indicated that their first use of a JUUL was of a flavored JUUL pod.[170]

162.    Research shows that when youth see advertisements for flavored e-cigarettes, they believe the advertisements and products are intended for them.[171]

163.    Flavors like mint and menthol are attractive to youth. According to Robin Koval, CEO and president of Truth Initiative, mint and menthol are among the most popular flavors for youth and that "[w]e also know, as does the tobacco industry, that menthol has been and continues to be the starter flavor of choice for young cigarette users."  According to the FDA, "younger

---

[167] U.S. Food & Drug Admin., *FDA Finalizes Enforcement Policy on Unauthorized  Flavored Cartridge-Based E-cigarettes that Appeal  to Children, Including Mint* (Jan. 22, 2020), https://www.fda.gov/news-events/press-announcements/fda-finalizes-enforcement-policy-unauthorized-flavored-cartridge-based-e-cigarettes-appeal-children.

[168] *See* Bridget K. Ambrose et al., *Flavored Tobacco Product Use Among US Youth Aged 12-17 Years, 2013-2014*, 314 JAMA 1871 (2015). Another peer-reviewed study concluded that young adults who use electronic cigarettes are more than four times as likely to begin using regular cigarettes as their peers who have not used e-cigarettes. *See* Brian A. Primack, et al. *Initiation of Traditional Cigarette Smoking after Electronic Cigarette Use Among Tobacco-Naïve US Young Adults*, 131 AM. J. MED. 443.e1 (2018).

[169] *See* U.S. Dep't of Health & Human Servs., *How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease: A Report of the Surgeon General*, Chapter 4 (Centers for Disease Control and Prevention ed. 2010), https://www.ncbi.nlm.nih. gov/books/NBK53018/ #ch4.s92.

[170] Karma McKelvey et al., *Adolescents and Young Adults Use in Perceptions of Pod-based Electronic Cigarettes*. 1 JAMA NETWORK OPEN e183535 (2018), https:// doi:10.1001/jamanetworkopen.2018.3535.

[171] D.C. Petrescu, et al., *What is the Impact of E-Cigarette Adverts on Children's Perceptions of Tobacco Smoking? An Experimental Study*, 26 TOBACCO CONTROL 421 (2016); Julia C. Chen-Sankey et al., *Perceived Ease of Flavored E-Cigarette Use and E-Cigarette Use Progression Among Youth Never Tobacco Users*, 14 PLOS ONE 1 (2019).

populations have the highest rate of smoking menthol cigarettes" and "menthol in cigarettes is likely associated with increased initiation and progression to regular [] cigarette smoking."[172]

164.    A significant majority of under-age users chose flavored e-cigarette products.[173] By at least early 2017, JLI knew that its flavors had attracted young people and non-smokers in droves.[174] Instead of taking corrective action or withdrawing the kid friendly flavors, JLI capitalized on their popularity with kids continued to promote JUUL's flavors. In a social media post from August 2017, for example, JLI tweeted "Beat The August Heat with Cool Mint" and "Crisp peppermint flavor with a pleasant aftertaste."[175] In another August 2017 tweet, JLI compared JUUL to dessert: "Do you brulée? RT [re-tweet] if you enjoy dessert without the spoon with our Creme Brulee #JUULpods."[176]

165.    JLI asserts that it did not intend its flavors to appeal to underage users. After eleven Senators sent a letter to JLI questioning its marketing approach and kid-friendly e-cigarette flavors, JLI visited Capitol Hill and told Senators that it never intended its products to appeal to kids and did not realize they were using the products, according to a staffer for Senator Richard Durbin[177]. JLI's statements to Congress—which parallel similar protests of innocence by cigarette company executives—were false.

166.    A former JUUL manager, who spoke to The New York Times on the condition that his name not be used, said that within months of JUUL's 2015 introduction, it became evident that teenagers were either buying JUULs online or finding others who made the purchases for them. Some people bought more JUUL kits on the company's website than they could

---

[172] *Preliminary Scientific Evaluation of the Possible Public Health Effects of Menthol Versus Nonmenthol Cigarettes* at 5, FDA, https://www.fda.gov/media/86497/download (last visited Mar. 28, 2020).

[173] Karen A. Cullen et al., *E-cigarette Use Among Youth in the United States*, 322 JAMA 2095 (2019), https://tinyurl.com/y3g75gmg ("Among current exclusive e-cigarette users, an estimated 72.2% . . . of high school students and 59.2% . . . of middle school students used flavored e-cigarettes. . . .").

[174] *See* INREJLI_00265068 (Feb. 13, 2017 internal JLI email string: ███████████████████████████████████████████████████████████████████████████████████████

[175] JUUL Labs, Inc. (@JUULvapor), Twitter (Aug. 4, 2017), http://tobacco.stanford.edu/tobacco_web/images/pod/juul/twitter/large/twitter_39.jpg.

[176] Kathleen Chaykowski, *The Disturbing Focus of Juul's Early Marketing Campaigns*, Forbes (Nov. 16, 2018), https://www.forbes.com/sites/kathleenchaykowski/2018/11/16/the-disturbing-focus-of-juuls-early-marketing-campaigns/#3da1e11b14f9.

[177] Lorraine Woellert & Sarah Owermohle, *Juul Tries to Make Friends in Washington as Regulators Circle*, POLITICO (Dec. 28, 2018), https://www.politico.com/story/2018/12/08/juul-lobbying-washington-1052219.

individually use—sometimes ten or more devices at a time. "First, they just knew it was being bought for resale," said the former senior manager, who was briefed on the company's business strategy. "Then, when they saw the social media, in fall and winter of 2015, they suspected it was teens."[178]

167.    JLI's use of flavors unfairly targeted not only youth, but unsuspecting adults as well. By positioning JUUL pods as a flavor-oriented product rather than a system for delivering a highly addictive drug, JLI deceptively led users to believe that JUUL pods were not only healthy (or at least essentially harmless), but also a pleasure to be enjoyed regularly, without guilt or adverse effect.

### b.    Defendants Developed and Promoted the Mint Flavor and Sought to Preserve its Market.

168.    While JLI and the Management Defendants were developing and marketing their flavored products to appeal to and recruit youth, Altria, recognizing the value of those young "replacement smokers" committed itself to the cause. With the shared goal to grow the number of nicotine-addicted users, and as detailed further herein, JLI's leadership, the Management Defendants, and Altria set out to do whatever was necessary to create and preserve the lucrative market for flavors. In order to maximize the value of its mint line of JUULpods, JLI, with the support of the Management Defendants, chemically and socially engineered its mint pods to become the most popular "flavor" among youth, including through extensive surveillance of youth behavior and preferences, all while seeking to conceal mint's appeal to youth.

169.    In July 2013, Reynolds American Inc.[179] released the Vuse, the first-known cartridge-based nicotine salt e-cigarette to reach the domestic market.[180] Altria entered the nicotine salt market one month later, with the MarkTen cig-a-like.[181] JLI would enter the market in June 2015.

---

[178] Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?*, N.Y. TIMES (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.

[179] Reynolds is now a wholly owned subsidiary of British American Tobacco.

[180] See FAQs, RJR Vapor Co., LLC, http://www.vusevapor.com/faqs/product/ ("Since Vuse's launch in 2013, all of our closed systems available for sale nationally (i.e., Vuse Solo, Vuse Ciro, Vuse Vibe, and Vuse Alto) include nicotine salts.").

[181] Additional Info, Nu Mark LLC, https://markten.com ("certain varieties" of MarkTen Original "contain … acetic acid, benzoic acid, and lactic acid.").

170.    Though mint was one of the least popular e-cigarette flavor categories with youth in 2015, trailing the fruit and dessert categories,[182] Reynolds, Altria and JLI had all introduced mint-flavored products within a year of each company's initial release. By mid-2014, Reynolds had added "Mint, Rich Mint, Spearmint, [and] Wintergreen" to its Vuse lineup.[183] By February 2015, Altria's Nu Mark LLC, under the leadership of Joe Murillo (JLI's current regulatory head), released a Winter Mint flavor for MarkTen.

171.    Unlike Reynolds and Altria, which released mint products after first releasing a menthol variant, JLI skipped menthol and went straight to mint, adding Menthol in late 2017 around the same time it released its mango JUULpods.

172.    JLI's flavored JUULpods were particularly popular with its underage users and, when mango was introduced, it was the underage user's flavor of choice.

173.    JLI, the Management Defendants, and Altria recognized both the potential of using flavors to hook kids and the inevitability that the government would seek to regulate said flavors. So, they sought to solidify the market presence of a "substitute" youth-friendly flavor—mint— which might escape regulation and preserve JLI's astronomical sales figures.

(i)    **JLI Manipulates Chemistry of Mint JUUL Pods.**

174.    One recent study found that JLI's mango had the lowest free-base content, making it the least harsh formula; and that mint had the highest free-base content (30% more free-base than mango), making mint the formula with the strongest nicotine impact:[184]

///

///

///

///

///

---

[182] *See* M.B. Harrell et al., *Flavored E-cigarette Use: Characterizing Youth, Young Adult, and Adult Users*, 5 PREVENTIVE MEDICINE REPS. 33-40, § 3.3 (Mar. 2017), https://www.sciencedirect.com/science/article/pii/S2211335516301346.
[183] *See* Sen. Richard Durbin, et al., *Gateway to Addiction?* (April 14, 2014), https://www.durbin.senate.gov/imo/media/doc/Report%20-%20E-Cigarettes%20with%20Cover.pdf.
[184] See Duell AK, et al. *Nicotine in Tobacco Product Aerosols:*
*"It's Déjà vu All Over Again*," 5 TOBACCO CONTROL (Dec. 17, 2019),
https://tobaccocontrol.bmj.com/content/tobaccocontrol/early/2019/12/16/tobaccocontrol-2019-055275.full.pdf.

| | $C_{Nic}/C_{Nic}$ | $a_{fb}$ |
|---|---|---|
| **Benzoic acid** | | |
| JUUL 'Cool Mint' (5% nicotine) | 0.97* | 0.13 |
| JUUL 'Classic Menthol' (5% nicotine) | 0.98* | 0.13 |
| JUUL 'Crème Brûlée' (5% nicotine) | 0.97* | 0.12 |
| JUUL 'Fruit Medley' (5% nicotine) | 0.99* | 0.12 |
| JUUL 'Cool Cucumber' (5% nicotine) | 1.00* | 0.11 |
| JUUL 'Classic Tobacco' (5% nicotine) | 1.00* | 0.11 |
| JUUL 'Virginia Tobacco' (5% nicotine) | 1.00* | 0.11 |
| JUUL "Mango" (5% nicotine) | 0.99* | 0.09 |
| JUUL "Virginia Tobacco" (3% nicotine) | 0.94* | 0.14 |
| JUUL 'Mint' (3% nicotine) | 1.04* | 0.11 |
| Averages for JUUL | 0.99±0.03 SD | 0.12±0.01 |

**Anna K. Duell et al., Nicotine in tobacco product aerosols: 'It's déjà vu all over again'**

175. These findings evidence JLI, the Management Defendants, and the Altria Defendants' plan to make the flavor whose lifespan they were working hard to preserve the most potent when it got into the hands of nonsmokers, including youth.

### c. JLI's Youth Surveillance Programs Confirmed that Mint JUUL Pods are Preferred by Teens.

176. In January 2018, Kevin Burns, JLI's new CEO, deployed his experience as the former CEO of a yogurt company to begin developing JUUL's flavor portfolio.

177. One part of this initiative included studying consumer reactions to flavor names. By February 2018, McKinsey & Company had provided a roadmap to JLI's Consumer Insights department, which included multiple flavor studies including a flavor "likability" tests, which was carried out under JUUL's marketing and commercial department.[185]

178. In April 2018, JLI received a document request from the FDA on April 24, 2018, seeking information about the design and marketing of JLI's products, among other things.[186]

179. In response, JLI announced a commitment of $30 million to youth prevention efforts and began sending JLI representatives to schools to present what were essentially advertising campaigns for JUUL products. This conduct resulted in a Warning Letter from

---

[185] INREJUUL_00053172.
[186] Matthew Holman, U.S. Food & Drug Admin., to Ziad Rouag, Juul Labs, Inc., *Letter from Director of Office of Science, Center for Tobacco Products* (Apr. 24, 2018), https://www.fda.gov/media/112339/download.

COMPLAINT
Case No. 19-md-02913-WHO

1    the FDA's Center for Tobacco Products to JLI in September 2019.[187]

2    180.    Under the guise of this youth prevention program, *JLI directly studied 13- to 17-*

3    *year-old teens' e-cigarette flavor preferences*.[188] These studies, undertaken at a time when JLI

4    and Altria were coordinating their activities, asked teens to rank a variety of e-cigarette flavors in

5    terms of appeal, and included the names of current JUUL flavors, JUUL flavors under

6    development, and flavors offered by JLI's competitors. Though they were not made public,

7    through document requests, two such studies have been identified from April 2018.

8    181.    The first study, carried out by McKinsey & Company, generated over 1,000

9    responses from teens aged 13 to 17 years old.[189] The second study, conducted by DB Research,

10   appears to have gathered data from a focus group of 16 kids in Bethesda, Maryland, and

11   Baltimore, Maryland.[190]

12   182.    Both studies found that teens' co-favorite JUUL flavors were mango and mint, and

13   that teens found only one third-party flavor more desirable than mango and mint: "Cotton Candy"

14   (McKinsey)[191] and "Fruit Loops" (DB Research).[192]

15   183.    Though the McKinsey study did not survey teens' preference for menthol, the DB

16   Research study did and found that while 28% of teens found menthol appealing, 72% of teens

17   liked mint.[193]

18   184.    In other words, these surveys showed that teens respond to mint the way they

19   respond to their favorite candy flavors and respond to Menthol the way they respond to traditional

20   tobacco flavors typically disfavored by youth. This is unsurprising, as the "Mint" flavor was

21   designed not to taste like a Menthol cigarette. Users have described JLI's Menthol flavor as

22   "tast[ing] like a [N]ewport" cigarette that "doesn't have that good peppermint taste like

23   ///

24

25   [187] Letter from U.S. Food & Drug Admin. to Kevin Burns, CEO of Juul Labs, Inc. (Sept. 9, 2019),
26   https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-
     inc-590950-09092019.
     [188] INREJUUL_00121627 (preliminary slides); INREJUUL_00124965 (data).
27   [189] *Id*.
     [190] INREJUUL_00035325.
28   [191] INREJUUL_00124965.
     [192] *Id.*
     [193] INREJUUL_00035325.

[C]ool [M]int."[194]

185.    Because of these and other studies, JLI, the Management Defendants, and the Altria Defendants knew that mint is an attractive flavor for kids. According to Siddharth Breja, who was senior vice president for global finance at JLI, after JLI pulled most flavored pods, including mango, from the market in a purported attempt to reduce youth usage of JUUL, then-CEO Kevin Burns said that "[y]ou need to have an IQ of 5 to know that when customers don't find mango they buy mint."[195] And it was public knowledge that mint and menthol have a well-documented history of facilitating youth tobacco use, as Dr. Jonathan Winickoff testified before Congress:

> [it is] completely false to suggest that mint is not an attractive flavor to children. From candy canes to toothpaste, children are introduced to mint flavor from a young age. Not only do children enjoy mint, but it has special properties that make it an especially dangerous flavor for tobacco. Menthol's anesthetic properties cool the throat, mask the harshness of nicotine, and make it easier for children to start using and continue using tobacco products. The impact of mint and menthol flavors on increasing youth tobacco addiction is well documented.[196]

186.    If the purpose of these youth prevention studies was to "better understand how different flavor profiles appeal to different age groups to inform youth prevention," as the McKinsey slides presenting that study's findings indicate, the lesson for JLI, the Management Defendants, and the Altria Defendants was that teens like mint as much or more than any other JUUL flavor, including mango, fruit medley, crème brulee, cucumber, and more than a dozen other candy-like flavors produced by third-parties for use with the JUUL device.

187.    With that knowledge and with no genuine interest in youth prevention, and as detailed below, JLI, the Management Defendants, and Altria committed to work to preserve mint as a flavor for as long as possible. Indeed, to further this goal, Defendants Pritzker and Valani

---

[194] Reddit, *How does Classic Menthol Compare to Cool Mint*,
   https://www.reddit.com/r/juul/comments/7wo39m/how_does_classic_menthol_compare_to_cool_mint/.
[195] Sheila Kaplan and Jan Hoffman, *Juul Knowingly Sold Tainted Nicotine Pods, Former Executive Say*, N.Y. TIMES (Nov. 20, 2019), https://www.nytimes.com/2019/10/30/health/juul-pods-contaminated.html.
[196] *Examining Juul's Role in the Youth Nicotine Epidemic*, *Hearing Before the H. Comm. on Oversight and Reform, Subcomm. on Econ. and Consumer Policy*, 116th Cong. 3 (2019) (statement of Jonathan P. Winickoff, American Academy of Pediatrics). ,
   https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019.07.24%20Winickoff%20AAP%20Testimony.pdf.

COMPLAINT
Case No. 19-md-02913-WHO

poured additional money into JLI a mere two months later as part of a $600 million funding round.[197]

188.    By keeping mint on the market long after other flavors were pulled, these Defendants continued to expand the number of addicted e-cigarette users.

**D.    Defendants Developed and Implemented a Marketing Scheme to Mislead Users into Believing that JUUL Products Contained Less Nicotine Than They Actually Do and Were Healthy and Safe.**

189.    Having created a product designed to hook users to its nicotine, JLI had to mislead users into believing JUUL was something other than what it actually was. So, the company engaged in a years' long campaign to downplay JUUL's nicotine content, nicotine delivery, and the unprecedented risks of abuse and addiction JUUL poses. Defendants devised and knowingly carried out a material scheme to defraud and addict users by (a) misrepresenting the nicotine content, nicotine delivery profile, and risks of JUUL products, (b) representing to the public that JUUL was a smoking cessation tool, and (c) using third-party groups to spread false and misleading narratives about e-cigarettes, and JUUL in particular.

**1.    The Defendants Knowingly Made False and Misleading Statements and Omissions Concerning JUUL's Nicotine Content.**

190.    As part of their strategy to market to youth and nonsmokers, JLI and the Management Defendants also did not effectively inform users that JUUL products contain nicotine. Despite making numerous revisions to JUUL products' packaging since 2015, JLI did not include nicotine warnings until forced to do so in August 2018.[198]

191.    Moreover, many of JUUL's advertisements, particularly prior to November 2017, also did not mention that JUUL contained nicotine. In the first year after JUUL's launch, not one of JLI's 171 promotional emails said anything about the nicotine content in JUUL products.[199] For example, in a July 11, 2015 email, JLI advertised its promotional events with the text, "Music,

---

[197] Alex Wilheim & Jason D. Rowley, *JUUL Raises $650M Of Its $1.25B Mega-Round,* CRUNCHBASE (Jul. 10, 2018), https://news.crunchbase.com/news/juul-raises-650m-of-its-1-25b-mega-round/.
[198] *See* INREJUUL_00444332 (2015 image of JLI packaging). The JLI packaging originally included such warnings about nicotine, but were removed during various rounds of revisions, *see e.g.*, INREJUUL_00021583-586 at 583 (2014 image of JLI packaging containing handwritten revisions of the original language).
[199] Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*, Stanford Research Into the Impact of Tobacco Advertising 25 (Jan. 31, 2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf.

COMPLAINT
Case No. 19-md-02913-WHO

Art, & JUUL. What could be better? Stop by and be gifted a free starter kit."[200] This email did not mention that JUULpods contain nicotine, nor did it say that JUUL or the free starter kits were intended for adults only.

192.    Similarly, none of JLI's 2,691 tweets between June 2015 and October 6, 2017 mentioned that JUUL contained nicotine.[201] For example:

A.    On August 7, 2015, JLI tweeted, "Need tix for @cinespia 8/15? We got you. Follow us and tweet #JUULallnight and our faves will get a pair of tix!"[202] This tweet did not mention that JUUL contained nicotine.

B.    On July 28, 2017, JLI tweeted an image of a Mango JUULpod next to mangos captioned "#ICYMI: Mango is now in Auto-ship! Get the #JUULpod flavor you love delivered & save 15%. Sign up today."[203] This tweet did not mention that JUUL contained nicotine.

C.    On August 4, 2017, JLI tweeted "Beat The August Heat with Cool Mint" and "Crisp peppermint flavor with a pleasant aftertaste," captioned "A new month means you can stock up on as many as 15 #JUULpod packs. Shop now."[204] This tweet did not mention that JUUL contained nicotine.

D.    On August 28, 2017, JLI tweeted "Do you brulée? RT [re-tweet] if you enjoy dessert without the spoon with our Creme Brulee #JUULpods." [205] This tweet did not mention that JUUL contained nicotine.

193.    Even after Defendants added a nicotine warning to JUUL products, they continued to mislead youth and the public about the amount of nicotine in a JUULpod. Every 5% strength JUUL pod package represents that one pod is equivalent to one pack of cigarettes. This statement is deceptive, false and misleading. As JLI's regulatory head explained internally to former CEO Kevin Burns in 2018, each JUUL pod contains "roughly *twice the nicotine content* of a pack

///

[200] *Check out our JUUL events this Summer*, JUUL (hello@juulvapor.com) (July 11, 2015), http://tobacco.stanford.edu/tobacco_web/images/pod/juul/email/large/email_2.jpg.

[201] Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*, Stanford Research Into the Impact of Tobacco Advertising 25 (Jan. 31, 2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf.

[202] JUUL Labs, Inc. (@JUULvapor), Twitter (Aug. 7, 2015), http://tobacco.stanford.edu/tobacco_web/images/pod/juul/twitter/large/twitter_18.jpg.

[203] JUUL Labs, Inc. (@JUULvapor), Twitter (July 28, 2017), http://tobacco.stanford.edu/tobacco_web/images/pod/juul/twitter/large/twitter_38.jpg.

[204] JUUL Labs, Inc. (@JUULvapor), Twitter (Aug. 4, 2017), http://tobacco.stanford.edu/tobacco_web/images/pod/juul/twitter/large/twitter_39.jpg.

[205] Kathleen Chaykowski, *The Disturbing Focus of Juul's Early Marketing Campaigns*, Forbes (Nov. 16, 2018), https://www.forbes.com/sites/kathleenchaykowski/2018/11/16/the-disturbing-focus-of-juuls-early-marketing-campaigns/#3da1e11b14f9.

of cigarettes."[206]

194.    In addition, and as JLI and the Management Defendants know, it is not just the amount of nicotine, but the efficiency with which the product delivers nicotine into the bloodstream, that determines the product's narcotic effect, risk of addiction, and therapeutic use. Most domestic cigarettes contain 10–15 mg of nicotine per cigarette[207] and each cigarette yields between 1.0 to 1.4 mg of nicotine,[208] meaning that around 10% of the nicotine in a cigarette is typically delivered to the user. JUUL e-cigarettes, on the other hand, have been found to deliver at least 82% of the nicotine contained in a JUUL pod to the user.[209] JLI's own internal studies suggest a nicotine transfer efficiency rate of closer to 100%.[210]

195.    Defendants also knew that the use of benzoic acid and nicotine salts in JUUL pods affects pH and facilitates "absorption of nicotine across biological membranes."[211] JUUL's e-liquid formulation is highly addictive not only because it contains a high concentration of nicotine, but because it contains a particularly potent form of nicotine, i.e., nicotine salts. Defendants knew this, as Adam Bowen advised the Board of Directors at an October 2015 Board meeting on JLI's "nicotine salts patent application."[212] And the Altria Defendants were aware of the research showing the potency of nicotine salts from their many years in the tobacco business.

196.    JLI and Defendant Bowen, knowing that the Phase 0 results illustrated that the nicotine content was greater than they wanted to represent, sought to engineer test results that differed from those results and were more consistent with JLI's deceptive messaging. In May 2014, within weeks of the Phase 0 study, JLI and Defendant Bowen carried out a second pharmacokinetics study in New Zealand. This study was called the CH-1401, or the "Phase 1"

---

[206] INREJUUL_00279931.

[207] Neal L Benowitz & Jack E Henningfield, *Reducing the Nicotine Content to Make Cigarettes less addictive*, 22 TOBACCO CONTROL Supp. 1, i14-17 (2013), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3632983/.

[208] Lynn T. Kozlowski & Janine L. Pilliteri, *Compensation for Nicotine by Smokers of Lower Yield Cigarettes*, 7 SMOKING AND TOBACCO CONTROL MONOGRAPH 161, 164 (1983), https://cancercontrol.cancer.gov/brp/tcrb/monographs/7/m7_12.pdf

[209] Samantha M. Reilly et al., *Free Radical, Carbonyl, and Nicotine Levels Produced by JUUL Electronic Cigarettes*, 21 NICOTINE TOBACCO RESEARCH 1274 (2019), https://www.ncbi.nlm.nih.gov/pubmed/30346584 (about 82%, for averages of 164 µg per puff).

[210] See, e.g., INREJUUL_00023597 (finding 94% nicotine transfer efficiency with 4% benzoate formula).

[211] Neal L. Benowitz et al., *Nicotine Chemistry, Metabolism, Kinetics and Biomarkers*, 192 HANDB.EXP.PHARMACOL. 29(2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2953858/

[212] INREJUUL_00278408.

study. This study again examined the effects of inhaling aerosol from various 2% nicotine solutions: nicotine benzoate (blend A), nicotine malate (blend B), and free-base nicotine (blend C).[213] In a further departure from the Phase 0 study, which used experienced e-cigarette users, the Phase 1 study used subjects that had not previously ingested aerosolized nicotine vapor, and who had certainly never ingested aerosolized nicotine vapor from nicotine salts. As Defendants JLI and Bowen knew, this difference is critical. Just as first-time smokers would not inhale as much cigarette smoke as regular smokers, inexperienced (or "learning") e-cigarette users will not inhale vapor at a rate that maximizes nicotine delivery.[214] JLI's decision to omit participants with previous e-cigarette experience from the criteria for inclusion in CH-1401 resulted in artificially deflated Cmax results.[215]

197.    The Cmax recorded in the Phase 1 study was approximately a third of that achieved by smoking a cigarette. Specifically, e-cigarette users recorded a Cmax of approximately 12.87 ng/ml, compared with the 31.47 ng/ml Cmax resulting from smoking a Pall Mall.[216]

198.    In possession of the results from both the Phase 0 and Phase 1 studies, JLI nevertheless decided to launch a 5% nicotine salt solution as its commercial product. An internal memo explained JLI's reasoning as follows: "[s]ince the Cmax of the [2%] nicotine salt was about 1/3 that of cigarettes, we chose a concentration of 5% for our commercial product (JUUL), which should provide a Tmax and Cmax consistent with a cigarette."[217]

199.    Instead of testing a 5% solution, JLI *estimated* the Cmax result of a 5% nicotine solution using a model.[218] But the Phase 0 data showed that a 4% benzoic acid / 5% nicotine solution would have a higher Cmax and AUC than those of a cigarette, not one that was equal.

200.    JLI and the Management Defendants knew that JLI's studies indicated that their 5% solution product was more potent and more addictive than a typical cigarette. But JLI and the Management Defendants then used their unsupported extrapolation of their flawed studies to market JUUL as providing a nicotine experience on par with a cigarette, even though they

---

[213] INREJUUL_00014159-INREJUUL_00014226.
[214] INREJUUL_00002526-INREJUUL_00002625.
[215] *Id.*
[216] *Id.*
[217] INREJUUL_00351717-INREJUUL_00351719.
[218] *Id.*

designed JUUL to ensure that was not true. In reality, there were never any measured test results in accord with JLI's marketing to distributors, retailers, and the public at large.

201.    In the United States, the unsupported extrapolations from what appears to be the Phase 1 study were used to create charts, which JLI posted on its website, shared with journalists, sent to retailers, and distributed to third party promoters, showing that JUUL's 5% solution achieved a pk profile just below that of a cigarette. For example, the following chart appeared on the online publication TechCrunch:[219]



202.    Simultaneously, while providing extrapolated data to the public, Phase 1 was used as the basis for representations to retailers that a *2% solution* achieved a pk profile equaling that of a cigarette. In a pitch deck dated March 25, 2015, and labeled as being intended for the convenience store distributor Core-Mark, JLI presented interim[220] Phase 1 data showing this equivalence:[221]

///

///

///

---

[219] Ryan Lawler, *Vaporization Startup Pax Labs Introduces Juul, Its Next-Gen-E-Cigarette*, TECH CRUNCH (Apr. 21, 2015), https://techcrunch.com/2015/04/21/pax-juul/.
[220] *See* JLI00363360.
[221] INREJUUL_00448896.

1
2
3
4
5
6
7
8
9
10
11



12    203.    These misrepresentations to the public were not accidental, nor were they the work

13   of a rogue employee. In a June 2014 Ploom Board meeting in London, the Ploom executives'

14   presentation to the Board, which at that time included Defendants Bowen, Monsees, Pritzker, and

15   Valani, explained the differences between the Phase 0 and Phase 1 results as "due to averaging

16   across more subjects with variability in puffing behavior."[222] Their explanation did not note that

17   "variability in puffing behavior" was partly a result of the fact that participants in the Phase 0

18   study were experienced e-cigarette users whereas the participants in the Phase 1 study were not.

19   Thus, Defendants Bowen, Monsees, Pritzker, and Valani were privy to both the Phase 0 and Phase

20   1 results. And they *knew* that the data JLI (then Ploom) was pushing on the public was false and

21   misleading, but none made any efforts to correct or withdraw those false and misleading

22   statements.  Aside from submitting the testing protocol and results of the Phase 0 study with the

23   '895 patent, JLI, Bowen, Monsees, Pritzker, and Valani otherwise ignored the Phase 0 study and

24   omitted it from public discussion of JUUL's nicotine delivery.

25   ///

26   ///

27   ///

28

[222] INREJUUL_00016443-INREJUUL_00016507.

## 2. JLI, the Management Defendants, and Altria Transmitted, Promoted and Utilized Statements Concerning JUUL's Nicotine Content that They Knew Was False and Misleading.

204.    As set forth above, the statements in JLI advertisements and on JUUL pod packaging that each JUUL pod contains about as much nicotine as a pack of cigarettes are deceptive, false and misleading. Defendants knew this.

205.    JLI and the Management Defendants caused deceptive, false and misleading statements that a JUUL pod had an equivalent amount of nicotine as one pack of cigarettes to be distributed via the wires and mails. These Defendants have thus materially misrepresented the nicotine content of JUUL products to the consuming public including Plaintiff, through acts of mail and wire fraud.

206.    By no later than October 30, 2016 (and likely earlier), the JLI Website—which, as discussed above, the Management Defendants on JLI's Board of Directors reviewed and approved—advertised that "[e]ach JUULpod contains 0.7mL with 5% nicotine by weight, approximately equivalent to 1 pack of cigarettes or 200 puffs."[223] The language on the website would later change, but still maintained the same fraudulent misrepresentation—i.e., that "[e]ach 5% JUULpod is roughly equivalent to one pack of cigarettes in nicotine delivery."[224]

207.    As noted above, JLI and the Management Defendants directed and approved the content of the JUUL website, and they also directed and approved the distribution channels for JUUL pods and deceptive, misleading and fraudulent statements regarding JUUL's nicotine content. And although they knew that these statements, which they caused to be transmitted over the wires and mails, were untrue, JLI and the Management Defendants have made no effort to retract such statements or correct their lies. Moreover, by no later than July 2018, James Monsees required JLI employees to personally seek his approval for the artwork on all JUUL and JUUL pod packaging.[225]

---

[223] JUULpod, JUUL Labs, Inc. (Oct. 30, 2016),
https://web.archive.org/web/20161030085646/https://www.juulvapor.com/shop-pods/
[224] What is Vaping?, JUUL Labs, Inc. (July 2, 2019), https://www.JUUL.com/resources/What-is-Vaping-How-to-Vape
[225] JLI10045538

208.    In addition to approving the JLI website, knowing that it contained deceptive, misleading and false statements, JLI (through its employees) and the Management Defendants also were directly responsible for the interstate transport, *via* U.S. mail, of JUULpod packaging contained misrepresentations and omissions. At the same Board Meeting where Defendants Pritzker, Huh, and Valani were installed as the Executive Committee, the Board directed JLI's management on, among other things, "the need to rely on distributors and the challenges in reaching customers otherwise."[226]

209.    JUUL pod packages that were sent *via* U.S. mail stated that a single Juul pod is "approximately equivalent to about 1 pack of cigarettes."[227] These statements, as well as the statements on the JLI website, are false and misleading.

210.    The statement on the JLI website, and in its advertisements and packaging, that each JUUL pod contains 5% nicotine and is approximately equivalent to a pack of cigarettes is false and likely to deceive and mislead, because the actual amount of nicotine contained in a JUUL pod is as much as twice as high as that in a pack of cigarettes.

211.    AGDC and Altria Client Services greatly expanded the reach of this fraud by providing their retail and distribution might for JLI products, causing millions of JUUL pods to be sent via U.S. mail with packaging stating that JUUL pods contain only 5% nicotine by weight and are "approximately equivalent to about 1 pack of cigarettes."[228] JLI, the Management Defendants, and the Altria Defendants knew that these statements were false and misleading, but nevertheless utilized JUUL product packing, marketing and advertising to maintain their fraud.

212.    The Altria Defendants knew in 2017 that a JUUL pod delivered more nicotine than one pack of cigarettes. In 2017, Altria, through its wholly owned subsidiary Nu Mark, launched its MarkTen Bold e-cigarette, a relatively high-strength 4% formulation compared to the 2.5% and 3.5% strength MarkTen products initially offered. Even though JUUL was already on store shelves and was rapidly gaining market share with its 5% nicotine formulation, Altria (through Nu Mark) chose to bring a less potent 4% formulation to market.

---

[226] INREJUUL_00278408.
[227] Juul Labs, Inc., Twitter, (Feb. 14, 2018), https://twitter.com/JUULvapor/status/963844069519773698,
[228] *Id.*

213.    According to Altria's own pharmacokinetic testing (likely conducted by Altria Client Services) as reflected in the chart below, this 4% less potent formulation was nevertheless sufficient to raise plasma nicotine to levels approaching those generated by combustible cigarettes. In other words, the Altria Defendants' own pharmacokinetic testing suggested the highly addictive nature of a 5% formulation, as such a formulation would readily equal or exceed the nicotine delivery profile of a combustible cigarette.



**Figure 1: Presented at Altria Group Inc.'s November 1, 2017 Investor Day Presentation. MarkTen Bold 4%**

214.    Based on its own internal knowledge, the Altria Defendants knew that a 5% nicotine formulation would carry more nicotine than one pack of cigarettes. In addition to data Altria and Altria Client Services received from JLI, their due diligence undoubtedly included a careful examination of JLI's intellectual property, including the '895 patent, which provides a detailed overview of nicotine benzoate's pharmacokinetic profile.

215.    Thus, JLI, the Management Defendants, and the Altria Defendants knew that the statement on JUUL pod packaging that each JUUL pod contains 5% nicotine and about as much nicotine as a pack of cigarettes is literally false and they intended such statements to mislead. Neither the Altria Defendants nor JLI or the Management Defendants have made any effort to correct or retract the false and misleading statements as to the true nicotine content in JUUL pods. Instead, they have continued to misrepresent the product's nicotine content and design, with the goal of misleading and deceiving users.

216.    From JUUL's pre-release announcements to this day, JLI has continuously represented that each pod is approximately equivalent to a pack of cigarettes. These claims, which JLI repeats widely in advertisements, press releases, and its web site, have been distributed *via* the wires and mails and disseminated by reputable and widely reliable sources that accepted those representations as true.[229]

217.    Not only have JLI and the Management Defendants misrepresented or concealed the actual amount of nicotine consumed *via* JUUL pods, but they also did not effectively or fully inform users about the risks associated with the potent dose of nicotine delivered by JLI's products. Despite going through numerous revisions since 2015, the JUUL packaging did not include nicotine addiction warnings until JLI was forced to add them in August 2018. The original JUUL product labels had a California Proposition 65 warning indicating that the product contains a substance known to cause cancer, and a warning to keep JUUL pods away from children and pets, but contained no warnings specifically about the known effects, or unknown long-term effects, of nicotine or consuming e-cigarettes/inhaling nicotine salts.[230]

218.    Moreover, the form of nicotine JUUL pods contain is particularly potent. JUUL's use of "strength" to indicate concentration by weight is also at odds with the industry standard of reporting concentration by volume,[231] leading users to believe it contains less nicotine than other formulations advertised as 6% nicotine, when JUUL pods in fact contain approximately the same nicotine as a solution that is 6% nicotine by volume.

---

[229] *See* Truth Initiative, *6 Important Facts about Juul*, https://truthinitiative.org/research-resources/emerging-tobacco-products/6-important-facts-about-juul; Erin Brodwin, *An E-cigarette with Twice the Nicotine of Comparable Devices is Taking over High Schools – and Scientists are Sounding the Alarm,* BUSINESS INSIDER (Apr. 30, 2018), https://www.businessinsider.com/juul-e-cig-vaping-health-effects-2018-3; Caroline Kee, *Everything you Need to Know About the JUUL, Including the Health Effects,* BUZZFEED NEWS (Feb. 5, 2018), https://www.buzzfeednews.com/article/carolinekee/juul-ecigarette-vape-health-effects; Jan Hoffman, *The Price of Cool: A Teenager, a Juul and Nicotine Addiction,* NEW YORK TIMES, (November 16, 2018), https://www.nytimes.com/2018/11/16/health/vaping-juul-teens-addiction-nicotine.html; Sarah Milov, *Like the Tobacco Industry, E-cigarette Manufacturers are Targeting Children,* THE WASHINGTON POST, (Sept. 23, 2018) https://www.washingtonpost.com/outlook/2018/09/23/like-tobacco-industry-e-cigarette-manufacturers-are-targeting-children/; Washington State Dep't of Health, *What are Vapor Products?,* https://www.doh.wa.gov/YouandYourFamily/Tobacco/VaporProducts.

[230] *See* INREJUUL_00444332 (2015 image of JLI packaging). Note that JLI packaging originally included such warnings about nicotine, but were apparently removed during various rounds of revisions, *see e.g.* INREJUUL_00021583 (2014 image of JLI packaging containing handwritten revisions of the original language.).

[231] See, e.g., American E-Liquids Manufacturing Standards Association, *E-Liquids Manufacturing Standards*, § 1.05 (2017), https://www.aemsa.org/wp-content/uploads/2017/03/AEMSA-Standards-v2.3.3.pdf, (quantifying e-liquid nicotine content in terms of volume).

219.    The "5% strength" statement in Defendants' advertisements misrepresents the most material feature of the JUUL product—the nicotine content—and has misled users to their detriment. Resellers, apparently assuming that "5% strength" means "50mg/ml" nicotine by volume, compound confusion among users by stating that JUUL pods contain "50 mg/ml," which they do not.[232]

220.    If JLI and the Management Defendants did not know when JLI released JUUL pods that the "5% strength" representation in Defendants' advertisements was misleading, they learned that there was widespread confusion about the JUUL pods' nicotine content. By 2017, studies revealed that smokers did not understand "5% strength," and some understood that phrase to mean 5% of a cigarette. Though this was identified as a "pain point" for new users,[233] JLI and the Management Defendants (and later the Altria Defendants) did nothing to stop or correct this confusion about the nicotine content.

221.    The "5% strength" statement in Defendants' advertisements is also misleading. At least two independent studies testing multiple varieties of JUUL pods have likewise found significantly higher concentrations of nicotine than the 59 mg/mL JUUL's website represents, suggesting that the difference in the total nicotine content of a JUUL pod vs. a pack of combustible cigarettes could be even greater.[234]

### 3.    Defendants Used Food and Coffee Themes to Give False Impression that JUUL Products Were Safe and Healthy.

222.    In late 2015, JLI and the Management Defendants employed a deceptive marketing scheme to downplay the harms of e-cigarettes with a food-based advertising campaign

---

[232] See, e.g. Tracy Vapors, Starter Kit, http://web.archive.org/web/20190422143424/https://www.tracyvapors.com/collections/starter-kit; Lindsey Fox, *JUUL Vapor Review, E-cigarette Reviewed,* (Mar. 20, 2017), https://ecigarettereviewed.com/juul-review ("The nicotine content of the JUUL pods is always the same: 5% or 50 mg/ml"); Jason Artman, *JUUL E-Cigarette Review*, eCig One (Oct. 26, 2016) https://ecigone.com/e¬cigarette-reviews/juul-e-cigarette-review/ ("the e-liquid contains 50 mg of nicotine per ml of e-liquid"); West Coast Vape Supply, Juul Starter Kit (July 18, 2019), http://web.archive.org/web/20190718190102/https://westcoastvapesupply.com/products/juul-starter-kit ("5% . . . 50 mg"); Vapor4Life, *How Much Nicotine is In a JUUL?* (Aug. 24, 2018), https://www.vapor4life.com/blog/how-much-nicotine-is-in-a-JUUL/. "Each official JUUL pod contains a whopping 50mg of nicotine per milliliter of liquid (most other devices range from 3 to 30mg per milliliter."
[233] INREJUUL_00123540.
[234] *See* J.F. Pankow et al., *Benzene Formation in Electronic Cigarettes*, 12 PLoS ONE 1 (2017); *See also* Anna K. Duell, et al., *Free-Base Nicotine Determination in Electronic Cigarette Liquids by 1H NMR Spectroscopy*, 31 CHEM. RES. TOXICOL. 431, 431-34 (2018).

called "Save Room for JUUL." The campaign framed JUUL's addictive pods as "flavors" to be paired with foods.[235] JLI described its Crème Brûlée nicotine pods as "the perfect evening treat" that would allow users to "indulge in dessert without the spoon."[236]  In one 2016 email, JLI bluntly suggested that users satisfy their sugar cravings with JUUL's highly-addictive nicotine vapor: "Have a sweet tooth? Try Brulee."[237] JLI similarly promoted the fruit medley pods using images of ripe berries.[238] JLI described its "Cool" Mint pods as having a "crisp peppermint taste with a pleasant aftertaste" and encouraged users to "Beat The August Heat With Cool Mint."[239]






[235] Erin Brodwin, *$15 Billion Startup JUUL Used 'Relaxation, Freedom, and Sex Appeal' to Market its Crème-brulee-flavored E-cigs on Twitter and Instagram—but its Success has Come at a Big Cost*, BUSINESS INSIDER (Oct. 26, 2018), https://www.businessinsider.com/juul-e-cig-marketing-youtube-twitter-instagram-social-media-advertising-study-2018-10.
[236] Stanford University, *Research into the Impact of Tobacco Advertising*, http://tobacco.stanford.edu/tobacco_main/images_pods.php?token2=fm_pods_st658.php&token1=fm_pods_img36019.php&theme_file=fm_pods_mt068.php&theme_name=JUUL&subtheme_name=Flavors
[237] Stanford University, *Research into the Impact of Tobacco Advertising*, http://tobacco.stanford.edu/tobacco_main/images_pods.php?token2=fm_pods_st658.php&token1=fm_pods_img36019.php&theme_file=fm_pods_mt068.php&theme_name=JUUL&subtheme_name=Flavors
[238] Stanford University, *Research into the Impact of Tobacco Advertising*, http://tobacco.stanford.edu/tobacco_web/images/pod/juul/flavors/large/flavor_6.jpg.
[239] Stanford University, *Research into the Impact of Tobacco Advertising*, http://tobacco.stanford.edu/tobacco_main/images_pods.php?token2=fm_pods_st658.php&token1=fm_pods_img36019.php&theme_file=fm_pods_mt068.php&theme_name=JUUL&subtheme_name=Flavors



223.    Again, none of these advertisements disclosed that JUUL was addictive and unsafe.

224.    In several caffeine-pairing advertisements, JUUL devices or pods sit next to coffee and other caffeinated drinks, sometimes with what appear to be textbooks in the picture.[240] JLI's coffee-based advertisements suggest that JUUL should be part of a comfortable routine, like a cup of coffee.

225.    JLI's reference to coffee is no mere marketing gimmick, it reflects the larger effort to mislead customers into believing that JUUL is no more harmful than coffee, reinforcing the false and dangerous concept that if a substance is "not harmful," then addiction to that substance cannot be harmful.

///

///

///

///

///

---

[240] *Id.*

226.    Defendants knew that tying JUUL to caffeine and food would mislead their target audience—youth and non-smokers—into believing that JUUL was a healthy, safe treat.

**4.    JLI's "Make the Switch" Campaign Intentionally Misled and Deceived Users to Believe that JUUL Is a Cessation Device.**

227.    JLI, the Altria Defendants, and the Management Defendants recognized that one of the keys to growing and preserving the number of nicotine-addicted e-cigarette users (and thus JLI's staggering market share), was to mislead potential customers about the true nature of JUUL products. Defendants knew that if it became public that JUUL was designed as a way to introduce nicotine to youth and otherwise hook new users with its potent nicotine content and delivery, it would not survive the public and regulatory backlash. Therefore, JLI (with the knowledge and support of the Management Defendants) and the Altria Defendants repeatedly made false and misleading statements to the public that JUUL was created and designed as a smoking cessation device, and falsely and misleadingly used the mails and wires to spread the subterfuge. JLI, the Management Defendants, and the Altria Defendants committed these deceptive, misleading and fraudulent acts intentionally and knowingly. In making these representations, JLI, the Management Defendants, and the Altria Defendants intended that users, the public, and regulators rely on misrepresentations that JUUL products were designed to assist smoking cessation.

228.    The most blatant evidence of the cover-up scheme was the January 2019, $10 million "*Make the Switch*" television advertising campaign. This campaign, which was a continuation of JLI's web-based Switch campaign, was announced less than a month after the Altria Defendants announced Altria's investment in JLI.

229.    The "*Make the Switch*" television ads featured former smokers aged 37 to 54 discussing "how JUUL helped them quit smoking."[241] According to JLI's Vice President of Marketing, the "*Make the Switch*" campaign was "an honest, straight down the middle of the fairway, very clear communication about what we're trying to do as a company."[242] These statements were false as JUUL was not intended to be a smoking cessation device. JLI and the Management Defendants committed acts of wire fraud when they caused the "Make the Switch" campaign to air on television with the fraudulent intent of deceiving and misleading the public, the United States Congress, and government regulators into believing that JLI is and had been focused solely on targeting adult smokers. The Altria Defendants also committed acts of mail fraud when they caused tens of thousands, if not millions, of written versions of the *Make the Switch* campaign to be distributed with packages of Altria's combustible cigarettes.

230.    The "*Make the Switch*" campaign was fraudulent and was made to protect, maintain, and expand the tremendous market share gained by lying to users and hooking youth on nicotine by convincing regulators and the public that JUUL was actually as cessation device and JLI's marketing was never aimed at youth.

231.    Defendants continually and intentionally sought to frame JUUL products as smoking cessation devices in their public statements and on their website as part of their scheme to mislead and defraud the public. Defendant Monsees explained during his testimony before Congress:

> **The history of cessation products have extremely low efficacy. That is the problem we are trying to solve here.** So, if we can give consumers an alternative and market it right next to other cigarettes, then we can actually make something work.
>
> [T]raditional nicotine replacement therapies, which are generally regarded as the gold standard for tools, right, for quitting, those are nicotine in a patch or a gum form, typically, and the efficacy rates on those hover just below about a 10 percent or so. JUUL-we ran a very large study of JUUL consumers, ex-smokers who had picked up JUUL, and looked at them, looked at their usage on a longitudinal basis, which is usually the way that we want to look at this, in a sophisticated fashion ... what we found was that after 90 days, 54 percent of those smokers had stopped

---

[241] Angelica LaVito, *JLI Combats Criticism with New TV Ad Campaign Featuring Adult Smokers Who Quit after Switching to E-cigarettes*, CNBC (Jan. 8, 2019), https://www.cnbc.com/2019/01/07/juul-highlights-smokers-switching-to-e-cigarettes-in-ad-campaign.html.
[242] *Id.*

smoking completely, for a minimum of 30 days already. And the most interesting part of this study is that if you follow it out further, to 180 days, that number continues to go up dramatically, and that is quite the opposite of what happens with traditional nicotine replacement therapies.[243]

232.    In response to a direct question about whether people buy JUUL to stop smoking, Defendant Monsees responded: "Yes. I would say nearly everyone uses our product as an alternative to traditional tobacco products."[244]

233.    Following Defendants Monsees' and Altria's lead, Defendants caused a number of other misleading public statements—suggesting that Juul would help existing adult smokers even though it delivered more nicotine than cigarettes and was designed to appeal to kids—to be made, including the following:

- "JUUL Labs was founded by former smokers, James and Adam, with the goal of improving the lives of the world's one billion adult smokers by **eliminating cigarettes**. We envision a world where fewer adults use cigarettes, and **where adults who smoke cigarettes have the tools to reduce or eliminate their consumption entirel**y, should they so desire." (JLI Website, April 2018 (or earlier));[245]

- "JUUL Labs, which exists to **help adult smokers switch** off of combustible cigarettes." (JLI Website, September 19, 2019); and,[246]

- "To paraphrase Commissioner Gottlieb, **we want to be the offramp for adult smokers** to switch from cigarettes, not an on-ramp for America's youth to initiate on nicotine." (JLI Website, November 13, 2018);[247]

---

[243] *Examining Juul's Role in the Youth Nicotine Epidemic, Hearing Before the H. Comm. on Oversight and Reform, Subcomm. on Econ. and Consumer Policy*, 116th Cong. (2019) (statement of James Monsees, Co-Founder, JUUL Labs, Inc.)., https://oversight.house.gov/legislation/hearings/examining-juul-s-role-in-the-youth-nicotine-epidemic-part-ii.

[244] *Id.*

[245] *Our Mission*, JUUL Labs, Inc. (2019), https://www.juul.com/mission-values.

[246] CONSUMER UPDATE: 9/19, JUUL Labs, Inc. (Sept. 19, 2019), https://newsroom.juul.com/consumer-update-9-19/.

[247] JLI Labs Action Plan, JUUL Labs, Inc. (Nov. 13, 2018), https://newsroom.juul.com/juul-labs-action-plan/ (statement of then-CEO Kevin Burns).

- "We are taking significant action to prepare for a future where adult smokers overwhelmingly choose non-combustible products over cigarettes by investing $12.8 billion in JUUL, **a world leader in switching adult smokers** . . . . We have long said that providing adult smokers with superior, satisfying products with the potential to reduce harm is the best way to achieve tobacco harm reduction." (Altria Website, December 20, 2018);[248]

- "We believe e-vapor products present an **important opportunity to adult smokers to switch from combustible cigarettes**." (Letter to FDA Commissioner Gottlieb, 10/25/18);[249]

- "We have long said that **providing adult smokers with superior, satisfying products with the potential to reduce harm** is the best way to achieve tobacco harm reduction. **Through Juul**, we are making the biggest investment in our history toward that goal." (Altria Press Release, Dec. 20, 2018);[250]

- "Through JUUL, we have found a unique opportunity to not only participate meaningfully in the e-vapor category but to also **support and even accelerate transition to noncombustible alternative products by adult smokers**." (Altria Earning Call, January 31, 2019);[251] and

- We expect the **JUUL product features that have driven JUUL's success in switching adult smokers in the U.S.** to strongly appeal to international adult cigarette smokers. (Altria Earning Call, January 31, 2019).[252]

234.    Defendants knew that the "switch" messaging they initiated for JUUL was false, deceptive and misleading. JUUL does not have FDA approval as a cessation product. The *Switch* advertisements reinforced the impression left by the testimony of JLI's co-founder, clearly linking JUUL to cessation and quitting. For example:

///

---

[248] *Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth*, BUSINESSWIRE (Dec. 20, 2018), https://www.businesswire.com/news/home/20181220005318/en/Altria-12.8-Billion-Minority-Investment-JUUL-Accelerate

[249] Letter from Howard A. Willard III, Altria, to Dr. Scott Gottlieb, FDA, at 1-2 (Oct. 25, 2018).

[250] *Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth*, (Dec. 20, 2018), BUSINESS WIRE, https://www.businesswire.com/news/home/20181220005318/en/Altria-12.8-Billion-Minority-Investment-JUUL-Accelerate.

[251] Altria Group (MO) Q4 2018 Earnings Conference Call Transcript: MO earnings call for the period ending December 31, 2018,  (Jan. 31, 2019), https://www.fool.com/earnings/call-transcripts/2019/02/01/altria-group-mo-q4-2018-earnings-conference-call-t.aspx.

[252] *Id.*

COMPLAINT
                                                Case No. 19-md-02913-WHO

235.    Representative Rashida Tlaib, upon presenting this ad to Monsees, had the following exchange:

**Rep. Tlaib:** After 30 lines, starting with "quit," the ad says "switch," followed by no further mentions of start smoking again. You were a smoker. Does this ad give a smoker hope that there might be a way to quit cigarettes for good?

**Mr. Monsees:** I think the intention of this ad is to make it very clear to consumers that there is an alternative, finally, to combustible cigarettes. I am one of those people.[253]

236.    Defendants' tacit message in their *Switch* advertisements is: switch because, unlike cigarettes, JUUL is harmless to your health.

---

[253] *Examining Juul's Role in the Youth Nicotine Epidemic*, *Hearing Before the H. Comm. on Oversight and Reform*, *Subcomm. on Econ. and Consumer Policy*, 116th Cong. (2019) (statement of James Monsees, Co-Founder, JUUL Labs, Inc.)., https://www.c-span.org/video/?c4811191/user-clip-wasserman-grothman-tlaib-question-monsees at 12:33-13:04.

COMPLAINT
Case No. 19-md-02913-WHO

237.    Defendants' false, deceptive and misleading *Switch* campaign suggests that purchasing a JUUL will "switch" a smoker to a non-smoker and that it was designed to switch adult smokers off cigarettes rather than addict youth to nicotine.

238.    Defendants know that a large number of smokers who use JUUL products do not end up switching but instead end up consuming both cigarettes and JUUL.

239.    Moreover, Defendants know that, by design, a large number of their customers are first-time youth users and that JUUL was never designed to be a cessation device.

240.    JLI has advertised cost-savings calculators as part of its *Switch* campaign. Those calculators assume that a smoker who switches will continue consuming the same amount of nicotine that he or she did as a smoker (*i.e.,* a pack a day smoker is presumed to consume one JUUL pod a day). Defendants know that the calculator is misleading because smokers who switch to JUUL frequently increase their nicotine intake.

241.    JUUL labels and advertisements also marketed the product as an "alternative" to cigarettes:



242.    Other advertisements similarly marketed the product as smoking "evolved":

///

///

COMPLAINT
Case No. 19-md-02913-WHO



243.    The goal of these advertisements was to convey the deceptive, misleading and false impression that JUUL products could help users quit smoking and break nicotine addiction in a way that was healthy and safe. But, as noted above, that was simply not the case. Defendants never disclosed to users that JUUL e-cigarettes and JUUL pods are at least as, if not more, addictive than combustible cigarettes. And each of JLI, the Management Defendants, and the Altria Defendants received data to this effect, as discussed above, and were aware of this fact.

244.    In addition, the notions that JUUL products are designed only for existing cigarette smokers, and safer than combustible cigarettes are belied by JLI's own knowledge, marketing plan and intentions on several fronts. *First*, Defendants sought to grow a new group of users of nicotine products (e.g., "vapers"), not just to market to the shrinking number of existing cigarette smokers. *Second,* JLI and Bowen designed the JUUL device to be easy to use for youth and others who have never smoked and to create and exacerbate nicotine addiction by encouraging ingestion of excessive amounts of nicotine. *Third,* as noted above, JLI's own internal testing revealed that JUUL products were often more potent than combustible cigarette smokers prefer. Each of the Management Defendants knew this from his position on JLI's Board of Directors, and the Altria Defendants knew the same when they began to actively coordinate with JLI and the Management Defendants. Despite this knowledge, these Defendants made numerous deceptive, false and misleading public statements that JUUL was intended to be a cessation device.

245.    JUUL is not a product adults typically use to quit smoking. Researchers have found that as of 2018, only 7.9% of American adults had ever used USB shaped e-cigarette

1    devices, like JUUL, and only 2% of adults currently used them.[254] By contrast, a recent study

2    found that 15- to 17-year-olds are *sixteen times* more likely to use JUUL products than 25 to 34-

3    year-olds.[255]

4        246.    JLI's own marketing research indicated that JUUL was not appropriate as a

5    cessation device for adults. In 2014, JLI when it was called Ploom hired the consumer research

6    firm Tragon to do research with prototypes of the JUUL e-cigarette. On September 30, 2014,

7    Lauren Collinsworth, a consumer researcher at Tragon, e-mailed Chelsea Kania, a marketing

8    employee at Ploom, with some of the preliminary results from the studies. She stated that the

9    testing showed that "the younger group is open to trying something new and liked J1 [the JUUL

10   prototype] for being smart, new, techy, etc." [256] Ms. Collinsworth added that "The qualitative

11   findings suggested *this product isn't going to fit as well with consumers who are looking to cut*

12   *back on the cigarette intake*."[257] On October 1, 2014, Ms. Collinsworth followed up with

13   additional comments. She stated that "[t]he delivery was almost too much for some smokers,

14   especially those used to regular e-cigarettes."[258] The final results from this consumer research

15   were distributed to upper management, including to then-CEO James Monsees[259] and then-Chief

16   Marketing Officer Richard Mumby.[260]

17       247.    The deceptive, misleading and fraudulent nature of the "*Make the Switch*"

18   campaign is evident when comparing the campaign's advertisements to JUUL's initial

19   advertising, as demonstrated below. The fact that these advertisements are for the same product

20   confirms that, notwithstanding the advice JLI and the Altria Defendants received from their media

21   consultants, the Defendants never intended to target only adult smokers.

22   ///

23   ///

24

25   [254] Kristy L. Marynak et al., *Use and Reasons for Use of Electronic Vapour Products Shaped like USB Flash Drivers Among a National Sample of Adults*, 28 TOBACCO CONTROL 685 (Nov. 2019), https://tobaccocontrol.bmj.com/content/28/6/685.

26   [255] D.M. Vallone et al., Prevalence and Correlates of JLI Use Among a National Sample of Youth and Young Adults, TOBACCO CONTROL (Oct. 29, 2018), http://dx.doi.org/10.1136/tobaccocontrol-2018-054693.

27   [256] JLI00365905.
     [257] *Id.* (emphasis added).

28   [258] JLI00365709.
     [259] JLI00364678.
     [260] JLI00364487.

COMPLAINT
Case No. 19-md-02913-WHO









And



248.    Defendants ensured that JUUL was the *opposite* of a "tool[] to reduce or eliminate" nicotine consumption. According to the National Institutes of Health, the "amount and speed of nicotine delivery . . . plays a critical role in the potential for abuse of tobacco products."[261] As described above, JLI and Bowen designed the JUUL product to deliver nicotine in larger amounts and at a faster rate than even cigarettes, and then knowingly misled the public about those facts.

249.    The *Switch* campaign also does not disclose or warn about the risks of using multiple tobacco products, "dual use" or that the JUUL is not a smoking cessation product. In addition to the heightened risks of addiction that multiple tobacco product use poses, one recent study found that persons who use e-cigarettes and smoke have blood toxin levels far higher than one would expect given the blood toxin levels that e-cigarettes and cigarettes generate individually.[262]

250.    The FDA and other government regulators, enforcing existing laws addressing e-cigarettes,[263] publicly criticized the "*Make the Switch*" campaign and other efforts by Defendants to depict JUUL as a smoking cessation device. Section 911(b)(2)(A)(i) of the Federal Food, Drug, and Cosmetics Act (FDCA) (21 U.S.C. § 387k(b)(2)(A)(i)) states that when advertising or labeling of a cigarette product directly or indirectly suggests that the product has a lower risk of cigarette-related disease, is less harmful than traditional cigarettes, or is otherwise 'safer' than traditional cigarettes, then the product becomes a "modified risk tobacco product."[264]

251.    In late 2019, and in response to the House of Representatives hearings in which JLI executives testified, the FDA issued two warning letters to JLI detailing its concern that JLI was unlawfully marketing its e-cigarette products as cessation tools or as "modified risk tobacco products" within the meaning of the FDCA.[265]

---

[261] U.S. Dep't of Health & Human Servs.,  Nicotine Addiction: Past and Present, How Tobacco Smoke Causes Disease (2010), https://www.ncbi.nlm.nih.gov/books/NBK53018/#ch4.s92

[262] Julie B. Wang  et al., *Cigarette and E-Cigarette Dual use and Risk of Cardiopulmonary Symptoms in the Health eHeart Study*, 13 PLoS ONE 1 (2018).

[263] Section 911(b)(2)(A)(i) of the FDCA (21 U.S.C. § 387k(b)(2)(A)(i)) states that when advertising or labeling of a cigarette product directly or indirectly suggests that the product has a lower risk of cigarette-related disease, is less harmful than traditional cigarettes, or is otherwise 'safer' than traditional cigarettes, then the product becomes a "modified risk tobacco product."

[264] *Id.*

[265] Letter from U.S. Food and Drug Admin. to Kevin Burns, CEO of JUUL Labs, Inc., (Sept. 9, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019.

252.    Then, in its September 9, 2019 letter to JLI, the FDA notified JLI that its advertising slogans such as "99% safer," "much safer," and "a safer alternative" than cigarettes was "particularly concerning because [those] statements were made directly to children in school."[266] The FDA concluded that in using advertising language that e-cigarettes were safer than cigarettes, JLI had violated Sections 902(8) and 911 by marketing JUUL products as "modified risk tobacco products" without prior approval.[267]

253.    The September 9, 2019 letter also detailed the FDA's concerns with JLI's "*Switch*" marketing campaign. "[T]roubled by recent testimony" that JLI had given to the House Subcommittee on Economic and Consumer Policy of the Committee on Oversight and Reform, the FDA noted that JLI's *Switch* advertising campaign "may also convey that switching to JUUL is a safer alternative to cigarettes."[268]

254.    The FDA specifically highlighted the *Switch* campaign slogans which referenced smoking cigarettes, or attempts to quit smoking, followed by "*Make the Switch*." The FDA stated that JLI's campaign was in violation of multiple FDA regulations and the FDCA subsections, and that JLI's *Switch* campaign purported to tell the public that using e-cigarettes was an alternative to smoking, or a possible cessation tool.[269]

255.    On the same day, the FDA requested that JLI provide all documents related to its decision to market the Switch campaign to the Cheyenne River Sioux Tribe, in light of the testimony by JLI that it had taken a "public health" approach to Native American tribes, and had sought healthcare professionals to refer Native American smokers to JLI's Switching Program.[270]

256.    Perhaps unsurprisingly, the *Make the Switch* campaign was spearheaded by a marketing firm with long-standing ties to the cigarette industry. In particular, it was led by a subsidiary of Omnicom Group, Inc., one of the "Big Four" advertising holding companies dominating marketing and communications worldwide since the 1990s, second only to WPP. Omnicom is the parent company of Mercury Public Affairs which, by at least April 2018, counted

---

[266] *Id.*
[267] *Id.*
[268] Letter from U.S. Food and Drug Admin. Ctr. for Tobacco Prods. to JUUL Labs, Inc. (Sept. 9, 2019), https://www.fda.gov/media/130859/download.
[269] *Id.*
[270] *Id.*

both Altria and JLI as its clients. Mercury lobbied for Altria on tobacco regulations,[271] and helped JLI push back against negative press coverage of youth usage of its products.[272]

257.    For example, on April 2, 2018, a managing director from Mercury, Erick Mullen, emailed Defendant Valani and Daniel Cruise, Chief Public Affairs Officer at JLI, with a numbered list of actions in response to *The New York Times* article published that day, "'I Can't Stop': Schools Struggle With Vaping Explosion."[273]

[REDACTED][274]

258.    Defendant Valani and Cruise each separately forwarded the email to JLI CEO Kevin Burns, with Cruise commenting, [REDACTED] 'campaign manager'" for us. His argument is in line with yours. We need to be systematic, aggressive and relentless. Btw we are not tobacco—have [you] corrected today's NYT story?"[275]

259.    In August 2018, Omnicom agency DDB Chicago[276] sent JLI a proposal for an estimated $11 million campaign "to more firmly establish the true intent of the company," noting [REDACTED][277]

### 5.    JLI, Altria, and Others in the E-Cigarette Industry Coordinated with Third-Party Groups to Mislead the Public About the Harms and Benefits of E-Cigarettes.

260.    Through a collective and parallel effort of funding, leadership, and board membership, JLI, the Altria Defendants and others in the e-cigarette industry leveraged third-parties, ranging from industry-funded non-governmental organizations to online blogs more

---

[271]  Kevin McCauley, *Altria Taps Mercury For Tobacco Regulation Work*, O'DWYER'S (Jun. 4, 2018), https://www.odwyerpr.com/story/public/10754/2018-06-04/altria-taps-mercury-for-tobacco-regulation-work.html.
[272] *See, e.g.,* INREJUUL_00262168; INREJUUL_00262226-INREJUUL_00262227.
[273] *See* INREJUUL_00262168; *see also* Kate Zernike, *'I Can't Stop': Schools Struggle With Vaping Explosion*, N.Y. Times (Apr. 2, 2018), https://www.nytimes.com/2018/04/02/health/vaping-ecigarettes-addiction-teen.html.
[274] INREJUUL_00262168.
[275] INREJUUL_00262226-227.
[276] *See* INREJUUL_00066530-539 (Other Omnicom entities were involved in this campaign. For example, OMD, "sister company to DDB and part of the Omnicom Group," sent JLI detailed Statements of Work for a U.S. Brand Campaign covering September 16, 2018 through February 28, 2019).
[277] *See* INREJUUL_00074841; *see also* INREJUUL_00074842-844 at 842.

accessible to youth, to mislead the public about the impacts of consuming e-cigarettes.

261.    An assortment of lobbyists, trade associations, and online publications have coordinated with the e-cigarette industry, including JLI and the Altria Defendants, to promote a consistent message that consuming e-cigarettes is not harmful, that nicotine is not harmful, and that the impacts of e-cigarettes are greatly exaggerated. These organizations receive funding from the e-cigarette industry, feature executives on those companies' boards of directors, and in return, promote industry products, industry views, or fund "independent" studies of their own that reach the same conclusions as e-cigarette industry-funded research.

### a.    The American Vaping Association

262.    The American Vaping Association ("AVA") is a pro-e-cigarette lobby group founded by Greg Conley, who notably publishes articles criticizing the CDC for its stance on restricting e-cigarette use.[278] Other executive members of the AVA possess business interests in e-cigarettes; for example, Treasurer David J. Danzak Jr. is associated with an e-cigarette business called Vapornine LLC.[279] Vice-President Antoinette Lanza is an owner of an exclusively e-cigarette shop in Hoboken, New Jersey called Smokeless Image.[280] Half of the AVA's functional expenses are for lobbying efforts.[281] It lists several sponsors, all of which are e-cigarette, e-liquid, or cigarette companies.[282]

263.    Conley has a prolific social media presence and frequently appears on television and radio to tout the benefits of consuming e-cigarettes and dispute negative news. The AVA website lists "studies" which are uniformly authored by noted industry-funded or industry-friendly authors, such as Polosa and Shahab.[283] AVA lists CASAA, Not Blowing Smoke, and the VTA, all established fronts for the e-cigarette industry, as "Resources."

264.    The AVA receives its funding from sponsors, who are organized into tiers such

---

[278] Jeff Stier & George Conley, *The War on E-Cigarettes*, NATIONAL REVIEW (Sept. 19, 2011), https://www.nationalreview.com/2011/09/war-e-cigarettes-jeff-stier-gregory-conley/.

[279] Vapornine LLC, BUZZFILE, http://www.buzzfile.com/business/Vapornine-LLC-904-372-3244 (business information page).

[280] Stacy Jones, *Tobacco Regulators Mull More Oversight as E-cigarettes See Increased Popularity*, NJ.com (Mar. 30, 2019), https://www.nj.com/business/2013/07/tobacco_regulators_mull_more_o.html.

[281] Form 990, American Vaping Association Inc.'s Return of Organization Exempt from Income Tax ( 2018), https://apps.irs.gov/pub/epostcard/cor/464203951_201812_990O_2019122716980021.pdf.

[282] AVA Sponsors, American Vaping Association, https://vaping.org/about-us/ava-sponsors/.

[283] Research Reports, American Vaping Association, https://vaping.org/research-report/.

COMPLAINT
Case No. 19-md-02913-WHO

as Platinum, Gold, Silver, Bronze, and Green.[284] Current advertised sponsors include e-cigarette distributors and retailers such as E-Cigarette Empire, and VaporBeast.[285] Prior sponsors are a who's who of e-cigarette retailers. In 2016, Platinum sponsors included AltSmoke and Vapor Kings, while Gold sponsors included the now defunct Smokeless Image.[286]

265.    On social media, the AVA regularly downplays the risks of consuming e-cigarettes, criticizes negative coverage as myths or exaggerations, and lauds efforts to curb any regulation of the e-cigarette industry.[287]

266.    JLI actively sought out the AVA to promote JUUL. In January 2016, e-mails between employees at JLI (then known as PAX) discussed a "list of thought leaders [JLI] can tap for stories for JUUL" which included Conley at the AVA and Satel.[288]

267.    In 2018, JLI took advantage of its coordinated efforts with the AVA to downplay the risks associated with JUUL. In an e-mail exchange between Christine Castro of JLI and a "Stratcomms" internal mailing list, Castro lamented a "testy conversation" with a USA Today reporter who pointed out that JLI's marketing and advertising appeared to feature and target minors and teenagers.[289] Castro noted that "I hit back at [the reporter] very aggressively but we can expect the usual B.S. Greg Conley is being allowed to write a 300-word rebuttal. I will email him and copy you Ashley [JLI employee] just so we can stay coordinated."[290]

268.    The AVA also coordinated with JLI on pro-e-cigarette research. In March 2018, Conley facilitated a conversation between Dr. Konstantinos Farsalinos, a researcher at the University of Patras, Greece, who regularly publishes e-cigarette industry-friendly articles, and Gal Cohen, then Director of Scientific Affairs at JLI.[291] In the e-mail, Conley asks Farsalinos to send Cohen "some info on your flavor study" to which Farsalinos responds by sending Conley

---

[284] AVA Sponsors, American Vaping Association, https://vaping.org/about-us/ava-sponsors/.
[285] Id.
[286] AVA Sponsors, American Vaping Association, Wayback Machine – Internet Archive (Aug. 14, 2017), https://web.archive.org/web/20170814221226/http://vaping.org/about-us/ava-sponsors/.
[287] American Vaping Association (@AVABoard), Twitter, https://twitter.com/AVABoard.
[288] INREJUUL_00278889
[289] See INREJUUL_00173252 (Apr. 4, 2018 email).
[290] Id.
[291] Juul Labs, Inc., JUUL Labs Presents Findings at the Global Forum on Nicotine 2018, Cision PR Newswire (June 15, 2018), https://www.prnewswire.com/news-releases/juul-labs-presents-findings-at-the-global-forum-on-nicotine-2018-300666743.html.

1   and Cohen an attachment: "USA FLAVORS SURVEY.pptx" and the note: "[A]ttached is a
2   PowerPoint presentation about the study we proposed."[292]

3   269.   The proposed study was a survey aimed at determining what flavors different
4   demographic groups preferred as e-cigarette flavors, which flavors they use frequently, and which
5   flavors they used when they first started consuming e-cigarettes. While the study was purportedly
6   to determine the impact of e-cigarette flavors on e-cigarette and smoking behavior, the data
7   obtained from such a study would have allowed JLI to understand which flavors were not only
8   the most popular, but which flavors were most popular by demographic.[293]

9                      **b.    Vaping360**

10   270.   Vaping360 is a website dedicated to news regarding the e-cigarette industry. The
11   website boasts "40 million smokers and vaping enthusiasts reached since 2015." This entity has
12   a big social media presence and huge publication strategy.

13   271.   Vaping360's main message misleads the public about the health impacts of
14   consuming e-cigarettes. Vaping360 has published various articles, including "10 Lies and Myths
15   About Juuling Exposed."[294] This article, published in May 9, 2018, claimed, among other things,
16   that JUUL was not as dangerous as smoking; JUUL did not cause cancer or "popcorn lung";
17   JUUL was not popular among teenagers, nor did JLI sell kid-friendly flavors or flavors aimed to
18   entice young people; and the nicotine in JUUL is "a relatively mild drug, [and] may cause
19   dependence."[295]

20   272.   Vaping360 regularly published articles praising, promoting, or downplaying the
21   risks of JUUL, including, among others: "These Scientists Want to Kill Smokers' Hope (For
22   Vaping)"; "UK Scientists to WHO: Your Vape Report Is Junk"; "One Free Pack JUUL Coupon
23   Codes 2019"; and an article disparaging anti-smoking advocacy group Truth Initiative by
24   claiming that "Truth Initiative Promo Encourages Risky Teen Behavior."[296]

25

26   _____
     [292] INREJUUL_0034128.
27   [293] Id.
     [294] Jim McDonald, *10 Lies and Myths About Juuling Exposed*, Vaping 360 (May 9, 2018),
       https://vaping360.com/lifestyle/juuling/.
28   [295] Id.
     [296] Jim McDonald, *Truth Initiative Promo Encourages Risky Teen Behavior*, Vaping 360 (Jan. 9, 2020),
       https://vaping360.com/vape-news/87705/truth-initiative-promo-encourages-risky-teen-behavior/.

COMPLAINT
                                              Case No. 19-md-02913-WHO

273.   One of the main writers at Vaping360 is Jim McDonald who aggressively attacks any negative science as fake news. For example, McDonald frequently posts on social media platforms, including on Facebook and Twitter, but also comments on others posts extensively disputing negative news about consuming e-cigarettes.[297]

274.   Vaping360 has taken funding from e-cigarette manufacturers, and in return coordinates with e-cigarette manufacturers to promote their products, while publishing favorable content. Vaping360 was paid by JLI for advertising and was given kickbacks (referred to as commission) for every coupon used for JUUL that originated from Vaping 360's website.

275.   In March 2017, JLI (then PAX) communicated with Chris Kendell and others at Vaping360 to discuss promoting JLI's products with a 15% discount coupon on Vaping360's website.[298] JLI representative Andy Martin also noted that JLI "figured out the commission issue," and expressed excitement at JLI's new mango flavor JUUL pod.[299] They also discussed a Facebook advertising link whereby Vaping360 could offer similar discounts for JLI products on social media.[300]

276.   In November 2017, Martin of JLI and Rawad Nassif of Vaping360 discussed a meeting agenda, with topics such as "new affiliate commission terms," "JLI funnelling [sic] project," and "exploring further opportunities."[301]

277.   In 2018, McDonald continued to write articles specifically praising JLI, such as "Coming Soon: A JUUL to Help You Quit JUULing" and "10 Lies and Myths About JUULing Exposed."[302] As of 2020, Vaping360 continues to offer discounts for JUUL products.[303]

///

///

---

[297] Jim McDonald, *Mass. Senate Passes Worst Vaping Law in the Countr*, Vaping 360 (Nov. 21, 2019), https://vaping360.com/vape-news/86852/mass-senate-passes-worst-vaping-law-in-the-country/; Jim McDonald, *Meet the Rich Moms Who Want to Ban Vaping,* Vaping 360 (Oct. 8, 2018), https://vaping360.com/vape-news/71696/meet-the-rich-moms-who-want-to-ban-vaping/.
[298] INREJUUL_00143870.
[299] *Id.*
[300] *Id.*
[301] INREJUUL_00139196
[302] Jim McDonald, *Coming Soon: A JUUL to Help You Quit Juuling,* Vaping 360 (Sept. 7, 2018), https://vaping360.com/vape-news/70262/coming-soon-a-juul-to-help-you-quit-juuling/.
[303] [One FREE Pack] JUUL Coupon Codes 2019, Vaping 360 (Aug. 24, 2018) https://vaping360.com/vape-coupons/juul-coupon-promo-code/.

### c.    Foundation for a Smoke-Free World

278.    The Foundation was founded in 2017, and presents itself as a public health organization, purportedly "advancing global progress in smoking cessation and harm reduction."[304] It is funded entirely by Philip Morris International, which in 2017 announced a $1 billion commitment to fund the Foundation.[305] The Foundation's 2018 Form 990 lists only one donor: PMI Global Services, Inc., or Philip Morris International, with a contribution of $80 million.[306]

279.    The Foundation is headed by Derek Yach, a noted advocate and promoter of e-cigarettes and consuming e-cigarettes.[307]

280.    In 2018, the Foundation announced that it would support Centers of Excellence to conduct tobacco control research.[308] This tactic is a well-known tool of the cigarette industry, which has a history of funding "research" centers to promote industry-friendly views, such as the Center for Indoor Air Research, which promulgated industry-funded studies that sowed doubt about the addictiveness of nicotine, claimed that indoor air quality was unaffected by cigarette smoke and downplayed the harms of cigarettes broadly. Institutes such as the Center for Indoor Air Research were forced to dissolve as part of the Master Settlement Agreement in 1998.

281.    A 2017 report in The Verge detailed the e-cigarette industry's apparently coordinated efforts to use biased research to downplay the risks of consuming e-cigarettes.[309] For example, e-cigarette manufacturers routinely conduct studies focusing on the "good news" about e-cigarettes, *i.e.* they release less harmful aerosolized chemicals than combustible cigarettes, or

---

[304] Foundation for a Smoke-Free World (2020), https://www.smokefreeworld.org/.
[305] David Meyer, *Philip Morris Pledges Almost $1 Billion to Anti-Smoking Fight*, FORTUNE (Sept. 13, 2017), https://www.webcitation.org/6tjyBv4dA.
[306] Return of Private Foundation, Foundation for a Smoke-Free World (2018), https://web.archive.org/web/20190828104138/https://www.smokefreeworld.org/sites/default/files/uploads/docum ents/fsfw_2018_form_990-pf_public_inspection.pdf.
[307] *Derek Yach: Anti-smoking Advocates Should Embrace E-cigarettes*, NATIONAL POST (Aug. 26, 2015), https://nationalpost.com/opinion/derek-yach-anti-smoking-advocates-should-embrace-e-cigarettes.
[308] Support Global Research, Foundation for a Smoke-Free World (May 31, 2018), https://web.archive.org/web/20180531105105/https://www.smokefreeworld.org/our-areas-focus/support-global-research.
[309] Liza Gross, *Vaping Companies are Using the Same Old Tricks as Big Tobacco*, THE VERGE (Nov. 16, 2017), https://www.theverge.com/2017/11/16/16658358/vape-lobby-vaping-health-risks-nicotine-big-tobacco-marketing.

that their aerosol lingers for less time indoors than combustible cigarettes.[310] Industry-funded authors then regularly cite to each other's studies in their own research.[311] On information and belief, JLI and Altria, among others in the e-cigarette industry, funnel their industry-funded studies to friendly pro-industry groups knowing that those entities will misrepresent the results as evidence that e-cigarettes are safe, or not harmful.

### d.    Vapor Technology Association

282.    The Vapor Technology Association (VTA) bills itself as a trade association and advocates for the e-cigarette industry. It was founded in January 2016, with the banner tagline on its website reading "VAPE IS HOPE."[312]

283.    In 2018, JLI, SMOK, VMR, Turning Point Brands, and Joyetech were all featured as "Platinum Members," a level of membership that required a $100,000 annual contribution. Thus, JLI paid VTA $100,000 in 2018 to become a Platinum Member, and in return, VTA offered JLI a board seat; invitations to lobbying strategy meetings; access to the FDA, other federal agencies, and members of Congress; and conference participation.[313]

284.    The VTA, like other lobbying and trade association groups in the industry, advocates for less regulation of e-cigarettes, and testifies in opposition to flavor bans.[314]

### e.    Retailer Lobbying

285.    Retailers have also taken to creating subsidiaries or wholly owned companies whose purpose is to produce quasi-journalistic content to promote consuming e-cigarettes,

---

[310] *See, e.g.*, J. Margham, et al., *Chemical Composition of Aerosol from an E-Cigarette: A Quantitative Comparison with Cigarette Smoke*, 29 CHEM. RES. TOXICOL. 1662 (2016); Tanvir Walele et al., *Evaluation of the Safety Profile of an Electronic Vapour Product Used for Two Years by Smokers in a Real-life Setting*, 92 REG. TOXICOL. PHARMACOL. 226 (2018); D. Martuzevicius, et al., *Characterization of the Spatial and Temporal Dispersion Differences Between Exhaled E-Cigarette Mist and Cigarette Smoke*, 21 NICOTINE & TOBACCO RES. 1371 (2019).
[311] *See, e.g.*, Gene Gillman et al., *Determining the Impact of Flavored E-liquids on Aldehyde Production During Vaping*, 112 REG. TOXICOL. PHARMACOL. 1 (2020); Colin Mendelsohn & Alex Wodak, *Legalising Vaping in Australia,* The McKell Institute (March 2019), https://pdfs.semanticscholar.org/3e13/8e46419913a29f8fc9ddad52ec771f73fa76.pdf; Violeta Kaunelienė et al., *Impact of Using a Tobacco Heating System (THS) on Indoor Air Quality in a Nightclub*, 19 AEROSOL AND AIR QUAL. RES. 1961 (2019); Maya Mitova et al., *Human Chemical Signature: Investigation on the Influence of Human Presence and Selected Activities on Concentrations of Airborne Constituents*, 257 ENV'TL POLLUTION 1 (2020).
[312] Vape is Hope, Vapor Technology Association (Feb. 25, 2016), https://web.archive.org/web/20160225154600/http://www.vaportechnology.org:80/
[313] Some of Our Members, Vapor Technology Association  (Nov. 28, 2018), https://web.archive.org/web/20181128162940/https://vaportechnology.org/membership/
[314] Vapor Technology Association, https://vaportechnology.org/.

discredit health initiatives, and suggest that consuming e-cigarettes has no harmful health impacts. The best example of this is the website SoupWire, which publishes articles and editorials that promote consuming e-cigarettes and criticizes studies that look at the negative impacts of consuming e-cigarettes.[315] For example, when JLI donated $7.5 million towards a study on the impacts of consuming e-cigarettes on teens, a SoupWire report concluded that the study will likely find "nothing Earth-shattering."[316]

### 6.    Altria Falsely Stated That It Intended to Use Its Expertise in "Underage Prevention" Issues to JLI

286.    Altria's announcement that it intended to invest in JLI came less than two months after it told the FDA that Altria "believe[s] that pod-based products significantly contribute to the rise in youth use of e-vapor products" and that it accordingly would be removing its own pod-based products from the market.[317] Altria made the same representations to its investors.[318]

287.    Although Altria claimed its investment in JLI had an altruistic motive—"When you add to JUUL's already substantial capabilities, our underage tobacco prevention expertise and ability to directly connect with adult smokers, we see a compelling future with long-term benefits for both adult tobacco consumers and our shareholders," Altria recently confirmed that JLI has not even availed itself of that experience.[319] In Altria's October 2019 letter to Senator Richard Durbin, Altria CEO Howard Willard acknowledged that while Altria "offered to JUUL services relating to underage prevention efforts," to date "JUUL has not accepted Altria's offers of assistance in addressing underage vaping relating issues."[320] Willard has stated that the deal would allow Altria to "work[] with JUUL to accelerate its mission."[321] but as Altria knew, as reflected

---

[315] Soupwire – The Truth About Vaping, https://soupwire.com/.
[316] Jeff Hawkins, *JUUL Donates $7.5 Million to Teen Vaping Study*, Soupwire – The Truth About Vaping (July 2, 2019), https://soupwire.com/juul-donates-7-5-million-to-teen-vaping-study/
[317] Letter from Howard A. Willard III, Altria, to Dr. Scott Gottlieb, FDA, 2 (October 25, 2018)
[318] Altria Group Inc (MO) Q3 2018 Earnings Conference Call Transcript, (October 25, 2018) https://www.fool.com/earnings/call-transcripts/2018/10/25/altria-group-inc-mo-q3-2018-earnings-conference-ca.aspx
[319] Altria Group (MO) Q4 2018 Earnings Conference Call Transcript: MO earnings call for the period ending December 31, 2018. (Jan. 31, 2019), https://www.fool.com/earnings/call-transcripts/2019/02/01/altria-group-mo-q4-2018-earnings-conference-call.aspx
[320] Letter from Howard A. Willard III to Senator Richard J. Durbin (October 14, 2019) (emphasis added).
[321] Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth, Business Wire (Dec. 20, 2018, 7:00 AM EST),

---

COMPLAINT
Case No. 19-md-02913-WHO

in its letter to the FDA just two months prior, that mission involved had resulted in usage throughout the youth market. Altria's admission that pod-based products contributed to underage use show that Altria knew its investment in JLI would "strengthen[] its financial profile and enhance[] future growth prospects" specifically because JLI dominated the youth market for e-cigarettes.[322]

288.     Altria recognized that JLI's market share dominance in the e-cigarette market, a share that it knew was gained via youth targeting and false and misleading advertising, was the path to Altria's continued viability and profitability. In a January 31, 2019 earnings call, Altria explained that "[w]hen you add to JUUL's already substantial capabilities, our underage tobacco prevention expertise and ability to directly connect with adult smokers, we see a compelling future with long-term benefits for both adult tobacco users and our shareholders. We are excited about JUUL's domestic growth and international prospects and their potential impact on our investment."[323] JUUL's growth was, as Altria well knew, due to the product's viral popularity among teens. Willard briefly acknowledged the youth vaping crisis, stating, "Briefly touching on the regulatory environment, the FDA and many others are concerned about an epidemic of youth e-vapor usage. We share those concerns. This is an issue that we and others in the industry must continue to address aggressively and promptly.[324]

289.     Altria's representations that it intended to help JUUL curb the prevalence of underage use was false and misleading. As discussed below, Altria coordinated with JUUL to capture and maintain the youth market.

**E.     Defendants Targeted the Youth Market**

290.     Having created a product, like combustible cigarettes, that sought to get users addicted to nicotine, and while taking steps to ensure that users and regulators did not appreciate

---

https://www.businesswire.com/news/home/20181220005318/en/Altria-12.8-Billion-Minority-Investment-JUUL-Accelerate.
[322] Press Release, *Altria Makes $12.8 Billion Minority Investment In Juul To Accelerate Harm Reduction And Drive Growth*, Altria (Dec. 20, 2018), https://www.sec.gov/Archives/edgar/data/764180/000119312518353970/d660871dex991.htm.
[323] Altria Group (MO) Q4 2018 Earnings Conference Call Transcript: MO earnings call for the period ending December 31, 2018 (Jan. 31, 2019), https://www.fool.com/earnings/call-transcripts/2019/02/01/altria-group-mo-q4-2018-earnings-conference-call-t.aspx.
[324] *Id.*

the true nicotine content or potential harm from using JUULs, to successfully sink their high-tech nicotine hook into American users, JLI, Bowen, and Monsees needed investors willing to adopt the tactics of the cigarette industry as their own. They found those investors in Pritzker, Huh, and Valani.

291.    Under the leadership of the Management Defendants, JLI marketed nicotine to kids. JLI and the Management Defendants deployed a sophisticated viral marketing campaign that strategically laced social media with false and misleading messages to ensure their uptake and distribution among young users. JLI and the Management Defendants' campaign was wildly successful—burying their hook into kids and initiating a public health crisis.

### 1.    JLI Emulated the Marketing of Cigarette Companies.

292.    As Defendants know, nearly 9 out of 10 smokers start smoking by age 18, and more than 80% of underage smokers choose brands from among the top three most heavily advertised.[325] The overwhelming consensus from public health authorities, independent studies, and credible expert witnesses is that "marketing is a substantial contributing factor to youth smoking initiation."[326]

293.    Struggling to define their own identities, teenagers are particularly vulnerable to image-heavy advertisements that psychologically cue them on the "right" way to look and behave amongst peers.[327] Advertisements that map onto adolescent aspirations and vulnerabilities drive adolescent tobacco product initiation.[328]

294.    For decades, cigarette companies spun smoking as signifier of adulthood. This turned smoking into a way for teenagers to project independence and enhance their image among their peers.[329]

295.    Youth marketing was critical to the success of cigarette companies. In the 1950s, Philip Morris—now JUUL's corporate affiliate—intentionally marketed cigarettes to young

---

[325] U.S. Dep't Health & Human Servs., *Preventing Tobacco Use Among Youths, Surgeon General Fact Sheet*, https://www.hhs.gov/surgeongeneral/reports-and-publications/tobacco/preventing-youth-tobacco-use-factsheet/index.html.
[326] *United States v. Philip Morris*, 449 F. Supp. 2d 1, 570 (D.D.C. 2006) (J. Kessler).
[327] *Id.* at 578.
[328] *Id.* at 570, 590.
[329] *Id.* at 1072.

COMPLAINT
Case No. 19-md-02913-WHO

1  people as a pool from which to "replace smokers" to ensure the economic future of the cigarette

2  industry.[330]

3          296.    Philip Morris's documents set out their youth strategy, explaining: "Today's

4  teenager is tomorrow's potential regular customer, and the overwhelming majority of smokers

5  first begin to smoke while still in their teens".[331]

6          297.    It wasn't just Philip Morris. The strategy of hooking kids was an open secret in the

7  cigarette industry.[332]

8          298.    As detailed below, JLI and the Management Defendants sought to emulate this

9  approach. Indeed, Monsees admitted to using historical cigarette ads to inform JLI's own

10  advertising campaign.[333]

11         299.    The emulation is obvious. A side-by-side comparison of JUUL advertisements

12  with historical cigarette advertisements reveals the appropriated pattern of focusing on imagery

13  related to attractiveness, stylishness, sex appeal, fun, "belonging," relaxation, and sensory

14  pleasure, including taste.[334]

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22

---

23  [330] *United States. v. Philip Morris*, No. 99- 2496 (D.D.C. Aug. 17, 2006), ECF No. 5750 at 972 (Amended Final Opinion).

[331] *Tobacco Company Quotes on Marketing to Kids*, Campaign for Tobacco-Free Kids (May 14, 2001), https://www.tobaccofreekids.org/assets/factsheets/0114.pdf.

[332] C.A. Tucker, *Marketing Plans Presentation to RJRI B of D* at 2, U.C.S.F. Truth Tobacco Industry Documents (Sept. 30, 1974), https://www.industrydocumentslibrary.ucsf.edu/tobacco/docs/#id=ypmw0091 (RJ Reynolds executive explaining that the "young adult . . . market . . . represent[s] tomorrow's cigarette business. As this 14-24 age group matures, they will account for a key share of the total cigarette volume—for at least the next 25 years.").

[333] Matthew Perone & Richard Lardner, *Juul exec: Never intended electronic cigarette for teens*, AP News (July 26, 2019), https://apnews.com/4b615e5fc9a042498c619d674ed0dc33; Gabriel Montoya, *Pax Labs: Origins with James Monsees*, Social Underground, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees (last visited Apr. 3, 2020).

[334] *See* Appendix B, Ads 9-50.

1
2
3
4
5
6
7
8
9
10
11
12



13
14
15
16
17
18
19
20
21
22



23    300.    JLI and the Management Defendants deployed this same strategy, but adapted it

24  to modern advertising tactics.

25    **2.    The Management Defendants Intentionally Marketed JUUL to Young**

26        **People.**

27    301.    The risk that children would use a new e-cigarette product was well known and

28  well publicized in the months leading up to the launch of the JUUL e-cigarette. For example, in

April 2015, the CDC published the results from its 2014 National Youth Tobacco Survey.[335] The CDC found that "[i]n 2014, e-cigarettes were the most commonly used tobacco product among middle (3.9%) and high (13.4%) school students."[336] Moreover, "[b]etween 2011 and 2014, statistically significant increases were observed among these students for current use of both e-cigarettes and hookahs (p<0.05), while decreases were observed for current use of more traditional products, such as cigarettes and cigars, resulting in no change in overall tobacco use."[337] The CDC blamed e-cigarette marketing, the use of "a mixture of 'sex, free samples, [and] flavors'—the same things that were originally found to be problematic with cigarette ads."[338]

302.    Seeking to enter this nascent youth market for e-cigarettes, JLI intentionally targeted youth from its inception. In March 2015, Management Defendants supervised the advertising campaigns that would accompany the launch of JUUL.

303.    JLI knew that its initial customer base would be the key to its growth. On June 15, 2015, JLI's COO Scott Dunlap wrote on article on Entrepreneur.com called "6 Ways to Get a Fanatical Customer Base," #1 of which was "Seed your initial customer base:"

304.    Your first group of customers is the foundation of all future growth, so know who they'll be, why they'll rave and help them tell your story. They'll first act as role models and then as advocates to help spread your mission, so make locating and engaging those core customers a priority. This is especially important if you're introducing something completely new to a traditional industry.[339] Despite this professed knowledge that JLI's "first group of customers is the foundation of all future growth" and consistent with Monsees' position that he has no "qualms" with marketing to people that were not yet addicted to nicotine,[340] JLI's marketing

---

[335] Centers for Disease Control and Prevention, *Tobacco Use Among Middle and High School Students — United States, 2011–2014*, Morbidity and Mortality Weekly Report (MMWR) 64(14);381-385 (Apr. 17, 2015), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6414a3.htm.
[336] *Id*.
[337] *Id*.
[338] Jacob Kastrenakes, *More teens are vaping instead of smoking,* The Verge (Apr. 16, 2015), https://www.theverge.com/2015/4/16/8429639/teen-ecigarette-use-triples-vaping-beats-smoking.
[339] Scott Dunlap, *6 Ways to Get a Fanatical Customer Base*, Entrepreneur (June 17, 2015) https://www.entrepreneur.com/article/247424.
[340] David H. Freedman, *How do you Sell a Product When You Really Can't Say What it Does?,* Inc., https://www.inc.com/magazine/201405/david-freedman/james-monsees-ploom-ecigarette-company-marketing-dilemma.html (last visited Apr. 4, 2020).

COMPLAINT
Case No. 19-md-02913-WHO

strategy targeted people that were "flavor-seeking, social 'vapers,'" and those who "have very limited experience with traditional tobacco cigarettes."[341]

305. JLI's first major marketing hire, Cult Collective Ltd. ("Cult Collective"), presented a pitch deck to JLI in late 2014, which defined the "target consumer" as a person "within a life stage or mindset where they are defining their own identity."[342] The study described the "modern vaper" as "trendy, sophisticated image managers seeking to balance their desire for originality against acceptance."[343] Put differently, their target consumer was an adolescent.

306. JLI professedly wanted kids to think JUUL was cool. In an email dated January 29, 2015, Sarah Richardson—then Director of Communications—sent a document dated December 31, 2014, to Dima Martirosyan, Director of Digital Marketing, who forwarded it to Rafael Burde, Director of Ecommerce.[344] The document stated that "[m]ost e-cigarettes to date are unsatisfying and seem 'douche-y'. The JUUL product delivers nicotine far more effectively, and the product design is elegant and cool. We need to tell this story in a credible fashion through press, influencers and social media."[345] The document repeatedly referred to Pax Labs's plan to target the "cool kids[.]"[346] For example, it described as one of the "Key needs" to "Establish premium positioning to entice the 'masses' to follow the trend setters; own the 'early adopter' / 'cool kid' equity as we build out volume[.]"[347] The document noted that "the voices of influencers can build strong demand."[348] Messaging to media similarly focused on "coolness" and the message that "JUUL singlehandedly made e-cigarettes cool."[349]

307. This focus on "cool kids" continued up to and after launch. On May 18, 2015, Kate Morgan, field marketing manager, emailed Richard Mumby, Chief Marketing Officer, and a variety of other marketing employees about "Some Music Options for JUUL Party" and noted that one of the options was a pair who were both "cool kids."[350] On June 7, 2015, Rafael Burde

---

[341] INREJUUL_00441209.
[342] INREJUUL_00057298-INREJUUL_00057487.
[343] INREJUUL_00057298-INREJUUL_00057487.
[344] INREJUUL_00057289.
[345] INREJUUL_00057293.
[346] *Id*.
[347] *Id*.
[348] *Id*.
[349] INREJUUL 00441325-INREJUUL_00441326.
[350] JLI00218598.

COMPLAINT
Case No. 19-md-02913-WHO

emailed Scott Dunlap, then Chief Operating Officer, stating that the JUUL launch party "was a resounding success (at least in my mind) in terms of winning over the cool kids . . . ."[351] Pax Labs employees used similar wording regarding interest in targeting "cool kids" in an email from Sarah Richardson on August 12, 2015,[352] and emails from Ashley Marand on September 15, 2015,[353] and October 21, 2015.[354] The consistency of the language around this target demographic confirms that marketing to "cool kids" was a company policy set by the executives and the Board, particularly because, before selling the Ploom assets to JTI, James Monsees said similar things about Ploom.[355]

308.    JLI identified its competitor in this space as cigarette companies, complaining that "cigarettes continue to own the 'cool' equity," and identifying a "key pillar to go-to-market" as "win[ning] with the 'cool crowd'" away from cigarettes.[356]

309.    With this goal in mind, JLI hired the Grit Creative Group ("Grit"), which billed itself as an agency whose marketing appealed to "cool kids."[357] Grit helped JLI to "use external audiences to communicate nuanced messages around early adoption 'coolness' and product performance."[358]

310.    In short order, the phrase "it's cool to JUUL" became an anthem among kids while youth e-cigarette use skyrocketed.

### 3.    JLI Advertising Exploited Young People's Psychological Vulnerabilities.

311.    Informed by decades of tobacco marketing, JLI ran a consistent, simple message: JUUL is used by young, popular, attractive, and stylish people.

312.    This was not the only marketing scheme JLI could have adopted. JLI had other options. In 2014, JLI engaged a Calgary-based advertising agency, Cult Collective, to complete

---

[351] JLI00206206.
[352] JLI00222528.
[353] JLI00461564.
[354] JLI00235965.
[355] JLI00514343 (describing Ploom as "providing optionality for distribution growth and consumer outreach to a younger, opinion leading audience").
[356] INREJUUL_00161703-INREJUUL_00161715.
[357] *Id*.
[358] INREJUUL_00277080-INREJUUL_00277104.

a "diagnostic" evaluation of the JUUL brand and to make recommendations regarding the best advertising strategy to market the JUUL e-cigarette.

313.    In keeping with typical e-cigarette marketing, which messaged to existing smokers looking to quit, Cult Collective recommended that JUUL position its e-cigarette technology as the focus of its advertisements. Cult Collective presented JUUL with exemplar advertisements that used images of a boom box and a joy stick, juxtaposed against the JUUL e-cigarette, with the tag line: "Everything changes. JUUL the evoluution of smoking."



314.    This campaign expressly invokes combustible cigarettes and positions the JUUL as a technological upgrade for the modern smoker.

315.    JLI rejected this approach.

316.    Instead, in June of 2015, JLI launched the "Vaporized" advertising campaign.[359] The express mission of the Vaporized campaign was to "own the 'early adopter'/'cool kid' equity."[360]

317.    Applying the template for preying on teens established by the cigarette industry, the Vaporized campaign used stylish models, bold colors, and highlighted themes

---

[359] Declan Harty, *JUUL Hopes to Reinvent E-Cigarette Ads with 'Vaporized Campaign'*, AdAge (June 23, 2015), http://adage.com/article/cmo-strategy/juul-hopes-reinvent-e-cigarette-ads¬campaign/299142/.
[360] INREJUUL_00057291-INREJUUL_00057295.

COMPLAINT
Case No. 19-md-02913-WHO

of sexual attractiveness, thinness, independence, rebelliousness and being "cool."[361]

318.    The targeting of young users was evident in the design and implementation of the Vaporized campaign, which featured models in their 20s whose "poses were often evocative of behaviors more characteristic of underage teen than mature adults."[362]





[361] *See* Appendix B, Advertisement 1 (example of targeting of young people).
[362] *Examining Juul's Role in the Youth Nicotine Epidemic*, *Hearing Before the H. Comm. on Oversight and Reform, Subcomm. on Econ. and Consumer Policy*, 116th Cong. (2019) (statement of Robert K Jackler, Professor, Stanford University). https://docs.house.gov/meetings/GO/GO05/20190724/109844/HHRG-116-GO05-Wstate-JacklerR-20190724.pdf.

COMPLAINT
Case No. 19-md-02913-WHO

319.    In the months leading up to the launch of JUUL e-cigarettes, Pax Labs executives and directors discussed how to market the new product and the Board approved specific marketing materials used in JUUL's launch. On March 23, 2015,[363] there was a meeting of the Board of Directors where the upcoming advertising campaign was discussed.[364] The Board at that time had five members: Pritzker, Valani, Monsees, Bowen, and Handelsman (occupying Valani's second seat). According to Chelsea Kania, then Brand Manager at Pax Labs, prior to this meeting, she had met with the Board to discuss the models who would be used in the marketing collateral accompanying the JUUL launch. At that meeting, "there was some commentary at the youthfulness of the models[,]" but "nobody disliked them" and "everybody agreed they are pretty 'effective[.]'"[365] Ms. Kania also noted that she told the Board that "█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████"[366] The Management Defendants knew that the ads targeted youth and had the authority to determine which models to use, but "Juul's board of directors signed off on the company's launch plans[.]"[367] In addition, "Monsees, who was CEO at the time, personally reviewed images from

---

[363] INREJUUL_00371285.
[364] INREJUUL_00371314.
[365] INREJUUL_00174387.
[366] *Id.*
[367] Ainsley Harris, *How Juul, founded on a life-saving mission, became the most embattled startup of 2018: E-cigarette startup Juul Labs is valued at more than $16 billion. It's also hooking teens on nicotine and drawing scrutiny from the FDA. Can the company innovate its way out of a crisis it helped create?,* Fast Company (Nov.

COMPLAINT
Case No. 19-md-02913-WHO

the billboard photo shoot while it was in session."[368] A senior manager later told the New York Times that "he and others in the company were well aware" that the marketing campaign "could appeal to" teenagers.[369]

320.    As part of the Vaporized campaign, JLI advertised on a 12-panel display over Times Square.[370] Billboard advertising of cigarettes has for years been unlawful under the Master Settlement Agreement.



321.    These ads, which ran for nearly a month, generated an estimated 1.5 million impressions per day.[371]

322.    In fact, JLI's Vaporized campaign was so effective that it gained national attention on an October 15th, 2015 episode of Late Night with Stephen Colbert, who ridiculed the notion that the young, dancing models were consistent with a target market of adult smokers. As Colbert

19, 2018), https://www.fastcompany.com/90262821/how-juul-founded-on-a-life-saving-mission-became-the-most-embattled-startup-of-2018.

[368] *Id.*

[369] Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?*, N.Y. Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.

[370] *See* Appendix B, image 14; *see also* https://inrejuul.myportfolio.com (also available at http://tobacco.stanford.edu/tobacco_main/subtheme_pods.php?token=fm_pods_ mt068.php) (last visited April 3, 2020) (additional images and videos).

[371] INREJUUL_00093933-INREJUUL_00093934.

joked after viewing the close-up video of young models dancing in place, "[y]eah! There is something about vaping that just makes me want to dance in a way that doesn't require much lung strength. . . . And it's not just ads featuring hip young triangles that appeal to the youths. . . . There is no reason to worry about the long-term effects of vaping, because e-cigarettes are so new that their long-term effects are still unknown."[372]

323.    The Vaporized campaign was not limited to the Times Square billboards however. The ads were also placed in nationally-distributed magazines, and the videos were displayed on screens at the top of point-of-sale JUUL kiosks provided by JUUL to retailers across the country.

324.    To the extent that the Vaporized advertisements disclosed that JUUL contained nicotine, the warnings were in small print against low-contrast backgrounds, making them easy to overlook. By way of comparison, cigarette advertisements, are required to display a health warning in high contrast black and white, covering 20% of the image.

325.    Likewise, JLI's social media ads did not disclose any health risks of using JUUL until May of 2018, when they were required to warn of addiction. But even then, JUUL placed these warnings in areas that were only viewable if the social media user clicked on the "full version" of the JLI post, which is not how teens typically engage with social media advertising.[373] Notably, on Twitter, a social media platform that is geared towards reading text, and on Facebook, where some users do read text, JLI typically did not include the disclaimer in its advertisements at all.[374]

### 4.    JLI Pushed the Vaporized Campaign Into Youth Targeted Channels.

#### a.    JLI Placed Its Vaporized Ads on Youth Oriented Websites and Media.

326.    JLI engaged programmatic media buyers to place advertisements on websites attractive to children, adolescents in middle school and high school, and underage college students. These advertisements, which included the images of models from the Vaporized

---

[372] *The Late Show With Stephen Colbert*: *Vaping is So Hot Right Now*, YouTube (Oct. 7, 2015), https://www.youtube.com/watch?v=PMtGca_7leM.
[373] *See* Appendix B, Advertisement 3.
[374] *See* Appendix B, Advertisement 65; *see also* Juul Image Galleries (2015-2018) SRITA Collection, https://inrejuul.myportfolio.com/twitter-1 (last visited Apr. 3, 2020).

1  campaign, began appearing on websites as early as June 2015. The chosen websites included:
2  nickjr.com (the website for a children's television network run by Nickelodeon Group); the
3  Cartoon Network's website at cartoonnetwork.com; allfreekidscrafts.com; hellokids.com; and
4  kidsgameheroes.com.

5      327.    A picture of the homepage of nickjr.com is below:



16      328.    JLI also purchased banner advertisements on websites providing games targeted
17  to younger girls,[375] educational websites for middle school and high school students,[376] and other
18  teen-targeted websites.[377]

19      329.    JLI knew what it was doing. In May 2015, Chelsea Kania contacted Cult
20  Collective to raise concerns about advertising on younghollywood.com. Kania explained that the
21  website's demographics are "age 12-34 . . . and *weighing the % who could actually afford JUUL*
22  *against the risk we'd run being flagged for advertising on that site* – I don't think we should do
23  it."[378] Nevertheless, JLI continued to push its campaign on websites with young demographics.

24      330.    JLI promoted the Vaporized campaign on Facebook, Instagram, and Twitter.

---

26  [375] The sites included dailydressupgames.com, didigames.com, forhergames.com, games2girls.com, girlcames.com,
    and girlsgogames.com.
27  [376] *E.g.,* coolmath-games.com. JUUL also purchased advertisements on basic-mathematics.com, coolmath.com,
    math-aids.com, mathplayground.com, mathway.com, onlinemathlearning.com, and purplemath.com.
28  [377] *E.g.,* teen.com, seventeen.com, justjaredjr.com, and hireteen.com. JUUL purchased advertisements on websites
    for high school students hoping to attend college such as collegeconfidential.com and collegeview.com.
[378] INREJUUL_00082179-INREJUUL_00082185.

331.    JLI could have employed age-gating on its social media accounts to prevent underage users from viewing its Vaporized advertisements, but chose not to do so.

332.    The Vaporized campaign included the largest e-cigarette smartphone campaign of 2015, which accounted for 74% of all such smartphone advertising that year.

333.    JLI promoted Vaporized through Vice Magazine, which bills itself as the "#1 youth media brand" in the world.[379]



334.    By 2016, an estimated 20.5 million U.S. middle and high school students were exposed to advertisements for e-cigarettes, including JUUL.[380]

**b.    JLI Used Influencers and Affiliates to Amplify Its Message to a Teenage Audience.**

335.    JLI used "influencers" to push their product to young people. Influencers are "high-social net worth" individuals who have developed large social media followings—*i.e.*, the "cool kids" of the social media world.[381] Influencers are prized sources of brand promotion on social media networks.

---

[379] Kathleen Chaykowski, *The Disturbing Focus of Juul's Early Marketing Campaigns*, Forbes (Nov. 16, 2018), https://www.forbes.com/sites/kathleenchaykowski/2018/11/16/the-disturbing-focus-of-juuls-early-marketing-campaigns/#3da1e11b14f9.

[380] Kristy Marynak et al., *Exposure to Electronic Cigarette Advertising Among Middle and High School Students – United States, 2014-2016*, CDC: Morbidity and Mortality Weekly Report (Mar. 16, 2018), https://www.cdc.gov/mmwr/volumes/67/wr/mm6710a3.htm.

[381] *See* INREJUUL_00091138 (Aug. 26, 2015 "JLI Influencer Program" defining an influencer as "individuals who have strong influence over their audience. We are aiming for influencers in popular culture with large audiences in various sectors such as music, movies, social, pop media, etc.").

336.    Like its Vaporized campaign, JLI's influencer strategy was youth-focused, with the stated aim of "show[ing] that the tastemakers, cool kids and early adopters who consume tobacco use JUUL."[382] In keeping with this strategy, JLI targeted influencers that were young and popular with adolescents. One influencer JLI targeted was Tavi Gevinson, who was nineteen years old in the summer of 2015. The year before, Rolling Stone magazine described Gevinson as "possibly the most influential 18-year-old in America."[383]

337.    JLI contracted with Grit to enlist influencers by sending them free JUUL e-cigarettes.  Documents obtained pursuant to a Congressional investigation show that in July 2015, JLI's contract with Grit was for services that included "Influencer Relations," in which Grit agreed to provide two "Social Buzzmakers" for six events within a four-week period, with each Social Buzzmaker having a minimum of 30,000 followers and be active on at least two social media channels, such as Instagram, Twitter, or Facebook. The contract provided that JLI would determine or approve the timing of the Buzzmakers' posts. In addition, JLI engaged Grit to "develop influencer engagement efforts to establish a network of creatives to leverage as loyalists for Juul/Pax brand activations."[384]

338.    Grit also provided free JUULs to Luka Sabbat, known as the "the Internet's Coolest Teenager,"[385] who was 17 years old during the summer of 2015.

339.    Grit targeted celebrities with large numbers of underage fans, including Miley Cyrus, former star of "Hannah Montana," a series that aired for four seasons on the Disney Channel and won eight Teen Choice Awards.[386]

340.    JLI paid these social media influencers to post photos of themselves with JUUL devices and to use the hashtags that it was cultivating.[387] One such influencer was

---

[382] INREJUUL_00057293.

[383] Alex Morris, *Tavi Gevinson: A Power Teen's New Direction*, Rolling Stone (Aug. 14, 2014), https://www.rollingstone.com/culture/culture-features/tavi-gevinson-a-power-teens-new-direction-232286/.

[384] Kenrick Cai, *Juul Funded High Schools, Recruited Social Media Influencers To Reach Youth, House Panel Charges*, Forbes (July 25, 2019), https://www.forbes.com/sites/kenrickcai/2019/07/25/juul-high-schools-influencers-reach-youth-house-investigation/#57735a4a33e2. *See* JLI-HOR-00042050-052 at 050.

[385] Alexis Barnett, *Who Is Luka Sabbat? Meet the Internet's Coolest Teenager*, Complex (Aug. 17, 2015), https://www.complex.com/style/luka-sabbat-interview-on-youth-kanye-west-and-fashion.

[386] *See*, INREJUUL_00091141 (Aug. 26, 2015 "JLI Influencer Seeding Chart" provided by Grit listing various celebrities and influencers, including Miley Cyrus.).

Christina Zayas, whom JLI paid $1,000 for just one blog post and one Instagram post in the fall of 2017.



341.    JLI encouraged its distributors, wholesalers, and other resellers—either explicitly or implicitly— to hire affiliates and influencers to promote JLI's brand and products. Even if not paid directly by JLI, these influencers profited from the promotion of JUUL products either because they were paid by JUUL resellers, JUUL accessory sellers, or sellers of JUUL-compatible products.

342.    For example, one YouTube user Donnysmokes (Donny Karle, age twenty-one) created a JUUL promotional video in 2017 that garnered roughly 52,000 views, many of which were from users under the age of eighteen.[388] Since that time, Karle has made a series of videos, including videos titled "How to hide your JUUL from your parents" and "How to HIDE & HIT Your JUUL at SCHOOL WITHOUT Getting CAUGHT."[389] Karle has admitted to earning approximately $1200 a month from unspecified sources simply from posting videos of himself consuming e-cigarettes, especially of JUUL products online.[390]

343.    Karle also created a YouTube sensation called the "JUUL Challenge," which is

---

[388] *Examining Juul's Role in the Youth Nicotine Epidemic*, *Hearing Before the H. Comm. on Oversight and Reform*, *Subcomm. on Econ. and Consumer Policy*, 116th Cong. (2019) (statement of Robert K Jackler, Professor, Stanford University). https://docs.house.gov/meetings/GO/GO05/20190724/109844/HHRG-116-GO05-Wstate-JacklerR-20190724.pdf.

[389] *Id.*

[390] Allie Conti, *This 21-year-old is Making Thousands a Month Vaping on YouTube*, Vice (Feb. 5, 2018), https://www.vice.com/en_us/article/8xvjmk/this-21-year-old-is-making-thousands-a-month¬vaping-on-youtube.

a play on the viral "Ice Bucket Challenge." In the JUUL Challenge, the goal is to suck down as much nicotine as possible within a predetermined amount of time. The JUUL Challenge, which promotes nicotine abuse and adolescent use of JUUL products, went viral like the Ice Bucket Challenge it mimicked. Soon, youth across the country were posting their own JUUL Challenge videos, a practice that continues to this day on YouTube, Instagram, Snapchat and other social media platforms. In one recent JUUL Challenge on YouTube, which has received nearly 500,000 views, the two teenagers filming themselves discussing the hundreds of thousands of views their prior JUUL Challenge received and comment upon the "virality" of their JUUL Challenge content.[391]

344.    In or around 2017, JLI began using a company called Impact Radius for the management of JLI's affiliate program. Impact Radius's affiliate application stated that JLI "auto-approve[d]" applications and did not ask for or confirm the affiliate's age.[392] JLI's affiliates promoted JUUL on social media platforms including YouTube, Instagram, Facebook, Snapchat, and Twitter and routinely failed to disclose that they were being paid to promote JUUL products.

345.    JLI's "affiliate program" recruited those who authored favorable reviews of its products by providing such reviewers with a 20% discount of purchases of JUUL products.[393] It even recruited JUUL users to act as part of their marketing team by asking users to "refer a friend and get a discount."[394]

346.    As with much of the marketing strategy for JUUL, the practices described above are prohibited by the Master Settlement Agreement.

### c.    JLI Used Viral Marketing Techniques Known to Reach Young People.

347.    JLI deployed "viral marketing" techniques to great success. Viral marketing is defined as "marketing techniques that seek to exploit pre-existing social networks to produce

---

[391] Nate420, JUUL Challenge (Apr. 22, 2018), https://youtu.be/gnM8hqW_2oo (last visited Mar. 30, 2020).
[392] INREJUUL_00113437-INREJUUL_00113441.
[393] *Examining Juul's Role in the Youth Nicotine Epidemic*, *Hearing Before the H. Comm. on Oversight and Reform*, *Subcomm. on Econ. and Consumer Policy*, 116th Cong. (2019) (statement of Robert K Jackler, Professor, Stanford University), https://docs.house.gov/meetings/GO/GO05/20190724/109844/HHRG-116-GO05-Wstate-JacklerR-20190724.pdf.
[394] *Id.* at 9.

COMPLAINT
Case No. 19-md-02913-WHO

exponential increases in brand awareness, through processes similar to the spread of an epidemic."[395] Viral marketing effectively converts customers into salespeople, who, by sharing their use of a product (on social media or otherwise), repeat a company's representations and endorse the product within their network. The success of viral marketing depends on peer-to-peer transmission. Hence, a successful viral marketing campaign looks like a series of unrelated, grassroots communications, when in fact they are the result of carefully orchestrated corporate advertising campaigns.

348.    As JLI boasted in a pitch deck to potential investors dated December 2016, "Viral Marketing Wins."[396]



349.    Social media platforms are the most effective way to launch viral marketing campaigns among young people. As of May 2018, among teenagers, 95% reported use of a smart phone, 85% use YouTube, 72% use Instagram, and 45% reported being online "constantly."[397]

350.    A key feature of JLI's viral marketing campaign was inviting user-generated content. This strategy revolves around prompting social media followers to provide their own JUUL-related content—e.g., post a selfie in your favorite place to use JUUL. The response provided by a user is then typically distributed—by the social media platform employed—into the user's personal network. In this way, brands can infiltrate online communities with personalized content that promotes their product (e.g. a picture of a friend using a JUUL e-

---

[395] N. Deepa et al., *Viral Marketing as an On-Line Marketing Medium*, IOSR J. of Bus. & Mgmt. 18, http://www.iosrjournals.org/iosr-jbm/papers/ncibppte-volume-2/1115.pdf (last visited Apr. 3, 2020); P. R. Datta et al., *Viral Marketing: New Form of Word-of-Mouth Through Internet*, 3 The Bus. Rev. 69 (2005).
[396] INREJUUL_00349529-560 at 541.
[397] Monica Anderson & Jingjing Jiang, *Teens, Social Media & Technology 2018: Appendix A: Detailed Tables*, Pew Research Center (May 31, 2018), https://www.pewresearch.org/internet/2018/05/31/teens-technology-appendix-a-detailed-tables/.

COMPLAINT
Case No. 19-md-02913-WHO

cigarette ).[398]



351.    Within a few months of the JLI's commercial release in June 2015, a former JLI executive reportedly told the New York Times that JLI "quickly realized that teenagers were, in fact, using [JUULs] because they posted images of themselves vaping JUULs on social media."[399]

352.    To drive consumer participation in its ad campaign, JLI peppered its advertising and social media posts with hashtags, including those referencing JLI and consuming e-cigarettes (e.g., #juul, #juulvapor, #switchtojuul, #vaporized, #juulnation, #juullife, #juulmoment); and trending topics unrelated to JUUL, as well as topics #mothersday, #goldenglobes, #nyc, etc. JLI's hashtag marketing went beyond passive posts to being "very proactive to find and reach out to people who are (or might be) interested in JUUL. This means searching hashtags to engage, using widely used hashtags, paying close attention to our followers, being responsive to posts, etc."[400]

---

[398] *The Rise in the Use of Juul Among Young People: The Power of Design and Social Media Marketing*, Campaign for Tobacco Free Kids, https://www.tobaccofreekids.org/assets/images/content/JUUL_Presentation.pdf.
[399] Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?*, N.Y. Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.
[400] INREJUUL_00093294.



353.    JLI's hashtags attracted an enormous community of youthful posts on a wide array of subjects. According to Dr. Jackler, #Juul contains literally thousands of juvenile postings, and numerous Instagram hashtags contain the JUUL brand name.[401]

354.    Just as JLI intended, JUUL users began taking photos of themselves using JUUL devices and putting them on social media with the hashtag #juul. They were creating JUUL content that looked and felt like real JUUL ads: featuring young people having fun and using JUUL. The flavor-based hashtag campaigns #MangoMonday and #coolmint generated hundreds of thousands of user-generated posts.

355.    JLI could have stepped in and attempted to stop the use of its trademark in posts directed to underage audiences, including the use of all the hashtags that contain the word "JUUL." It could have promptly sought to shut down infringing accounts such as @doit4juul and @JUULgirls. It did not do so.

### 5.    JLI Targeted Youth Retail Locations.

356.    Studies show that tobacco use is associated with exposure to retail advertising and relative ease of in-store access to tobacco products. Some studies have shown that youth who were frequently exposed to point of sale tobacco marketing were twice as likely to try or initiate smoking than those who were not as frequently exposed.

---

[401] Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market* at 2, STAN. RES. INTO THE IMPACT OF TOBACCO ADVERT. (2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf.

357.    For years, JLI made it difficult for smoke shops and other age-restricted stores to carry its products, instead directing its product to gas stations and convenience stores, which historically make the most underage sales. JLI knows that nicotine-naïve young people frequent gas stations and convenience stores rather than smoke shops. By distributing in those kinds of stores, JUUL increased the likelihood that these people would purchase its product.

358.    JLI marketed its products extensively in convenience stores, employing video and product displays with bright colors and young adults using and displaying the JUUL device. The retail marketing worked and, by late 2017, JUUL became the most popular e-cigarette sold in convenience stores according to Nielsen data.[402]

359.    Like all in-store cigarette advertising, JLI's point–of–sale materials played a major role in driving youth addiction. JLI actively encouraged youth to seek out these laxly regulated retail locations, sending marketing e-mails to hundreds of thousands of customers, referring them to the JUUL store locator and offering discounts. And JLI actively encouraged its retailers to leniently regulate sales to youth by providing profit margins that far exceeded any other tobacco product being sold.

360.    Before JUUL's launch in 2015, JLI and Cult Collective developed packaging and in-store displays that looked similar to iPhone packaging, which JLI knew would resonate with young people and further JLI's campaign to be the "the iPhone of e-cigarettes."

361.    As a 2015 marketing plan shows, JLI's in-store promotional content "stands out" from competing tobacco products by conveying that the "JUUL brand is colorful, approachable, and fun—core elements of trade support assets."[403]

///

///

///

///

///

---

[402] Laura Bach, *JUUL and Youth: Rising E-Cigarette Popularity*, Campaign for Tobacco-Free Kids (July 6, 2018), http://www.kdheks.gov/tobacco/download/Campaign_for_tobacco-free_kids_rising_popularity_of_e-cigarettes.pdf.
[403] INREJUUL_00370796-INREJUUL_00370806, 805.

1

2

3

4

5

6

7

8

9

**POS Poster**    **Merchandising Unit**    **Retail Video Stills**





POS Video Link: https://vimeo.com/121325103
Password: ploom

### 6.    JLI Hosted Parties to Create a Youthful Brand and Gave Away Free Products to Get New Users Hooked.

362.    JLI also sponsored at least twenty-five live social events for its products in California, Florida, New York, and Nevada. The invitations to JUUL's events did not indicate that the JUUL was intended for cigarette smokers, contained nicotine, or was addictive.[404] Instead, the invitations traded on PAX Lab, Inc.'s (PAX) reputation as a manufacturer of marijuana vaporizers and promised attendees "free #JUUL starter kit[s]," live music, or slumber parties.[405] Photographs from these events indicate that they drew a youthful crowd. Product promotion through sponsored events was a long-standing practice for cigarette companies, but is now prohibited.

///

///

///

///

///

///

///

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[404] *See* Appendix B, Advertisements 78-81.
[405] *Id.*

COMPLAINT
Case No. 19-md-02913-WHO









363.    At these live social events, JLI gave attendees free JUUL "Starter Kits," which contain a JUUL device and 4 JUUL pods of various flavors. JLI gave away samples at music events without age restrictions, including Outside Lands in San Francisco's Golden Gate Park, and other events aimed at a youthful audience, such as the annual Cinespia "Movies All Night Slumber Party" in Los Angeles. These events, in addition to providing youthful crowds for handing out samples, were opportunities for JLI to cultivate its brand image as youthful, hip, and trendy—but had nothing to do with smoking cessation. For example, on August 7, 2015, JLI tweeted, "Need tix for @cinespia 8/15? We got you. Follow us and tweet #JUULallnight and our faves will get a pair of tix!"[406]

364.    Giving away free samples is prohibited conduct for a cigarette company under the Master Settlement Agreement.

365.    As part of the Vaporized campaign, JLI also emulated trendy pop-up restaurants and stores by using a shipping container "pop-up JUUL bar" at festivals and events in the Los Angeles and New York City metro areas. The firm BeCore designed and created the container for JLI and managed it as a mobile JUUL product sampling lounge.[407]



Juul's container bar

[408]

366.    JLI also held sampling events in stores. By September 2015, JLI was on schedule to host sampling events in more than 5,000 stores in twenty cities in twelve states.[409] Documents

---

[407] Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*, Stanford Research Into the Impact of Tobacco Advertising 9 (Jan. 31, 2019),
http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf.
[408] Declan Harty, *JUUL Hopes to Reinvent E-Cigarette Ads with 'Vaporized Campaign'*, AdAge (June 23, 2015), http://adage.com/article/cmo-strategy/juul-hopes-reinvent-e-cigarette-ads¬campaign/299142/.
[409] INREJUUL_00160394.

COMPLAINT
Case No. 19-md-02913-WHO

obtained by the New York Attorney General show that JLI recruited young "brand ambassadors" to staff these events and required a dress code that included skinny jeans, high-top sneakers or booties, and an iPhone in a JUUL-branded case.[410]



367.    JLI also engaged PUSH Agency, LLC ("PUSH"), a promotional model and event staffing agency, to provide models and brand ambassadors to hand out coupons in trendy areas of New York City popular with young people. In a September 2017 email between PUSH and JLI, for example, PUSH offered suggestions "for the nightlife shifts" of "places that are popular for nightlife" that "would be great to hit," including the Marquee nightclub in Chelsea, Provocateur, and Le Bain, a penthouse discotheque.[411]

368.    Though JLI publicly acknowledged in October 2017 that it is unlawful to distribute free samples of its products at live events,[412] it continued to reach out to new users by offering samples, sometimes at $1 "demo events." Like so many of JLI's initiatives, promotions of this kind are prohibited for cigarette companies by the Master Settlement Agreement.

---

[410] Jake Offenhartz, *Juul Hooked Teens Through Sick Parties and Hip Ambassadors, NY AG Says*, Gothamist (Nov. 19, 2019), https://gothamist.com/news/juul-hooked-teens-through-sick-parties-and-hip-ambassadors-ny-ag-says; Kathleen Chaykowski, *The Disturbing Focus of Juul's Early Marketing Campaigns*, Forbes (Nov. 16, 2018), https://www.forbes.com/sites/kathleenchaykowski/2018/11/16/the-disturbing-focus-of-juuls-early-marketing-campaigns/#3da1e11b14f9.
[411] INREJUUL_00158794-803 at 794.
[412] *See* Nik Davis (@bigbabynik), Twitter (Nov. 17, 2017 1:11 PM), https://twitter.com/JLIvapor/status/931630885887266816; *The Role of the Company in the Juul Teen Epidemic*, *Examining Juul's Role in the Youth Nicotine Epidemic*, *Hearing Before the H. Comm. on Oversight and Reform*, *Subcomm. on Econ. and Consumer Policy*, 116th Cong. (2019) (statement of Robert K Jackler, Professor, Stanford University). https://docs.house.gov/meetings/GO/GO05/20190724/109844/HHRG-116-GO05-Wstate-JacklerR-20190724.pdf.

369.    The effect—and purpose—of JLI's Vaporized giveaways was to flood major cities with products that would hook thousands of new users, and to generate buzz for the brand among urban trendsetters who would then spread JLI's message to their friends via word of mouth and social media.

370.    According to BeCore, one of the firms responsible for designing and implementing JLI's live events, JLI distributed the nicotine-equivalent of approximately 500,000 packs of cigarettes at all twenty-five events.[413] And this was just to get people started.

### 7.    The Management Defendants' Direction of and Participation in JLI and in the Youth Marketing Schemes.

█████ **The Management Defendants, and in particular Pritzker, Valani, and** ███████████████████

371.    ████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████

.[416]

████████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

[413] Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*, Stanford Research Into the Impact of Tobacco Advertising 9 (Jan. 31, 2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf.
414 JLI01362389 (Fifth Amended and Restated Voting Agreement, March 2015); JLI01362388 (Fifth Amended and Restated Voting Agreement, Dec 2016); JLI01439393 (Sixth Amended and Restated Voting Agreement, March 2017); JLI01440777 (Seventh Amended and Restated Voting Agreement, Jun 2018).
415 JLI01426710 (March 25, 2013 board minutes note V has seats, discuss a potential designee by Ploom Investments/aka V); JLI10268480 ("Ploom Investments is controlled by Riaz Valani").
416 JLI01426164.
417 JLI00216307; JLI01365707
418 JLI01362388.

COMPLAINT
Case No. 19-md-02913-WHO



373.

374.

375.

376.

377.

419 JLI01365707
420 JLI00220992
421 ALGAT0002834151.
422 JLI01362388
423 JLI01439394
424 JLI01425021

COMPLAINT
Case No. 19-md-02913-WHO

378.

b.    **Pritzker, Huh, and Valani were active, involved board members.**

379.

---

425 JLI01440776
426 ALGAT0000280623
427 JLI01356230; JLI01356237 (Nov. 2017); JLI00417815 (Feb. 2018)
428 JLI01385478
429 *Id.*
430 JLI00206239
431 *Id.*
432 *Id.*



380.

433
434
435
436
437
438

     **c.    The Management Defendants, and in particular Bowen, Monsees, Pritzker, Valani, and Huh, oversaw and directed the youth marketing scheme.**

381.    The Management Defendants were well aware that JUUL branding was oriented toward teens and duplicated earlier efforts by the cigarette industry to hook children on nicotine. The Management Defendants directed and approved JUUL branding to be oriented toward teenagers. The Management Defendants directed and participated in every marketing campaign pushing the JUUL e-cigarette, as they had "final say" over all marketing campaigns (including the Vaporized campaign and the other formal and informal marketing efforts described above),[439] and Monsees provided specific direction on the content of the website to JLI employees.

382.    James Monsees testified to Congress in 2019 that the Board of Directors had "final say" over marketing campaigns, and he was not speaking to only the current state of affairs at the time. As noted above, from 2015 on, JLI's own documents establish that the Board of Directors

---

433 JLI01369470
434 *See, e.g.*, JLI00210436; JLI00380098
435 JLI00206172.
436 INREJUUL_00174498
437 JLI01356230; JLI01356237 (Nov. 2017); JLI00417815 (Feb. 2018)
438 JLI02272904
439 *Examining JLI's Role in the Youth Nicotine Epidemic: Part II: Hearing Before the Subcomm. on Econ. & Consumer Policy of the Comm. on Oversight & Reform, H.R.*, 116th Cong. 70 (2019) (statement of James Monsees, Co-Founder, JUUL Labs, Inc.).

closely reviewed and approved marketing plans and specific marketing materials, and set the marketing strategy for the company.

383.

440

441

385.

442

440 JLI01259728
441 JLI00212009.
442 JLI01121750

COMPLAINT
Case No. 19-md-02913-WHO

386.



387.

388.

389.    After launch, executives and directors discussed whether to rein in the advertising to teenagers. According to Scott Dunlap, then Chief Operating Officer, in June 2015, Nicholas Pritzker commented that the branding "feels too young[.]"[446] At the June 17, 2015 Board meeting, the Board heard "an update on the rollout of JUUL. . . . Mr. Mumby then provided the board with

---

[443] JLI00216307.
[444] INREJUUL_00174387.
[445] Ainsley Harris, *How Juul, founded on a life-saving mission, became the most embattled startup of 2018: E-cigarette startup Juul Labs is valued at more than $16 billion. It's also hooking teens on nicotine and drawing scrutiny from the FDA. Can the company innovate its way out of a crisis it helped create?*, Fast Company (Nov. 19, 2018), https://www.fastcompany.com/90262821/how-juul-founded-on-a-life-saving-mission-became-the-most-embattled-startup-of-2018.
[446] JLI00206239.

COMPLAINT
                                                      Case No. 19-md-02913-WHO

his perspective on the JUUL launch and customer feedback. The Board discussed the Company's approach to advertising and marketing and portrayal of the product, which led to a discussion of the Company's longer term strategy led by Mr. Monsees."[447]

390.   According to an anonymous former company manager: "Inside the company, the first signs that Juul had a strong appeal to young people came almost immediately after the sleek device went on sale in 2015."[448] "[E]arly signs of teenage use kicked off an internal debate . . . Some company leaders . . . argued for immediate action to curb youth sales. . . . The counter-argument came from other company directors, including healthcare entrepreneur Hoyoung Huh and other early investors"—that is, Pritzker and Valani—who "argued the company couldn't be blamed for youth nicotine addiction."[449]

391.   ███████████████████████████████████████████ [450] ████████████████████████████████████████████████████████████ He began by noting that "our fears around tobacco / nicotine are not going away. We will continue to have plenty of agitation if we don't come to terms with the fact that these substances are almost irretrievably connected to the shittiest companies and practices in the history of business."[451] He stated that "an approach needs to be taken that actively, if implicitly, distances us from [Big Tobacco]: what we say, the way we sell, the way we run the company, what we emphasi[z]e, who we hire, etc."[452] Referring to JLI's strategy to use the same marketing techniques as major tobacco companies used to market to youths, Asseily added that "[t]he trouble with just doing 'what the others do' is that we'll end up as Nick [Pritzker] rightly points out in the same ethical barrel as them, something none of us want no matter the payoff (I think)."[453] He continued that "the world is transparent and increasingly intolerant of bullshit. It's not about faking it - it's about doing it correctly....which could mean **not doing a lot of things we thought we would do like putting young people in**

---

[447] JLI01426553.
[448] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, REUTERS (Nov. 5, 2019), https://www.reuters.com/investigates/special-report/juul-ecigarette/.
[449] *Id*.
[450] JLI00214617.
[451] *Id*.
[452] *Id*.
[453] *Id*.

COMPLAINT
Case No. 19-md-02913-WHO

**our poster ads or drafting in the wake of big players in the market.**"[454]

[BLACK REDACTION]

[455]

392.    Pritzker, Valani, and Huh rejected this approach, opposing any actions to curb youth sales. Youth sales were a large potential source of revenue.[456] As one manager explained, perhaps "people internally had an issue" with sales of JUULs to teenagers, "[b]ut a lot of people had no problem with 500 percent year-over-year growth."[457] And company leaders understood that teenagers who were hooked on nicotine were the most likely segment to become lifelong addicts and thus were the most profitable customers to target.[458]

393.    In October 2015, the debate was resolved in favor of selling to teens.

[BLACK REDACTION]

Even though the directors and executives of JLI knew—and explicitly stated—that what they were doing was wrong, they pressed ahead with JUUL's youth-oriented Vaporized ad campaign through early 2016.[459]

394.    The company also implemented the Board's decision to target and sell to minors in many other ways. For example, in early October 2015, sales and marketing employees of Pax Labs noted that only 74% of users were able to pass the age gate on the website, "which is a steep decline in sales for us."[460] In mid-January 2016, a similar group of employees estimated that about

---

[454] *Id.* (emphasis added).
[455] *Id.*
[456] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, Reuters (Nov. 5, 2019), https://www.reuters.com/investigates/special-report/juul-ecigarette/.
[457] *Id.*
[458] *Id.*
[459] The Vaporized advertising campaign continued at least into early 2016. Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*, Stanford Research Into the Impact of Tobacco Advertising 7 (Jan. 31, 2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf.
[460] INREJUUL_00276445.

11% of those reaching the JUUL Purchase Confirmation Page on Pax Labs's own website were under 18 years old.[461] But, rather than strengthen JUUL's age verification system, Pax Labs worked to weaken it. In February 2016,[462] Pax Labs modified the age verification system so that 92% of users were able to pass the age gate.[463] By changing the age verification process so that users were more likely to pass—while knowing that some minors had already been able to pass before the change—Pax Labs deliberately chose to continue selling to underage purchasers.

395.   In July 2015, Asseily suggested "a cheeky campaign that asks existing smokers to return their unused cigarette packets (or other vaping products) to us in return for a discount on JUUL" because that would "send the only message that's needed: JUUL is a superior alternative to conventional smoking and mediocre vaping products."[464] But JLI did not run this campaign then and in fact did not begin focusing its advertising on switching from combustible cigarettes until 2018.[465]

396.   By March 2016, however, JLI employees internally recognized that JLI's efforts to market to children were too obvious. On March 2, 2016, Richard Mumby, the Chief Marketing Officer, sent a document related to JLI's branding to Hoyoung Huh and a number of other marketing employees of JLI.[466] According to Mumby, he was sending the document because Hoyoung Huh "indicated that [he] would review [JLI's] brand and collateral positioning on behalf of the board."[467] The attached document noted that "[t]he models that we used for the #Vaporized campaign appeared to be too youthful for many consumers (and the media)[.]"[468] Under a header that listed as one of JLI's "Objectives" to "Be Different & Have Integrity[,]" the document stated that "[w]e need to be sensitive to the subjectivity of youthfulness by positioning the brand to be mature and relatable."[469] On March 11, 2016, Mumby sent another version of this document to

[461] Native attachment to INREJUUL_00078494.
[462] JLI00068428.
[463] Kate Horowitz's LinkedIn profile, https://www.linkedin.com/in/k8horowitz (last visited Mar. 9, 2020).
[464] JLI00214617.
[465] Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*, Stanford Research Into the Impact of Tobacco Advertising 16 (Jan. 31, 2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf.
[466] INREJUUL_00178377.
[467] INREJUUL_00061469.
[468] INREJUUL_00178379.
[469] INREJUUL_00178384.

Hoyoung Huh and Zach Frankel (who was then an observer on the Board and would later become a director), and Mumby thanked them "for the support on this."[470] Around this time, Pax Labs reoriented its JUUL advertising from the explicitly youth-oriented Vaporized campaign to a more subtle approach to appeal to the young. The advertising's key themes continued to include pleasure/relaxation, socialization/romance, and flavors[471]—all of which still appealed to teenagers, as was made clear in the previous litigation against the cigarette industry and Altria and Philip Morris in particular.

397.    Pritzker, Valani, and Huh, along with Bowen and Monsees continued to direct and approve misleading marketing campaigns long after launch. For example, JLI deceptively marketed mint to youth, through flavor-driven advertising, hashtag campaigns, and ads cross-promoting mango and mint.

398.    Notably, none of JLI's early advertisements, including those of the "Vaporized" campaign and others targeted to youths, disclosed that JUUL contains high amounts of nicotine; indeed, many of those advertisements did not advertise JUUL's nicotine content whatsoever.

399.    Likewise, none of JLI's advertisements, including those of the "Vaporized" campaign and others targeted to youths, disclosed the health risks from consuming JUUL products.

400.    JLI and the Management Defendants knew of course that JUUL contained an ultra-high concentration of nicotine, and that ultra-high concentration of nicotine was designed to addict. They also knew that e-cigarette products, including JUUL, would expose users to increased health risks, including risks to their lungs and cardiovascular system. Despite that knowledge, JLI and the Management Defendants took affirmative actions, the natural consequence of which was the approval and transmission of these false and misleading advertisements that did not include a disclosure of JUUL's high nicotine content and concentration, nor any health risks at all.

---

[470] INREJUUL_00061274.

[471] Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*, Stanford Research Into the Impact of Tobacco Advertising 9 (Jan. 31, 2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf.

1

2

####        d.    Pritzker, Huh, and Valani Were Able to Direct and Participate in the Youth Marketing Because They Seized Control of the JLI Board of Directors.

3

4        401.    Although Defendants Bowen and Monsees were the visionaries behind JLI and the

5 most hands-on in its early stages, by the time JLI was pushing its marketing campaigns in early-

6 to mid-2015, JLI (through the individuals running the company), Bowen, Monsees, Pritzker,

Valani, and Huh were each intimately involved in the planning and execution of activities.

7        402.    For example, JLI stopped interacting with the press in the summer of 2015 while

8 its Board of Directors, controlled by Bowen, Monsees, Pritzker, Huh, and Valani, was finalizing

9 a "messaging framework."[472] A legitimate business enterprise would typically ramp up, rather

10 than shut down, press outreach at the very time the company is supposed to be building awareness

11 for its recently launched product.

12        403.    But the Management Defendants at this point were taking actions that went beyond

13 the regular and legitimate business operations of JLI. At the same time JLI stopped traditional

14 press engagement, the Board of Directors was directing and monitoring the launch plans that they

15 had set in motion – including the launch of sponsored content on social media in July 2015 (which

16 content did not include any warnings about JUUL's nicotine content or health risks).[473]

17        404.    And at the same time the Management Defendants had approved the early JLI

18 marketing campaigns that were intentionally targeting youth, there was a fundamental shift in

19 roles when Defendants Pritzker, Valani, and Huh took charge of the instrumentalities of JLI,

20 including its employees and resources.

21        405.    Specifically, in October 2015, Monsees stepped down from his role as Chief

22 Executive Officer of JLI (to become Chief Product Officer) and, in his stead, Pritzker, Valani,

23 and Huh formed an Executive Committee of the JLI Board of Directors that would take charge of

24 fraudulently marketing JUUL products, including to youth. The Management Defendants, and in

25 particular Huh, wanted to continue their fraudulent marketing, knowing that these ads were also

26 targeted to youth, "argu[ing] that the company couldn't be blamed for youth nicotine

27

28
_____
[472] INREJUUL_00056077 [Confidential].
[473] *Id.*

addiction[.]"[474]

406.    Keeping the company's youth marketing on track was critical to and consistent with Pritzker, Valani, and Huh's objective of accelerating JUUL's growth and expanding its customer base—and increasing profitability.

[redacted]

407.

[redacted]
[476]

408.    JLI's organizational charts later reflected the executive committee in the place of a CEO. Before late 2015, the company's organizational charts showed the CEO at the head of the company, reporting to the Board.[477]

## org chart - October 2015

[474] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, Reuters (Nov. 5, 2019), https://www.reuters.com/investigates/special-report/juul-ecigarette/.
[475] JLI01369470
[476] JLI00214159
[477] *See* INREJUUL_00016456 (July 9, 2014).

409.    After Monsees was removed as CEO, the Executive Committee appeared in the place of the CEO.[478]



410.    Board minutes also illustrate how the Executive Committee of Pritzker, Valani and Huh, acted as CEO of JLI during this time period, taking direct control of the company and making critical decisions about how to market JUUL. Until late October 2015, Monsees (then the CEO) ran Board meetings.[479] In late October 2015 and thereafter, however, Huh (then Executive Chairman and member of the Executive Board) began running Board meetings.[480] Also, the late October minutes report that the "Board discussed . . . the additional responsibilities that would be assigned to Bryan White" (who was a Vice President of Engineering and Product Design at the time), and furthermore that "[a] discussion followed regarding who Bryan should report to, and it was agreed that the executive committee that had been formed since the last Board meeting, consisting of Messrs. Huh, Pritzker and Valani, would address this issue."[481] Additionally, the Board "discussed how these new roles and responsibilities would be communicated internally."[482]

---

[478] INREJUUL_00278332 (Dec. 7, 2015); INREJUUL_00061420 (Apr.21, 2016).
[479] *See* INREJUUL_00278406 *et seq.* (Oct. 5, 2015); INREJUUL_00278410 *et seq.* (Sept. 24, 2015).
[480] *See* INREJUUL_00278404 *et seq.* (October 26, 2015); INREJUUL_00278402 *et seq.* (Nov. 10, 2015).
[481] INREJUUL_00278405 (Oct. 26, 2015).
[482] *Id.*

1

2 [redacted]483

411.    By December 2015, it was confirmed that "Hoyoung [Huh] will make decisions

on behalf of the BOD [Board of Directors] Exec[utive] Comm[ittee]" and "3-4 days/week Nick

[Pritzker] and/or Hoyoung [Huh] will be in the office" to "help us manage our people[.]"484

412. [redacted]

486 [redacted] 487

413. [redacted]

488 [redacted]

489

414.    In December 2015, Monsees expressed concerns about JLI's marketing budget to

Huh in an extremely deferential way, concluding, [redacted]

---

483 JLI01115999. Direct reports attending board meetings included Piotr Brezizinski, VP International; Christine
Castro, VP, Public Relations; Gal Cohen, Senior Director Scientific and Regulatory Affairs; Tim Danaher, CFO;
Joanna Engelke, CQO; Ashley Gould, Chief Administrative Officer; Jacob Honig, Head of E-commerce; Mark
Jones, Associate General Counsel; Vittal Kadapakkam, Senior Director Strategic Finance; Sonia Kastner, VP
Global Supply; Vincent Lim, VP, Human Resources; Danna McKay, General Manager; Isaac Pritzer, Advisor to
Executive Team; Bob Robbins, Chief Sales Officer; Wayne Sobon, VP, Intellectual Property; Tevi Troy, VP,
Public Policy; Jacob Turner, Director of Finance; William Ward, Senior IP Counsel; Bryan White, VP Product
Design; Rasmus Wissmann, VP Data.
484 INREJUUL_00061856.
485 JLI01346296
486 INREJUUL_00278352 – 00278359
487 Id.
488 JLI01363643
489 JLI01363649

[Blocks of redacted (blacked-out) text with footnote markers 490, 491, 492, 493]

416.

417.    Over the next year, until the installation of a new CEO in August 2016, Defendants Pritzker, Valani, and Huh used their newly formed Executive Committee to expand the number of e-cigarette users through fraudulent advertising and representations to the public. They cleaned house at JLI by "dismiss[ing] other senior leaders and effectively tak[ing] over the company."[494] Despite any potential internal misgivings about their fraudulent conduct, notably, none of Management Defendants terminated their relationship with JLI during this time period.

**8.    Pritzker, Valani, and Huh continued to exercise control over and direct the affairs of JLI even after a new CEO was appointed.**

418.    Although JLI hired a new CEO in August 2016, Pritzker, Valani, and Huh's Executive Committee does not appear to have been dissolved, and these three Defendants continued to exercise control over and direct the affairs of JLI.

419.    In 2017, the Board—controlled at that time by Pritzker, Valani, and Huh -

---

[490] JLI01363612
[491] JLI01363610
[492] JLI01369376
[493] JLI01369407
[494] Julie Creswell & Sheila Kaplan, *How Juul Hooked a Generation on Nicotine*, N.Y. Times (Nov. 24, 2019), https://www.nytimes.com/2019/11/23/health/juul-vaping-crisis.html.

1  continued to make decisions on the details of the media plans for marketing.

2

3

4

5

6

7  [495]

8    420.    In December 2017, Valani directed aspects of JLI's distribution and dissemination.

9

10  [496]

11    421.    Pritzker also controlled several aspects of JLI's branding.

12

13  [497]

14    422.

15

16

17  [498]

18    423.

19

20  [499]

21    424.

22

23

24  [500]

25

26  ─────────────────────
    [495] INREJUUL_00100719
27  [496] JLI00308379
    [497] JLI01345258
28  [498] JLI01345255
    [499] JLI00322485
    [500] JLI11015358

425.    Pritzker and Valani were also in close control of JLI's public relations and media strategies.



426.

427.

[501] JLI00024566.
[502] JLI00147328
[503] JLI1053533
[504] JLI10529705
[505] JLI00151297; JLI00151298
[506] JLI10071280
[507] JLI10071228

428.

[REDACTED]

429.

[REDACTED]

### 9.    Pritzker and Valani directed and controlled JLI's negotiations with Altria

430.    Pritzker and Valani, along with Kevin Burns, were the lead negotiators for JLI on the Altria deal.

431.    Altria knew that when it was negotiating with JLI, Pritzker and Valani were the company. [REDACTED]

432.    On paper, negotiations were between Howard Willard (Altria's then-CEO), and Pritzker, Valani, and Kevin Burns for JLI. [REDACTED]

---

[508] JLI1007754
[509] JLI10071922
[510] JLI0070326
[511] JLI10064121
[512] JLI01144202
[513] ALGAT0002834151.
[514] ALGAT0000280623

433.

434.    Pritzker and Valani worked to build a partnership with Altria.

435.    Pritzker and Valani continued to communicate with Altria's CEO on behalf of JLI after the negotiations ended.

[515] JLI10530188
[516] JLI10530232
[517] See, e.g., JLI01389789; JLI10523767; JLI01389792; JLI10518886.
[518] ALGAT0000113109
[519] Id.
[520] ALGAT0003889812
[521] ALGAT0003285214

436. Pritzker, Valani, Willard, and Crosthwaite coordinated a response to the Youth Vaping Prevention Plan in July 2019.

[522]

**10. JLI and the Management Defendants Knew Their Efforts Were Wildly Successful in Building a Youth Market and Took Coordinated Action to Ensure That Youth Could Purchase JUUL Products.**

**a. JLI's Strategy Worked.**

437. The Management Defendants knew that the JUUL marketing campaigns they directed and approved were successful in targeting youth. As Reuters has reported, "the first signs that JUUL had a strong appeal to young people came almost immediately after the sleek device went on sale in 2015 . . . . Employees started fielding calls from teenagers asking where they could buy more JUULs, along with the cartridge-like disposable 'pods' that contain the liquid nicotine."[523] A former senior manager told the New York Times that "[s]ome people bought more JLI kits on the company's website than they could individually use—sometimes 10 or more devices." He added that "[f]irst, they just knew it was being bought for resale," but later "when they saw the social media, in fall and winter of 2015, they suspected it was teens."[524] Adam Bowen admitted that "he was aware early on of the risks e-cigarettes posed to teenagers[.]"[525] On January 5, 2016, Gal Cohen forwarded a presentation dated December 16, 2015, which asked the question: "If *large numbers of youth are initiating tobacco use with flavored e-cigarettes*, but adults [*sic*] smokers may benefit from completely switching to an e-cigarette, what should the market look like?"[526] It was common knowledge within JLI that JUULs were being sold to children.

438. After the Vaporized campaign, retail stores began selling out of JUUL

---

[522] ALGAT0003279064
[523] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, Reuters (Nov. 5, 2019), https://www.reuters.com/investigates/special-report/juul-ecigarette/.
[524] Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?: The e-cigarette company says it never sought teenage users, but the F.D.A. is investigating whether Juul intentionally marketed its devices to youth*, NY Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.
[525] *Id.*
[526] INREJUUL_00339938 (emphasis added).

products, and JLI had a difficult time trying to meet demand coming from its online ordering platform.

439.    Furthermore, it was obvious to those outside the company that JLI was selling JUUL products to children. In June 2015, reporting on the "Vaporized" campaign that accompanied the JUUL launch, AdAge reported that John Schachter, director of state communications for Campaign for Tobacco-Free Kids, "expressed concern about the JUUL campaign because of the youth of the men and women depicted in the campaign, especially when adjoined with the design" and added that there had been "obvious trends that appeal to adolescents in e-cigarette campaigns[.]"[527] Robert Jackler, a Stanford physician who investigated JLI's launch campaign, concluded that "JLI's launch campaign was patently youth-oriented."[528] JLI's commercials' attempts to appeal to teenagers were so obvious that, by October 2015, Stephen Colbert ran a satirical segment on it that noted, among other things: "And it's not just ads featuring hip young triangles that appeal to the youths; so do vape flavors like cotton candy, gummi bear, and skittles."[529]

440.    Moreover, the Management Defendants knew that kids were marketing JLI products on social media, and some even sought to take advantage of that to build the JLI brand. For example, on July 16, 2016, Adam Bowen emailed Tyler Goldman about social media posts by children about JUUL e-cigarettes, stating, "I'm astounded by this 'ad campaign' that apparently some rich east coast boarding school kids are putting on."[530] Bowen added that "Riaz [Valani] was thinking maybe we can leverage user generated content."[531]

///

///

///

---

[527] Declan Harty, *JUUL Hopes to Reinvent E-Cigarette Ads with 'Vaporized Campaign'*, AdAge (June 23, 2015), http://adage.com/article/cmo-strategy/juul-hopes-reinvent-e-cigarette-ads¬campaign/299142/.
[528] Erin Brodwin, *See how Juul turned teens into influencers and threw buzzy parties to fuel its rise as Silicon Valley's favorite e-cig company,* Bus. Insider (Nov 26, 2018), https://www.businessinsider.com/stanford-juul-ads-photos-teens-e-cig-vaping-2018-11.
[529] *The Late Show with Stephen Colbert*: *Vaping is So Hot Right Now*, YouTube (Oct. 7, 2015), https://www.youtube.com/watch?v=PMtGca_7leM. The "triangles" ad was a JUUL ad; the listed flavors were not, but JUUL also had flavors that appealed to children.
[530] JLI00382271.
[531] *Id*.

COMPLAINT
Case No. 19-md-02913-WHO

### b.    JLI Closely Tracked Its Progress in Reaching Young Customers through Social Media and Online Marketing

441.    Tracking the behaviors and preferences of youth that are under twenty-one, and especially those under eighteen, has long been essential to the successful marketing of tobacco products. Whether the activity is called "tracking" or "targeting," the purpose has always been the same: getting young people to start smoking and keeping them as customers.

442.    As early as 1953, Philip Morris was gathering survey data on the smoking habits of "a cross section of men and women 15 years of age and over."[532] Commenting on these data, George Weissman, then-Vice President of Philip Morris, observed that "we have our greatest strength in the 15-24 age group."[533]

443.    Traditional approaches to youth tracking (e.g., interviews conducted face-to-face or over the telephone) were limited, however, in that they often failed to capture data from certain subsets of the target market. As a Philip Morris employee noted in a June 12, 1970 memorandum, Marlboro smokers were "among the types of young people our survey misses of necessity (on campus college students, those in the military and those under 18 years of age)."[534]

444.    However, modern technology has removed many of the hurdles that made youth tracking difficult in decades past. With industry connections, e-mail, social media and online forums, JLI can track, and has consistently tracked and monitored its target youth market, including those below the minimum legal age to purchase or use JUUL products.

445.    First, JLI knew from its sales data that the large majority of its customers were under the age of 21.



" [535]

---

[532] Philip Morris Vice President for Research and Development, *Why One Smokes*, First Draft, 1969, Autumn (Minnesota Trial)
[533] *United States v. Philip Morris*, 449 F. Supp. 2d 1, 581 (D.D.C. 2006).
[534] *Id.*
[535] JLI10344468.

COMPLAINT
Case No. 19-md-02913-WHO

446.    Second, using the tools available to it, JLI would have known that its viral marketing program was a resounding success, and in particular with young people.

447.    Between 2015 and 2017, JUUL-related posts on Twitter increased quadratically, which is the exact result to be expected from an effective viral marketing campaign.[538] Its growth on Instagram was likely even more rapid.

448.    A 2018 study of JLI's sales and presence on social media platforms found that JLI grew nearly 700%, yet spent "no recorded money" in the first half of 2017 on major advertising channels, and spent only $20,000 on business-to-business advertising.[539] Despite JLI's apparently minimal advertising spend in 2017, the study found a significant increase in JUUL-related tweets in 2017.[540]

449.    On Instagram, the study found seven JUUL-related accounts, including DoIt4JUUL and JUULgirls, which accounted for 4,230 total JUUL-related posts and had more than 270,000 followers.[541]

450.    In addition to JUUL's explosive growth on individual social media platforms, the study found JUUL products being marketed across platforms in an apparently coordinated fashion, including smaller targeted campaigns and affiliate marketing, all of which caused the

---

[536] *Id.*
[537] *Id.*
[538] *See* Brittany Emelle, et al., *Mobile Marketing of Electronic Cigarettes in the U.S.,* (May 2017), https://www.slideshare.net/YTHorg/mobile-marketing-of-electronic-cigarettes.
[539] Jidong Huang et al., *Vaping versus JUULing: how the extraordinary growth and marketing of JUUL transformed the US retail e-cigarette market*, Tobacco Control (May 31, 2018), https://tobaccocontrol.bmj.com/content/28/2/146.full.
[540] *Id.*
[541] *Id.*

COMPLAINT
Case No. 19-md-02913-WHO

authors to question whether JLI was paying for positive reviews and JUUL-related social media content.

451.    The lead author of the study concluded that JLI was "taking advantage" of the reach and accessibility of multiple social media platforms to "target the youth and young adults . . . because there are no restrictions," on social media advertising.[542]

452.    Similarly, an account named @JUULnation was established on Instagram and posted tips on how to conceal JUUL devices in school supplies. The account also ridiculed efforts to combat JUUL use in schools, promoted videos of JUUL influencers, and promoted videos like the "JUUL Challenge," in which users inhale as much JUUL nicotine vapor as possible in a fixed period of time. JLI repeatedly used the hashtag "#JUULnation" on posts on its own Instagram account, for example when advertising its "Cool Mint" JUULpods, JUUL's portability, or party mode.[543]

453.    A separate study of e-cigarette advertising on mobile devices, where young people spend most of their day consuming media, found that 74% of total advertising impressions were for JUUL products.[544]

454.    A 2019 study found that as much as half of JUUL's Twitter followers were aged thirteen to seventeen.[545]

455.    A 2019 study characterizing JUUL-related Instagram posts between March and May 2018 found that among nearly 15,000 relevant posts from over 5,000 unique Instagram accounts, more than half were related to youth or youth lifestyle.[546]

---

[542] Laura Kelly, *JUUL Sales Among Young People Fueled by Social Media, Says Study*, The Wash. Times (June 4, 2018), https://www.washingtontimes.com/news/2018/jun/4/juul-sales-among-young-people-fueled-by-social-med/.
[543] JLI00682401-484 at 428, 444, 451; *see also* Stanford University, *Research into the Impact of Tobacco Advertising*, http://tobacco.stanford.edu/tobacco_web/images/pod/juul/instagram/large/ig_11.jpg; Stanford University, *Research into the Impact of Tobacco Advertising*, http://tobacco.stanford.edu/tobacco_web/images/pod/juul/instagram/large/ig_12.jpg.
[544] *See* Brittany Emelle et al., *Mobile Marketing of Electronic Cigarettes in the U.S.,* Truth Iniative (May 2017), https://www.slideshare.net/YTHorg/mobile-marketing-of-electronic-cigarettes.
[545] Steven Reinberg, *Study: Half of Juul's Twitter followers are teens, young adults*, HealthDay News, (May 20, 2019) https://www.upi.com/Health_News/2019/05/20/Study-Half-of-Juuls-Twitter-followers-are-teens-young-adults/1981558384957/.
[546] Lauren Czaplicki et al.*, Characterising JUUL-related posts on Instagram*, Truth Initiative (Aug. 1, 2019), https://tobaccocontrol.bmj.com/content/early/2019/07/30/tobaccocontrol-2018-054824.

COMPLAINT
Case No. 19-md-02913-WHO

456.    Some Twitter users have reported what appear to be JUUL bots.[547] Other Twitter users appear to either be bot accounts or native advertisers, in that they have a small number of followers, follow few other users, and post exclusively about JUUL content.[548]

457.    By April 2018, searching "JUUL" on YouTube yielded 137,000 videos with forty-three videos having over 100,000 views.[549] Of these, a huge number were plainly related to underage use, including: 1,730 videos on "hiding JUUL in school," 789 on "JUUL in school bathroom," 992 on "hiding JUUL at home," and 241 on "hiding JUUL in Sharpie."[550]

458.    In 2018, JLI was internally collecting hundreds of social media posts—directed at JLI—informing it of JUUL's wild popularity with young people and in many cases requesting that JLI do something to stop it.[551]

## 11.    JLI Worked with Veratad Technologies To Expand Youth Access to JUUL Products.

459.    At the same time JLI and the Management Defendants were taking coordinated actions to maintain and expand the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base through unlawful marketing and distribution activities, they worked with an outside entity—Veratad Technologies LLC—to get JUULs into the hands of the largest number of users possible.

460.    In furtherance of JLI and the Management Defendants' efforts to secure youth sales so crucial to expanding JUUL's market share (and JLI's profits), and as detailed below, from approximately 2015 to 2018, JLI and Veratad worked together to try to pass as many people as possible through an on-line "age verification" system that users had to pass to be able to order JUUL products.

461.    JLI's website, including its online store, was pivotal to these efforts. Early

---

[547] One example of what appear to be JUUL bots in action on Twitter is available at: https://twitter.com/search?q=juul%20bot&src=typd (last visited Apr. 4, 2020).

[548] Hennrythejuul (@hennrythejuul), Twitter (Mar. 4, 2020, 9:35 am) https://twitter.com/hennrythejuul.

[549] Divya Ramamurthi et al., *JUUL and Other Stealth Vaporizers: Hiding the Habit from Parents and Teachers, Tobacco Control 2019,* Stanford Univ. (Sept. 15, 2018), https://tobaccocontrol.bmj.com/content/tobaccocontrol/28/6/610.full.pdf.

[550] *Id.*

[551] Complaint at 60, People v. JUUL Labs, Inc., No. RG19043543 (Super. Ct. of Cal. Nov. 18, 2019), https://oag.ca.gov/system/files/attachments/press-docs/91186258.pdf.=.

1   marketing documents show that JLI planned a "consumer journey" that started with a consumer

2   being exposed to misleading JUUL marketing in stores, where JUUL's "fun" and

3   "approachable" in-store marketing would lead users to JLI's website for additional

4   misrepresentations and omissions about JUUL products, an email subscription sign-up, and

5   purchases through JLI's ecommerce platform:[552]



18      462.    JLI worked with Veratad to provide age verification services for its website from

19   2015 to 2018. Veratad has also provided age verification services to other e-cigarette sellers,

20   including Lorillard[553] and Altria.[554] Consistent with the claim on Veratad's website that "*You

21   can create your own verification rules*," the company encouraged sellers like JLI to set the

22   desired compliance level for age verification. As a member of a major e-cigarette trade

23   organization, Veratad also offered insight into what competitors were doing, and offered to

24   "guide your setup to follow industry best practices for age verification."

25      463.    Though it is illegal to sell and ship e-cigarettes to minors under both state and

[552] INREJUUL_00329660
[553] Staff of Sen. Richard Durbin et al., 113th Cong., *Gateway to Addiction?* (Apr. 14, 2014),
      https://www.durbin.senate.gov/imo/media/doc/Report%20-%20E-Cigarettes%20with%20Cover.pdf.
[554] INREJUUL_00174362.

1   federal law, JLI and Veratad designed and implemented an age verification system designed to

2   maximize the number of prospective purchasers who "pass" the process, rather than to minimize

3   the number of underage sales.[555] As a result of these intentionally permissive age verification

4   practices, JLI and Veratad used online payment systems and the US mails to ship tens of

5   millions of dollars of JUULpods to unverified customers, many of whom were minors.

6       464.    From June 2015 through the end of 2018, the age verification process on JLI's

7   website typically prompted prospective purchasers to submit their name, address, and date of

8   birth, which JLI forwarded to Veratad. Veratad then attempted to match all or some limited part

9   of the consumer's information to a person of the minimum legal sales age in its database. If

10  Veratad was able to locate a sufficient match of the prospective purchaser to a person of the

11  minimum legal sales age in its database, then it would return a "pass" result to JLI. If Veratad

12  was unable to make such a match, Veratad returned a "fail" result to JLI.

13      465.    If Veratad returned a "fail" result to JLI, rather than decline the prospective

14  purchaser, JLI would prompt the person to enter an "alternate" address. If Veratad still could

15  not find a match based on this alternate address, JLI would prompt the consumer to enter the

16  last four digits of his or her social security number.

17      466.    If Veratad, supplied with the last four digits of a consumer's social security

18  number, still could not match the consumer to a person of the minimum legal sales age in its

19  database, JLI would prompt the consumer to upload an image or photograph of his or her

20  driver's license or another governmental identification document. A JLI employee would then

21  conduct a personal review of the image and decide whether the consumer was of the minimum

22  legal sales age.

23      467.    Crucially, Veratad's age verification system was purposefully flexible, so JLI

24  and Veratad could work together to decide just how closely a prospective purchaser's personal

25  information had to match records in Veratad's database in order to "pass" the age verification

26  process. JLI and Veratad could also set, or modify, the applicable minimum legal sales age to

27

28

---

[555] Complaint at 165, People v. JUUL Labs, Inc., No. RG19043543 (Super. Ct. of Cal. Nov. 18, 2019),
https://oag.ca.gov/system/files/attachments/press-docs/91186258.pdf.=.

1    be used for verification.

2    468.    By the fall of 2015, JLI and Veratad knew that bulk purchases were being made

3    for resale on JLI's website by minors and for resale to minors.[556] For example, on May 25,

4    2016, JLI employees discussed an online purchase of JUUL products made by a fifteen-year-old

5    boy.  A JLI employee wrote that "[t]his order had failed age verification a few times with the

6    person's information as below. The person even uploaded an ID, which was obviously fake and

7    rejected by us. Then, the user entered a different email address and passed from Veratad, and

8    the order was sent."  The employee discussed a communication with Veratad that confirmed

9    that Veratad did not review the date of birth entered by the user when determining whether a

10   person passed age verification for JUUL.  JLI recognized that "[t]his situation can potentially

11   happen again."[557]

12   469.    Internal JLI documents confirm that JLI discussed underage purchases with

13   Veratad. For example, on May 27, 2016, JLI's Head of Compliance & Brand Protection wrote

14   that an "underage purchaser changed his email address; which, allowed the order to be passed

15   by Veratad. . . . I believe that Nick and his team are still looking into the matter with Veratad to

16   see if they can get a better understanding of what happened."  A JLI employee replied "hmmm.

17   Probably impossible to put up an age gate that thwarts a committed teenager from penetrating it

18   :)"[558]

19   470.    Nevertheless, the two companies worked together to find ways to "bump up

20   [JLI's] rate of people who get through age verification."[559] JLI repeatedly sought, and Veratad

21   repeatedly recommended and directed, changes to the age verification process so that more

22   prospective JUUL purchasers would "pass." Both did so in an effort to increase direct sales of

23   JLI's e-cigarettes without regard to whether its less stringent age verification process would

24   permit more underage users to purchase them.

25

26   [556] Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?: The e-cigarette company

27   says it never sought teenage users, but the F.D.A. is investigating whether Juul intentionally marketed its devices
     to youth*, NY Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-
     marketing.html.

28   [557] INREJUUL_00300253-258
     [558] INREJUUL_00209176-180
     [559] INREJUUL_00276489-INREJUUL_00276490

471. Between June 2015 and August 2017 (and perhaps even through early 2018), JLI and Veratad tailored the age verification system to "pass" prospective purchasers even if certain portions of the purchaser's personal information—e.g., the purchaser's street address or date of birth—did not match the information corresponding to a person of the minimum legal sales age in Veratad's database.[560]

472. Similarly, between June 2015 and August 2017, JLI and Veratad tailored the system to "pass" a prospective purchaser under certain circumstances even when the prospective purchaser's year of birth did not match the information corresponding to a person of the minimum legal sales age in Veratad's database.

473. JLI and Veratad sought to increase "pass" rates by modifying the age verification system to allow users multiple opportunities to change their personal information if a match was not initially found in an appropriate government database. A Veratad Performance Report from August 5, 2017 shows that, for 1,963 users Veratad recorded 3,794 transactions—an average of 1.93 attempts per consumer.[561] Only 966 users—less than half—passed age verification on the first attempt.[562] By allowing users to alter their personal information and attempt age verification up to three times, JLI was able to increase its database match pass rate from 49.2% to 61.2%.[563]

474. By design, these lax requirements ensured underage users could "pass" JLI's age verification process and purchase JUUL e-cigarettes directly from JLI's website by using their parent's name, home address, and an approximate date of birth. JLI was aware of this fact, as evidenced by the multiple complaints it received from parents who alleged their children did just that.[564]

---

[560] Complaint at 43, People v. JUUL Labs, Inc., No. RG19043543 (Super. Ct. of Cal. Nov. 18, 2019), https://oag.ca.gov/system/files/attachments/press-docs/91186258.pdf.=. A January 29, 2018 email exchange between Tom Canfarotta, Director of Strategic Accounts & Client Quality Services at Veratad, and Annie Kennedy, JUUL's Compliance Manager, reveals this to have been the case. Kennedy asked Canfarotta why a particular customer had "passed via the address step (public record check)…but we've since learned that is not a correct address—so we're curious as to how it passed." In response, Canfarotta wrote, "Your current rule set does not require a full address match." He went on to explain that approval of the customer was not an anomaly or a mistake; instead, Veratad's age verification system was working exactly the way it was designed.
[561] Id.
[562] Id.
[563] Id.
[564] INREJUUL_00184119.

475.    JLI directed and approved the system it had implemented with Veratad that caused accounts with "bad info" to be "AV approved" but, as a Senior Business Systems Manager at JLI commented, "if [v]eratad passed it [then] it's not on us."

476.    JLI customer service representatives even encouraged those who failed age verification to "make multiple accounts in order to pass AV [age verification]."[565] Customer service representatives would go so far as to alter identifying information for them; a Slack chat among customer service representatives confirmed that representatives were authorized to "adjust the street address, apartment number, or zip code" associated with shipment.[566]

477.    The age verification procedures designed by JLI and Veratad have allowed hundreds of thousands of e-cigarette products to be sold and/or delivered to fictitious individuals at fictitious addresses.[567] Many of these improper sales may have been made to underage purchasers or to resellers who sold the products to underage users on the grey market.[568]

478.    By divorcing the address from the other customer data in the age verification process, JLI and Veratad allowed users to request that tobacco products be sent to locations other than their permanent legal residences.[569] For example, JLI sent thousands of orders to commercial high rises and office parks.[570] It is unlikely these orders would have been approved had JUUL and Veratad required that addresses provided by users match information in an appropriate government database and followed the requirement that the shipping address and billing address be the same.[571]

479.    The failure of the JLI/Veratad age verification procedure was intentional.[572] And despite JLI's concerted effort to enable the sale of federally regulated tobacco products to minors, JLI nevertheless publicly touted Veratad as the "gold standard" of age verification

---

[565] INREJUUL_00215324-INREJUUL_00215325.
[566] Complaint at 168, People v. JUUL Labs, Inc., No. RG19043543 (Super. Ct. of Cal. Nov. 18, 2019), https://oag.ca.gov/system/files/attachments/press-docs/91186258.pdf.=..
[567] *Id.* at 138.
[568] *Id.*
[569] *Id.* at 146
[570] *Id.* at 147.
[571] *Id.*
[572] *Id.* at 173.

services. For example, JLI told a reporter with CBS, Pam Tighe, that "[t]here is an extensive age verification process in place to purchase JUUL online" and that JLI "work[s] with Veratad Technologies, the state-of-the-art, gold-standard for age verification. . . . Veratad uses billions of records from multiple trusted data sources to verify the information customers provide and to ensure customers qualify to access and purchase products from JUULvapor.com."[573] JLI later planned on sending this same, canned false language to a student journalist at Georgetown University.[574] Similarly, a JLI spokesperson told a reporter at a New York newspaper, *ANMY*, that JLI uses "industry-leading ID match and age verification technology to ensure that customers" are over twenty-one years of age and that the "information is verified against multiple databases."[575]

480.    In August 2017, JLI responded to public scrutiny by publicly stating that it would increase the purchase age on its website to 21+ by August 23, 2017. In the weeks leading up to that date, it emailed the approximately 500,000 or more potential customers to report that customers who signed up for JLI's "auto-ship" subscription service before August 23, 2017 would not have to prove that they were 21+ for as long as they maintained the subscription to receive JUULpods. As discussed herein, JLI knew that these marketing emails were being sent to underage individuals, including those who failed age verification. And at the same time, JLI advertised that the most popular flavor among youth, Mango, was now available on its "auto-ship" subscription service. As a result of this scheme, JLI's subscription gains more than offset any losses from the site's heightened age verification requirements.

///
///
///
///
///
///

---

[573] INREJUUL00178123-24.
[574] INREJUUL_00264882-84.
[575] Alison Fox, *'Juul' e-cigarettes require stronger FDA regulation, Schmuer Says*, AMNY, (Oct. 15, 2017), https://www.amny.com/news/juul-e-cigarettes-fda-regulation-1-14485385/.

COMPLAINT
Case No. 19-md-02913-WHO



481.    Further underscoring JLI's purpose of growing the e-cigarette market, even if that meant selling to youth, JLI and Veratad did not require that the year of birth and last four digits of the social security number match exactly the information corresponding to a person of the minimum legal sales age in Veratad's database until August 2018.

482.    Tellingly, after JLI and Veratad implemented industry-standard age verification practices, JLI boasted to the FDA that approval rate for sales on its website had dropped to 27%.

483.    While on one hand JLI continued working with Veratad to ensure minors could purchase JUUL products online, on the other JLI continued to make false and fraudulent statements about the strength of its age verification system. For example, on June 5, 2018, JLI tweeted about its relationship with Veratad, claiming that "We've partnered with Veratad Technologies to complete a public records search, only reporting back whether or not you are 21 years of age or older."[576] In addition, on November 13, 2018, JLI and the Managements Defendants caused a post to appear on JLI's website stating that JLI was "Restricting Flavors to Adults 21+ On Our Secure Website" and that JLI's age-verification system was "an already industry-leading online sales system that is restricted to 21+ and utilizes third party verification."[577] A video accompanying this message stated "At JUUL labs we're committed to leading the industry in online age verification security to ensure that our products don't end up in the hands of underage users" and included an image of a computer with a chain wrapped around it and locked in place.[578] These statements were fraudulent because JLI and the Management Defendants were and had been coordinating with Veratad to ensure that their age verification system did not actually prevent youth from purchasing JUUL products.

484.    Not only did JLI's efforts result in more sales to minors, JLI was also able to build a marketing email list that included minors—a data set that would prove highly valuable to Altria.

---

[576] JUUL Labs, Inc. (@JUULvapor), Twitter (June 5, 2018),
    https://twitter.com/juulvapor/status/1004055352692752386.
[577] *JUUL Labs Action Plan* ("November 2018 Action Plan"), JUUL Labs, Inc. (Nov. 12, 2018),
    https://newsroom.juul.com/juul-labs-action-plan/ (last visited Apr. 30, 2020).
[578] *Id.*

COMPLAINT
Case No. 19-md-02913-WHO

485.    In the summer of 2017, JLI engaged a company called Tower Data to determine the ages of the persons associated with email addresses on its email marketing list. According to this analysis, approximately 269,000 email addresses on JLI's email marketing list were not associated with a record of an individual who had "passed" JLI's age verification process.[579] Additionally, approximately 40,000 email addresses on JLI's email marketing list were associated with records of individuals who had "failed" JLI's own age verification process.[580] Tower Data informed JLI that 83% of the approximately 420,000 email addresses on JLI's marketing list could not be matched with the record of an individual at least eighteen years of age.[581]

486.    Despite knowing that their marketing list included minors, JLI continued to use that marketing list to sell JUUL products, and then shared that list with Altria to use for its marketing purposes.

487.    JLI and the Management Defendants knew, however, that it was not enough to disseminate advertisements and marketing materials that promote JLI to youth or to open online sales to youth, while omitting mention of JUUL's nicotine content and manipulated potency. To truly expand the nicotine market, they needed to deceive those purchasing a JUUL device and JUULpods as to how much nicotine they were actually consuming. And, through Pritzker, Huh, and Valani's control of JLI's Board of Directors, they did just that.

**12.    JLI Engaged in a Sham "Youth Prevention" Campaign**

488.    By April 2017, JLI had determined that the publicity around its marketing to children was a problem. Ashley Gould, the company's General Counsel and Chief Regulatory and Communications Officer, thus sought to "hire a crisis communication firm to help manage the youth interest JUUL has received[.]"[582] By June 2017, JLI began developing a "youth

---

[579] Complaint at 121, *Commonwealth of Massachusetts v. JUUL, et al.*, No. 20-00402 (Super. Ct. of Mass. Feb. 12, 2020) https://www.mass.gov/doc/juul-complaint/download; Janice Tan, *E-cigarette firm JUUL sued for using programmatic buying to target adolescents*, Marketing (Feb. 14, 2020), https://www.marketing-interactive.com/e-cigarette-firm-juul-sued-for-using-programmatic-buying-to-target-adolescents.
[580] *Id.*
[581] *Id.*
[582] INREJUUL_00264878; *see also* INREJUUL_00265042 (retaining Sard Verbinnen, a strategic communications firm).

prevention program[.]"[583] While ostensibly aimed at reducing youth sales, JLI's youth prevention program actually served to increase, not reduce, sales to children.

489.    By December 2017, JLI's youth prevention program included extensive work with schools.[584] JLI paid schools for access to their students during school time, in summer school, and during a Saturday School Program that was billed as "an alternative to 'traditional discipline' for children caught using e-cigarettes in school."[585] JLI created the curriculum for these programs, and, like the "Think Don't Smoke" campaign by Philip Morris, which "insidiously encourage[d] kids to use tobacco and become addicted Philip Morris customers[,]"[586] JLI's programs were shams intended to encourage youth e-cigarette use, not curb it. According to testimony before Congress, during at least one presentation, "[n]o parents or teachers were in the room, and JUUL's messaging was that the product was 'totally safe.' The presenter even demonstrated to the kids how to use a JUUL."[587] Furthermore, JLI "provided the children snacks" and "collect[ed] student information from the sessions."[588]

490.    The problems with JLI's youth prevention programs were widespread. According to outside analyses, "the JUUL Curriculum is not portraying the harmful details of their product, similar to how past tobacco industry curricula left out details of the health risks of cigarette use."[589] Although it is well-known that teaching children to deconstruct ads is one of the most effective prevention techniques, JLI programs entirely omitted this skill, and JLI's curriculum barely mentioned JUUL products as among the potentially harmful products to avoid.[590] As one expert pointed out, "we know, more from anecdotal research, that [teens] may consider [JUULs] to be a vaping device, but they don't call it that. So when you say to a young

---

[583] *See, e.g.*, INREJUUL_00211242.
[584] INREJUUL_00173409.
[585] Subcommittee on Economic and Consumer Policy Memo (July 25, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Supplemental%20Memo.pdf.
[586] William V. Corr, *American Legacy Foundation Study Shows Philip Morris 'Think Don't Smoke' Youth Anti-Smoking Campaign is a Sham*, Campaign for Tobacco Free Kids (May 29, 2002), https://www.tobaccofreekids.org/press-releases/id_0499.
[587] Subcommittee on Economic and Consumer Policy Memo (July 25, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Supplemental%20Memo.pdf.
[588] *Id.*
[589] Victoria Albert, *Juul Prevention Program Didn't School Kids on Dangers, Expert Says*, The Daily Beast (Oct. 19, 2018), https://www.thedailybeast.com/juul-prevention-program-didnt-school-kids-on-dangers-expert-says.
[590] *Id.*

COMPLAINT
Case No. 19-md-02913-WHO

person, 'Vapes or e-cigarettes are harmful,' they say, 'Oh I know, but I'm using a JUUL.'"[591]

491.    Internal emails confirm both that JLI employees knew about the similarities of JLI's "youth prevention program" to the earlier pretextual antismoking campaigns by the cigarette industry and that JLI management at the highest levels was personally involved in these efforts. In April 2018, Julie Henderson, the Youth Prevention Director, emailed school officials about "the optics of us attending a student health fair" because of "how much our efforts seem to duplicate those of big tobacco (Philip Morris attended fairs and carnivals where they distributed various branded items under the guise of 'youth prevention')."[592] She later wrote that she would "confirm our participation w[ith] Ashley & Kevin"[593]—an apparent reference to Kevin Burns, at the time the CEO of JLI, who would later personally approve JLI's involvement in school programs. In May 2018, Julie Henderson spoke with former members of Philip Morris's "youth education" team,[594] and Ashley Gould received and forwarded what was described as "the paper that ended the Think Don't Smoke campaign undertaken by Philip Morris."[595] The paper concluded that "the Philip Morris campaign had a counterproductive influence."[596]

492.    JLI also bought access to teenagers at programs outside of school. For example, JLI paid $89,000 to the Police Activities League of Richmond, California, so that all youth in the Richmond Diversion Program—which targeted "youth, aged 12-17, who face suspension from school for using e-cigarettes and/or marijuana" and "juveniles who have committed misdemeanor (lesser category) offenses"—would "participate in the JUUL labs developed program, Moving Beyond" for as long as ten weeks.[597] Similarly, JLI paid $134,000 to set up a summer program for 80 students from a charter school in Baltimore, Maryland.[598] Participants

---

[591] *Id.*

[592] INREJUUL_00197608.

[593] INREJUUL_00197607.

[594] INREJUUL_00196624.

[595] INREJUUL_00265202.

[596] Matthew C. Farrelly et al., *Getting to the Truth: Evaluating National Tobacco Countermarketing Campaigns*, 92 Am. J. Public Health 901 (2002).

[597] JLI-HOR-00002181 – 00002182.

[598] INREJUUL_00194247; Invoice to JUUL Labs from The Freedom & Democracy Schools, Inc. for $134,000, dated June 21, 2018, https://oversight.house.gov/sites/democrats.oversight.house.gov/files/JLI-HOR-00003711.pdf.

were "recruited from grades 3 through 12"[599] and worked closely with teachers to develop personal health plans. JLI paid nearly 70% of the cost of hiring eight teachers, eight instructional aides, and three other support personnel for the program.[600]

493.    JLI was aware that these out-of-school programs were, in the words of Julie Henderson, "eerily similar" to the tactics of the tobacco industry.[601] In June 2018, Ms. Henderson described "current executive concerns & discussion re: discontinuing our work w[ith] schools[.]"[602] Eventually, JLI ended this version of the youth prevention program, but the damage had been done: following the playbook of the tobacco industry, JLI had hooked more kids on nicotine.

494.    The Board was intimately involved in these "youth prevention" activities. For example, in April 2018, Riaz Valani and Nicholas Pritzker edited a youth prevention press release, noting that they "don't want to get these small items wrong" and "think it's critical to get this right."[603]

**13.    The FDA Warned JUUL and Others That Their Conduct is Unlawful**

495.    Throughout 2018, the FDA put JLI and others in the e-cigarette industry on notice that their practices of marketing to minors needed to stop. It issued a series of warnings letters and enforcement actions:

496.    On February 24, 2018, the FDA sent a letter to JLI expressing concern about the popularity of its products among youth and demanding that JLI produce documents regarding its marketing practices.[604]

497.    In April 2018, the FDA conducted an undercover enforcement effort, which resulted in fifty-six warning letters issued to online retailers, and six civil money complaints to retail establishments, all of which were related to the illegal sale of e-cigarettes to

---

[599] INREJUUL_0019428.
[600] The Freedom & Democracy Schools, Inc., *Proposal to JUUL Labs for Funding the Healthy Life Adventures Summer Pilot* (June 9, 2018), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/JLI-HOR-00002789_Redacted.pdf.
[601] INREJUUL_00194646.
[602] INREJUUL_00194646.
[603] JLI00151300.
[604] Matthew Holman, *Letter from Director of Office of Science, Center for Tobacco Products, to Zaid Rouag, at JUUL Labs, Inc.*, U.S. FDA (Apr. 24, 2018), https://www.fda.gov/media/112339/download.

1  minors.[605] Manufacturers such as JLI were also sent letters requesting documents regarding

2  their marketing and sales methods.[606]

3      498.    In May 2018, the FDA again issued more warning letters to manufacturers,

4  distributors, and retailers of e-liquids for labeling and advertising violations; these labels and

5  advertisements targeted children and resembled children's food items such as candy or

6  cookies.[607]

7      499.    In September 2018, the FDA engaged in several other regulatory enforcement

8  actions, issuing over 1300 warning letters and civil money complaints to e-cigarette and e-liquid

9  retailers and distributors.[608]

10     500.    On September 12, 2018, the FDA sent letters to JLI and other e-cigarette

11 manufacturers putting them on notice that their products were being used by youth at disturbing

12 rates.[609] The FDA additionally requested manufacturers to enhance their compliance monitoring

13 mechanisms, implement stricter age verification methods, and limit quantities and volume of e-

14 cigarette products that could be purchased at a time.[610]

15     501.    Finally, in October 2018, the FDA raided JLI's headquarters and seized more

16 than a thousand documents relating to JLI's sales and marketing practices.[611] Since then, the

17 FDA, the Federal Trade Commission, multiple state attorneys general and the U.S. House of

18 Representatives Committee on Oversight and Reform have all commenced investigations into

19 JLI's role in the youth e-cigarette epidemic and whether JLI's marketing practices purposefully

20 targeted youth.

21     502.    Siddharth Breja, who was senior vice president for global finance at JLI,

22

23 ───────────────────────────

[605] *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization*, U.S. FDA (Jan. 2020), https://www.fda.gov/media/133880/download.
24 [606] *Id.*
[607] *Id.*
25 [608] *Id.*
[609] *Letter from US FDA to Kevin Burns*, U.S. FDA (Sept. 12, 2018), https://www.fda.gov/media/119669/download.
26 [610] Press Release, *FDA takes new steps to address epidemic of youth e-cigarette use, including a historic action against more than 1,300 retailers and 5 major manufacturers for their roles perpetuating youth access*, US FDA
27 (Sept. 11, 2018), https://www.fda.gov/news-events/press-announcements/fda-takes-new-steps-address-epidemic-youth-e-cigarette-use-including-historic-action-against-more.
[611] Laurie McGinley, *FDA Seizes Juul E-Cigarette Documents in Surprise Inspection of Headquarters*, Wash. Post
28 (Oct. 2, 2018), https://www.washingtonpost.com/health/2018/10/02/fda-seizes-juul-e-cigarette-documents-surprise-inspection-headquarters/.

1    "claims that after the F.D.A. raided Juul headquarters in October 2018, seeking internal

2    documents, Mr. Burns instructed Mr. Breja and other executives not to put anything relating to

3    regulatory or safety issues in writing, so that the F.D.A. could not get them in the future."[612]

4        **14.**     **In Response to Regulatory Scrutiny, Defendants Misled the Public,**

5                   **Regulators, and Congress that JLI Did Not Target Youth**

6        503.     To shield their youth-driven success from scrutiny, Altria, JLI, and the

7    Management Defendants' had a long-running strategy to feign ignorance over JLI and the

8    Management Defendants' youth marketing efforts and youth access to JLI's products. They

9    were well aware that JLI's conduct in targeting underage users was reprehensible and unlawful,

10    and that if it became widely known that this was how JLI obtained its massive market share,

11    there would be a public outcry and calls for stricter regulation or a ban on JLI's products. Given

12    the increasing public and regulatory scrutiny of JLI's market share and marketing tactics, a dis-

13    information campaign was urgently needed to protect the Defendants' bottom line. For this

14    reason, JLI, the Management Defendants, and Altria all hid JLI's conduct by vociferously

15    denying that JLI had marketed to and targeted youth and instead falsely claimed that JLI

16    engaged in youth prevention. Defendants continued to make these statements while and after

17    actively and successfully trying to market to and recruit youth non-smokers. These false

18    statements were designed to protect JLI's market share, and Altria's investment, by concealing

19    JLI's misconduct.

20        504.     For example, after 11 senators sent a letter to JLI questioning its marketing

21    approach and kid-friendly e-cigarette flavors like Fruit Medley, Creme Brulee and mango, JLI

22    visited Capitol Hill and told senators that it never intended its products to appeal to kids and did

23    not realize youth were using its products, according to a staffer for Sen. Dick Durbin (D-Ill.).

24    JLI's statements to Congress—which parallel similar protests of innocence by tobacco company

25    executives—were false.

26        505.     Defendants also caused JLI to make public statements seeking to disavow

27

28

---

[612] Sheila Kaplan & Jan Hoffman, *Juul Knowingly Sold Tainted Nicotine Pods, Former Executive Say*, N.Y. Times (Nov. 20, 2019), https://www.nytimes.com/2019/10/30/health/juul-pods-contaminated.html.

COMPLAINT
Case No. 19-md-02913-WHO

the notion that it had targeted and sought to addict teens:

- "It's a really, really important issue. **We don't want kids using our products**." (CNBC Interview of JLI's Chief Administrative Officer, December 14, 2017)[613]
- "We market our products responsibly, following strict guidelines to have material directly **exclusively toward adult smokers and never to youth audiences**." (JLI Social Media Post, March 14, 2018)[614]

- "Our company's mission is to eliminate cigarettes and **help the more than one billion smokers worldwide switch to a better alternative**," said JUUL Labs Chief Executive Officer Kevin Burns. "We are already seeing success in our efforts to enable adult smokers to transition away from cigarettes and believe our products have the potential over the long-term to contribute meaningfully to public health in the U.S. and around the world. At the same time, we are committed to deterring young people, as well as adults who do not currently smoke, from using our products. **We cannot be more emphatic on this point: No young person or non-nicotine user should ever try JUUL**." (JLI Press Release, April 25, 2018);[615]

- "Our objective is to provide the 38 million American adult smokers with **meaningful alternatives to cigarettes while also ensuring that individuals who are not already smokers, particularly young people, are not attracted to nicotine products such as JUUL**," said JUUL Labs Chief Administrative Officer Ashley Gould, who heads the company's regulatory, scientific and youth education and prevention programs. "We want to be a leader in seeking solutions, and are actively engaged with, and listening to, community leaders, educators and lawmakers on how best to effectively keep young people away from JUUL." (JLI Press Release, April 25, 2018);[616]
- "Of course, we understand that **parents and lawmakers are concerned about underage use of JUUL. As are we**. We can't restate this enough. As an independent company that is not big tobacco, we are driven by our mission and commitment to adult smokers." (JLI CEO Kevin Burns Letter to JUUL Community on Reddit, July 18, 2018)[617]

- "We welcome the opportunity to work with the Massachusetts Attorney General because, **we too, are committed to preventing underage use of JUUL**. We utilize stringent online tools to block attempts by those under the age of 21 from purchasing our products, including unique ID match and age verification

---

[613] Angelica LaVito, *Nearly one-quarter of teens are using pot*, CNBC (Dec. 14, 2017), https://www.cnbc.com/2017/12/13/marijuana-and-nicotine-vaping-popular-among-teens-according-to-study.html (Interview with Ashely Gould, JUUL Chief Administrative Officer) (emphasis added).

[614] Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*, Stanford Research Into the Impact of Tobacco Advertising 15 (Jan. 31, 2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf (citing a JUUL social media post from March 14, 2018) (emphasis added).

[615] JUUL Labs, Inc., *JUUL Labs Announces Comprehensive Strategy to Combat Underage Use*, MarketWatch (Apr. 25, 2018), https://www.marketwatch.com/press-release/juul-labs-announces-comprehensive-strategy-to-combat-underage-use-2018-04-25 (emphasis added).

[616] *Id* (emphasis added).

[617] *A Letter to the JUUL Community from CEO Kevin Burns*, Reddit (July 18, 2018), https://www.reddit.com/r/juul/comments/8zvlbh/a_letter_to_the_juul_community_from_ceo_kevin/ (emphasis added).

technology. Furthermore, we have never marketed to anyone underage. Like many Silicon Valley technology startups, our growth is not the result of marketing but rather a superior product disrupting an archaic industry. When adult smokers find an effective alternative to cigarettes, they tell other adult smokers. That's how we've gained 70% of the market share. . . Our ecommerce platform utilizes unique ID match and age verification technology to make sure minors are not able to access and purchase our products online." (Statement from Matt David, JLI Chief Communications Officer, July 24, 2018);[618]

- **"We did not create JUUL to undermine years of effective tobacco control, and we do not want to see a new generation of smokers**. . . . We want to be part of the solution to end combustible smoking, not part of a problem to attract youth, never smokers, or former smokers to nicotine products. . . .We adhere to strict guidelines to ensure that our marketing is directed towards existing adult smokers."." (JLI's website as of July 26, 2018);[619]

- "We don't want anyone who doesn't smoke, or already use nicotine, to use JUUL products. We certainly don't want youth using the product. It is bad for public health, and it is bad for our mission. JUUL Labs and FDA share a common goal – preventing youth from initiating on nicotine. . . . **Our intent was never to have youth use JUUL products**." (JLI Website, November 12, 2018)[620]

- "To paraphrase Commissioner Gottlieb, **we want to be the offramp for adult smokers** to switch from cigarettes, not an on-ramp for America's youth to initiate on nicotine." (JLI Website, November 13, 2018)[621]

- "Any underage consumers using this product are absolutely a negative for our business. We don't want them. **We will never market to them. We never have.**" (James Monsees, quoted in *Forbes*, November 16, 2018);[622]

- "First of all, I'd tell them that I'm sorry that their child's using the product. **It's not intended for them**. I hope there was nothing that we did that made it appealing to them. As a parent of a 16-year-old, I'm sorry for them, and I have empathy for them, in terms of what the challenges they're going through." (CNBC Interview of JLI CEO, July 13, 2019)[623]

---

[618] *Statement Regarding The Press Conference Held By The Massachusetts Attorney General*, JUUL Labs, Inc. (July 24, 2018), https://newsroom.juul.com/statement-regarding-the-press-conference-held-by-the-massachusetts-attorney-general/ (emphasis added).

[619] *Our Responsibility*, JUUL Labs, Inc. (July 26, 2018), https://web.archive.org/web/20180726021743/https://www.juul.com/our-responsibility (last visited Mar. 29, 2020) (emphasis added).

[620] *JUUL Labs Action Plan*, JUUL Labs, Inc. (Nov. 13, 2018), https://newsroom.juul.com/juul-labs-action-plan/ (statement of Ken Burns, former CEO of JUUL) (emphasis added).

[621] *Id*. (emphasis added).

[622] Kathleen Chaykowski, *The Disturbing Focus of Juul's Early Marketing Campaigns*, Forbes (Nov. 16, 2018 2:38 PM), https://www.forbes.com/sites/kathleenchaykowski/2018/11/16/the-disturbing-focus-of-juuls-early-marketing-campaigns/#3da1e11b14f9 (emphasis added) (statement of James Monsees).

[623] Angelica LaVito, *As JLI grapples with teen vaping 'epidemic,' CEO tells parent 'I'm sorry'*, CNBC (July 13, 2019), https://www.cnbc.com/2019/07/13/as-juul-deals-with-teen-vaping-epidemic-ceo-tells-parents-im-sorry.html (emphasis added).

- "We have **no higher priority than to prevent youth usage of our products** which is why we have taken aggressive, industry leading actions to combat youth usage." (JLI Website, August 29, 2019)[624]

- James Monsees, one of the company's co-founders, said **selling JUUL products to youth was "antithetical to the company's mission."**(James Monsees' Statement to New York Times, August 27, 2019)[625]

- Adam Bowen, one of the company's co-founders, said he was aware early on of the risks e-cigarettes posed to teenagers, and the **company had tried to make JUUL "as adult-oriented as possible.**"(Adam Bowen's Statement to the New York Times, August 27, 2019);[626]

- **"We have never marketed to youth and we never will**."(JLI Statement to Los Angeles Times, September 24, 2019);[627]

- "I have long believed in a future where adult smokers overwhelmingly choose alternative products like JUUL. **That has been this company's mission since it was founded,** and it has taken great strides in that direction." (JLI's CEO K.C. Crosthwaite, September 25, 2019);[628]

- "As scientists, product designers and engineers, we believe that vaping can have a positive impact when used by adult smokers, and can have a negative impact when used by nonsmokers. **Our goal is to maximize the positive and reduce the negative.**" (JLI Website, March 6, 2020);[629]

- "**JUUL was designed with adult smokers in mind.**" (JLI Website, last visited March 29, 2020).[630]

506.    Defendants either made these statements directly or caused them to be transmitted as a part of their schemes to defraud the public about what they were selling and to whom.

507.    Altria also engaged in wire fraud when it made public statements seeking to disavow the notion that JLI had targeted and sought to addict teens:

- "Altria and JUUL are committed to preventing kids from using any tobacco products. As recent studies have made clear, youth vaping is a serious problem, which both Altria and JUUL are committed to solve. **As JUUL previously said,**

---

[624] *Our Actions to Combat Underage Use*, JUUL Labs, Inc. (Aug. 29, 2019), https://newsroom.juul.com/our-actions-to-combat-underage-use/ (JUUL statement in response to lawsuits) (emphasis added).

[625] Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?*, N.Y. Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html (emphasis added).

[626] *Id* (emphasis added).

[627] Michael Hiltzik, *Column: Studies show how JLI exploited social media to get teens to start vaping*, L.A. Times (Sept. 24, 2019), https://www.latimes.com/business/story/2019-09-24/hiltzik-juul-target-teens (statement made on behalf of JUUL) (emphasis added).

[628] Juul Labs Names New Leadership, Outlines Changes to Policy and Marketing Efforts, JUUL Labs, Inc. (Sept. 25, 2019), https://newsroom.juul.com/juul-labs-names-new-leadership-outlines-changes-to-policy-and-marketing-efforts/ (emphasis added) (statement by K.C. Crosthwaite).

[629] *Our Mission*, JUUL LABS (2019), https://www.juul.com/mission-values (last visited Apr. 4, 2020) (emphasis added).

[630] JUUL Labs, Inc., https://www.juul.com/ (last visited Mar. 29, 2020) (emphasis added).

COMPLAINT
Case No. 19-md-02913-WHO

**'Our intent was never to have youth use JUUL products.'"** (Altria News Release, December 20, 2018).[631]

508.    However, JLI, the Management Defendants, and Altria realized that attempting to shift public opinion through fraudulent statements was not enough to achieve their goal of staving off regulation. To accomplish this goal, they would also need to deceive the FDA and Congress. And so they set out to do just that through statements and testimony by JLI representatives. These include, but are not limited to, the following:

***Statements by JLI to the FDA:***

- "JUUL was not designed for youth, **nor has any marketing or research effort since the product's inception been targeted to youth**." (Letter to FDA, June 15, 2018).[632]
- "With this response, the Company hopes FDA comes to appreciate why the product was developed and **how JUUL has been marketed — to provide a viable alternative to cigarettes for adult smokers**." (Letter to FDA, June 15, 2018).[633]

***Statements by Altria to the FDA:***

- "**[W]e do not believe we have a current issue with youth access** to or use of our pod-based products, we do not want to risk contributing to the issue." (Letter from Altria CEO to FDA Commissioner Scott Gottlieb, October 25, 2018).[634]
- "We believe e-vapor products present an important opportunity to **adult smokers to switch from combustible cigarettes**." (Letter to FDA Commissioner Gottlieb, 10/25/18)

***Statements by JLI to Congress:***

- "**We never wanted any non-nicotine user, and certainly nobody under the legal age of purchase, to ever use JLI products**. . . .That is a serious problem. Our company has no higher priority than combatting underage use." (Testimony of James Monsees, July 25, 2019).[635]

---

[631] Altria Group, Inc., *Altria Makes $12.8 Billion Minority Investment to Accelerate Harm Reduction and Drive Growth* ("Altria Minority Investment") (Form 8-K), Ex. 99.1 (Dec. 20, 2018), https://www.sec.gov/Archives/edgar/data/764180/000119312518353970/d660871dex991.htm (emphasis added).

[632] Letter from JUUL's Counsel at Sidley Austin to Dr. Matthew Holman, FDA at 2 (June 15, 2018) (emphasis added).

[633] *Id.* at 3 (emphasis added).

[634] Letter from Altria CEO Howard Willard to Dr. Scott Gottlieb, FDA at 2 (October 25, 2018) (emphasis added).

[635] *Examining Juul's Role in the Youth Nicotine Epidemic*, *Hearing Before the H. Comm. on Oversight and Reform*, *Subcomm. on Econ. and Consumer Policy*, 116th Cong. 1 (2019) (statement of James Monsees, Co-Founder, JUUL Labs, Inc.)., https://docs.house.gov/meetings/GO/GO05/20190725/109846/HHRG-116-GO05-Wstate-MONSEESJ-20190725.pdf.

COMPLAINT
Case No. 19-md-02913-WHO

- "Our product is **intended to help smokers stop smoking combustible cigarettes**." (Ashley Gould, JLI Chief Administrative Officer, Testimony before House Committee on Oversight and Reform, July 25, 2019).[636]

**Statements by Altria to Congress:**

- "In late 2017 and into early 2018, we saw that the previously flat e-vapor category had begun to grow rapidly. JUUL was responsible for much of the category growth and **had quickly become a very compelling product among adult vapers**. We decided to pursue an economic interest in JUUL, believing that an investment would **significantly improve our ability to bring adult smokers a leading portfolio of non-combustible products** and strengthen our competitive position with regards to potentially reduced risk products." (Letter from Altria CEO to Senator Durbin, October 14, 2019).[637]

509.    Each of the foregoing statements constitutes an act of wire fraud. JLI, Monsees, and Altria made these statements, knowing they would be transmitted via wire, with the intent to deceive the public, the FDA, and Congress as to the Defendants' true intentions of hooking underage users.

510.    Their disinformation scheme was successful. While certain groups such as the American Medical Association were calling for a "sweeping ban on vaping products,"[638] no such ban has been implemented to date. Accordingly, JLI's highly addictive products remain on the market and available to underage users.

**F.    Altria Provided Services to JLI to Expand JUUL Sales and Maintain JUUL's Position as the Dominant E-Cigarette.**

**1.    Before Altria's Investment in JLI, Altria Knew JLI Was Targeting Youth.**

511.    As stated above, according to Howard Willard, Altria first contacted JLI about a commercial relationship in early 2017, with "confidential discussions" spearheaded by Pritzker and Valani, on the one hand, and senior executives of Altria and Altria Client Services on the other, beginning in the Spring of 2017.[639]  These continued for eighteen months, culminating in Altria's December 2018 equity investment in JLI.

---

[636] *Examining Juul's Role in the Youth Nicotine Epidemic*, *Hearing Before the H. Comm. on Oversight and Reform*, *Subcomm. on Econ. and Consumer Policy*, 116th Cong. (2019) (statement of Ashley Gould, Chief Administrative Officer, JUUL Labs, Inc. )., https://www.c-span.org/video/?462992-1/hearing-cigarettes-teen-usage-day-2&start=6431 at 01:53:25 (emphasis added).

[637] Letter from Howard A. Willard III, Altria to Senator Richard J. Durbin, 6 (October 14, 2019) (emphasis added).

[638] Karen Zraick, *A.M.A. Urges Ban on Vaping Products as JLI is Sued by More States*, N.Y. Times (Nov. 19, 2019), https://www.nytimes.com/2019/11/19/health/juul-lawsuit-ny-california.html.

[639] Altria's October 14, 2019 letter to Senator Durbin, et. al., by Howard Willard III (2019).

COMPLAINT
                                            Case No. 19-md-02913-WHO

512.    While at first blush, these meetings between Altria and Altria Client Services and Pritzker and Valani about potential investment—described in detail below—might seem like ordinary business activity, they were anything but. For nearly 18 months, Altria and Altria Client Services dangled the carrot of a multi-billion dollar payout in front of Pritzker and Valani—months in which Pritzker, Valani, and the other Management Defendants committed numerous acts of fraud to grow the business of JLI in order to satisfy Altria's expectations. And at the same time, Altria and Altria Client Services were actively courting Pritzker and Valani with that promised payout, they were gathering information on JLI that confirmed Altria would be purchasing a company with a proven track-record of sales to youths.

513.    Even before 2017, Altria and Altria Client Services—as with anyone paying attention to the e-vapor industry at the time—were well aware that JLI had been targeting kids with its youthful marketing. As noted above, JLI's "Vaporized" campaign had made its way into the national zeitgeist, with Stephen Colbert noting that the advertising appealed "to the youths." So, not only did Altria and Altria Client Services know JLI was targeting kids at the time it reached out to begin negotiations, it also knew that such targeting was highly successful.



514.

640 ALGAT0002412177
641 As discussed below, JLI had a partnership with Avail Vapor in which Avail gathered detailed data on the sale of JUUL products. Also discussed below, Altria was a minority owner of Avail at the time.



515.

516.

**2.    Altria Worked with Pritzker and Valani to Secure Control of JLI and to Exploit JLI for Their Mutual Benefit.**

517.    The initial discussions between Altria (and Altria Client Services) and JLI's leadership

"642

518.    Internal documents from the time show that Altria was eyeing JLI as an acquisition target.

---

642 JLI01369848



519.

520.    From the very beginning of their negotiations, it was clear to Altria and Altria

Client Services that they were operating within a closing window in which JLI's sales to youths

---

[643] ALGAT0002412177
[644] INREJUUL_00349529.
[645] ALGAT0002412181

COMPLAINT
Case No. 19-md-02913-WHO

1    could continue unabated. ███████████████████████████████

2    ████████████████████████████████████████████████████

3    ███████████████████████████████████████ [646] And as set forth below,

4    Altria and Altria Client Services were well aware of the public scrutiny of JLI's youth

5    marketing efforts, which could only lead to unfavorable regulatory action. Altria and Altria

6    Client Services had to convince Pritzker and Valani to let Altria acquire or buy into JLI before it

7    was too late.

8        521.



24       522.    From the very beginning of their relationship, Altria and Altria Client Services

25   communicated to Pritzker and Valani—who, in turn, communicated to Defendants Bowen,

26   Monsees, and Huh—that they would profit handsomely by accepting Altria's investment and

27

28   ───────────────────────
[646] *Id.*
[647] ALGAT0002834151
[648] *Id.*

1    following its lead in growing the business of JLI. Of course, and as set forth herein, this growth

2    would be pursued through fraud and deceit to both the public and regulators.

3        523.    ████████████████████████████ Pritzker and Valani

4    were the perfect choice to liaise with Altria and Altria Client Services on behalf of the

5    Management Defendants. Pritzker has been long familiar with the tobacco industry from his

6    family's ownership of chewing-tobacco giant Conwood before selling it to Reynolds American,

7    Inc., a subsidiary of British American Tobacco. And Valani, for his part, was intimately familiar

8    with the business of JLI. He was the company's first "angel investor" and was a regular

9    presence within the halls of JLI (then Pax Labs) well before the company even had a working

10   product.[649] Notably, Pritzker and Valani are the only Defendants who have admitted to using

11   non-discoverable messaging services to communicate regarding JLI business. Pritzker and

12   Valani both used the "Confide" messaging application, which allows users to send encrypted,

13   ephemeral and screenshot proof messages.[650] And Pritzker and Valani both used Signal, which

14   provides state-of-the-art end-to-end encryption for phone calls and messages.[651]

15       524.    Altria was an ideal model for growing JLI. Altria, including through its

16   subsidiaries, has decades of experience targeting kids through youth-appealing marketing

17   images and themes.[652] It also had decades of experience using flavors to hook kids, and still

18   does so in many international markets.[653] And Altria has decades of experience misleading and

19   lying to the public about their efforts to target kids through marketing and flavors, and making

20   similar fraudulent representations to regulators in order to delay or deter regulations.[654] Yet,

21   because it was a party to the Master Settlement Agreement, many of the tactics used by JLI to

22

---

23   [649] Alex Norcia, JUUL Founders' First Marketing Boss Told Us the Vape Giant's Strange, Messy Origins, VICE
        (Nov. 5, 2019), https://www.vice.com/en/article/43kmwm/juul-founders-first-marketing-boss-told-us-the-vape-
24      giants-strange-messy-origins.
     [650] Riaz Valani's Responses and Objections to Plaintiffs' First Set of Interrogatories; Nicholas Pritzker's Responses
25      and Objections to Plaintiffs' First Set of Interrogatories.
     [651] Id.
26   [652] Hafez, N., & Ling, P. M. (2005). How Philip Morris built Marlboro into a global brand for young adults:
        implications for international tobacco control. Tobacco Control, 14(4), 262-271. Retrieved from
27      https://escholarship.org/uc/item/5tp828kn
     [653] Campaign for Tobacco Free Kids, The Facts about Philip Morris International: Company Is Cause of the
28      Tobacco Problem, Not the Solution (November 15, 2017), available at
        https://www.tobaccofreekids.org/assets/images/content/PMI_bad_acts.pdf.
     [654] See, e.g., United States v. Philip Morris USA, Inc., 449 F. Supp. 2d 1 (D.D.C. 2006).

COMPLAINT
                                    Case No. 19-md-02913-WHO

target kids were unavailable to Altria. So Altria and Altria Client Services found a new way, drawing on Altria's storied history of unlawful activity to partner to the Management Defendants in JLI's fraud at every turn. The result was bundles of cash for the Management Defendants, a new generation of youth customers for Altria and its subsidiaries, and a public left reeling from a rapidly growing youth vaping epidemic.



525.

526.

527.

[655] ALGAT0000082947
[656] *Id.*
[657] *Id.*
[658] ALGAT0000112523
[659] *Id.*



528.    Communications between Altria, Altria Client Services, Pritzker, and Valani were frequent and their meetings continued at a regular pace over the next year and a half.

529.

530.    Altria and Altria Client Services and Pritzker and Valani continued their correspondence between December 2017 and July 2018.

---

[660] ALGAT0000025589; ALGAT0000041165.
[661] ALGAT0000036407; ALGAT0000111921
[662] ALGAT0002817348



531.

[663] JLIFTC00639178
[664] JLIFTC00638936; ALGAT0005452943
[665] ALGAT0004031391
[666] JLIFTC01082372
[667] JLIFTC01082370
[668] ALGAT0004030132
[669] ALGAT0004031645-46
[670] *Id.* (emphasis added)
[671] *Id.*



532.

533.

[672] *Id.* (emphasis added)
[673] ALGAT0002817356
[674] ALGAT0000113109

534. 

535.

536.

537.

538.     At some point after negotiations had been ongoing between Altria, Altria Client Services, Pritzker, and Valani, Kevin Burns, then-CEO of JLI, joined the negotiations. By this point, Pritzker and Valani had already pushed Altria and Altria Client Services to offer terms highly favorable to the individual investors in JLI, regardless of the true benefit to the company. And by virtue of their control of JLI, the Management Defendants ensured that Kevin Burns went along with the deal.

539.

---

[675] *Id.*
[676] ALGAT0000113121
[677] *Id.*
[678] *Id.*
[679] *Id.*

COMPLAINT
Case No. 19-md-02913-WHO

[680]

540.

[681]

”[682]

541.

[683]

---

[680] ALGAT0003443977
[681] ALGAT0003352121; ALGAT0003352122
[682] ALGAT0003327931.
[683] JLI01389789
[684] JLI01389792

542.

[685]

[686]

543.

[687]

544.

[689]

---

[685] JLI10518738
[686] *Id.*
[687] JLIFTC00653389
[688] JLI01374739; JLI01374736
[689] JLI01374736

COMPLAINT
Case No. 19-md-02913-WHO

545.

[REDACTED]

690
.

3.    **Altria Participated in and Directed the Fraudulent Acts of JLI Designed to Protect the Youth Market for JUUL**

a.    **Altria Participated in and Directed JLI's Make the Switch Campaign.**

546.    Altria did not simply take in information regarding JLI's youth sales passively while it pursued ownership of JLI. It also worked to ensure that the Management Defendants would take steps to continue JUUL's exponential sales growth and to stave off any regulation that might hinder that growth.

547.    Specifically, Altria worked behind the scenes to bolster JLI's public narrative claiming that JUUL was a cessation device intended for adult smokers. Well before JLI launched the "Make the Switch" campaign in January 2019, Altria was pushing the narrative that e-vapor products could help adult smokers "switch" off of combustible cigarettes. In an October 25, 2018 letter from Howard Willard to the FDA—sent while Altria was finalizing the terms of its deal with Pritzker, Valani, and Burns—Willard touted that "We believe e-vapor products present an **important opportunity to adult smokers to switch from combustible cigarettes**."[691] As noted below, Howard Willard shared this letter with Pritzker and Valani the same day he sent it to the FDA.

548.

[REDACTED]

---

[690] ALGAT0003776795
[691] Letter from Howard A. Willard III, Altria, to Dr. Scott Gottlieb, FDA, at 1 (Oct. 25, 2018) (emphasis added).

COMPLAINT
                                                    Case No. 19-md-02913-WHO



692

**b.    Altria Participated in and Directed JLI's Fraudulent Scheme to Keep Mint on the Market.**

549.    Altria and Altria Client Services also came to the bargaining table with Pritzker and Valani armed with important knowledge – that flavors would be crucial to JLI's continued ability to target and sell to youth users and wanting to ensure JLI proactively and fraudulently protect those flavors.

550.

693

694.

551.

695

552.

692 JLI10071280; JLI10071228
693 JLI10678579
694 *Id.*
695 *Id.*

Page 173                                                                    COMPLAINT
                                                              Case No. 19-md-02913-WHO

553.

696

697

554.    The following year, 2018, when it became clear that the FDA was increasing scrutiny of the e-vapor industry, JLI, the Management Defendants, and Altria publicly defended mint flavoring as a substitute for menthol cigarette smokers, when in fact JLI's studies—which had been made available to Altria and Altria Client Services as part of due diligence for its ultimate investment in JLI—indicated that mint users are not former menthol smokers and that mint pods were as popular with teens as Mango pods. By fighting to keep mint as the last flavor on the market, the cigarette industry could continue to appeal to non-smokers, including youth. JLI and the Management Defendants coordinated with Altria to pursue a fraudulent scheme to persuade the FDA into leaving the mint flavor on the market, willingly sacrificing other flavors in the process as a purported show of commitment to youth prevention.

555.    Altria's specific fraudulent acts with regard to this fraudulent scheme are detailed further below.

### 4.    JLI, the Management Defendants and Altria Coordinated to Market JUUL in Highly-Visible Retail Locations

556.    JLI, the Management Defendants, and Altria's coordination continued in other ways throughout 2018 as they prepared for Altria's equity investment in JLI.

557.    A key aspect of this early coordination was Altria's acquisition of shelf-space that it would later provide to JLI to sustain the exponential growth of underage users of JUUL products. By acquiring shelf space, Altria took steps to ensure that JUUL products would be

---

696 JLI10679070
697 ALGAT0002412177

COMPLAINT
Case No. 19-md-02913-WHO

placed in premium shelf space next to Marlboro brand cigarettes, the best-selling cigarette overall and by far the most popular brand among youth.

558.    Altria's investment was not for its own e-cigarette products. Altria spent approximately $100 million in 2018 to secure shelf-space at retailers for e-cigarette products— purportedly for the MarkTen e-cigarette that Altria stopped manufacturing in 2018, and its pod-based MarkTen Elite, which it launched on a small scale in only 25,000 stores. By comparison, the 2014 launch of the original MarkTen resulted in product placement in 60,000 stores in the first month in the western United States alone. Yet Altria's payments for shelf space were a mixture of "cash and display fixtures in exchange for a commitment that its e-cigarettes would occupy prime shelf space for at least two years."

559.    In reality, Altria spent approximately $100 million on shelf-space in furtherance of expanding the e-cigarette market, including JLI's massive, ill-gotten market share.

560.    When Altria later announced its $12.8 billion investment in JLI, part of the agreement between the two companies was that Altria would provide JLI with this premium shelf space.

561.    Altria's purchase of shelf space in 2018 and its subsequent provision of that space to JLI shows how Altria, JLI, and the Management Defendants were coordinating even before Altria announced its investment in JLI.  Altria's actions ensured that, even after public and regulatory scrutiny forced JLI to stop its youth-oriented advertising, JUUL products would still be placed where kids are most likely to see them—next to Marlboros, the most iconic, popular brand of cigarettes among underage users—in a location they are most likely to buy them—retail establishments.

### 5.    Altria Works with the Management Defendants to Direct JLI's Affairs and Commit Fraud.

562.    In December 2018, Altria formalized its relationship with JLI's leadership by making a $12.8 billion equity investment in JLI through Altria Group and its wholly-owned subsidiary, Altria Enterprises[698], the largest equity investment in United States history. ■

---

[698] Archive00760162

COMPLAINT
Case No. 19-md-02913-WHO

[black redaction box with footnote marker]

.699

The Management Defendants' payout reflects their active role in JLI's growth, not just a return on their investment.

563.    In July 2018, JLI's valuation was approximately $15 billion.[700] But, in December 2018, Altria's investment of $12.8 billion for a 35% stake in the company reflected a valuation of approximately $38 billion—more than two and a half times the valuation just five months earlier. Defendants Monsees, Bowen, Pritzker, Huh, and Valani thus saw the value of their investments in JLI skyrocket as a result of the Altria agreement, allowing them to cash out via a special dividend and bonus, as well as through stock sales that were not available to other of JLI's minority shareholders.[701] This investment further intertwined JLI and the Altria.

564.    While Pritzker, Valani, and Altria carefully structured the deal to avoid the appearance of Altria's control of JLI, for fear of drawing regulatory and public scrutiny, the structure does not tell the whole story. Altria and Altria Client Services had been involved in directing the affairs of JLI indirectly long before its investment, and the Altria Defendants' involvement was even more direct following the investment. And although Altria took only a 35% share initially, it retained the option to buy JLI outright in 2022. This promise of a future purchase gave it significant influence over the actions of JLI's leadership—i.e., the Management Defendants who stood to profit even more handsomely from an ultimate acquisition by Altria.

---

[699] JLI11387060.
[700] https://www.theverge.com/2018/7/3/17529442/juul-vapes-nicotine-electronic-cigarettes-addiction-funding
[701] Tiffany Kary, *JUUL Founders Sued for Self-Dealing Over Altria's $12.8 Billion*, Bloomberg (Jan. 13, 2020), https://www.bloomberg.com/news/articles/2020-01-13/juul-founders-sued-for-self-dealing-over-altria-s-12-8-billion.

565.     While JLI and Altria remain separate corporate entities in name, following its equity investment in JLI, the Altria Defendants worked with the Management Defendants, and Pritzker and Valani in particular, to forge Altria and JLI forged even greater significant, systemic links, *i.e.*, shared leadership, contractual relationships, financial ties, and continuing coordination of activities with JLI's leadership. Because Altria and its subsidiaries could no longer market Altria's products to children or lie to adults about the safety, addictiveness, or health effects of its own cigarettes as result of prior tobacco litigation and regulation, Altria took even greater control of JLI in order to accomplish both of these goals through that company.

a.     **Altria Installs Its Own Executives into Leadership Positions to Direct the Affairs of JLI.**

566.     To exercise its influence and control of JLI, Altria worked with Pritzker and Valani to install two key Altria executives into leadership positions at JLI: K.C. Crosthwaite and Joe Murillo:

a.     K.C. Crosthwaite, who was Vice President of Altria Client Services when the company carried out a study that would later be used by Altria to shield JUUL's Mint pods from federal regulation, is now JLI's CEO. Before joining JLI, Crosthwaite was Altria's and Altria Client Services' Chief Growth Officer and played a major role in Altria's investment in JLI, and had experience in the marketing of tobacco products from his time as president of Philip Morris USA.

b.     Joe Murillo, who launched the MarkTen e-cigarette line at Altria (as President and General Manager of Nu Mark LLC) and more recently headed regulatory affairs for Altria (as Senior Vice President of Regulatory Affairs of Altria Client Services) , is now JLI's chief regulatory officer.[702] A 24-year career Altria executive, Murillo previously ran Altria's e-cigarette business, Nu Mark, "before Altria pulled its e-cigarettes off the market as part of its deal with J[UUL]."[703]

567.     As mentioned above, K.C. Crosthwaite played a major role in Altria's investment in JLI. Crosthwaite frequently communicated with Altria Group's senior management about Altria's investment. ████████████████████

---

[702] Jennifer Maloney, *JLI Hires Another Top Altria Executive*, Wall St. J. (Oct. 1, 2019), https://www.wsj.com/articles/juul-hires-another-top-altria-executive-11569971306.
[703] *Id.*



568.    While working on this investment, Altria, and Crosthwaite himself, discussed their goal to influence and control JLI.



569.

570.

[704] ALGAT0000036407; ALGAT0000111921.
[705] ALGAT0002817348.
[706] JLI01374736; JLI01416851.
[707] JLI01392046.
[708] Archive00760280.
[709] ALGAT0003327931-33.
[710] JLI01416851.
[711] ALGAT0002856951.

1

2

3 ████████████████████████ 712

4      571.    Crosthwaite continue to be involved in meetings between Altria and the

5 Management Defendants as his time as an "observer" on the JLI Board went on.

6

7

8

9

10 ████ 714

11      572.    To facilitate that ████████████ and its control of JLI, Altria decided to

12 install one of its own career executives, Crosthwaite, as the head of JLI.

13

14        715

15           716

16

17

18      573.    As the summer approached, ████████████████

19

20        717

21                                                                                          718

22      574.    While Altria had not yet officially installed Crosthwaite as JLI's CEO, that did

23 not prevent them from giving JLI's leadership, and specifically Pritzker and Valani, advice and

24 direction about how to run the company. ████████████████████

25

26  ────────────
[712] ALGAT0000114034.
[713] ALGAT0000080766.
27 [714] ALGAT0003889812.
[715] JLI01416851.
28 [716] JLI01416851.
[717] JLI01416851.
[718] JLI01416851.



575.

576.

577.    After this conversation,

719 ALGAT0003285214.
720 ALGAT0003279064.
721 JLI00417815.
722 JLI01416851.
723 JLI01416851.
724 JLI01416851.
725 ALGAT0005389689.
726 ALGAT0005389689.
727 ALGAT0005389689; ALGAT0005389687; *see also, e.g.*, ALGAT0003360382, ALGAT0003778898.



578.

579.

580.

581.

[728] ALGAT0005410667.
[729] JLI01416851.
[730] JLI01416851.
[731] JLI01416851.
[732] JLI01416851.
[733] JLI01416851.
[734] JLI01416851.
[735] JLI01416851.
[736] JLI01416851.
[737] JLI01416851.

COMPLAINT
Case No. 19-md-02913-WHO



582.

583.

743 Altria's plan was a success.

**b.    Altria Furthered the JLI Enterprise by Participating in and Directing the Marketing and Distribution of JUUL Products.**

584.    In addition to installing its own executives as senior leadership at JLI, after its investment, the Altria Defendants worked with JLI's leadership to assist JUUL's growth through marketing and distribution, despite its knowledge that JUUL's growth was based on selling to minors and lying to adults about JUUL products. The Altria Defendants helped JUUL thrive in the areas of "direct marketing; sales, distribution and fixture services; and regulatory affairs."[744] This included, among other things:

    c.    "Piloting a distribution program to provide long haul freight, warehouse storage and last mile freight services."

    d.    "Making available [Altria's] previously contracted shelf space with certain retailers," thus allowing JUUL products to receive prominent placement alongside a top-rated brand of combustible cigarettes, Marlboro, favored by youth.

    e.    "Executing direct mail and email campaigns and related activities. . . ."

---

[738] JLI01416851.
[739] JLI01416851.
[740] JLI01416851. Pursuant to JLI's by-laws, the Company's CEO is automatically appointed to the Board.
[741] JLI01416851.
[742] JLI01416851.
[743] JLI01416851.
[744] Letter from Howard Willard III, Altria Senator Durbin, et. al., at 11 (Oct. 14, 2019).

COMPLAINT
Case No. 19-md-02913-WHO

f.  "Leveraging Altria's field sales force to . . . provide services such as limited initiative selling, hanging signs, light product merchandising, and surveys of a subset of the retail stores that Altria calls upon."

g.  "Providing regulatory affairs consulting and related services to [JUUL] as it prepares its PMTA application."[745]

585.  In an attempt to legitimize its support of JUUL's growth and despite public and regulatory concern, the Altria Defendants entered into a number of formal agreements with JLI. These agreements included collaboration with Defendants Altria Group Distribution Company, Altria Client Services, and Philip Morris USA, █████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████ [746]

586.  In each agreement, JLI agreed to █████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████ [747]

587.  In exchange, Altria Group Distribution Company agreed to distribute and sell JUUL products across the country greatly expanding JUUL's retail footprint. While JUUL products have typically been sold in 90,000 U.S. retail outlets, Altria's products reach 230,000 U.S. outlets. Altria Group Distribution Company also brings its logistics and distribution experience (although, after increasing public scrutiny, Altria announced on January 30, 2020 that it would limit its support to regulatory efforts beginning in March 2020[748]).

588.  Specifically, AGDC agreed to:

a.  ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

---

[745] *Id.* at 13.
[746] *See, e.g.*, JLI10490204.
[747] *See, e.g.*, JLI10490204.
[748] Nathan Bomey, *Marlboro maker Altria distances itself from vaping giant JLI amid legal scrutiny*, USA Today (Jan. 31, 2020), https://www.usatoday.com/story/money/2020/01/31/juul-altria-distances-itself-e-cigarette-maker-amid-scrutiny/4618993002/.

COMPLAINT
Case No. 19-md-02913-WHO



b.

c.

d.

e.

f.

g.

[749] JLI10490204.
[750] JLI01339886.
[751] JLI01339886.
[752] JLI01339878.
[753] JLI01339918.
[754] JLI01339903.

COMPLAINT
Case No. 19-md-02913-WHO



h. ,755

,756 and

i.

,757

589.    Through these distribution services, Altria Group Distribution Services, and Altria Client Services (as the "Provider Manager") used the mail and wires to transmit JUUL collateral and packaging that contained the false representation that a single JUUL pod was equivalent to a pack of cigarettes. A representation which, as discussed above, Altria and Altria Client Services knew was false.

590.



,758

,759

---

755 JLI01339937; JLI01339930; JLI01339980. The November to December 2019 agreement also included AGDC's assistance in removing the companies' "Make the Switch" campaign materials, which were the subject of a warning letter by the FDA.
756 JLI01339973.
757 JLI01339955.
758 JLI01010641.
759 JLI01010641.

COMPLAINT
Case No. 19-md-02913-WHO

591. 

592.

593.    AGDC's work was effective.

594.    Altria Client Services, for

595.    For example,                              , ACS agreed to:

        a.

760 ALGAT0000772561.
761 ALGAT0000772561.
762 JLI01392499.
763 JLI01392499.
764 ALGAT0002940950.
765 JLI01339882; JLI013398976.

b. ,[766]

c. ,[767]

d. ,[768] and

e. ,[769]

f. ,[770]

g. ,[771]

h. ,[772] and

i. ,[773]

[766] JLI01426119
[767] JLI01426125
[768] JLI01426135.
[769] JLI01426141.
[770] JLI01339943.
[771] JLI01426146.
[772] JLI01426130.
[773] JLI01339988.

596.     Altria Client Services also market JUUL products by sending out mailers, emails, and coupons to millions of people across the United States. For example, ACS agreed to:

a.     ██████████████████████████████████
       ██████████████████████████████████
       ██████████████████████████████████.774

b.     ██████████████████████████████████
       ██████████████████████████████████
       ██████████████████████████████████.775

597.     Altria also worked with JLI to cross-market JUUL and Marlboro cigarettes. ██
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████.776



774 JLI01339912; JLI01339915; JLI01339967; JLI01339970. ████████████████████████
████████████████████████ JLI013339970.
775 JLI01339927.
776 *Points for us!*, Reddit (Sept. 16, 2019), https://www.reddit.com/r/juul/comments/d50jku/points_for_us/
  (depicting an image of a Marlboro carton with a JUUL starter kit coupon inside); JLI01339874.

598.    Both the inserts distributed by Philip Morris and the mail and email advertisements sent by Altria Client Services were advertisements for JLI's fraudulent "Make the Switch" campaign described above.

599.    In order to help JUUL expand and be able to keep selling to kids and lying to adults, Altria and Altria Client Services also directed JLI in combatting legal and regulatory challenges, helping with patent infringement battles and consumer health claims and helping to navigate the regulatory waters and FDA pressure. For example [REDACTED]

[REDACTED][777]

600.    Altria also brings lobbying muscle to the table, which worked to prevent new federal or state legislation targeting JUUL or the e-cigarette category more broadly. Altria "has a potent lobbying network in Washington [D.C.] and around the country."[778] Vince Willmore, a spokesman for the Campaign for Tobacco-Free Kids, which has been involved in many state lobbying battles, said, "It's hard to say where Altria ends and JLI begins."[779] While an Altria spokesman has denied that there was any contractual services agreement for lobbying between JLI and Altria, he admitted that he did not know what informal advice and conversations Altria has had with JLI about lobbying efforts. [REDACTED]

[REDACTED].[780] And Altria installed Joe Murillo, then the head of regulatory affairs for Altria and a 24-year Altria veteran with extensive experience in e-cigarette regulations, as Chief Regulatory Officer for JLI. Indeed, since Altria worked with the Management Defendants to assume some control over JLI, JLI's spending on lobbying has risen significantly. JLI spent $4.28 million on lobbying in 2019, compared to $1.64 million in 2018.[781]

---

[777] ALGAT0002856956.
[778] Shelia Kaplan, *In Washington, JLI Vows to Curb Youth Vaping. Its Lobbying in States Runs Counter to That Pledge.*, N.Y. Times (Apr. 28, 2019), https://www.nytimes.com/2019/04/28/health/juul-lobbying-states-ecigarettes.html.
[779] *Id.*
[780] ALGAT0002856953.
[781] *Client Profile: JUUL Labs*, Center for Responsive Politics, https://www.opensecrets.org/federal-lobbying/clients/summary?cycle=2019&id=D000070920 (last visited Apr. 4, 2020).

601.    Contrary to public statements, Altria's investment in JLI was not only a financial contribution nor were these agreements about just "services"; rather, they were manifestations of Altria's and the Management Defendants' plan to continue selling JUUL to kids and lying to adults about JUUL products, all while staving off regulation and public outcry.  Internal documents show that Altria did not consider itself a mere non-voting minority investor or service provider.  Instead,

[REDACTED]

782

[REDACTED]

783

602.    The Altria Defendants' services agreements with JLI  obscured Altria's takeover of large portions of JUUL's distribution and marketing.  Altria's goal was always to expand the reach and sales of JUUL products, despite the knowledge of their lies and youth targeting.

[REDACTED]

784 And importantly, as noted above, Altria gives JLI access to shelf space that it had obtained under fraudulent pretenses. This is not just any shelf space; it is space near Altria's (Philip Morris USA's) blockbuster Marlboro cigarettes, and other premium products and retail displays. The arrangement allows JLI's tobacco and menthol-based products to receive prominent placement alongside a top-rated brand of combustible cigarettes.

603.    Altria's investment and the Altria Defendants' collaboration with the Management Defendants was not just about investing in a legitimate business or selling to adult smokers. Instead, Altria used its relationship with the Management Defendant and with JLI to continue selling to youth and lying to the public, just as it had done in the past.  Despite its

---

[782] ALGAT0002856956.
[783] ALGAT0000772561.
[784] ALGAT0002856953.

knowledge of JUUL's youth targeting, when announcing its investment, Altria explained that its investment in JLI "enhances future growth prospects" and committed to applying "its logistics and distribution experience to help JLI expand its reach and efficiency."[785]

██████████████████████████████████████████████████████

██████████████████████[786] And with the help of the Management Defendants, and Pritzker and Valani in particular, the Altria Defendants have successfully ensured that JUUL would maintain and expand its market share—a market share that, based on Altria's own October 25, 2018 letter to the FDA, it believes was gained by employing marketing and advertising practices that contributed to youth e-cigarette use.

**G.    JLI, Altria, and Others Have Successfully Caused More Young People to Start Using E-Cigarettes, Creating a Youth E-Cigarette Epidemic and Public Health Crisis.**

604.    Defendants' tactics have misled the public regarding the addictiveness and safety of e-cigarettes generally, and JUUL products specifically, resulting in an epidemic of e-cigarette use among youth in particular.

605.    Defendants' advertising and third-party strategy, as discussed above, ensured that everyone from adults to young children, would believe JUULing was a cool, fun, and safe activity.

606.    To this day, JLI has not fully disclosed the health risks associated with its products, has not recalled or modified its products despite the known risks, and continues to foster a public health crisis, placing millions of people in harm's way.

**1.    Defendants' Scheme Caused Users, Including Minors, to be Misled into Believing that JUUL was Safe and Healthy.**

607.    In 2016, the National Institute on Drug Abuse issued findings regarding "Teens and Cigarettes," reporting that 66% of teens believed that e-cigarettes contained only flavoring, rather than nicotine.[787]

---

[785] *Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth*, BusinessWire (Dec. 20, 2018), https://www.businesswire.com/news/home/20181220005318/en/Altria-12.8-Billion-Minority-Investment-JUUL-Accelerate.

[786] ALGAT0004641801.

[787] *Teens and E-cigarettes*, Nat'l Inst. on Drug Abuse, https://www.drugabuse.gov/related-topics/trends-statistics/infographics/teens-e-cigarettes (last visited Apr. 4, 2020).

608.    Two years later, despite the ongoing efforts of public health advocates, a 2018 study of JUUL users between the ages of fifteen and twenty-four revealed that 63% remained unaware that JUUL products contain nicotine.[788] Further, the study found that respondents using e-cigarettes were less likely to report that e-cigarettes were harmful to their health, that people can get addicted to e-cigarettes, or that smoke from others' e-cigarettes was harmful.[789]

609.    Similarly, in 2018, a literature review of seventy-two articles published in the International Journal of Environmental Research and Public Health found that e-cigarettes were perceived by adults and youth as being healthier, safer, less addictive, safer for one's social environment, and safer to use during pregnancy than combustible cigarettes.[790] Further, researchers found that specific flavors (including dessert and fruit flavors) were perceived to be less harmful than tobacco flavors among adult and youth e-cigarette users.[791] In addition, researchers found that youth e-cigarette users perceived e-cigarettes as safe to use and fashionable.[792]

610.    In 2019, a study published in Pediatrics found that 40% of participants reported using nicotine-free e-cigarette products, when in fact the products they were using contained significant levels of nicotine.[793]

611.    In 2019, a study published in the British Medical Journal Open systematically reviewed all peer-reviewed scientific literature published on e-cigarette perceptions through March 2018 which included fifty-one articles.[794] Researchers found consistent evidence showing that flavors attract both youth and young adults to use e-cigarettes.[795] In addition, among this same group, fruit and dessert flavors decrease the perception that e-cigarettes

---

[788] Jeffrey G. Willett et al. *Recognition, Use and Perceptions of Juul Among Youth and Young Adults,* 28 Tobacco Control 054273 (2019).
[789] *Id.*
[790] *Id.*
[791] Kim A. G. J. Romijnders et al., *Perceptions and Reasons Regarding E-Cigarette Use Among Users and Non-Users: A Narrative Literature Review*, 15 Int'l J. of Envtl. Research & Public Health 1190 (2018), https://doi: 10.3390/ijerph15061190.
[792] *Id.*
[793] Rachel Boykan et al., *Self-Reported Use of Tobacco, E-Cigarettes, and Marijuana versus Urinary Biomarkers*, 143 Pediatrics (2019), https://doi.org/10.1542/peds.2018-3531.
[794] Meernik, et al, *Impact of Non-Menthol Flavours in E-Cigarettes on Perceptions and Use: An Updated Systematic Review*, *BMJ Open*, 9:e031598 (2019), https://bmjopen.bmj.com/content/9/10/e031598.
[795] *Id.*

are harmful, while increasing the willingness to try e-cigarettes.[796]

### 2. Use of JUUL by Minors Has Skyrocketed

612.   On December 28, 2018, the University of Michigan's National Adolescent Drug Trends for 2018 reported that increases in adolescent e-cigarette use from 2017 to 2018 were the "largest ever recorded in the past 43 years for any adolescent substance use outcome in the U.S."[797]

613.   The percentage of 12th grade students who reported consuming nicotine almost doubled between 2017 and 2018, rising from 11% to 20.9%.[798] This increase was "twice as large as the previous record for largest-ever increase among past 30-day outcomes in 12th grade."

614.   By 2018 approximately 3.6 million middle and high school students were consuming e-cigarettes regularly,[799] and one in five 12th graders reported used an e-cigarette containing nicotine in the last 30 days.[800] As of late 2019, 5 million students reported active use of e-cigarettes, with 27.5% of high school students and 10.5% of middle school students using them within the last thirty days and with most youth reporting JUUL as their usual brand.[801]



[796] *Id.*

[797] *National Adolescent Drug Trends in 2018*, Univ. of Mich. Inst. for Social Research (Dec. 17, 2018), http://monitoringthefuture.org/pressreleases/18drugpr.pdf.

[798] News Release, *Teens Using Vaping Devices in Record Numbers*, Nat'l Insts. of Health (Dec. 17, 2018) https://www.nih.gov/news-events/news-releases/teens-using-vaping-devices-record-numbers.

[799] *See* Jan Hoffman, *Addicted to Vaped Nicotine, Teenagers Have no Clear Path to Quitting*, N.Y. Times (Dec. 18, 2018), https://www.nytimes.com/2018/12/18/health/vaping-nicotine-teenagers.html.

[800] *Id.*

[801] National Youth Tobacco Survey, U.S. FDA (2019), https://www.fda.gov/tobacco-products/youth-and-tobacco/youth-tobacco-use-results-national-youth-tobacco-survey; Karen Cullen et al., *e-Cigarette Use Among Youth in the United States, 2019*, 322 JAMA 2095 (2019).

615.    The Secretary of the U.S. Department of Health and Human Services declared that "[w]e have never seen use of any substance by America's young people rise as rapidly as e-cigarette use [is rising]."[802] Then FDA Commissioner Dr. Gottlieb described the increase in e-cigarette consumption as an "almost ubiquitous—and dangerous—trend" that is responsible for an "epidemic" of nicotine use among teenagers.[803] The rapid—indeed infectious—adoption of e-cigarettes "reverse[s] years of favorable trends in our nation's fight to prevent youth addiction to tobacco products."[804] CDC Director Robert Redfield agreed, "The skyrocketing growth of young people's e-cigarette use over the past year threatens to erase progress made in reducing tobacco use. It's putting a new generation at risk for nicotine addiction."[805] Then-Commissioner Gottlieb identified the two primary forces driving the epidemic as "youth appeal and youth access to flavored tobacco products."[806]

616.    Within days of the FDA's declaration of an epidemic, Surgeon General Dr. Jerome Adams also warned that the "epidemic of youth e-cigarette use" could condemn a generation to "a lifetime of nicotine addiction and associated health risks."[807] The Surgeon General's 2018 Advisory states that JUUL, with its combination of non-irritating vapor and potent nicotine hit, "is of particular concern for young people, because it could make it easier for them to initiate the use of nicotine . . . and also could make it easier to progress to regular e-cigarette use and nicotine dependence."[808]

617.    Kids are consuming so much nicotine that they are experiencing symptoms of nicotine toxicity, including headaches, nausea, sweating, and dizziness, and they have even coined a term for it: "nic sick." As one high school student explained to *CBS News*, it "kinda

---

[802] Jan Hoffman, *Study Shows Big Rise in Teen Vaping This Year*, N.Y. Times (Dec. 17, 2018), https://www.nytimes.com/2018/12/17/health/ecigarettes-teens-nicotine-.html; Rajiv Bahl, *Teen Use of Flavored Tobacco was Down, But E-Cigarettes Are Bringing It Back Up*, Healthline (Jan. 9, 2019), https://www.healthline.com/health-news/flavored-tobacco-use-rising-again-among-teens#An-unhealthy-habit.

[803] News Release, *FDA Launches New, Comprehensive Campaign to Warn Kids About the Dangers of E-Cigarette Use as Part of Agency's Youth Tobacco Prevention Plan, Amid Evidence of Sharply Rising Use Among Kids,* U.S. FDA (Sept. 18, 2018), https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm620788.htm.

[804] *Id.*

[805] Amir Vera, *Texas Governor Signs Law Increasing the Age to Buy Tobacco Products to 21*, CNN (June 8, 2019), https://www-m.cnn.com/2019/06/08/health/texas-new-tobacco-law/index.html.

[806] *Id.*

[807] Surgeon General's Advisory on E-cigarette Use Among Youth (2018), https://e-cigarettes.surgeongeneral.gov/documents/surgeon-generals-advisory-on-e-cigarette-use-among-youth-2018.pdf.

[808] *Id.* a 2.

seems like a really bad flu, like, just out of nowhere. Your face goes pale, you start throwing up and stuff, and you just feel horrible."[809]

618.   The JUUL youth addiction epidemic spread rapidly across high schools in the United States. JUUL surged in popularity, largely through social media networks, and created patterns of youth usage, illegal youth transactions, and addiction, that are consistent with this account from Reddit in 2017:

> Between classes the big bathroom in my school averages 20-25 kids, and 5-10 JUULs. Kids usually will give you a dollar for a JUUL rip if you don't know them, if you want to buy a pod for 5$ you just head into the bathroom after lunch. We call the kids in there between every class begging for rips 'JUUL fiends.' Pod boys are the freshman that say 'can I put my pod in ur juul?' and are in there every block. I myself spent about 180$ on mango pods and bought out a store, and sold these pods for 10$ a pod, making myself an absolutely massive profit in literally 9 days. Given because I'm 18 with a car and that's the tobacco age around here, I always get offers to get pod runs or juuls for kids. people even understand the best system to get a head rush in your 2 minutes between classes, is all the juuls at once. So someone yells "GIVE ME ALL THE JUULS" and 3-7 are passed around, two hits each. This saves us all juice, and gives you a massive head rush. Kids also scratch logos and words onto their juuls to make i[t] their own, every day you can find the pod covers in my student parking lot. I know this sounds exaggerated, but with a school with 1400 kids near the city and JUULs being perceived as popular, it's truly fascinating what can happen.[810]

619.   In response to the post above, several others reported similar experiences:

a.   "[T]his is the exact same thing that happens at my school, we call [JUUL fiends] the same thing, kind of scary how similar it is."[811]

b.   "Same thing at my school. JUUL fiend is a term too."[812]

c.   "Yeah nicotine addiction has become a huge problem in my high school because of juuls even the teachers know what they are."[813]

d.   "[S]ame [expletive] at my school except more secretive because it's a private school. It's crazy. Kids hit in class, we hit 3-5 at once,

---

[809] *High school students say about 20% of their peers are vaping, some as young as 8th grade*, CBS News (Aug. 30, 2019), https://www.cbsnews.com/news/high-school-students-say-about-20-of-their-peers-are-vaping-some-as-young-as-8th-grade/.

[810] *What's Juul in School*, https://www.reddit.com/r/juul/comments/61is7i/whats_juul_in_school/ (last visited Apr. 4, 2020).

[811] *Id.*

[812] *Id.*

[813] *Id.*

and everyone calls each other a juul fiend or just a fiend. Funny how similar it all is."[814]

e.    "[T]he same [expletive] is happening in my school. kids that vaped were called [expletive] for the longest time, that all changed now."[815]

f.    "Made an account to say that it's exactly the same way in my school! LOL. I'm from California and I think I know over 40 kids that have it here just in my school. We do it in the bathrooms, at lunch etc. LMAO. 'Do you have a pod man?'"[816]

g.    "It's the same at my school and just about every other school in Colorado."[817]

h.    "2 months into this school year, my high school made a newspaper article about the 'JUUL epidemic.'"[818]

i.    "Wow do you go to high school in Kansas because this sounds EXACTLY like my school. I'll go into a different bathroom 4 times a day and there will be kids in there ripping JUUL's in every single one."[819].

j.    "At my high school towards the end of lunch everyone goes to the bathroom for what we call a 'juul party.' People bring juuls, phixes, etc. It's actually a great bonding experience because freshman can actually relate to some upperclassmen and talk about vaping."[820]

k.    "To everyone thinking that this is just in certain states, it's not. This is a nationwide trend right now. I've seen it myself. If you have one you're instantly insanely popular. Everyone from the high-achievers to the kids who use to say 'e-cigs are for [expletives]' are using the juul. It's a craze. I love it, I've made an insane amount of money. It's something that has swept through our age group and has truly taken over. And it happened almost overnight."[821]

620.    The following graph illustrates JLI's responsibility for the nationwide youth e-cigarette epidemic. While the rest of the e-cigarette industry stagnated from 2017 through 2018, JLI experienced meteoric growth. Through that same timeframe, youth e-cigarette rates nearly

---

[814] *Id.*
[815] *Id.*
[816] *Id.*
[817] *Id.*
[818] *Id.* (citing *Juuls Now Rule the School as Students Frenzy Over E-cig* (Oct. 5, 2016), https://imgur.com/a/BKepw).
[819] *Id.*
[820] *Id.*
[821] *Id.* (emphasis added).

doubled from more than 11% in 2017 to more than 20% in 2018. Through October 5, 2019 (the last date for which data was available), rates of youth e-cigarette use continued to increase, tracking the growth of JUUL.



621.    The unique features of the JUUL e-cigarette—high nicotine delivery, low harshness, and easy-to-conceal design—have caused patterns of addiction with no historical precedent. It is not uncommon for fifteen-year-old students, even those who live at home with their parents, to consume two or more JUUL pods a day.

622.    The downwards trend in youth smoking that public health departments and school anti-tobacco programs worked so hard to create has completely reversed. In 2018, more than one in four high school students in the United States reported using a tobacco product in the past thirty days, a dramatic increase from just one year before.[823] But there was no increase in the use of cigarettes, cigars, or hookahs during that same time period.[824] There was only increased use in a single tobacco product: e-cigarettes. While use of all other tobacco products

---

[822] The area graph depicts e-cigarette unit sale volumes in retail outlets tracked by Nielsen by manufacturer and month from 2013 through October 5, 2019; the line graph depicts national high school and middle school e-cigarette past-30-day usage rates as percentages from 2013 through 2019, with each data point representing a year. *See* Nielsen: Tobacco All Channel Data; National Youth Tobacco Survey (2019), https://www.fda.gov/tobacco-products/youth-and-tobacco/youth-tobacco-use-results-national-youth-tobacco-survey; *see also* Compl. at 2 (Figure 1), *Commonwealth of Penn. v. Juul Labs, Inc*., (Ct. Common Pleas, Feb. 10, 2020).
[823] *Progress Erased: Youth Tobacco Use Increased During 2017-2018*, CDC (Feb. 11, 2019), https://www.cdc.gov/media/releases/2019/p0211-youth-tobacco-use-increased.html.
[824] *Tobacco Use By Youth Is Rising: E-Cigarettes are the Main Reason*, CDC (Feb. 2019), https://www.cdc.gov/vitalsigns/youth-tobacco-use/index.html.

COMPLAINT
Case No. 19-md-02913-WHO

continued to decrease as it had been for decades, e-cigarette use increased 78% in just one year.[825] This drastic reversal caused the CDC to describe youth e-cigarette use as an "epidemic."[826]

**H.    JLI Thrived Due to Extensive Efforts to Delay Meaningful Regulation of its Products**

**1.    E-Cigarette Manufacturers Successfully Blocked the Types of Regulations that Reduced Cigarette Sales, Creating the Perfect Opportunity for JLI.**

623.    One of the main reasons e-cigarettes like JUUL were so appealing from an investment and business development perspective is that, unlike combustible cigarettes, e-cigarettes were relatively unregulated. This regulatory void was not an accident; the cigarette industry, and then the e-cigarette industry, spent significant resources blocking, frustrating, and delaying government action. A 1996 article in the *Yale Law & Policy Review* detailed how cigarette companies vehemently opposed the FDA mid-1990s rules on tobacco products, using lawsuits, notice-and-comment, and arguments related to the FDA's jurisdiction to delay or undo any regulatory efforts.[827]

624.    In 2009, Congress enacted the Family Smoking Prevention and Tobacco Control Act ("TCA"). The TCA amended the Federal Food, Drug, and Cosmetic Act to allow the FDA to regulate tobacco products.

625.    Although the TCA granted the FDA immediate authority to regulate combustible cigarettes, it did not give the FDA explicit authority over all types of tobacco products—including those that had not yet been invented or were not yet popular. To "deem" a product for regulation, the FDA must issue a "deeming rule" that specifically designates a tobacco product, such as e-cigarettes, as falling within the purview of the FDA's authority under the TCA.

626.    The TCA also mandated that all "new" tobacco products (i.e., any product not on the market as of February 15, 2007) undergo a premarket authorization process before

---

[825] Scott Gottlieb, Statement from FDA Commissioner Scott Gottlieb, M.D., on proposed new steps to protect youth by preventing access to flavored tobacco products and banning menthol in cigarettes, FDA (Nov. 15, 2018), https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-proposed-new-steps-protect-youth-preventing-access.

[826] Jerome Adams, *Surgeon General's Advisory on E-cigarette Use Among Youth*, CDC (Dec. 2018), https://e-cigarettes.surgeongeneral.gov/documents/surgeon-generals-advisory-on-e-cigarette-use-among-youth-2018.pdf.

[827] Melvin Davis, *Developments in Policy: The FDA's Tobacco Regulations*, 15 Yale L. & Policy Rev. 399 (1996).

1    they could be sold in the United States.

2        627.    Four years later, on April 25, 2014, the FDA finally issued a proposed rule

3    deeming e-cigarettes for regulation under the Tobacco Act ("2014 Proposed Rule").

4        628.    Once issued, the e-cigarette industry, together with its newfound allies, parent

5    companies, and investors—the cigarette industry and pro-e-cigarette lobbyists—set to work to

6    dilute the rule's effectiveness. For example, in comments to the 2014 Proposed Rule, companies

7    such as Johnson Creek Enterprises (one of the first e-liquid manufacturers) stated that the "FDA

8    [] blatantly ignored evidence that our products improve people's lives."[828]

9        629.    The New York Times reported that Altria was leading the effort to dilute,

10   diminish, or remove e-cigarette regulations. Notwithstanding Altria's professed concern about

11   flavors attracting youth customers, Altria submitted comments in August 2014 in response to

12   the proposed rule opposing the regulation of flavors. Altria asserted that restrictions could result

13   in more illicit sales, and that adults also liked fruity and sweet e-cigarette flavors.[829]

14       630.    In 2015, Altria lobbied Capitol Hill with its own draft legislation to eliminate the

15   new requirement that most e-cigarettes already on sale in the United States be evaluated

16   retroactively to determine if they are "appropriate for the protection of public health." In effect,

17   Altria lobbied to "grandfather" all existing e-cigarette brands, including JUUL, into a lax

18   regulatory regime. That proposed legislation was endorsed by R.J. Reynolds. Altria delivered its

19   proposal, entitled "F.D.A. Deeming Clarification Act of 2015," to Representative Tom Cole of

20   Oklahoma, who introduced the bill two weeks later using Altria's draft verbatim.[830] Seventy

21   other representatives signed on to Altria's legislation.[831]

22       631.    The e-cigarette industry, along with the intertwined cigarette industry, was able

23   to leverage support among Members of Congress such as Representative Cole and

---

[828] Eric Lipton, *A Lobbyist Wrote the Bill. Will the Tobacco Industry Win Its E-Cigarette Fight?*, N.Y. Times (Sept. 2, 2016), https://www.nytimes.com/2016/09/03/us/politics/e-cigarettes-vaping-cigars-fda-altria.html.

[829] Altria Client Services Inc., Comment Letter on Proposed Rule Deeming Tobacco Products to be Subject to the Federal Food, Drug, and Cosmetic Act 47-48 (Aug. 8, 2014), https://www.altria.com/-/media/Project/Altria/Altria/about-altria/federal-regulation-of-tobacco/regulatory-filings/documents/ALCS-NuMark-Comments-FDA-2014-N-0189.pdf.

[830] Eric Lipton, *A Lobbyist Wrote the Bill. Will the Tobacco Industry Win Its E-Cigarette Fight?*, N.Y. Times (Sept. 2, 2016), https://www.nytimes.com/2016/09/03/us/politics/e-cigarettes-vaping-cigars-fda-altria.html.

[831] *Id*.

COMPLAINT
Case No. 19-md-02913-WHO

Representative Sanford Bishop of Georgia, who advocated for cigarette industry interests and opposed retroactive evaluation of e-cigarette products. Both Cole and Bishop echoed a common cigarette and e-cigarette industry refrain, that any regulations proposed by the FDA would bankrupt small businesses, even though the overwhelming majority of e-cigarettes were manufactured and distributed by large cigarette companies.

632.    Representatives Cole and Bishop received some of the largest cigarette industry contributions of any member of the U.S. House of Representatives, with Representative Bishop receiving $13,000 from Altria, and Representative Cole $10,000 from Altria in the 2015-2016 cycle.[832]

633.    By thwarting and delaying regulation, or by ensuring what regulation did pass was laced with industry-friendly components, the e-cigarette industry, including Defendants, hobbled the FDA—and by extension—Congress's efforts to regulate e-cigarettes. Simultaneously, the e-cigarette industry continued to market their products to youth, and it coordinated to sow doubt and confusion about the addictiveness and health impacts of e-cigarettes.

634.    Even after the FDA issued its final deeming rule in 2016, e-cigarette industry lobbying continued to pay dividends to companies like JLI. In 2017, when Dr. Scott Gottlieb took over as the FDA Commissioner, one of his first major acts was to grant e-cigarette companies a four-year extension to comply with the deeming rule, even as data indicated sharp increases in teen e-cigarette use.[833] Gottlieb had previously served on the board of Kure, a chain of e-cigarette lounges in the United States, though he fully divested before taking the helm at the FDA.[834]

635.    The four-year extension was celebrated by e-cigarette lobbyists. Greg Conley, president of the American Vaping Association ("AVA"), stated that but for the extension, "over

---

[832] *Id.*; *Rep. Tom Cole - Oklahoma District 04, Contributors 2015-16*, OpenSecrets (2017), https://www.opensecrets.org/members-of-congress/contributors?cid=N00025726&cycle=2016.
[833] Katie Thomas & Sheila Kaplan, *E-Cigarettes Went Unchecked in 10 Years of Federal Inaction*, N.Y. Times (Oct. 14, 2019), https://www.nytimes.com/2019/10/14/health/vaping-e-cigarettes-fda.html.
[834] Zeke Faux et al., *Vaping Venture Poses Potential Conflict for Trump's FDA Nominee*, Bloomberg, (Apr. 19, 2017), https://www.bloomberg.com/news/articles/2017-04-19/vaping-venture-poses-potential-conflict-for-trump-s-fda-nominee.

99 percent of vaper products available on the market today would be banned next year."[835]
Despite the minimal research publicly available on the health effect of e-cigarettes, Ray Story,
who had since become commissioner of the Tobacco Vapor Electronic Cigarette Association,
lauded the decision: "Absolutely, it's a good thing . . . [w]hen you look at harm reduction, it's a
no brainer."[836]

### 2. JLI, the Management Defendants, and Altria Defendants Successfully Shielded the Popular Mint Flavor from Regulation.

636.    JLI, the Management Defendants, and Altria Defendants had a two-fold plan for
staving off regulation: (1) ensure the FDA allowed certain flavors, namely mint, to remain on
the market; and (2) stave off a total prohibition on JUUL that was being contemplated in light of
JLI's role in the youth e-cigarette epidemic. These schemes involved acts of mail and wire
fraud, with the intent to deceive the FDA, Congress, and the public at large.

637.    First, JLI, the Management Defendants, and Altria publicly defended mint
flavoring as a substitute for menthol cigarette smokers, when in fact JLI's studies indicated that
mint users are not former menthol smokers. Second, by fighting to keep mint as the last flavor
on the market, the cigarette industry could continue to appeal to non-smokers, including youth.
JLI and the Management Defendants coordinated with Altria to pursue a fraudulent scheme to
convince the FDA into leaving the mint flavor on the market, sacrificing other flavors in the
process.

638.    On August 2, 2018, JLI met with the FDA to discuss a proposed youth-
behavioral study regarding the prevalence of use, perceptions of use, and intentions to use
JUUL and other tobacco products among adolescents aged 13-17 years (the "Youth Prevalence
Study").[837]

639.    On November 5, 2018, JLI transmitted the results of the Youth Prevalence Study
to the FDA and reported that a study of over 1,000 youth had found that only 1.5% of youth had

---

[835] Sheila Kaplan, *F.D.A. Delays Rules That Would Have Limited E-Cigarettes on Market*, N.Y. Times (July 28, 2017), https://www.nytimes.com/2017/07/28/health/electronic-cigarette-tobacco-nicotine-fda.html.
[836] *Id.*
[837] Letter from Joanna Engelke, JUUL Labs, Inc., to David Portnoy, Ph.D., M.P.H., FDA Center for Tobacco Products (Nov. 5, 2018).

COMPLAINT
Case No. 19-md-02913-WHO

ever used a JUUL, and that only 0.8% of youth had used a JUUL in the last 30 days. And in stark contrast to the McKinsey and DB Research studies discussed above, the Youth Prevalence Study suggested that mango was four times as popular as mint.[838] Specifically, the study found that 47% of youth who reported use of a JUUL device in the last 30-days professed to using mango most often, with only about 12% reporting the same for mint.

640.    JLI's study was a sham. JLI, the Management Defendants, and Altria knew their reported data was inconsistent with the McKinsey and DB Research studies conducted just a few months earlier. JLI's report featured responses to a carefully selected survey question—which *single* flavor youth used most often?—that obscured the widespread use of mint JUUL pods among youth.

641.    Ironically, just a few days after JLI submitted the misleading Youth Prevalence Study to the FDA, the National Youth Tobacco Survey was released. Revealing the depths of the deception of JLI's Youth Prevalence Study, which found that only 1.5% of youth were current users of e-cigarettes, the National Youth Tobacco Survey found that 20.8% of high school student were current users (*i.e.*, consumed e-cigarettes within the last 30 days).

642.    The Youth Prevalence Study that JLI submitted to the FDA, either via U.S. mail or by electronic transmission, was false and misleading. JLI, the Management Defendants, and Altria knew as much. Indeed, they counted on it.

643.    As the e-cigarette crisis grew, on September 25, 2018, then-FDA Commissioner Scott Gottlieb sent letters to Altria, JLI and other e-cigarette manufacturers, requesting a "detailed plan, including specific timeframes, to address and mitigate widespread use by minors."[839]

644.    As evidenced by Altria's recent admission that negotiations with JLI were ongoing in late 2017,[840] Altria and JLI's responses to the FDA reflect a coordinated effort to mislead the FDA with the intention that regulators, in reliance on their statements, allow JLI

---

[838] *Id.* at 3.
[839] Letter from Scott Gottlieb, M.D. to JUUL Labs, Inc. (Sept. 12, 2018); Letter from Scott Gottlieb, M.D. to Altria Group Inc. (Sept. 12, 2018).
[840] Letter from Howard Willard III, Altria to Senator Durbin, et. al. ( Oct. 14, 2019).

1    to continue marketing mint JUUL pods.[841]

2        645.    Defendants' plan centered on efforts to deceive the FDA that (1) mint was more

3    akin to Tobacco and Menthol than other flavors; and (2) kids did not prefer mint.

4        646.    JLI took the first step in this coordinated effort to deceive the FDA. In response

5    to then-Commissioner Gottlieb's September 12, 2018 letter, JLI prepared an "Action Plan,"

6    which it presented to the FDA at an October 16, 2018 meeting, and presented to the public on

7    November 12, 2018. The substance of JLI's presentation to the FDA and its public-facing

8    Action Plan were largely identical.[842] JLI purported to "share a common goal- preventing youth

9    from initiating on nicotine."[843] As part of this plan, JLI stated that it would be "stopping

10   flavored JUUL pod sales to all 90,000+ retail stores."

11       647.    But this statement was not true. JLI was continuing retail sales of its mint JUUL

12   pods, which JLI categorized as a non-flavored "tobacco and menthol product."[844] In JLI's

13   Action Plan, then-CEO Burns stated that only products that "mirror what is currently available

14   for combustible cigarettes—tobacco and menthol-based products (menthol and mint pods)—

15   will be sold to retail stores."[845]

16       648.    In both JLI's October 2018 presentation to the FDA and JLI's Action Plan that

17   was shared with the public, JLI and its CEO fraudulently characterized mint as a non-flavored

18   cigarette product, akin to tobacco and menthol cigarettes, suggesting that it was a product for

19   adult smokers. The image below was included in both the public-facing Action Plan and JLI's

20   presentation to the FDA.

21   ///

22   ///

23   ///

24   ///

25

---

26   [841] *See United States v. Jones*, 712 F.2d 1316, 1320-21 (9th Cir. 1983) ("It is enough that the mails be used as part of a 'lulling' scheme by reassuring the victim that all is well and discouraging him from investigating and uncovering the fraud.").

27   [842] JUUL did not include in its Action Plan a proposal for Bluetooth or Wi-Fi equipped devices that was included in JLI's October presentation.

28   [843] JUUL Labs, Inc. *FDA Presentation*, 2 (Oct. 16, 2018); INREJUUL_00182989.
     [844] *Id.*
     [845] *JUUL Labs Action Plan*, JUUL Labs, Inc. (Nov. 13, 2018), https://newsroom.juul.com/juul-labs-action-plan/.



649.    JLI knew that non-smoking youth liked mint as much as any flavor.

650.    Numerous internal studies had informed JLI that mint's success was "not because it's a menthol/a familiar tobacco flavor but because it is the best JUUL flavor profile on multiple levels."[846] Indeed, despite JLI's attempts to explicitly link mint to menthol, JLI knew there was "No Implied Relationship Between Mint & Menthol,"[847] and "menthol smokers are not the only driver behind the popularity of mint flavored JUULpods."[848]

651.    Most importantly, JLI knew that mint was the most popular JUUL pod. Though other flavors might draw new customers, JLI's most addictive "flavor" predictably became its most popular.

652.    The characterization of mint as an adult tobacco product was also fraudulent because JLI *knew first hand* from the McKinsey and DB Research studies that teens viewed mint as favorably as mango, which implies that mango and mint were fungible goods for JLI's underage users. The McKinsey and DB Research studies also showed that youth preferred mint over the more stereotypically youth-oriented flavors like fruit medley, crème brule, and cucumber. As alleged in a Whistleblower Complaint, JLI's then-CEO told his employees: "

///

---

[846] INREJUUL_00265069.
[847] INREJUUL_00079307-INREJUUL_00079409, at 395.
[848] *Id.*

COMPLAINT
Case No. 19-md-02913-WHO

1      You need to have an IQ of 5 to know that when customers don't find mango they buy mint."[849]

2          653.    On October 25, 2018, less than ten days after JLI presented its fraudulent,

3      misleading Action Plan to the FDA, Altria's CEO Howard Willard submitted a letter in

4      response to the FDA's call to combat the youth epidemic. Willard's letter was a clear indication

5      of Altria's willingness to continue the fraudulent scheme and deception of the FDA. While

6      Willard's letter confirmed that Altria understood that JLI's conduct and product was addicting

7      many children to nicotine, this letter repeated the misleading statement that mint was a

8      "traditional tobacco flavor" despite Altria and JLI knowing it was no such thing. Willard then

9      claimed that the youth epidemic was caused, in part, by "flavors that go beyond traditional

10     tobacco flavors"—which, according to JLI and Altria, did not include mint—and announced

11     that Altria would discontinue all MarkTen flavors except for "traditional tobacco, menthol and

12     mint flavors." Willard asserted that these three flavors were essential for transitioning smokers.

13     But Willard, and Altria, knew this was not true.[850]

14         654.    That same day—October 25, 2018—Altria continued its deception on an

15     earnings call with investors. Altria fraudulently described its decision to remove its pod-based

16     products from the market as one intended to address the dramatic increase in youth e-cigarette

17     use, while it was only weeks away from publicly announcing its 35% stake in JLI:

18            We recently met with Commissioner Gottlieb to discuss steps that could be taken
19            to address underage access and use. Consistent with our discussion with the FDA
              and because we believe in the long-term promise of e-vapor products and harm
20            reduction, we're taking immediate action to address this complex situation.

21            First, Nu Mark will remove from the market MarkTen Elite and Apex by MarkTen
              pod-based products until these products receive a market order from the FDA or
22            the youth issue is otherwise addressed. Second, for our remaining MarkTen and
              Green Smoke cig-a-like products, Nu Mark will sell only tobacco, menthol and
23            mint varieties. Nu Mark will discontinue the sale of all other flavor variants of our
              cig-a-like products until these products receive a market order from the FDA or
24            the youth issue is otherwise addressed. Although we don't believe we have a
              current issue with youth access or use of our e-vapor products, we are taking this
25            action, because we don't want to risk contributing to the issue.

26

27     _____

28     [849] Angelica LaVito, *Former JLI executive sues over retaliation, claims company knowingly sold tainted nicotine
       pods*, CNBC (Oct. 30, 2019), https://www.cnbc.com/2019/10/30/former-juul-executive-sues-over-retaliation-
       claims-company-knowingly-sold-tainted-pods.html.
       [850] Letter from Howard Willard III, Altria to Senator Durbin, et. al. (Oct. 14, 2019).

COMPLAINT
                                                              Case No. 19-md-02913-WHO

After removing Nu Mark's pod-based products and cig-a-like flavor variants, approximately 80% of Nu Mark's e-vapor volume in the third quarter of 2018 will remain on the market.[851]

655.   Willard reiterated that "pod-based products and flavored products" were behind the increase in youth use of e-cigarettes:

I mean, I think the way we thought about this was that we believe e-vapor has a lot of opportunity to convert adult cigarette smokers in the short, medium and long-term, but clearly, this significant increase in youth usage of the products puts that at risk and we think rapid and significant action is necessary. And I think as we looked at the data that is available in some of the remarks from the FDA, I think we concluded that the driver of the recent increase we think is pod-based products and flavored products and so we thought that the two actions that we took addressed the drivers of the increased youth usage here in the short run.[852]

656.   Willard emphasized that Altria's withdrawal of its own pod-based products was intended to address youth use: "[W]e really feel like in light of this dramatic increase in youth usage, withdrawing those products until the PMTA is filed is one path forward." He later said: "And frankly, the actions we took were the actions that we thought we could take that would have the biggest impact on addressing the increased use of e-vapor products by youth . . . we wanted to make a significant contribution to addressing the issue."[853] As noted above, however, it has since been reported that Altria "pulled its e-cigarettes off the market" not out of concern for the epidemic of youth nicotine addiction that JLI created, but because a non-compete clause was a "part of its deal with J[LI]."[854]

657.   Thus, while Altria publicly announced that it would pull its pod-based products to combat youth usage, and publicly seemed to support removal of youth-friendly flavors, its defense of mint as a tobacco-analog was actually part of the scheme to protect the profits associated with JLI's mint JUUL pods, one of JLI's strongest products with the highest nicotine content and highest popularity among non-smokers and youth.

658.   In support of his arguments to the FDA that mint was a flavor for adult

---

[851] Altria Group Inc (MO) Q3 2018 Earnings Conference Call Transcript
MO earnings call for the period ending September 30, 2018 (Oct. 25, 2018),
https://www.fool.com/earnings/call-transcripts/2018/10/25/altria-group-inc-mo-q3-2018-earnings-conference-ca.aspx.
[852] Id.
[853] Id.
[854] Id.

smokers, Willard cited to a study that Altria Client Services had conducted and presented at a conference that JLI attended.[855] But Willard did *not* disclose that Altria Client Services' "study" was merely a "quasi-experimental online survey" and not a true scientific study.[856] Notably, JLI's current CEO, K.C. Crosthwaite, was the Vice President of Strategy and Business Development of Altria Client Services when it conducted Altria's mint "study" in Spring 2017, the same time that the Management Defendants and Altria and Altria Client Services began their "confidential negotiations."[857] Willard did not disclose that this study was contradicted by the "youth prevention" data provided by JLI during its acquisition due-diligence showing that mint was popular among teens.

659.    Through these letters, Altria sought to prevent the FDA—which was actively considering regulating flavors[858]—from banning JLI's mint JUULpods.

660.    Acting in concert, JLI and Altria committed acts of mail or wire fraud when (1) JLI transmitted its Action Plan to the FDA and the public; and (2) Altria transmitted Willard's letter to the FDA.

661.    ███████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████████████████████████[859]

662.    It is no surprise that Altria was coordinating with Pritzker and Valani on the scheme to protect flavors. It knew a potential ban on flavors would have a material impact on the ability of JLI to continue its youth sales, and on the value of those sales. ████████████
████████████████████████████████████████████████████████
█████████████████[860]

---

[855] Jessica Parker Zdinak, Ph.D., *E-vapor Product Appeal Among Tobacco Users and Non-users and the Role of Flavor in Tobacco Harm Reduction*, 72nd Tobacco Science Research Conference (Sept. 18, 2018), https://sciences.altria.com/library/-/media/Project/Altria/Sciences/library/conferences/2018%20TSRC%20J%20Zdniak%20Presentation.pdf.
[856] *Id.*
[857] Letter from Howard Willard III, Altria to Senator Durbin, et. al. (Oct. 14, 2019).
[858] Alex Lardieri, *FDA Considers Ban on E-Cigarette Flavors Amid 'Epidemic' Use By Teens*, U.S. News & World Report (Sept. 12, 2018), https://www.usnews.com/news/health-care-news/articles/2018-09-12/fda-considers-ban-on-e-cigarette-flavors-amid-epidemic-use-by-teens.
[859] JLIFTC00653389
[860] ALGAT0000389729.

COMPLAINT
Case No. 19-md-02913-WHO

663.    At the heart of these acts of fraud was Defendants' characterization of mint as a tobacco product that was targeted to adult smokers. This characterization was fraudulent because Defendants knew kids prefer mint flavor and that JLI designed mint to be one of JLI's most potent products. Altria supported this plan and helped execute it. Together, these actions by JLI and Altria ensured that mint would remain available to youths for many months, furthering their efforts to maintain and expand the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base.

664.    The deceptive scheme worked—the FDA did not protest JLI and Altria's plan. And on December 20, 2018, one month after JLI announced its Action Plan to keep selling mint, Altria made a $12.8 billion equity investment in JLI.

665.    By February of 2019, the FDA became aware that it had been deceived by JLI and Altria. On February 6, 2019, then-FDA commissioner Gottlieb wrote JLI and Altria demanding in-person meetings, excoriating Altria for its "newly announced plans with JUUL [that] *contradict the commitments you made to the FDA*" in a prior meeting and Willard's October 25, 2018 letter to the FDA.[861] Gottlieb's letter to JLI alleged that JLI's conduct was "inconsistent with its previous representations to the FDA."[862]

666.    The FDA demanded Altria be prepared to explain itself regarding its "plans to stop marketing e-cigarettes and to address the crisis of youth use of e-cigarettes." Then-Commissioner Gottlieb told Altria that "deeply concerning data" shows that "youth use of JUUL represents a significant proportion of overall use of e-cigarette products by children" and despite any alleged steps the companies had taken to address the issue he "ha[d] no reason to believe these youth patterns of use are abating in the near term, and they certainly do not appear to be reversing."

667.    JLI and Altria met with Gottlieb in March 2019 in a meeting the then-Commissioner described as "difficult."[863] Gottlieb "did not come away with any evidence that

---

[861] Letter from Scott Gottlieb, FDA to Howard Willard, Altria (Feb. 9, 2019).
[862] Letter from Scott Gottlieb, FDA to Kevin Burns, JUUL Labs, Inc. (Feb. 9, 2019).
[863] Kate Rooney & Angelica LaVito, *Altria Shares Fall After FDA's Gottlieb Describes 'Difficult' Meeting on Juul*, CNBC (Mar. 19, 2019), https://www.cnbc.com/2019/03/19/altria-shares-fall-after-fdas-gottlieb-describes-difficult-meeting-on-juul.html.

public health concerns drove Altria's decision to invest in JLI, and instead said it looked like a business decision. According to reporting by the New York Times, Gottlieb angrily criticized JLI's lobbying of Congress and the White House, stating:

> We have taken your meetings, returned your calls and I had personally met with you more times than I met with any other regulated company, and yet you still tried to go around us to the Hill and White House and undermine our public health efforts. I was trying to curb the illegal use by kids of your product and you are fighting me on it.[864]

668.    But just a week after the "difficult" meeting with JLI and Altria, Gottlieb posted a statement about the FDA's new e-cigarette policy, proposing to ban all flavors *except* "tobacco-, mint- and menthol-flavored products."[865] He cited the strong support of President Trump (whose administration JLI had aggressively lobbied[866]), and also cited "recent evidence indicat[ing] that mint- and menthol-flavored ENDS products are preferred more by adults than minors."[867] Just a few weeks later, Gottlieb resigned from his position as commissioner of the FDA.

669.    The scheme had succeeded in saving mint JUUL pods, as well as each Defendant's bottom line. JLI's sale of mint JUUL pods rose from one third of its sales in September 2018 to approximately two thirds in February 2019. JLI's 2019 revenues were estimated to be between $2.36 billion and $3.4 billion, and mint JUUL pods accounted for approximately 75% of JLI's total 2019 sales. And because mint remained on the market until JLI withdrew it in November 2019 in the face of growing scrutiny,[868] thousands, if not millions, of underage JUUL users suffered the consequences.

670.    As former New York City Mayor Mike Bloomberg stated: "JUUL's decision to keep mint- and menthol-flavored e-cigarettes on the shelves is a page right out of the

---

[864] Julie Creswell & Sheila Kaplan, *How Juul Hooked a Generation on Nicotine*, N.Y. Times (Nov. 24, 2019), https://www.nytimes.com/2019/11/23/health/juul-vaping-crisis.html.

[865] News Release, *Statement from FDA Commissioner Scott Gottlieb, M.D., on advancing new policies aimed at preventing youth access to, and appeal of, flavored tobacco products, including e-cigarettes and cigars*, U.S. FDA (Mar. 13, 2019), https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-advancing-new-policies-aimed-preventing-youth-access.

[866] Evan Sully & Ben Brody, *JLI Spent Record $1.2 Million Lobbying as Regulators Stepped Up*, Wash. Post (Oct. 22, 2019), https://www.washingtonpost.com/business/on-small-business/juul-spent-record-12-million-lobbying-as-regulators-stepped-up/2019/10/22/2a0dbc52-f4de-11e9-b2d2-1f37c9d82dbb_story.html.

[867] *Id*.

[868] Ellen Huet, *JLI Pulls Mint-Flavor Vaping Products, but Menthol Remains*, Bloomberg (Nov. 7, 2019), https://www.bloomberg.com/news/articles/2019-11-07/juul-stops-selling-mint-flavored-vaping-products.

1  tobacco industry's playbook."[869]

2      671.    JLI continues to sell menthol-flavored products.[870]

3  **3.    In Response to the Public Health Crisis Created by JUUL, the FDA**

4  **Belatedly Tried to Slow the Epidemic.**

5      672.    In 2017, the FDA announced that it would be taking steps to regulate e-cigarette

6  devices such as JUUL. In late 2017, the FDA initiated its investigation of e-cigarette

7  companies' advertising and sales practices. But, as noted above, the FDA's 2017 Compliance

8  Policy issued a four-year extension for compliance with the 2016 deeming rule, apparently to

9  "balance between regulation and encouraging development of innovative tobacco products that

10 may be less harmful than cigarettes."[871] In March 2018, the 2017 Compliance Policy was

11 challenged by the American Academy of Pediatrics, along with other public health

12 organizations concerned that a compliance extension for the e-cigarette industry would allow

13 more e-cigarette products into the market and continue to addict thousands of youth.[872]

14      673.    In March 2019, the FDA drafted guidance that modified the 2017 Compliance

15 Policy, but it did not go into full effect. However, on May 15, 2019, the lawsuit filed by the

16 American Academy of Pediatrics was successful—the U.S. District Court for the District of

17 Maryland vacated the 2017 Compliance Policy, and directed the FDA to "require that premarket

18 authorization applications for all new deemed products" ("new" referred to any product

19 launched after February 15, 2007 and thus would include JUUL) be submitted within ten

20 months, by May 2020.[873]

21      674.    In January 2020, the FDA issued: Enforcement Priorities for Electronic Nicotine

22 Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket

23 Authorization: Guidance for Industry (2020 FDA Guidance), directed at the e-cigarette industry,

24 which detailed the FDA's plan to prioritize enforcement of regulations prohibiting the sale of

25

26 [869] *Id.*

27 [870] Sheila Kaplan, *Juul Halts Sales of Mint, Its Top-Selling e-Cigarette Flavor*, N.Y. Times (Nov. 7, 2019), https://www.nytimes.com/2019/11/07/health/vaping-juul-mint-flavors.html.

28 [871] *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization*, U.S. FDA (Jan. 2020), https://www.fda.gov/media/133880/download.
[872] *Id.*
[873] *Id.*; *Am. Academy of Pediatrics v. FDA*, 379 F. Supp. 3d 461, 496 (D. Md. 2019).

flavored e-cigarette products and prohibiting the targeting of youth and minors.[874] The 2020

FDA Guidance focused on flavored e-cigarettes that appeal to children, including fruit and mint:

"[C]ompanies that do not cease manufacture, distribution and sale of unauthorized flavored

cartridge-based e-cigarettes . . . within 30 days risk FDA enforcement actions."[875]

### 4.    The Government's Efforts to Address the JUUL Crisis Were Too Late and the Damage Has Already Been Done

675.    By the time the FDA acted, youth consumption of e-cigarettes had already

reached an all-time high, and the e-cigarette industry's presence on social media became an

unstoppable force. The 2020 FDA Guidance acknowledges that two of the largest 2019 surveys

of youth cigarette use found that e-cigarette use had reached the highest levels ever recorded.[876]

By December 2019, there were over 2,500 reported cases of e-cigarette related hospitalization

for lung injury, including over fifty confirmed deaths.[877] Despite the FDA's efforts between

2017 and 2019, youth consumption of e-cigarettes doubled among middle and high school

students over the same period.[878] In 2019, the total number of middle and high school students

reporting current use of e-cigarettes surpassed five million for the first time in history.[879]

676.    JLI's presence on social media has also persisted, even without further initiation

by JLI—the hallmark of a successful viral marketing campaign. When the "#juul" hashtag was

first used on social media, it was a series of thirteen tweets on Twitter. By the time JLI

announced it would shut down its Instagram account, "#juul" had been featured in over 250,000

posts on Instagram. A study by Stanford University found that in the eight months after JLI

ceased all promotional postings, community posting accelerated, to nearly half a million posts.

Whereas before JLI exited Instagram, "#juul" appeared on average in 315 posts per day,

---

[874] *Id.*

[875] News Release, *FDA Finalizes Enforcement Policy on Unauthorized Flavored Cartridge-Based E-Cigarettes That Appeal to Children, Including Fruit and Mint*, U.S. FDA (Jan. 2, 2020), https://www.fda.gov/news-events/press-announcements/fda-finalizes-enforcement-policy-unauthorized-flavored-cartridge-based-e-cigarettes-appeal-children.

[876] *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization*, U.S. FDA (Jan. 2020), https://www.fda.gov/media/133880/download.

[877] Karen A. Cullen et al., *E-cigarette Use Among Youth in the United States, 2019*, 322 JAMA 2095 (2019).

[878] *Id.*

[879] *Id.*

COMPLAINT
Case No. 19-md-02913-WHO

that number tripled to 1084 posts per day after JLI shut down its Instagram account.[880]

677.    The FDA's anti-e-cigarette campaign on social media was aimed at youth and middle and high school students. The campaign used the slogan "The Real Cost" to educate youth on social media platforms about the health impacts of e-cigarette consumption—the real cost of using e-cigarettes. A recent study from the University of California Berkeley found that since September 2018, when the FDA's social media campaign began, the hashtag "#TheRealCost" was used about fifty times per month on Instagram. By comparison, e-cigarette related hashtags were used as many as 10,000 times more often. Despite the FDA's social media intervention, the number of e-cigarette related posts, and the median number of likes (a strong metric of viewer engagement) the posts received, increased three-fold and six-fold, respectively.[881]

678.    In short, by the time the FDA reacted to the epidemic created by Defendants, millions of youth were addicted to e-cigarettes and nicotine, and were sharing e-cigarette related posts on social media on their own.

## V.    GOVERNMENT ENTITY FACTUAL ALLEGATIONS

### A.    E-cigarette Use in Schools

679.    In addition to severe health consequences, widespread e-cigarette use, and particularly JUUL use, has placed severe burdens on society and schools in particular. It is not an overstatement to say that JUUL has changed the high school and even middle school experience of students across the nation. As one e-cigarette shop manager told KOMO News, "It's the new high school thing. Everyone's got the JUUL."[882]

680.    The JUUL youth addiction epidemic spread rapidly across high schools in the United States. JUUL surged in popularity, largely through social media networks, and created patterns of youth usage, illegal youth transactions, and addiction, that are consistent with

---

[880] Robert K. Jackler et al., *Rapid Growth of JUUL Hashtags After the Company Ceased Social Media Promotion*, Stanford Research Into the Impact of Tobacco Advertising (July 22, 2019), http://tobacco.stanford.edu/tobacco_main/publications/Hashtag JUUL Project_7-22-19F.pdf.

[881] Julia Vassey, *#Vape: Measuring E-cigarette Influence on Instagram With Deep Learning and Text Analysis*, 4 Frontiers in Comme'n 75 (2020),https://www.frontiersin.org/articles/10.3389/fcomm.2019.00075/full.

[882] *Juuling at School*, KOMO News (2019), https://komonews.com/news/healthworks/dangerous-teen-trend-juuling-at-school.

                                                                    COMPLAINT
                                                            Case No. 19-md-02913-WHO

the account from Reddit that described widespread JUUL use discussed above.

681.   E-cigarette use has completely changed school bathrooms—now known as "the Juul room."[883] As one high school student explained, "it's just a cloud."[884]

682.   As another high school student explained, "You can pull it out, you can have it anywhere. To smoke a cigarette you have to hit the bus stop. You want a Juul you hit the bathroom, it's easy."[885] He added that JLI "market[s] it as an alternative to cigarettes but really it's a bunch of kids who have never picked up a pack and they're starting their nicotine addiction there."[886] Students at another high school stated that classmates had "set off the fire alarm four times last year from vaping in the bathrooms [at school]," adding that it is commonplace to see students using e-cigarettes in school bathrooms or in the parking lot.[887]

683.   An April 20, 2018 article in *The Wall Street Journal* described the problems parents and schools are facing with the meteoric rise of nicotine use by America's youth:

> At Northern High School in Dillsburg, Pa., Principal Steve Lehman's locked safe, which once contained the occasional pack of confiscated cigarettes, is now filled with around 40 devices that look like flash drives.
>
> The device is called a Juul and it is a type of e-cigarette that delivers a powerful dose of nicotine, derived from tobacco, in a patented salt solution that smokers say closely mimics the feeling of inhaling cigarettes.  It has become a coveted teen status symbol and a growing problem in high schools and middle schools, spreading with a speed that has taken teachers, parents and school administrators by surprise.
>
> \*        \*        \*
>
> After two decades of declining teen cigarette use, "JUULing" is exploding.  The JUUL liquid's 5% nicotine concentration is significantly higher than that of most other commercially available e-cigarettes.  JUUL Labs Inc., maker of the device, says one liquid pod delivers nicotine comparable to that delivered by a pack of

---

[883] Moriah Balingit, *In the 'Juul room': E-cigarettes spawn a form of teen addiction that worries doctors, parents and schools*, Wash. Post (July 26, 2019), https://www.washingtonpost.com/local/education/helpless-to-the-draw-of-nicotine-doctors-parents-and-schools-grapple-with-teens-addicted-to-e-cigarettes/2019/07/25/e1e8ac9c-830a-11e9-933d-7501070ee669_story.html.

[884] Greta Jochem, *Juuling in School: e-Cigarette Use Prevalent Among Local Youth*, Daily Hampshire Gazette (Nov. 13, 2018), https://www.gazettenet.com/Juuling-in-Schools-21439655.

[885] Alison Grande, *'Juuling': Vaping device that looks like USB drive popular with teens*, KIRO 7 (Dec. 8, 2017), https://www.kiro7.com/news/local/juuling-vaping-device-that-looks-like-usb-drive-popular-with-teens/660965605/.

[886] *Id.*

[887] Manisha Jha, *'You need to stop vaping right now': Students and faculty react to Washington vape ban*, The Daily, U. of Wash. (Sept. 30, 2019), http://www.dailyuw.com/news/article_960d8692-e324-11e9-870c-9f9d571115d6.html.

cigarettes, or 200 puffs—important for adult smokers trying to switch to an e-cigarette. It is also part of what attracts teens to the product, which some experts say is potentially as addictive as cigarettes and has schools and parents scrambling to get a grip on the problem.[888]

684.    This impact was only made worse by JLI intentionally targeting schools, as described above.

685.    Such rampant e-cigarette use has effectively added another category to teachers' and school administrators' job descriptions; many now receive special training to respond to the various problems that youth e-cigarette use presents, both in and out of the classroom. A national survey of middle schools and high schools found that 44.4% of schools have had to implement policies to address JUUL use.[889] Participants in the survey reported multiple barriers to enforcing these policies, including the discreet appearance of the product, difficulty pinpointing the vapor or scent, and the addictive nature of the product.

686.    Across the United States, schools have had to divert resources and administrators have had to go to extreme lengths to respond to the ever-growing number of students using e-cigarettes on school grounds, including in restrooms. According to the *Truth Initiative*, more than 40% of all teachers and administrators reported responding to the JUUL crisis through camera surveillance near the school's restroom; almost half (46%) reported camera surveillance elsewhere in the school; and 23% reported using assigned teachers for restroom surveillance.[890] Some schools have responded by removing bathroom doors or even shutting bathrooms down, and schools have banned flash drives to avoid any confusion between flash drives and JUULs. Schools have also paid thousands of dollars to install special monitors to detect e-cigarette use, which they say is a small price to pay compared to the plumbing repairs otherwise spent as a result of students flushing e-cigarette paraphernalia down toilets. Other school districts have

---

[888] Anne Marie Chaker, *Schools and Parents Fight a Juul E-Cigarette Epidemic*, Wall St. J. (Apr. 4, 2018), https://www.wsj.com/articles/schools-parents-fight-a-juul-e-cigarette-epidemic-1522677246.

[889] Barbara A. Schillo, PhD et al., *JUUL in School: Teacher and Administrator Awareness and Policies of E-Cigarettes and JUUL in U.S. Middle and High Schools*, Truth Initiative Vol. 21(1) Health Promotion Practice 20-24 (Sept. 18, 2019), https://journals.sagepub.com/doi/full/10.1177/1524839919868222?url_ver=Z39.88-2003&rfr_id=ori:rid:crossref.org&rfr_dat=cr_pub%3dpubmed.

[890] *How are schools responding to JUUL and the youth e-cigarette epidemic?*, Truth Initiative (Jan. 18, 2019), https://truthinitiative.org/research-resources/emerging-tobacco-products/how-are-schools-responding-juul-and-youth-e-cigarette.

sought state grant money to create new positions for tobacco prevention supervisors, who get phone alerts when e-cigarette smoke is detected in bathrooms.

687.    Many schools have also shifted their disciplinary policies in order to effectively address the youth e-cigarette epidemic. Rather than immediately suspending students for a first offense, school districts have created anti-e-cigarette curricula which students are required to follow in sessions held outside of normal school hours, including on Saturdays. Teachers prepare lessons and study materials for these sessions with information on the marketing and health dangers of e-cigarettes—extra work which requires teachers to work atypical hours early in the mornings and on weekends. Some schools will increase their drug testing budget to include random nicotine tests for students before they join extracurricular activities. Under this drug-testing protocol, first offenders will undergo drug and alcohol educational programming; second and third offenders with be forced to sit out from extra-curricular activities and attend substance abuse counseling.

688.    A July 26, 2019 article in *The Washington Post* noted the measures some schools were taking to combat "JUULing" by students:

> Many schools are at a loss for how to deal with Juuls and other e-cigarettes. Some educators report increases in the number of students being suspended after they're caught with e-cigarettes.
>
> Desperate school administrators have banned USB drives because they're indistinguishable from Juuls. Others removed bathroom doors because teens were regularly gathering there to vape, and some have even started searching students.
>
> Jonathon Bryant, chief administrator of Lincoln Charter School in North Carolina, estimated that three-quarters of suspensions in the just-completed academic year were related to vaping, and some students were suspended more than once.[891]

689.    JUUL's prevalence in schools is not a coincidence; JLI actively sought to enter school campuses. By June 2017, JLI began developing what they claimed to be a "youth

---

[891] Moriah Balingit, *In the 'Juul room': E-cigarettes spawn a form of teen addiction that worries doctors, parents and schools*, Wash. Post (July 26, 2019), https://www.washingtonpost.com/local/education/helpless-to-the-draw-of-nicotine-doctors-parents-and-schools-grapple-with-teens-addicted-to-e-cigarettes/2019/07/25/e1e8ac9c-830a-11e9-933d-7501070ee669_story.html.

COMPLAINT
Case No. 19-md-02913-WHO

prevention program[.]"[892] By December 2017, JLI's venture included extensive work with schools.[893]

690.    As discussed above, the U.S. House Subcommittee on Economic and Consumer Policy ("Subcommittee") conducted a months-long investigation of JLI, including reviewing tens of thousands of internal documents, and concluded that JLI "deliberately targeted children in order to become the nation's largest seller of e-cigarettes."[894] The Subcommittee found that "(1) JUUL deployed a sophisticated program to enter schools and convey its messaging directly to teenage children; (2) JUUL also targeted teenagers and children, as young as eight years-old, in summer camps and public out-of-school programs; and (3) JUUL recruited thousands of online 'influencers' to market to teens."[895]

691.    According to the Subcommittee, JLI was willing to pay schools and organizations hundreds of thousands of dollars to have more direct access to kids. For example, JLI paid a Baltimore charter school organization $134,000 to start a summer camp to teach kids healthy lifestyles, for which JLI itself would provide the curriculum.[896] Participants were "recruited from grades 3 through 12."[897] JLI also offered schools $10,000 to talk to students on campus and gave the Police Activities League in Richmond, California, almost $90,000 to provide JLI's own e-cigarette education program, "Moving On," to teenage students suspended for using cigarettes. The Richmond Diversion Program targeted "youth, aged 12-17, who face suspension from school for using e-cigarettes and/or marijuana" and "juveniles who have committed misdemeanour (lesser category) offenses" and required students to "participate in the JUUL labs developed program, Moving Beyond," for as long as ten weeks.[898]

692.    Community members testified before the Subcommittee as to the content of one of JLI's presentations in school. During JLI's presentation to students, "[n]o parents or teachers

---

[892] *See, e.g.*, INREJUUL_00211242-243 at 242.
[893] INREJUUL_00173409.
[894] *Memorandum*, U.S. House Subcommittee on Econ. & Consumer Policy (July 25, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Supplemental%20Memo.pdf.
[895] *Id*.
[896] *See* INREJUUL_00194247-251; *see also* JLI-HOR-00003711-712 (invoice to JLI from The Freedom & Democracy Schools, Inc. for $134,000 dated June 21, 2018).
[897] INREJUUL_0019427-251 at 428.
[898] JLI-HOR-00002180-184 at 181-182.

were in the room, and JUUL's messaging was that the product was 'totally safe.' The presenter even demonstrated to the kids how to use a JUUL."[899]

693.    In 2018, a representative from JLI spoke at a high school during a presentation for ninth graders, stating that JUUL "was much safer than cigarettes," that the "FDA would approve it any day," that JUUL was "totally safe," that JUUL was a "safer alternative than smoking cigarettes, and it would be better for the kid to use," and that the "FDA was about to come out and say it [JUUL] was 99% safer than cigarettes . . . and that . . . would happen very soon[.]"[900] "The presenter even demonstrated to the kids how to use a JUUL."[901]

694.    In the FDA's September 9, 2019 Warning Letter, which discussed this presentation to ninth graders, the agency noted its "concern is amplified by the epidemic rate of increase in youth use of ENDS products, including JUUL's products, and evidence that ENDS products contribute to youth use of, and addiction to, nicotine, to which youth are especially vulnerable."[902]

695.    The FDA's Center for Tobacco Products issued a separate letter to JUUL CEO Kevin Burns, requesting "documents and information from JUUL Labs, Inc. (JUUL) regarding JUUL's marketing, advertising, promotional, and educational campaigns, as well as certain product development activity."[903] The FDA also issued a news release on September 9, 2019, in which it chided JUUL for its role in the youth e-cigarette epidemic, noting "[s]ome of this youth use appears to have been a direct result of JUUL's *product design and promotional activities* and outreach efforts," in particular, its outreach efforts to students.[904]

---

[899] Committee Staff, *Memorandum re: Supplemental Memo for Hearing on "Examining JUUL's Role in the Youth Nicotine Epidemic: Parts 1 & II* ("Supplemental Memo for Hearing") at 1, Subcommittee on Econ. & Consumer Policy (July 25, 2019),
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Supplemental%20Memo.pdf.
[900] *Juul Labs, Inc. Warning Letter*, FDA (Sept. 9, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019.
[901] Subcommittee on Economic and Consumer Policy Memo (July 25, 2019).
[902] *Id*.
[903] Letter from Mitchell Zeller, Director, Center for Tobacco Products, to Kevin Burns, CEO of JUUL Labs, Inc. at 1 (Sept. 9, 2019), https://www.fda.gov/media/130859/download.
[904] *FDA warns JUUL Labs for marketing unauthorized modified risk tobacco products, including in outreach to youth*, FDA (Sept. 9, 2019), https://www.fda.gov/news-events/press-announcements/fda-warns-juul-labs-marketing-unauthorized-modified-risk-tobacco-products-including-outreach-youth (emphasis added)Letter from Center for Tobacco Products, to Kevin Burns, CEO of JUUL Labs, Inc. (Sept. 9, 2019), https://www.fda.gov/media/130859/download.

696.    The Center for Tobacco Products letter requested documents and explanations on multiple topics, including, but not limited to:

> Ms. Meredith Berkman, Co-founder, Parents Against Vaping e-cigarettes (PAVe), testified that, "In California, a retired school superintendent was offering schools in his state and in Massachusetts money if they would implement the anti-JUUL curriculum that…a man named Bruce Harder was offering on JUUL's behalf."

*    *    *

> On July 25, 2019, in response to questions from Chairman Krishnamoorthi about JUUL's program to pay schools $10,000 or more to use a JUUL "youth prevention" curriculum, Ms. Ashley Gould, Chief Administrative Officer, JUUL Labs, Inc., testified: "That is not currently the case. We ended that program in the fall of 2018," and that, "…there were six schools that received funding from JUUL to implement programming to prevent teen vaping…."

> In addition, in response to questions from Chairman Krishnamoorthi about internal JUUL correspondence in 2018 about setting up a booth at a school health fair, Ms. Gould testified that JUUL ended its youth prevention program.[905]

697.    JLI also sponsored a "Saturday School Program" in which students caught using e-cigarettes in school were presented with JLI-sponsored curriculum and snacks, and JLI "established the right to collect student information from the sessions."[906] A JLI spokesman said the company is no longer funding such programs.

698.    As mentioned above, the problems with JLI's youth prevention programs were widespread. According to outside analyses, "the JUUL Curriculum is not portraying the harmful details of their product, similar to how past tobacco industry curricula left out details of the health risks of cigarette use."[907] Although it is well-known that teaching children to deconstruct ads is one of the most effective prevention techniques, JLI programs entirely omitted this skill, and JLI's curriculum barely mentioned JUUL products as among the potentially harmful

---

[905] Letter from Mitchell Zeller, Director, Center for Tobacco Products, to Kevin Burns, CEO of JUUL Labs, Inc. at 2 (Sept. 9, 2019), https://www.fda.gov/media/130859/download.
[906] Committee Staff, *Memorandum re: Supplemental Memo for Hearing on "Examining JUUL's Role in the Youth Nicotine Epidemic: Parts 1 & II* ("Supplemental Memo for Hearing") at 2, Subcommittee on Econ. & Consumer Policy (July 25, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Supplemental%20Memo.pdf.
[907] Victoria Albert, *Juul Prevention Program Didn't School Kids on Dangers, Expert Says: SMOKE AND MIRRORS. JUUL—which made up 68 percent of the e-cigarette market as of mid-June—seems to have taken a page from the playbook of Big Tobacco*, The Daily Beast (Oct. 19, 2018), https://www.thedailybeast.com/juul-prevention-program-didnt-school-kids-on-dangers-expert-says.

COMPLAINT
Case No. 19-md-02913-WHO

products to avoid.[908] As one expert pointed out, "we know, more from anecdotal research, that [teens] may consider [JUULs] to be a vaping device, but they don't call it that. So when you say to a young person, 'Vapes or e-cigarettes are harmful,' they say, 'Oh I know, but I'm using a JUUL.'"[909]

699.    Internal emails confirm both that JLI employees knew about the similarities of JLI's "youth prevention program" to the earlier pretextual antismoking campaigns by the cigarette industry and that JLI management at the highest levels was personally involved in these efforts. In April 2018, Julie Henderson, the Youth Prevention Director, emailed school officials about "the optics of us attending a student health fair" because of "how much our efforts seem to duplicate those of big tobacco (Philip Morris attended fairs and carnivals where they distributed various branded items under the guise of 'youth prevention')."[910] She later wrote that she would "confirm our participation w[ith] Ashley & Kevin"[911]—an apparent reference to Kevin Burns, at the time the CEO of JLI, who would later personally approve JLI's involvement in school programs. In May 2018, Henderson spoke with former members of Philip Morris's "youth education" team,[912] and Ashley Gould received and forwarded what was described as "the paper that ended the Think Don't Smoke campaign undertaken by Philip Morris."[913] The paper concluded that "the Philip Morris's ['youth prevention'] campaign had a counterproductive influence."[914]

700.    The Management Defendants were intimately involved in these "youth prevention" activities. For example, in April 2018, Defendants Valani and Pritzker edited a "youth prevention" press release, noting that they "don't want to get these small items wrong" and that they "think it's critical to get this right."[915]

701.    JLI was aware that these out-of-school programs were, in the words of

---

[908] *Id.*

[909] *Id.*

[910] INREJUUL_00197607-608 at 608.

[911] *Id.* at 607.

[912] INREJUUL_00196624-625.

[913] INREJUUL_00265202.

[914] Matthew C. Farrelly et al., *Getting to the Truth: Evaluating National Tobacco Countermarketing Campaigns*, 92 Am. J. Public Health 901 (2002), https://www.industrydocuments.ucsf.edu/tobacco/docs/#id=nxhb0024.

[915] JLI00151300.

Henderson, "eerily similar" to the tactics of the tobacco industry.[916] Eventually, JLI ended this version of its youth prevention program, but the damage had been done: following the cigarette industry playbook, JLI had hooked more youth on nicotine.

702.    As the sales of JUUL continued to mushroom, it was readily apparent, and widely reported, that the rapid growth in sales was due to the surging popularity of e-cigarette use among teenagers. By March 2018, multiple national news outlets including *National Public Radio*, *USA Today*, and *Business Insider* reported youth were using JUUL with alarming frequency, posting about using JUUL in school restrooms on social media, and bragging about being able to use the device in the classroom due to JUUL's discreet design.

703.    One of the priorities for JLI, Altria, and the Management Defendants was therefore to control the messaging and narrative around youth e-cigarette use. Faced with an urgent, growing public health crisis, national media attention, and the ire of the public, the FDA and members of Congress, the Defendants realized that dis-information campaign was urgently needed to protect its bottom line. This campaign was the "*Make the Switch*" campaign discussed above.

704.    The "*Make the Switch*" campaign was a cover-up, and its goal was to convince the public, including schools and public health departments, that JUUL had never marketed to youth and was instead intended to be a smoking cessation device. This campaign was false. As mentioned above, one of JLI's engineers admitted, "we're not trying to design a cessation product at all . . . anything about health is not on our mind."[917] And as described elsewhere herein, JLI and the Management Defendants directly targeted underage nonsmokers. Indeed, JLI did not mention the term "adult" or "adult smoker" on its Twitter feed until July 5, 2017. JLI, the Management Defendants, and Altria were all well aware that such users made up a significant percentage of JLI's customer base in 2018—in fact, they counted on this customer base to grow and preserve JUUL's market share—and that the statements they disseminated regarding "Make the Switch" from smoking being JLI's mission from the start were

---

[916] INREJUUL_00194646.
[917] Kevin Roose, *Juul's Convenient Smoke Screen*, N.Y. Times (Jan. 11, 2019),
  https://www.nytimes.com/2019/01/11/technology/juul-cigarettes-marketing.html.

COMPLAINT
Case No. 19-md-02913-WHO

fraudulent, to the detriment of schools and public health departments.

705.    As JUUL sales skyrocketed in 2017 and 2018 and schools quickly became overwhelmed by this public health crisis, everyone from tobacco industry giants to e-cigarette start-ups launched their own products to take advantage of the illicit youth e-cigarette market Defendants created, using the key elements of JUUL's design: flavor pods, nicotine salts, and a tech-like appearance.

706.    The cigarette industry, which already marketed e-cigarettes, launched "JUULalike" versions of their products in 2018, in flavors such as Mango Apricot and Green Apple, and with nicotine salt formulations and higher nicotine content than their earlier e-cigarettes.[918]

707.    The launch of "JUULalike" products concerned Vince Willmore, Vice President of Communications for the Campaign for Tobacco-Free Kids. According to Willmore, "Juul is our biggest concern right as it is being widely used by kids across the country . . . [b]ut we are also concerned that the introduction of a growing number of Juul-like products could make the problem even worse."[919] Willmore was not the only one worried. Then FDA Commissioner Gottlieb expressed concern about products copying JUUL's features, stating that such products "closely resemble a USB flash drive, have high levels of nicotine and emissions that are hard to see. These characteristics may facilitate youth use, by making the products more attractive to children and teens."[920]

///

---

[918] Rachel Becker, *Juul's Nicotine Salts Are Dominating the Market – And Other Companies Want In*, The Verge (Nov. 21, 2018), https://www.theverge.com/2018/11/21/18105969/juul-vaping-nicotine-salts-electronic-cigarettes-myblu-vuse-markten; *blu Launches myblu E-Vapor Device*, CStore Decisions (Feb. 21, 2018), https://cstoredecisions.com/2018/02/21/blu-launches-myblu-e-vapor-device/; Angelica LaVito, *Juul's momentum slips as NJOY woos customers with dollar e-cigarettes*, CNBC (Aug. 20, 2019), https://www.cnbc.com/2019/08/20/juuls-momentum-slips-as-njoy-woos-customers-with-dollar-e-cigarettes.html.
[919] Ben Tobin, *FDA targets e-cigarettes like Juul as teachers fear 'epidemic' use by students*, USA Today (Aug. 16, 2018), https://www.usatoday.com/story/money/2018/08/16/juul-labs-back-school-teachers-e-cigarettes/917531002/.
[920] Scott Gottlieb, Statement from FDA Commissioner Scott Gottlieb, M.D., on new enforcement actions and a Youth Tobacco Prevention Plan to stop youth use of, and access to, JUUL and other e-cigarettes, FDA (Apr. 23, 2018), https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-new-enforcement-actions-and-youth-tobacco-prevention?utm_campaign=04242018_Statement_Youth%20Tobacco%20Prevention&utm_medium=email&utm_source=Eloqua.

708.    Researchers from SRITA called it "a nicotine arms race," writing that "JUUL's success in the e-cigarette marketplace has spurred a variety of new pod-based products with exceptionally high nicotine."[921] "As of September 2018," the researchers wrote, "there were at least 39 JUUL knock off devices on the market"—none of which were sold prior to the introduction of JUUL.[922]

709.    The rapid proliferation of e-cigarette products in JUUL's wake and the speed with which the e-cigarette market evolves make it difficult to enact effective legislative and regulatory measures.

710.    The Secretary of HHS recognized, "The United States has never seen an epidemic of substance use arise as quickly as our current epidemic of youth use of e-cigarettes."[923] FDA Commissioner Stephen Hahn, M.D. added, "As we work to combat the troubling epidemic of youth e-cigarette use, the enforcement policy we're issuing today confirms our commitment to dramatically limit children's access to certain flavored e-cigarette products we know are so appealing to them—so-called cartridge-based products that are both easy to use and easily concealable."[924]

711.    Enterprising companies recognized loopholes in a policy aimed only at cartridge-based products and the opportunity to fill the demand for fruit-flavored nicotine created by JLI. Disposable e-cigarettes have become increasingly popular with youth due to the youth e-cigarette market Defendant JLI created. The use of disposable e-cigarettes is now "rampant" in schools, further intensifying this public health crisis.[925]

712.    For every company inspired by JLI to sell candy-flavored e-cigarette products that exits the market, more materialize to take its place, driven by the knowledge that there is a large market of nicotine-addicted youth eager for their products, a market created by JLI.

---

[921] Robert K. Jackler & Divya Ramamurthi, *Nicotine arms race: JUUL and the high-nicotine product market*. 28 Tobacco Control 623-28 (2019), https://tobaccocontrol.bmj.com/content/28/6/623.
[922] *Id.*
[923] U.S. Food & Drug Administration, *FDA finalizes enforcement policy on unauthorized flavored cartridge-based e-cigarettes that appeal to children, including fruit and mint* ("FDA News Release"), FDA (Jan. 2, 2020), https://www.fda.gov/news-events/press-announcements/fda-finalizes-enforcement-policy-unauthorized-flavored-cartridge-based-e-cigarettes-appeal-children.
[924] *Id.*
[925] Sheila Kaplan, *Teens Find a Big Loophole in the New Flavored Vaping Ban*, N.Y. Times (Jan. 31, 2020), https://www.nytimes.com/2020/01/31/health/vaping-flavors-disposable.html.

COMPLAINT
Case No. 19-md-02913-WHO

713.    The rise in disposable products demonstrates why additional measures are necessary to halt the spread of youth e-cigarette use.[926]

**B.    Impact of the Youth E-Cigarette Crisis on Plaintiff MSAD**

714.    Plaintiff MSAD is a public school district that serves approximately 1,903 students in Pre-Kindergarten through Twelfth Grade in 1 preschool program, 3 elementary schools, 1 middle school, 1 comprehensive high school and 1 adult education center.  MSAD is part of Cumberland County, located in the most populous county in the state, approximately 25 miles from Portland, with a population of approximately 295,003 residents.

715.    Plaintiff has been hit hard by the youth e-cigarette epidemic. Students in Plaintiff's schools have openly charged e-cigarette devices in classrooms, causing disruption and diverting staff resources away from classroom instruction.  Other students, addicted to nicotine, have demonstrated anxious, distracted and acting out behaviors, causing disruption and diverting staff resources away from classroom instruction and requiring additional time and attention for addicted students.  These increasing numbers are consistent with the rise in youth e-cigarette use throughout the nation

716.    Defendants' conduct has created a public health crisis in Plaintiff's schools and Plaintiff spent significant and unexpected levels of time and resources on addressing the pervasiveness of youth e-cigarette use.

717.    Smoking combustible cigarettes in public places has become increasingly socially unacceptable as a result of years of sustained anti-smoking efforts by public health advocates, but due to Defendants' actions and efforts to market e-cigarettes as a "safe" and "healthier" alternative to smoking and as a way to defy existing smoke-free regulations, e-cigarette use has become normalized and regarded as "cool" particularly among youth peer groups. This contributes to the false impression among Plaintiff's youth that e-cigarette use is safe.

---

[926] *Press Release: Raising the Tobacco Age to 21 Won't Stop the Youth E-Cigarette Epidemic and Is Not a Substitute for Eliminating the Flavored Products that Lure Kids*, Tobacco Free Kids (Dec. 16, 2019), https://www.tobaccofreekids.org/press-releases/2019_12_16_tobacco21_flavor.

COMPLAINT
Case No. 19-md-02913-WHO

718.    Plaintiff has had to devote and divert staff resources to conduct staff training on e-cigarette use. Plaintiff's teachers and administrators have had to become educated about Defendants' products and their dangers. One component of the necessary education has been simply recognizing the devices for what they are: due to the USB-mimicking design of JUUL and its copycats, many teachers do not recognize the e-cigarette devices when they see them.

719.    Plaintiff also has dedicated time at school assemblies to address the issue of e-cigarette use, time that could have otherwise been devoted to other important issues facing Plaintiff's students.

720.    In addition to working with students, Plaintiff's counselors and administrators also train the district's teachers and work to educate parents in Plaintiff's community. Plaintiff has created resources and materials and shared resources and education materials with its community, who rely on Plaintiff for information about youth e-cigarette use. Plaintiff has had to devote and divert staff resources to deploying student, family and parent-teacher education regarding the dangers of e-cigarette products.

721.    Plaintiff has had to devote and divert staff resources to intervening in student e-cigarette activities and coordinating necessary follow-up, devoting class time to discuss youth e-cigarette use with students.

722.    Plaintiff also has had to add additional School Resource Officer ("SRO") personnel to focus on deterring and preventing student e-cigarette use.

723.    The work that Plaintiff does to educate students and parents is particularly important, and necessary, as a result of the widespread misinformation about e-cigarette products. Many students in Plaintiff's schools have been deceived by Defendants' marketing and misinformation and are unaware of the true nature, health risks, and addictiveness of e-cigarette products. As a result of Defendants' advertising campaigns, some students in Plaintiff's schools believe that Defendants' products contain only flavoring, not nicotine. Additionally, both teens and their parents have been deceived into thinking e-cigarette use is harmless, and as a result of the low perception of harm, youth use e-cigarettes more frequently.

724.    Discipline and suspensions related to incidents of e-cigarette use in

Plaintiff's schools have increased at alarming rates and staff are required to spend increased time addressing discipline problems related to student e-cigarette use. While the initial response was to suspend students for e-cigarette offenses, Plaintiff was concerned that this time away from school only enabled further e-cigarette use. Because of the alarming rise of discipline and suspensions associated with student e-cigarette use, Plaintiff has devoted and diverted staff resources to develop a diversion program so as to allow students who are caught using e-cigarettes to remain in school and in class where possible. Consequently, Plaintiff's school administrators and teachers are having to address these issues during school hours, which interferes with curriculum and regular teaching time.

725. Relatedly, because e-cigarette use in bathrooms is pervasive at Plaintiff's schools, Plaintiff has had to close some bathrooms and Plaintiff's staff has had to devote staff time and resources to monitoring the bathrooms, including regularly walking through them both during class and between classes. Because many students who do not engage in e-cigarette activities do not wish to use the school restrooms, even to wash their hands, Plaintiff has had to go so far as to rent multiple portable hand-washing stations that have been placed outside of restrooms in an effort to maintain student hygiene and prevent the spread of disease. Plaintiff has also installed numerous additional cameras on property in Plaintiff's district and has created and installed anti-vaping signs around its property.

726. Not only have Defendants' e-cigarette products addicted a new generation to nicotine, Defendants are also creating a growing hazardous waste problem in Plaintiff's schools. Defendants' e-cigarette products contain chemicals that can be toxic or fatal if ingested in their concentrated forms,[927] as well as lithium-ion batteries,[928] which cannot be safely disposed of in

---

[927] *See, e.g.*, *How do I dispose of a JUULpod?*, JUUL Labs, Inc., https://support.juul.com/hc/en-us/articles/360023529793-How-do-I-dispose-of-a-JUULpod- (last visited Mar. 3, 2020) ("JUULpods should be recycled along with other e-waste."); American Acad. of Pediatrics, *Liquid Nicotine Used in E-Cigarettes Can Kill Children*, healthychildren.org, https://www.healthychildren.org/english/safety-prevention/at-home/pages/liquid-nicotine-used-in-e-cigarettes-can-kill-children.aspx (last visited Mar. 3, 2020).

[928] *See, e.g.*, JUUL Labs, Inc. (2020), https://support.juul.com/hc/en-us/articles/360023319614-What-kind-of-battery-is-in-the-device- (last visited Feb. 3, 2020) ("JUUL uses a lithium-ion polymer battery. All portable electronics containing lithium-ion batteries present rare, but potentially serious safety hazards."); JUUL Labs, Inc. (2020), https://support.juul.com/hc/en-us/articles/ 360023366194-How-do-I-dispose-of-a-JUUL-device- (last visited Mar. 13, 2020) ("Unlike other e-cigarettes, JUUL isn't disposable and should be treated as a consumer

the normal stream of trash. The e-cigarette epidemic has led to significant levels of hazardous waste from these e-cigarette products throughout Plaintiff's schools, either from youth improperly disposing of them by littering or throwing them in the trash or toilets, or because teachers and school staff must confiscate and store them. JLI contributed to the improper disposal of JUULpods by telling customers to throw JUULpods away in the "regular trash" until at least April 27, 2019.[929] Due to the widespread nature of this problem, Plaintiff has struggled to determine how best to respond.

727.    Plaintiff has been taking important steps to combat the youth e-cigarette crisis, but it cannot fully address the existing widespread use of e-cigarette products and resulting nicotine addiction among youth. Because of the smoothness of nicotine salts contained in Defendants' e-cigarette products as well as Defendants' discreet device designs, many youth use their e-cigarette devices with high frequency throughout the day—with some kids taking a puff as often as every few minutes. Unlike a combustible cigarette with its telltale emissions of smoke and distinct smell, the JUUL device and "JUULalikes" allow kids to use e-cigarettes undetected behind closed doors and even behind their teachers' backs in the classroom. Such frequent use makes it much more likely that nicotine addiction will develop, particularly when coupled with the high nicotine content in JUULpods and copycat products. Youth e-cigarette use has therefore resulted in a higher incidence of addiction than that caused by youth smoking of combustible cigarettes.

728.    As the researchers conducting the national *Monitoring the Future* survey wrote in a letter to the *New England Journal of Medicine* in October 2019, current efforts are insufficient to address youth nicotine addiction from e-cigarette use:

> Current efforts by the vaping industry, government agencies, and schools have thus far proved insufficient to stop the rapid spread of nicotine vaping among adolescents. Of particular concern are the accompanying increases in the

---

electronic device. Follow your city's local recommendations for disposing of a lithium-polymer rechargeable battery.").

[929] JUUL Labs, Inc.  (@JUULvapor), Twitter (Jul. 16, 2018), https://twitter.com/juulvapor/status/1018976775676792834?lang=en ("JUULpods can be thrown away in a regular trash receptacle"); *see also* JUULpod Basics, JUUL Labs, Inc (Apr. 27, 2019), https://web.archive.org/web/20190427023811/https://support.juul.com/home/learn/faqs/juulpod-basics ("How do I dispose of a JUULpod?" "JUULpods are closed systems and are not intended to be refilled. They can be thrown away in a regular trash can.").

proportions of youth who are physically addicted to nicotine, an addiction that is very difficult to overcome once established. The substantial levels of daily vaping suggest the development of nicotine addiction. New efforts are needed to protect youth from using nicotine during adolescence, when the developing brain is particularly susceptible to permanent changes from nicotine use and when almost all nicotine addiction is established.[930]

729.    The lack of available nicotine-addiction treatment options for youth presents a challenge to communities across the country. The lack of treatment options for students within Plaintiff's school district who are addicted to nicotine is a significant concern for Plaintiff, but such treatment options will be difficult to develop. The available FDA-approved tobacco cessation products are not intended for, and are not approved for, pediatric use. With additional resources, Plaintiff would support the development of additional, youth-appropriate cessation options that can meet the needs of its students. Plaintiff would also support the development of e-cigarette-specific cessation resources to address the ways in which e-cigarette cessation may differ from traditional smoking cessation. Development of such resources is a crucial step to combat the youth e-cigarette epidemic.

730.    With additional resources, Plaintiff would develop and implement a district-wide education and outreach campaign about e-cigarette use and its dangers in order to combat Defendants' marketing and the social pressures the youth e-cigarette epidemic has created. Carrying out such a campaign effectively and countering Defendants' extensive marketing will require significant funding as well as staff time. This education and outreach campaign must include developing prevention and education materials appropriate for middle school and even elementary school students, as the e-cigarette crisis continues to spread to even younger children. And critically, Plaintiff wants to establish more comprehensive parent education programs to broaden capacity for families to support their children who are struggling with e-cigarette use and addiction.

731.    In addition, Plaintiff would conduct more traditional outreach efforts such as media development and targeted marketing campaigns to support Plaintiff's prevention and education work. This would require significant expenditure of resources to ensure the message

---

[930] Miech, *supra* note 4.

1    was spread widely enough to reach students and combat Defendants' extensive marketing and

2    misinformation. In order to make the message resonate with youth, Plaintiff will have to work

3    with youth to cultivate the most effective message.

4          732.    Funding is also needed to establish a peer mentorship and prevention program.

5    Peer-to-peer messaging is crucial because it is necessary to change the social norms around e-

6    cigarette use, just as previous efforts ultimately changed social norms around combustible

7    cigarette smoking. Defendants have been adept at using peer-to-peer messaging to promote their

8    addictive e-cigarette products to kids through the use of social media campaigns and paid

9    influencers. Because young people are often most willing to listen to other young people,

10   countering Defendants' conduct will require training and supporting youth to educate their

11   peers.

12         733.    With sufficient funding, Plaintiff would also purchase e-cigarette detectors to

13   install in its bathrooms and cameras for the hallways, in order to both reduce the amount of staff

14   time devoted to patrolling the bathroom and ensure that students using e-cigarettes at school are

15   identified and connected with resources to help them quit.  Where necessary, Plaintiff also

16   would physically modify the design of certain areas of its property, such as restrooms, with

17   alternative floorplans that have been demonstrated to reduce the ability of students to use

18   contraband such as e-cigarette devices.

19         734.    Fully addressing the harms to Plaintiff caused by Defendants' conduct will

20   require a comprehensive approach. Without the resources to fund measures such as those

21   described herein, Plaintiff will continue to be harmed by the ongoing consequences of

22   Defendants' conduct.

23   **C.    No Federal Agency Action, Including by the FDA, Can Provide the Relief Plaintiff**

24   **Seeks Here.**

25         735.    The injuries Plaintiff has suffered and will continue to suffer cannot be addressed

26   by agency or regulatory action. There are no rules the FDA could make or actions the agency

27   could take that would provide Plaintiff the relief it seeks in this litigation.

28         736.    Even if e-cigarettes were entirely banned today or only used by adults,

1    millions of youth, including Plaintiff's students, would remain addicted to nicotine.

2        737.    Regulatory action would do nothing to compensate Plaintiff for the money and

3    resources it has already expended addressing the impacts of the youth e-cigarette epidemic and

4    the resources it will need in the future. Only this litigation has the ability to provide Plaintiff

5    with the relief it seeks.

6        738.    Furthermore, the costs Plaintiff has incurred in responding to the public health

7    crisis caused by youth e-cigarette and taking the actions described above are recoverable

8    pursuant to the causes of actions raised by Plaintiff. Defendants' misconduct alleged herein is

9    not a series of isolated incidents, but instead the result of a sophisticated and complex marketing

10    scheme and related cover-up scheme that has caused a continuing, substantial, and long-term

11    burden on the services provided by Plaintiff. In addition, the public nuisance created by

12    Defendants and Plaintiff's requested relief in seeking abatement further compels Defendants to

13    reimburse and compensate Plaintiff for the substantial resources it has expended and will need

14    to continue to expend to address the youth e-cigarette epidemic.

## VI.    CAUSES OF ACTION

### COUNT ONE — VIOLATIONS OF PUBLIC NUISANCE LAW

17        739.    Plaintiff incorporates each preceding paragraph as though set forth fully herein.

18        740.    Defendant JUUL created and maintained a public nuisance which proximately

19    caused injury to Plaintiff.

20        741.    Plaintiff and its students have a right to be free from conduct that endangers their

21    health and safety. Yet Defendants have engaged in conduct and omissions which unreasonably

22    and injuriously interfered with the public health and safety in Plaintiff's community and created

23    substantial and unreasonable annoyance, inconvenience, and injury to the public by their

24    production, promotion, distribution, and marketing of e-cigarette products, including, but not

25    limited to JUUL, for use by youth in Plaintiff's schools. Defendants' actions and omissions

26    have substantially, unreasonably, and injuriously interfered with Plaintiff's functions and

27    operations and affected the public health, safety, and welfare of Plaintiff's community.

28        742.    Each Defendant has created or assisted in the creation of a condition that

1  is injurious to the health and safety of Plaintiff and its students and interferes with the

2  comfortable enjoyment of life and property of Plaintiff's community.

3      743.    Defendants' conduct has directly caused a severe disruption of the public health,

4  order, and safety. Defendants' conduct is ongoing and continues to produce permanent and

5  long-lasting damage.

6      744.    This harm to Plaintiff and the public is substantial, unreasonable, widespread,

7  and ongoing

8      745.    Defendant's design, manufacture, production, marketing, distribution, and sale of

9  highly-addictive and harmful e-cigarettes and nicotine juice pods, when such actions were taken

10 with the intent to market and, in fact, were marketed to youth through repeated misstatements

11 and omissions of material fact, unreasonably interfered with a public right in that the results of

12 Defendant's actions created and maintained a condition dangerous to the public's health, was

13 offensive to community moral standards, or unlawfully obstructed the public in free use of

14 public property. Defendant intentionally created and maintained a public nuisance by, among

15 other acts:

16          a.    designing a product that was uniquely youth-oriented in design,

17              resembling a common USB flash drive;

18          b.    designing a product that was meant to facilitate underage use, both

19              generally and by enabling easy concealment of Defendant's e-cigarette in

20              school;

21          c.    designing a product with a nicotine delivery system that results in a

22              quicker and more potent dose of nicotine to its users;

23          d.    designing a product with as little irritation to a user's throat, like that

24              experienced from smoking a combustible cigarette, as possible to

25              facilitate initiation of nicotine use by youth and non-smokers;

26          e.    designing a flavored nicotine juice for its e-cigarette that was intended to

27              mask the harmful effects of nicotine and facilitate initiation of nicotine

28              use by youth and non-smokers;

f. marketing highly-addictive nicotine products to youth, who are, because of their age and lack of experience, particularly susceptible to Defendant's targeted marketing preying on their need for social acceptance;

g. marketing a nicotine product to a population—youth—that, because of their developmental stage, is more susceptible to nicotine addiction;

h. marketing nicotine products to a population—youth—that faces an increased risk of adverse mental and physical health impacts from nicotine use; and

i. misrepresenting, in marketing and elsewhere, the actual amount of nicotine that its product contains and delivers, as well as misrepresenting the amount of benzoic acid and other chemicals Defendant's nicotine juice contains.

746. Defendants' conduct substantially and unreasonably interfered with public health, safety and the right to a public education in a safe and healthy environment. In that regard, and in other ways discussed herein, the public nuisance created or maintained by Defendants was connected to Plaintiff's property, including but not limited to school buildings.

747. The health and safety of the youth of Plaintiff's schools, including those who use, have used, or will use e-cigarette products, as well as those affected by others' use of e-cigarette products, are matters of substantial public interest and of legitimate concern to Plaintiff, as well as to Plaintiff's community.

748. Defendants' conduct has affected and continues to affect a substantial number of people within Plaintiff's school district and is likely to continue causing significant harm.

749. But for Defendants' actions, e-cigarette products, including, but not limited to JUUL, used by youth would not be as widespread as they are today, and the youth e-cigarette public health crisis that currently exists as a result of Defendants' conduct would have been averted.

750. Defendants knew or should have known that their conduct would create a

public nuisance. Defendants knew or reasonably should have known that their statements regarding the risks and benefits of e-cigarette use were false and misleading, that their marketing methods were designed to appeal to minors, and that their false and misleading statements, marketing to minors, and active efforts to increase the accessibility of e-cigarette products and grow JUUL's market share, or the market share of Defendants' products, were causing harm to youth and to municipalities, schools, and counties, including youth in Plaintiff's school district and to Plaintiff itself.

751.    Thus, the public nuisance caused by Defendants was reasonably foreseeable, including the financial and economic losses incurred by Plaintiff.

752.    Alternatively, Defendants' conduct was a substantial factor in bringing about the public nuisance even if a similar result would have occurred without it. By directly marketing to youth and continuing these marketing practices after it was evident that children were using JUUL products in large numbers and were specifically using these products in schools, JLI and the Management Defendants directly facilitated the spread of the youth e-cigarette crisis and the public nuisance affecting Plaintiff.

753.    Altria, by investing billions of dollars in JLI and actively working to promote the sale and spread of JUUL products with the knowledge of JLI's practice of marketing JUUL products to youth and its failure to control youth access to JUUL products, directly facilitated the spread of the youth e-cigarette crisis and the public nuisance affecting Plaintiff.

754.    Plaintiff has taken steps to address the harm caused by Defendants' conduct, including, but not limited to, those listed in Section V.B above.

755.    Fully abating the epidemic of youth e-cigarette use resulting from Defendants' conduct will require much more than these steps.

756.    As detailed herein, Plaintiff has suffered special injury, different in kind from those suffered by the general public, including, but not limited to, those arising from: discipline and suspensions related to incidents of e-cigarette use in Plaintiff's schools have increased at alarming rates; because of the alarming rise of discipline and suspensions associated with student e-cigarette use, Plaintiff has devoted and diverted staff resources to develop a diversion

program so as to allow students who are caught using e-cigarettes to remain in school and in class where possible; Plaintiff has had to close certain school restrooms to deter use of e-cigarette devices; because many students who do not engage in e-cigarette activities do not wish to use the school restrooms even to wash their hands, Plaintiff has rented multiple portable hand-washing stations that have been placed outside of restrooms in an effort to maintain student hygiene and prevent the spread of disease; students in Plaintiff's schools have openly charged e-cigarette devices in classrooms, causing disruption and diverting staff resources away from classroom instruction; students in Plaintiff's schools, addicted to nicotine, have demonstrated anxious, distracted and acting out behaviors, causing disruption and diverting staff resources away from classroom instruction and requiring additional time and attention for addicted students; Plaintiff has had to devote and divert staff resources to intervening in student e-cigarette activities and coordinating necessary follow-up; Plaintiff has had to devote and divert staff resources to conduct staff training on e-cigarette use; Plaintiff has had to devote and divert staff resources to deploying student, family and parent-teacher education regarding the dangers of e-cigarette products; Plaintiff has had to add an additional high-school vice principal to address issues related to student e-cigarette use; Plaintiff has had to add additional school resource officer ("SRO") personnel to focus on deterring and preventing student e-cigarette use; Plaintiff has had to devote additional middle school guidance counseling resources to address issues related to student e-cigarette use; Plaintiff has had to acquire and install numerous additional security cameras on its premises to deter e-cigarette activity; Plaintiff has had to install additional signage on district premises to deter e-cigarette activity; expending, diverting and increasing resources to make physical changes to schools and/or address property damage in schools.

757.    Plaintiff therefore requests all the relief to which it is entitled in its own right and relating to the special damage or injury it has suffered, and not in any representative or *parens patriae* capacity on behalf of students, including damages in an amount to be determined at trial and an order providing for the abatement of the public nuisance that Defendants have created or assisted in the creation of, and enjoining Defendants from future conduct contributing to

the public nuisance described above.

758.    Defendants engaged in conduct, as described above, that constituted malice, oppression, or fraud, with intent to cause injury and/or with willful and knowing disregard of the rights or safety of another, being fully aware of the probable dangerous consequences of the conduct and deliberately failing to avoid those consequences.

759.    Defendants' conduct constituting malice, oppression or fraud was committed by one or more officers, directors, or managing agents of Defendants, who acted on behalf of Defendants; and/or

760.    Defendants' conduct constituting malice, oppression or fraud was authorized by one or more officers, directors, or managing agents of Defendants; and/or

761.    One or more officers, directors, or managing agents of Defendants knew of the conduct constituting malice, oppression, or fraud and adopted or approved that conduct after it occurred.

762.    Defendants regularly risks the lives and health of consumers and users of its products with full knowledge of the dangers of its products.  Defendants made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff's students or Plaintiff.  Defendants' willful, knowing and reckless conduct, constituting malice, oppression or fraud therefore warrants an award of aggravated or punitive damages.

## COUNT TWO — VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")

### 1.    Violation of 18 U.S.C. § 1962(c)

763.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

764.    This claim is brought by Plaintiff against Defendants Monsees, Bowen, Pritzker, Huh, Valani, and Altria (the "RICO Defendants") for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964, for violations of 18 U.S.C. § 1961, et seq.

765.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce,

to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c).

766.    At all relevant times, each RICO Defendant is and has been a "person" within the meaning of 18 U.S.C. § 1961(3), because they are capable of holding, and do hold, "a legal or beneficial interest in property."

767.    Each RICO Defendant conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c), as described herein.

768.    Plaintiff is a "person," as that term is defined in 18 U.S.C. § 1961(3), and has standing to sue under 18 U.S.C. § 1964(c) as it was and is injured in its business and/or property "by reason of" the RICO Act violations described herein.

769.    Plaintiff demands the applicable relief set forth in the Prayer for Relief below.

> **a.    JLI is an Enterprise Engaged in, or its Activities Affect, Interstate or Foreign Commerce**

770.    Section 1961(4) defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

771.    JUUL Labs, Inc. ("JLI") is a corporation and therefore meets the definition of "enterprise" under the RICO Act. Specifically, JLI is registered as a corporate entity in the State of Delaware.

772.    Each of Defendants Pritzker, Huh, Valani, Bowen, and Monsees controlled the JLI Enterprise—that is, they used JLI as the vehicle through which an unlawful pattern of racketeering activity was committed—through their roles as officers and directors of JLI. As set forth below, their roles allowed them to control the resources and instrumentalities of JLI and use that control to perpetrate a number of fraudulent schemes involving the use of mail and wires, including sales to youth and fraudulently misrepresenting or omitting the truth about JUUL products to adult users and the public at large. For its part, Altria and Altria Client Services began conspiring with Defendants Pritzker and Valani to direct the affairs of JLI as early as Spring 2017, messaging that if JLI continued its massive growth—which they knew

was achieved through youth marketing and fraudulent misrepresentations and omissions—they would receive a massive personal pay-off. The Altria Defendants started personally transmitting statements over the mail and wires in furtherance of the fraudulent schemes even before Altria's December 2018 investment in JLI. After that point, Altria gained even further influence over the JLI Board of Directors and installed its own personnel in key roles at JLI, cementing its direction of the Enterprise.

773.    JLI is an enterprise that is engaged in and affects interstate commerce because the company has sold and continues to sell products across the United States, as alleged herein.

### b.    "Conduct or Participate, Directly or Indirectly, in the Conduct of Such Enterprise's Affairs"

774.    "[T]o conduct or participate, directly or indirectly, in the conduct" of an enterprise, "one must participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993).

775.    As described herein, each RICO Defendant participated in the operation or management of the JLI Enterprise, and directed the affairs of the JLI Enterprise through a pattern of racketeering activity, including masterminding schemes to defraud that were carried out by and through JLI using the mail and wires in furtherance of plans that were designed with specific intent to defraud.

776.    Bowen and Monsees Founded the JLI Enterprise and Started its Mission of Hooking Kids and Lying to the Public and Regulators

777.    Plaintiff incorporates by reference, as if fully set forth herein, the factual allegations stated against Defendants Bowen and Monsees above.

778.    As described above in more detail, Defendants Bowen and Monsees were the visionaries behind JUUL, led JLI in its infancy to develop a highly addictive product, and formed JLI with the aim of creating a growing base of loyal users, including an illicit youth market of nicotine users, by following the same tactics that the cigarette industry has used for decades: selling to kids and lying to adults about their products. Together, Bowen and

1    Monsees set out to "deliver solutions that refresh the magic and luxury of the tobacco

2    category."[931]

3         779.    Monsees admitted that when creating JLI, he and Bowen carefully studied the

4    marketing strategies, advertisements, and product design revealed in cigarette industry

5    documents that were uncovered through litigation and made public under the November 1998

6    Master Settlement Agreement between the state Attorneys General of forty-six states, five U.S.

7    territories, the District of Columbia, and the four largest cigarette manufacturers in the United

8    States. "[Cigarette industry documents] became a very intriguing space for us to investigate

9    because we had so much information that you wouldn't normally be able to get in most

10   industries. And we were able to catch up, right, to a huge, huge industry in no time. And then

11   we started building prototypes."[932]

12        780.    Seizing on the decline in cigarette consumption and the lax regulatory

13   environment for e-cigarettes, Bowen, Monsees, and investors in their company sought to

14   introduce nicotine to a whole new generation of youth users, with JLI as the dominant supplier,

15   by concealing the nicotine content and addictiveness of the products, and promoting these

16   products to youth users.  To achieve that goal, they knew they would need to create and market

17   a product that would make nicotine cool to kids again, without the stigma associated with

18   cigarettes, deceive the public about what they were doing, and prevent and delay regulation that

19   would hinder their efforts to expand JUUL sales.

20        781.    Bowen led the design of the JUUL product, including by participating as a

21   subject in many of the company's human studies. Bowen was instrumental in making the JUUL

22   product appealing to youth, even though "he was aware early on of the risks e-cigarettes posed

23   to teenagers." He drew on his experience as a design engineer at Apple to make JUUL resonate

24   with Apple's popular aesthetics. This high-tech style made JUULs look "more like a cool

25   gadget and less like a drug delivery device. This wasn't smoking or vaping, this was

26

27

28   ─────────────────
     [931] Josh Mings, *Ploom Model Two Slays Smoking With Slick Design and Heated Tobacco Pods*, Solid Smack (Apr. 23, 2014), www.solidsmack.com/ design/ploom-modeltwo-slick-design-tobacco-pods.
     [932] Gabriel Montoya, *Pax Labs: Origins with James Monsees*, Social Underground, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/.

JUULing."[933] The evocation of technology makes JUUL familiar and desirable to the younger tech-savvy generation, particularly teenagers. According to a 19-year-old interviewed for the Vox series By Design, "our grandmas have iPhones now, normal kids have JUULs now. Because it looks so modern, we kind of trust modern stuff a little bit more so we're like, we can use it, we're not going to have any trouble with it because you can trust it."[934]

782.    Bowen designed JUUL products to foster and sustain addiction, not break it. JLI and Bowen were the first to design an e-cigarette that could compete with combustible cigarettes on the speed and strength of nicotine delivery. Indeed, JUUL products use nicotine formulas and delivery methods much stronger than combustible cigarettes, confirming that what Bowen created an initiation product, not a cessation or cigarette replacement product. Bowen also innovated by making an e-cigarette that was smooth and easy to inhale, practically eliminating the harsh "throat hit," which otherwise deters nicotine consumption, especially among nicotine "learners," as R.J. Reynolds' chemist Claude Teague called new addicts, primarily young people.

783.    Bowen worked to minimize "throat hit" and maximize "buzz" of the JUUL e-cigarette. Dramatically reducing the throat hit is not necessary for a product that is aimed at smokers, who are accustomed to the harshness of cigarette smoke, but it very effectively appeals to nonsmokers, especially youth.

784.    The "buzz" testing results demonstrate that Bowen's goal was not to match the nicotine delivery profile of a cigarette, but to surpass it by designing a maximally addictive product, which could only be marketed as a cigarette substitute through a sophisticated fraud campaign.

785.    Bowen designed the JUUL product to deliver nicotine in larger amounts and at a faster rate than traditional cigarettes. This feature made the product more likely to capture users with the first hit.

786.    Bowen was also heavily involved with JLI's marketing strategy, which

---

[933] *How JUUL Made Nicotine Go Viral*, Vox (Aug. 10, 2018),
  https://www.youtube.com/watch?v=AFOpoKBUyok.
[934] *Id.*

COMPLAINT
Case No. 19-md-02913-WHO

primarily targeted youth users.

787.    Bowen personally developed JLI's strategy to market to youth and make JLI as profitable as possible, so that it would be an attractive investment for a major manufacturer of traditional cigarettes. In a 2016 e-mail exchange with JLI employees regarding potential partnerships with e-cigarette juice manufacturers, Bowen reminded the employees that "big tobacco is used to paying high multiples for brands and market share."[935] Bowen knew that to achieve the ultimate goal of acquisition, JLI would have to grow the market share of nicotine-addicted e-cigarette users, regardless of the human cost.

788.    Bowen's role in marketing included changing the name of "Crisp Mint" to "Cool Mint" in 2015. ███████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████

789.    Like Bowen, Monsees was instrumental to founding JLI with the aim of expanding the market of nicotine addicted e-cigarette users to include those "who aren't perfectly aligned with traditional tobacco products."[936]

790.    Monsees personally helped to market JLI to the "cool kids," using a sophisticated viral marketing campaign that strategically laced social media with false and misleading messages, to ensure their uptake and distribution among young users. Then, he subsequently and personally denied to the public and regulators that JLI had done just that.

791.    With help from their early investors and board members, who include Nicholas Pritzker, Hoyoung Huh, and Riaz Valani, Bowen and Monsees succeeded in hooking millions of youth, intercepting millions of adults trying to overcome their nicotine addictions, delaying regulation that would have stopped their unlawful activities, and, of course, earning billions of dollars in profits.

///

///

---

[935] INREJUUL_00294198.
[936] Id.

1

2

               c.        **Pritzker, Huh, and Valani Exercised Control and Direction Over the JLI Enterprise**

3

792.     Plaintiff incorporates by reference, as if fully set forth herein, the factual

4

allegations stated against Pritzker, Huh, and Valani above. As described above, Pritzker, Huh,

5

and Valani were early investors in JLI who worked closely with Monsees and Bowen, and took

6

control of the JLI Board of Directors in 2015.  Working in close collaboration with Monsees

7

and Bowen, Pritzker, Huh, and Valani directed JLI's affairs and used the corporation to

8

effectuate and continue fraudulent schemes for their own personal profits and financial benefits.

9

Pritzker, Huh, and Valani ███████████████████████ and, unlike most

10

corporate board members, had active involvement in directing the company's actions week-to-

11

week, including JLI's marketing efforts.

12

793.     Pritzker, Huh, and Valani exercised an intimate level of control over JLI during a

13

key period—from October 2015 through at least May 2016—when the three Defendants

14

(Pritzker, Huh, and Valani) served as the Executive Committee of the JLI Board of Directors.

15

794.     As detailed above, in 2015, there was a power struggle within JLI about whether

16

to grow JLI's consumer base by targeting young people. ████████████████████

17

███████████████████████████. By October 2015, the power struggle

18

was over, with the debate resolved in favor of selling to teens. At that time, Monsees stepped

19

down as CEO to be replaced by the three-member "Executive Committee" comprised of

20

Pritzker, Huh, and Valani. Huh served as the Executive Committee Chairman, and Pritzker

21

served as Co-Chairman. The Executive Committee had the final say over all day-to-day

22

operations of the JLI business. Huh, as Chairman, and Pritzker, as Co-Chairman of JLI, were

23

involved in the management of the company on a weekly basis. ████████████████

24

████████████████████████████████████████████████

25

██████████ Valani, for his part, was also an active Board member, involved in the management

26

of the company on a weekly basis. Dating back to 2011, Valani was a regular presence in

27

///

28

///

1    JLI's offices, appearing in person at JLI's offices "a couple times a week."[937]

2          **d.    Bowen, Monsees, Pritzker, Huh and Valani Exercised a Firm Grip**

3                **over JLI**

4    795.



5

6

7

8

9

10

11

12

13

14

15    796.

16

17

18

19

20

21

22

23

24

25    797.    Through the Board of Directors' control over all aspects of JLI's business,

26    Bowen, Monsees, Pritzker, Huh, and Valani used JLI as a vehicle to further fraudulent schemes

27

28
_____
[937] https://www.vice.com/en/article/43kmwm/juul-founders-first-marketing-boss-told-us-the-vape-giants-strange-messy-origins

of targeting youth, misrepresenting and omitting to users of all ages what JLI was really selling and to whom, and seeking to delay or prevent regulation that would impede the exponential growth of JUUL's massive youth market share. They achieved their ultimate goal of self-enrichment through fraud when Altria made an equity investment in JLI in December 2018.

        e.       **In 2017, Altria Conspired with Pritzker and Valani to Influence and Indirectly Exercise Control Over JLI.**

798.    Plaintiff incorporates by reference, as if fully set forth herein, the factual allegations stated against the Altria Defendants above. As set forth above, Altria (through its subsidiary, Defendant Philip Morris) has been manufacturing and selling "combustible" cigarettes for more than a century, but, recognizing that regulation and litigation had resulted in declining cigarette sales, Altria was looking to enter the e-cigarette space. It formed a subsidiary, Nu Mark LLC, to develop and market an e-cigarette product, the Mark Ten. The Mark Ten was not a success, so Altria began eyeing an acquisition of the biggest player in the youth addiction game, JLI.

799.    Altria's pursuit led to eighteen months of negotiations with Altria and Altria Client Services on the one hand, and Defendants Pritzker and Valani on the other, regarding a potential acquisition or equity investment in JLI. They conspired to achieve the best outcome for Pritzker and Valani personally, and for Altria as an entity. During these eighteen months, Altria, and Altria Client Services specifically, enticed Pritzker and Valani with a potential multi-billion-dollar payout. During that time, Pritzker, Valani, and the other Management Defendants committed numerous acts of fraud to grow the business of JLI to satisfy Altria's expectations. Meanwhile, Altria and Altria Client Services actively conspired with Pritzker and Valani to continue growing JLI's youth market by continuing JLI's fraudulent activities, their compliance ensured by that promised payout. Altria was gathering information on JLI to confirm Altria would be purchasing a company with a proven track record of sales to youths.

///
///
///

1

2

###### f.    Altria Directly Exercises Control and Participates in of the JLI Enterprise

3    800.    By October 2018, Altria was directly transmitting statements over the mail and

4    wires to support the JLI enterprise's efforts to fraudulently market JUUL products and to

5    prevent or delay regulation.

6    801.    In December 2018, Altria publicly announced its ties to the JLI enterprise by

7    making a $12.8 billion equity investment in JLI, the largest private equity investment in United

8    States history. This investment led to massive personal financial benefit for each of the

9    Management Defendants and gave Altria three seats on the JLI Board of Directors, allowing it

10    to assert greater management and control over the JLI Enterprise, which used the

11    instrumentalities of JLI to effectuate many of its fraudulent schemes.

12    802.    Following the investment, Altria also directly distributed fraudulent statements

13    that JLI was a cessation device, that JLI did not target youth, and that the nicotine in a single

14    JUUL pod was equivalent to a pack of cigarettes.

15    803.    Moreover, to further bolster its influence and control of JLI, Altria worked with

16    Pritzker and Valani to install two key Altria executives into leadership positions at JLI: K.C.

17    Crosthwaite and Joe Murillo.

18    **The Fraudulent Schemes**

19    804.    As detailed above, the operation of the JLI Enterprise, as directed by the five

20    individual Defendants and Altria, included several  schemes to defraud that helped to further the

21    goals of the RICO Defendants—i.e., to expand the e-cigarette market, particularly among youth,

22    for the five individual Defendants to reap huge personal profits, and for Altria to regain the

23    market share that it was losing in the traditional cigarette arena and could no longer openly

24    pursue through the same tactics used by JLI and the five individual Defendants.

25    **Fraudulent Marketing Scheme**

26    805.    As described above and in Sections IV.D, IV.E, JLI, and Defendants Bowen,

27    Monsees, Pritzker, Huh, and Valani directed and caused JLI to make false and misleading

28    advertisements that omitted references to JUUL's nicotine content and potency to be

transmitted via the mail and wires, including the Vaporized campaign.

806.    As early as 2014, ███████████████████████████████████████
████████████████████████████████████████████

807.    In 2015, Bowen helped to finalize the messaging framework for JUUL's launch plan, including sponsored content on social media. This messaging was patently youth oriented and intentionally targeted children.

808.    Monsees studied the marketing techniques of the traditional cigarette industry, and he personally reviewed the photographs that were used in the youth-oriented advertisements that accompanied JUUL's launch. The "Vaporized" campaign featured bright colors and young models who were in "poses were often evocative of behaviors more characteristic of underage teen than mature adults."[938]

809.    Monsees also provided specific direction as to the content of the JUUL website to JLI employees, and that content include false, misleading, and deceptive statements designed to induce users, and particularly young people, to purchase the JUUL product.

810.    Pritzker, Valani, Monsees, and Bowen—individually and collectively—approved images from the JUUL "Vaporized" ad campaign in 2015. ███████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
█████████████████████████████████████████████████

811.    Before the launch of new JUUL advertising campaigns in 2015, ████████████
██████████████████████████████████████████████████████████████
████████████████████████████████████████

812.    Along with Valani, Pritzker was so directly involved in the "Vaporized" advertising campaign—which, as described above, marketed the JUUL product to teens—███

[938] *Examining Juul's Role in the Youth Nicotine Epidemic*, *Hearing Before the H. Comm. on Oversight and Reform*, *Subcomm. on Econ. and Consumer Policy*, 116th Cong. (2019) (statement of Robert K Jackler, Professor, Stanford University). https://docs.house.gov/meetings/GO/GO05/20190724/109844/HHRG-116-GO05-Wstate-JacklerR-20190724.pdf.

813.    Huh was also instrumental in these early marketing campaigns, which were targeted to youth and omitted references to JUUL's nicotine content. In debates about whether to continue marketing JUUL aggressively to youth, Huh supported that action and asserted that the company could not be blamed for youth nicotine addiction.

814.    During his stint as Executive Committee chairman, which lasted at least until May 2016, ███████████████████████████████ as JLI developed and implemented its plans for marketing to youth.

815.    Various communications post-October 2015 demonstrate that Monsees deferred to Huh with regard to the direction of the company.

816.    Pritzker also personally controlled several aspects of JLI's branding. ████████████████████████████████████████████. JLI used this website as another means to market its products to youth.

817.    Through the allegations above, Plaintiff has shown a direct connection between the RICO Defendants and this fraudulent scheme, including personal involvement in directing, in some part, the affairs of the JLI Enterprise.

**Youth Access Scheme**

818.    As described above and in Section IV.E, the five Management Defendants who controlled JLI acted individually and in concert to expand youth access to JUUL products through schemes to mislead customers about the products.

819.    As reflected in Section IV.E.11, JLI worked with Veratad to expand youth access while giving the appearance the JLI was combating youth access to its products.

820.    Through the allegations above, Plaintiff has shown a direct connection between the RICO Defendants and this fraudulent scheme, including personal involvement in directing, in some part, the affairs of the JLI Enterprise.

**Nicotine Content Misrepresentation Scheme**

821.    As described above and in Section IV.D, IV.G, the five Management

Defendants and Altria caused thousands, if not millions, of JUULpod packages to be distributed to users with false and misleading information regarding the JUUL pods' nicotine content. The five individual Defendants who controlled JLI also caused the same false and misleading information to be distributed via JLI's website.

822. ███████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████████████████████████████████████ As formulated, JUUL pods were foreseeably exceptionally addictive, particularly when used by persons without prior exposure to nicotine.

823. As alleged above, Defendants Monsees, Pritzker, and Valani ███████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
█.

824. Defendants Bowen, Monsees, Pritzker and Valani thus caused the distribution of numerous JUUL pod packages, and statements on the JLI website and elsewhere, that fraudulently equated the nicotine content of one JUUL pod as equivalent to one pack of cigarettes. These statements were false, as a JUUL pod had substantially more nicotine than a standard pack of combustible cigarettes.

825. █████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████████████████████████. On May 10, 2018, the Washington Post published an article, quoting a JUUL spokesperson extensively and stating that JUUL "contains about the same amount of nicotine as a pack of cigarettes"—██████████████████
█████████████████████████████████.

826. █████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

COMPLAINT
Case No. 19-md-02913-WHO

827. ████████████████████████████████████

828.    Several Altria Defendants were involved in this scheme as well. ████████ ███████████████████████████████████████████ distributed millions of JUULpod packages to stores across the country. These packages included the false and misleading information regarding JUUL pods' nicotine content.

829.    Through the allegations above, Plaintiff has shown a direct connection between the RICO Defendants and this fraudulent scheme, including personal involvement in directing, in some part, the affairs of the JLI Enterprise.

**Flavor Preservation Scheme**

830.    As described above and in Section IV.I, the RICO Defendants worked in concert to defraud the public and deceive regulators to prevent regulation that would have impeded their plan to keep selling to children. Specifically, they worked to ensure that the FDA allowed JUUL's mint flavor to remain on the market.

831.    

832.    Weeks before Altria's equity investment in December 2018, the regulatory pressure ramped up significantly, and Altria and JLI engaged in active fraud to lull the FDA that mint was simply a traditional cigarette flavor designed to help adult smokers switch, rather than a flavor that appealed primarily to youth. With the scheme in place, Altria and JLI finalized their deal.

833.    In September 25, 2018, then-FDA Commissioner Scott Gottlieb sent letters

1  to Altria, JLI and other e-cigarette manufacturers, requesting a "detailed plan, including specific

2  timeframes, to address and mitigate widespread use by minors."[939]

3      834.    Altria and JLI's responses to the FDA reflect a coordinated effort to mislead the

4  FDA with the intention that regulators, in reliance on their statements, would allow JLI to

5  continue marketing mint JUUL pods.[940]

6      835.    On October 25, 2018, Altria Group sent a letter to the FDA portraying mint as a

7  traditional tobacco flavor. ███████████████████████████. JLI, at the direction

8  of the five Management Defendants, subsequently sent a similar letter and false youth study,

9  fraudulently claiming that mint was a traditional tobacco flavor and was not attractive to kids.

10     836.    ██████████████████████████████████████

11  ████████████████████████████████████. They focused on

12  selling this flavor in particular to take advantage of delayed regulation.

13     837.    Through the allegations above, Plaintiff has shown a direct connection between

14  the RICO Defendants and this fraudulent scheme, including personal involvement in directing,

15  in some part, the affairs of the JLI Enterprise.

16  **Cover-up Scheme**

17     838.    The RICO Defendants were not only concerned with protecting flavors,

18  however. In light of growing public scrutiny of JLI's role in the youth vaping crisis, these

19  Defendants continued their scheme to prevent a complete ban on JLI's product by portraying

20  JUUL as a smoking cessation device and denying that the company ever marketed to youth.

21     839.    As described above and in Sections IV.D, IV.E, JLI maintained website pages

22  that provided false information about the addictive potential of its products and denied that JLI

23  marketed to youth. Defendants Bowen, Monsees, Pritzker, Huh, and Valani directed the content

24  of the JLI website and had "final say" over JLI's marketing messaging.

25     840.    Bowen understood that children were using the JUUL product and

---

[939] Letter from Scott Gottlieb, M.D. to JUUL Labs, Inc. (Sept. 12, 2018); Letter from Scott Gottlieb, M.D. to Altria Group Inc. (Sept. 12, 2018).

[940] *See United States v. Jones*, 712 F.2d 1316, 1320-21 (9th Cir. 1983) ("It is enough that the mails be used as part of a 'lulling' scheme by reassuring the victim that all is well and discouraging him from investigating and uncovering the fraud.").

intentionally continued the youth-appealing marketing strategy. For instance, in 2016, upon seeing social media posts of teenagers using JUUL products, he remarked that he was "astounded by this 'ad campaign' that apparently some rich east coast boarding school kids are putting on," and he added that Valani was plotting how JUUL could "leverage user generated content" to increase sales.

841.    Monsees knew before the JUUL launch that JUUL would be attractive to youth. In October 2014, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Monsees saw this information as an opportunity, not as a warning.

842.    Bowen and Monsees were well aware that JUUL branding was oriented toward teens, and they mimicked the previous efforts of the tobacco industry to hook children on nicotine, to increase JUUL sales.

843.    In 2015, JLI's Board—controlled by Bowen, Monsees, Pritzker, Huh, and Valani—met frequently, and the appeal of JUUL to underage users was a constant topic of discussion, as detailed above.  Individually and collectively, Pritzker, Huh, and Valani affirmed this course of action, taking steps to continue marketing efforts to youth and rejecting efforts by other Board members to curtail them.

844.    Also in 2018, when concern grew about youth vaping, Valani directed JLI's strategy in responding to such concerns. ███████████████████████████████████████████████████████████████████████████████████████████—a misinformation campaign designed to stave off regulation or the ban of JUUL products.

845.    Likewise, in 2018, Pritzker and Valani were heavily involved in planning sham "youth prevention" activities, whereby JLI would put on seminars for school children that ostensibly were designed to prevent youth vaping, but which actually told school children that vaping was safe and even taught children how to use the product.

846.    Pritzker was heavily involved in JLI's public relations activities, including

granular detail such as directing responses to particular inquiries from teachers. Along with Valani, Pritzker also approved a press release in response to an inquiry by U.S. Senators, falsely detailing JLI's alleged youth vaping prevention efforts.

847.    Pritzker and Valani each edited and revised press releases about JLI's youth prevention activities and steps it claimed to be taking to prevent youth sales, and ████████████ ████████████████████████████████████████████████████████████████████████████ ██████████████████████

848.    The five individual Defendants caused false and misleading advertising to be distributed over television and the internet, to give the impression that JLI's product was a smoking cessation device and that JLI never marketed to youth.

849.    Valani and Pritzker routinely approved the copy for JUUL advertising spots. For example, ████████████████████████████████████████████████████████████ ████████████████, which was distributed over the mail and wires.

850.    The *Make the Switch* campaign featured former smokers aged 37 to 54 discussing how JUUL helped them quit smoking. According to JLI's Vice President of Marketing, the "*Make the Switch*" campaign was "an honest, straight down the middle of the fairway, very clear communication about what we're trying to do as a company." But these statements were false, as JUUL was not intended to be a smoking cessation device.

851.    Defendant Altria Group's ████████████████████████████████ continued this scheme by transmitting the fraudulent *"Make the Switch"* advertisements in packs of its combustible cigarettes. These advertisements falsely portrayed the JUUL product as a smoking cessation device for adults. Defendant ████████████████ did the same by e-mailing and mailing out hundreds of thousands of "Make the Switch" advertisements, with the approval and consent of Altria Group.

852.    Monsees perpetuated the myth that JUUL was designed as a smoking cessation device, even though it was designed to appeal to young nonsmokers. Monsees testified before congress that JUUL was an "alternative" to traditional "cessation products" that "have extremely low efficacy."

853.    In response to a direct question about whether people buy JUUL to stop smoking, Defendant Monsees responded: "Yes. I would say nearly everyone uses our product as an alternative to traditional tobacco products."[941]

854.    These statements were false, and Monsees knew that they were false, as JUUL was not intended as a smoking cessation device.

855.    Monsees also committed mail or wire fraud by giving the following written testimony to Congress, which was false: "We never wanted any non-nicotine user, and certainly nobody under the legal age of purchase, to ever use JLI products. ... That is a serious problem. Our company has no higher priority than combatting underage use."

856.    Monsees further committed mail or wire fraud with a false statement, through JLI's website, that: "We have no higher priority than to prevent youth usage of our products which is why we have taken aggressive, industry leading actions to combat youth usage." In reality, the RICO Defendants, through JLI, knowingly and intentionally marketed its product to youth users.

857.    Beginning in October 2018, both Altria and JLI transmitted false and misleading communications to the public and the federal government, including Congress and the FDA, in an attempt to stave off regulation of the JUUL product.

858.    As detailed above, each RICO Defendant directed and participated in these fraudulent  schemes, either directly or indirectly, with specific intent to defraud, and used JLI as a vehicle to carry out this pattern of racketeering activity.

### g.    "Pattern of Racketeering Activity"

859.    The RICO Defendants did willfully or knowingly conduct or participate in, directly or indirectly, the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

860.    Specifically, the RICO Defendants—individually and collectively—have committed, conspired to commit, and/or aided and abetted in the commission of, at least two

---

[941] *Id.*

predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years, as described herein.

861.   The multiple acts of racketeering activity that the RICO Defendants committed, or aided or abetted in the commission of, were related to each other, pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

862.   The RICO Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of the Enterprise's objectives through common misrepresentations, concealments, and material omissions.

863.   As described above, the RICO Defendants devised and knowingly carried out material schemes and/or artifices to defraud the public and deceive regulators by (1) transmitting advertisements that fraudulently and deceptively omitted any reference to JUUL's nicotine content or potency (or any meaningful reference, where one was made); (2) causing false and misleading statements regarding the nicotine content of JUUL pods to be posted on the JLI website; (3) causing thousands, if not millions, of JUUL pod packages containing false and misleading statements regarding the nicotine content of JUUL pods to be transmitted via U.S. mail; (4) representing to users and the public at-large that JUUL was created and designed as a smoking cessation device; (5) misrepresenting the nicotine content and addictive potential of its products; (6) making fraudulent statements to the FDA to persuade the FDA to allow mint flavored JUUL pods to remain on the market; and (7) making fraudulent statements to the public (including through advertising), the FDA, and Congress to prevent prohibition of JUUL cigarettes, as was being contemplated in light of JLI's role in the youth vaping epidemic.

864.   The RICO Defendants committed these racketeering acts intentionally and knowingly, with the specific intent to defraud and to personally or directly profit from these actions.

865.   The RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

> A.   Mail Fraud: the Enterprise violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, fraudulent materials via U.S. mail or commercial interstate carriers for the purpose of deceiving the public, regulators, and Congress.

B.  Wire Fraud: the Enterprise violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, fraudulent materials by wire for the purpose of deceiving the public, regulators, and Congress.

866.    As explained above, the RICO Defendants conducted the affairs of the Enterprise through a pattern of racketeering activity by falsely and misleadingly using the mails and wires in violation of 18 U.S.C. § 1341 and § 1343.  To the extent that JLI itself or a JLI officer other than one or more of the RICO Defendants made a particular statement listed below, the five individual Defendants who controlled JLI and Altria caused those statements to be made through their control of JLI and through their control of the communications that JLI was disseminating to the FDA, to Congress, and to the general public in connection with directing the affairs of JLI.  As detailed above, these statements are alleged to be part of the fraudulent schemes masterminded by the RICO Defendants who conducted the affairs of JLI.

867.    Illustrative and non-exhaustive examples include the following:

| From | To | Date | Description |
|---|---|---|---|
| *Statements Omitting Reference to JUUL's Nicotine Content (see Section IV.E)* | | | |
| JLI | Public (via television, internet, and mail) | 2015 | "Vaporized" Campaign, and other advertising campaigns transmitted via the mails and wires which targeted under-age vapers and omitted any reference to JUUL's nicotine content. |
| JLI | Members of the public on JLI's email distribution list | June 2015 to April 7, 2016 | 171 promotional emails were sent to members of the public with no mention of JUUL nicotine content. For example, on July 11, 2015, JLI, following the marketing plan directed and approved by the Management Defendants, sent an email via the wires in interstate commerce from JUUL's email address to people who had signed up from JUUL emails, including youth. This email advertised JUUL's promotion events and said "Music, Art, & JUUL. What could be better? Stop by and be gifted a free starter kit." This email did not mention that JUUL contained nicotine nor that JUUL or the free starter kits were only for adults. |

| JLI | Public (via internet – Twitter) | June 2015 to October 6, 2017 | JLI's Twitter feed, @JUULvapor, and its 2,691 tweets, did not contain a nicotine warning. For example, on August 7, 2015, the @JUULvapor Twitter account published a tweet advertising the Cinespia "Movies All Night Slumber Party" and captioned it "Need tix for @cinespia 8/15? We got you. Follow us and tweet #JUULallnight and our faves will get a pair of tix!" This tweet was delivered via the wires in interstate commerce to members of the public, including followers of JLI's Twitter Feed, which included youth. This tweet did not mention that JUUL contained nicotine. |
| --- | --- | --- | --- |
| JLI | Public (via internet – Twitter) | July 28, 2017 | The @JUULvapor Twitter account published a tweet, showing an image of a Mango JUULpod next to mangos, and captioned "#ICYMI: Mango is now in Auto-ship! Get the #JUULpod flavor you love delivered & save 15%. Sign up today." This tweet was delivered via the wires in interstate commerce to members of the public, including followers of JLI's Twitter Feed, which included youth. This tweet did not mention that JUUL contained nicotine. |
| JLI | Public (via internet – Twitter) | August 4, 2017 | The @JUULvapor Twitter account published a tweet promoting Mint JUULpods with an image stating "Beat The August Heat with Cool Mint" and "Crisp peppermint flavor with a pleasant aftertaste," captioned "A new month means you can stock up on as many as 15 #JUULpod packs. Shop now." This tweet was delivered via the wires in interstate commerce to members of the public, including followers of JLI's Twitter Feed, which included youth. This tweet did not mention that JUUL contained nicotine. |
| JLI | Public (via internet – Twitter) | August 28, 2017 | The @JUULvapor Twitter account published a tweet comparing JUULpods to dessert with an image and stating "Do you bruleé? RT if you enjoy dessert without a spoon with our Crème Brulee #JUULpods." This tweet was delivered via the wires in interstate commerce to members of the public, including followers of JLI's Twitter Feed, which included youth. This tweet did not mention that JUUL contained nicotine. |
| *Statements that JUUL is a Cessation Device (see Section IV.D.4)* | | | |
| JLI | Public (via internet – Twitter) | July 5, 2017 | The @JUULvapor Twitter account published a tweet stating "Here at JUUL we are focused on driving innovation to eliminate cigarettes, with the corporate goal of improving the lives of the world's one billion adult smokers." |

| JLI | Public (via internet – JLI Website) | April 25, 2018 (or earlier) to Present | "JUUL Labs was founded by former smokers, James and Adam, with the goal of improving the lives of the world's one billion adult smokers by eliminating cigarettes. We envision a world where fewer adults use cigarettes, and where adults who smoke cigarettes have the tools to reduce or eliminate their consumption entirely, should they so desire." |
| Kevin Burns (former JLI CEO) | Public (via internet – JLI Website) | November 13, 2018 | "To paraphrase Commissioner Gottlieb, we want to be the offramp for adult smokers to switch from cigarettes, not an on-ramp for America's youth to initiate on nicotine." |
| JLI | Public (via internet – JLI Website) | September 19, 2019 | "JUUL Labs, which exists to help adult smokers switch off of combustible cigarettes." |
| Howard Willard (Altria CEO) | Public (via internet – Altria website) | December 20, 2018 | "We are taking significant action to prepare for a future where adult smokers overwhelmingly choose non-combustible products over cigarettes by investing $12.8 billion in JUUL, a world leader in switching adult smokers. ... We have long said that providing adult smokers with superior, satisfying products with the potential to reduce harm is the best way to achieve tobacco harm reduction." |
| Howard Willard | FDA (via U.S. mail or electronic transmission of letter to Commissioner Gottlieb) | October 25, 2018 | "We believe e-vapor products present an important opportunity to adult smokers to switch from combustible cigarettes." |
| ***Statements Regarding Nicotine Content in JUUL pods (see Section IV.D)*** | | | |
| JLI | Public (via internet – JLI website) | July 2, 2019 (or earlier) to Present | "Each 5% JUUL pod is roughly equivalent to one pack of cigarettes in nicotine delivery." |
| JLI | Public (via internet – JLI website) | April 21, 2017 | "JUUL pod is designed to contain approximately 0.7mL with 5% nicotine by weight at time of manufacture which is approximately equivalent to 1 pack of cigarettes or 200 puffs." |
| JLI; AGDC; Altria Client Services | Public (via U.S. mail distribution of JUUL pod packaging) | 2015 to Present | JUUL pod packages (1) claiming a 5% nicotine strength; (2) stating that a JUUL pod is "approximately equivalent to about 1 pack of cigarettes." |
| ***Statements to Prevent Regulation of Mint Flavor (see Sections IV.C.6 and IV.I.2)*** | | | |

| JLI | FDA (via U.S. mail or electronic transmission); Public (via internet – JLI website) | October 16, 2018 (FDA)<br><br>November 12, 2018 (Public) | JLI's Action Plan that fraudulently characterizes mint as a non-flavored tobacco and menthol product, suggesting that it was a product for adult smokers. |
|---|---|---|---|
| Howard Willard (Altria Group CEO) | FDA (via U.S. mail or electronic transmission of letter to Commissioner Gottlieb) | October 25, 2018 | Letter from H. Willard to FDA fraudulently representing mint as a non-flavored tobacco and menthol product, suggesting that it was a product for adult smokers. |
| JLI | FDA (via U.S. mail or electronic transmission) | November 5, 2018 | Fraudulent youth prevalence study transmitted by JLI to the FDA. |
| ***Statements to Prevent Ban on JUUL Products or Overwhelming Public Outcry (see Sections IV.D.4 and IV.E.14)*** | | | |
| JLI | Public (via Television) | January 2019 | $10 million "Make the Switch" advertising campaign, which was designed to deceive the public and regulators into believing that JLI was only targeting adult smokers with its advertising and product, and that JUUL was a smoking cessation product. |
| AGDC; Philip Morris; JLI | Public (via inserts in combustible cigarette packs) | December 2018 - Present | "Make the Switch" advertising campaign, for the purpose of deceiving smokers into believing that JUUL was a cessation product. |
| Altria Client Services; JLI | Public (via direct mail and email campaigns) | December 2018 – Present | "Make the Switch" advertising campaign, for the purpose of deceiving smokers into believing that JUUL was a cessation product. |
| JLI Chief Administrative Officer | Public (via interview with CNBC, later posted on internet) | December 14, 2017 | "It's a really, really important issue. We don't want kids using our products." |
| JLI | Public (via internet -social media) | March 14, 2018 | "We market our products responsibly, following strict guidelines to have material directly exclusively toward adult smokers and never to youth audiences." |

COMPLAINT
Case No. 19-md-02913-WHO

| JLI | FDA (via U.S. mail or electronic transmission); Public (via internet – JLI website) | October 16, 2018 (FDA)<br><br>November 12, 2018 (Public) | "We don't want anyone who doesn't smoke, or already use nicotine, to use JUUL products. We certainly don't want youth using the product. It is bad for public health, and it is bad for our mission. JUUL Labs and FDA share a common goal – preventing youth from initiating on nicotine. ... Our intent was never to have youth use JUUL products." |
|---|---|---|---|
| Then-CEO of JLI (Kevin Burns) | Public (via interview with CNBC – later posted on internet) | July 13, 2019 | "First of all, I'd tell them that I'm sorry that their child's using the product. It's not intended for them. I hope there was nothing that we did that made it appealing to them. As a parent of a 16-year-old, I'm sorry for them, and I have empathy for them, in terms of what the challenges they're going through." |
| JLI | Public (via internet - JLI website) | August 29, 2019 | "We have no higher priority than to prevent youth usage of our products which is why we have taken aggressive, industry leading actions to combat youth usage." |
| James Monsees | Public (via statement to New York Times – later posted on internet) | August 27, 2019 | Monsees said selling JUUL products to youth was "antithetical to the company's mission." |
| JLI | Public (via statement to Los Angeles Times – later posted on internet) | September 24, 2019 | "We have never marketed to youth and we never will." |
| JLI (via counsel) | FDA (via U.S. mail or electronic transmission to Dr. Matthew Holman) | June 15, 2018 | Letter from JLI's Counsel at Sidley Austin to Dr. Matthew Holman, FDA, stating: "JUUL was not designed for youth, nor has any marketing or research effort since the product's inception been targeted to youth." and "With this response, the Company hopes FDA comes to appreciate why the product was developed and how JUUL has been marketed — to provide a viable alternative to cigarettes for adult smokers." |
| James Monsees | Congress (via U.S. mail or electronic transmission of written testimony) | July 25, 2019 | Written Testimony of J. Monsees provided to Congress, stating: "We never wanted any non-nicotine user, and certainly nobody under the legal age of purchase, to ever use JLI products. ... That is a serious problem. Our company has no higher priority than combatting underage use." |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Howard Willard | FDA (via U.S. mail or electronic transmission of letter to Commissioner Gottlieb) | October 25, 2018 | "[W]e do not believe we have a current issue with youth access to or use of our pod-based products, we do not want to risk contributing to the issue." |
|---|---|---|---|
| Howard Willard | Congress (via U.S. mail or electronic transmission of letter to Senator Durbin) | October 14, 2019 | "In late 2017 and into early 2018, we saw that the previously flat e-vapor category had begun to grow rapidly. JUUL was responsible for much of the category growth and had quickly become a very compelling product among adult vapers. We decided to pursue an economic interest in JUUL, believing that an investment would significantly improve our ability to bring adult smokers a leading portfolio of non-combustible products and strengthen our competitive position with regards to potentially reduced risk products." |
| JLI | Public (via Pam Tighe at CBS News) | October 17, 2016 | "Our Marketing Efforts are Adult-targeted. . . Any media is focused on 21+ adult smokers and we always adhere to or exceed all tobacco guidelines for advertising in home, radio and digital." |
| Kevin Burns, then-CEO of JLI | Public (via JLI's website) | April 25, 2018 | "Our company's mission is to eliminate cigarettes and help the more than one billion smokers worldwide switch to a better alternative . . . . We are already seeing success in our efforts to enable adult smokers to transition away from cigarettes and believe our products have the potential over the long-term to contribute meaningfully to public health in the U.S. and around the world. At the same time, we are committed to deterring young people, as well as adults who do not currently smoke, from using our products. We cannot be more emphatic on this point: No young person or non-nicotine user should ever try JUUL." |
| Ashely Gould, JLI Chief Administrative Officer | Public (via JLI's website) | April 25, 2018 | "Our objective is to provide the 38 million American adult smokers with meaningful alternatives to cigarettes while also ensuring that individuals who are not already smokers, particularly young people, are not attracted to nicotine products such as JUUL . . . . We want to be a leader in seeking solutions, and are actively engaged with, and listening to, community leaders, educators and lawmakers on how best to effectively keep young people away from JUUL." |

| JLI | Public (via JLI's website) | July 24, 2018 | "We welcome the opportunity to work with the Massachusetts Attorney General because, we too, are committed to preventing underage use of JUUL. We utilize stringent online tools to block attempts by those under the age of 21 from purchasing our products, including unique ID match and age verification technology. Furthermore, we have never marketed to anyone underage. Like many Silicon Valley technology startups, our growth is not the result of marketing but rather a superior product disrupting an archaic industry. When adult smokers find an effective alternative to cigarettes, they tell other adult smokers. That's how we've gained 70% of the market share. . . . Our ecommerce platform utilizes unique ID match and age verification technology to make sure minors are not able to access and purchase our products online." |
|---|---|---|---|
| JLI | Public (via JLI's website) | July 26, 2018 | "We did not create JUUL to undermine years of effective tobacco control, and we do not want to see a new generation of smokers. . . . We want to be part of the solution to end combustible smoking, not part of a problem to attract youth, never smokers, or former smokers to nicotine products. . . .We adhere to strict guidelines to ensure that our marketing is directed towards existing adult smokers." |
| Adam Bowen | Public (via statement to New York Times – later posted on internet) | August 27, 2018 | Bowen said he was aware early on of the risks e-cigarettes posed to teenagers, and the company had tried to make the gadgets "as adult-oriented as possible," purposely choosing not to use cartoon characters or candy names for its flavors. |
| James Monsees | Public (via statement to *Forbes*, later published on internet) | November 16, 2018 | "Any underage consumers using this product are absolutely a negative for our business. We don't want them. We will never market to them. We never have." |
| Altria Group | Public (via internet) | December 20, 2018 | Statement published in Altria news release stating: "Altria and JUUL are committed to preventing kids from using any tobacco products. As recent studies have made clear, youth vaping is a serious problem, which both Altria and JUUL are committed to solve. As JUUL previously said, 'Our intent was never to have youth use JUUL products.'" |
| Altria Group | Public (via Earnings Call) | January 31, 2019 | "Through JUUL, we have found a unique opportunity to not only participate meaningfully in the e-vapor category but to also support and even accelerate transition to noncombustible alternative products by adult smokers." |

COMPLAINT

| K.C. Crosthwaite, JLI's CEO | Public (via JLI's website) | September 25, 2019 | "I have long believed in a future where adult smokers overwhelmingly choose alternative products like JUUL. That has been this company's mission since it was founded, and it has taken great strides in that direction." |
| JLI | Public (via JLI's website) | March 29, 2020 | "JUUL was designed with adult smokers in mind." |

868.    The mail and wire transmissions described herein were made in furtherance of the RICO Defendants' schemes and common course of conduct, thereby increasing or maintaining JLI's market share. The sections cross-referenced in the chart detail how the RICO Defendants caused such mailings or transmissions to be made. As described in those detailed factual allegations, the RICO Defendants did so either by directly approving certain fraudulent statements or by setting in motion a scheme to defraud that would reasonably lead to such fraudulent statements being transmitted via the mail and wires.

869.    As described above, the RICO Defendants used JLI to further schemes to defraud the public and deceive regulators, to continue selling nicotine products to youth, and to protect their market share by denying that JLI marketed to youth and claiming that JUUL was created and designed as a smoking cessation device (or a mitigated risk product).

870.    The RICO Defendants used these mail and wire transmissions, directly or indirectly, in furtherance of this scheme by transmitting deliberately false and misleading statements to the public and to government regulators.

871.    The RICO Defendants had a specific intent to deceive regulators and defraud the public. For example, as alleged above, JLI made repeated and unequivocal statements through the wires and mails that it was not marketing to children and that its products were designed for adult smokers. These statements were false. Each of the RICO Defendants knew these statements were false but caused these statements to be made anyway. Similarly, the RICO Defendants caused to be transmitted through the wires and mails false and misleading statements regarding the nicotine content in JUUL pods, which JLI's own internal data, and Altria's own pharmacokinetic studies, showed were false. Moreover, each of the Enterprise Defendants had direct involvement in marketing statements by JLI and thus caused such

statements to be made, notwithstanding that they knew they were false for the reasons detailed above.

872.    The RICO Defendants intended the public and regulators to rely on these false transmissions, and this scheme was therefore reasonably calculated to deceive persons of ordinary prudence and comprehension.

873.    The public and government regulators relied on the Enterprise's mail and wire fraud. For example, the regulators, including the FDA, relied on the Enterprise's statements that mint was not an appealing flavor for nonsmokers in allowing mint JUUL pods to remain on the market. Regulators also relied on the Enterprise's statements that it did not market to youth in allowing the RICO Defendants to continue marketing and selling JUUL. Congress likewise relied on the Enterprise's statements in not bringing legislation to recall or ban e-cigarettes, despite the calls of members of both parties to do just that. And, the public relied on statements (or the absence thereof) that were transmitted by the RICO Defendants regarding the nicotine content in and potency of JUUL pods in deciding to purchase JUUL products.

874.    Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden and cannot be alleged without access to the RICO Defendants' books and records. Plaintiff has, however, described the types of predicate acts of mail and/or wire fraud, including the specific types of fraudulent statements upon which, through the mail and wires, the RICO Defendants engaged in fraudulent activity in furtherance of their overlapping schemes.

875.    These were not isolated incidents. Instead, the RICO Defendants engaged in a pattern of racketeering activity by committing thousands of related predicate acts in a five-year period, in the form of mail and wire fraud, and there remains a threat that such conduct will continue or recur in the future. That each RICO Defendant participated in a variety of schemes involving thousands of predicate acts of mail and wire fraud establishes that such fraudulent acts are part of the Enterprise's regular way of doing business. Moreover, Plaintiff expects to uncover even more coordinated, predicate acts of fraud as discovery in this case continues.

///

1

2

### h.   Plaintiff Has Been Damaged by the Enterprise Defendants' RICO Violations

3

876.   Plaintiff has been injured by the Enterprise Defendants' conduct, and such injury would not have occurred but for the predicate acts of those defendants which also constitute the acts taken by the RICO Defendants in furtherance of their conspiracy pursuant to Section 1962(d). By working to preserve and expand the market of underage JUUL customers, fraudulently denying JLI's youth-focused marketing, and deceiving regulators and the public in order to allow JUUL products and mint-flavored JUULpods to remain on the market, the Enterprise caused the expansion of an illicit e-cigarette market for youth in Plaintiff's schools and caused a large number of youth in Plaintiff's schools to become addicted to nicotine, thus forcing Plaintiff to expend time, money, and resources to address the epidemic Defendants created through their conduct. Indeed, the Enterprise Defendants intentionally sought to reach into schools and deceive public health officials in order to continue growing JLI's youth customer base. The repeated fraudulent misstatements by the Enterprise Defendants denying that JLI marketed to youth have served to preserve JUUL's market share—a market share that is based upon children purchasing JLI's tobacco products.

877.   Plaintiff was a direct victim of Defendants' misconduct. The Enterprise Defendants displayed a wanton disregard for public health and safety by intentionally addicting youth, including youth in Plaintiff's schools, to nicotine and then attempting to cover up their scheme in order to maintain and expand JUUL's market share. Defendants actively concealed that they marketed to youth in order to avoid public condemnation and to keep their products on the market and continue youth sales. This forced Plaintiff to shoulder the responsibility for this youth e-cigarette crisis created by Defendants' misconduct. The harm from the illicit youth e-cigarette market created by Defendants required Plaintiff to expend its limited financial and other resources to mitigate the health crisis of youth e-cigarette use. The expansion of this youth e-cigarette market was the goal of the Enterprise and is critical to its success. Therefore, the harm suffered by Plaintiff because it must address and mitigate the youth e-cigarette crisis was directly foreseeable and, in fact, an intentional result of Defendants' misconduct.

878.    The creation and maintenance of this youth e-cigarette market directly harms Plaintiff by imposing costs on its business and property. Plaintiff's injuries were not solely the result of routine government expenses. Instead, as a result of Defendants' misconduct, Plaintiff has been and will be forced to go far beyond what a governmental entity might ordinarily be expected to pay to enforce the laws and to promote the general welfare in order to combat the youth e-cigarette crisis. This includes providing new programs and new services as a direct result and in direct response to Defendants' misconduct. As a result of the conduct of the Enterprise Defendants, Plaintiff has incurred and will incur costs that far exceed the norm.

879.    There are no intervening acts or parties that could interrupt the causal chain between the Defendants' mail and wire fraud and Plaintiff's injuries. Defendants, in furtherance of the Enterprise's common purpose, made false and misleading statements directly to the public, including Plaintiff, its employees, and its students. And in the case of fraud on third parties (i.e., FDA and Congress), causation is not defeated merely because the RICO Defendants deceived a third party into not taking action where the FDA's and Congress's failure to regulate directly allowed youth in Plaintiff's schools to purchase products that should not have been on the market and/or that should not have been marketed to minors.

880.    As to predicate acts occurring prior to May 8, 2016, Plaintiff did not discover, and could not have been aware despite the exercise of reasonable diligence, until shortly before the initiation of the instant litigation that Defendants transmitted fraudulent statements via the mails and wires regarding the topics described above including, inter alia, the true nicotine content in and delivered by JUUL products, such information the Defendants concealed and failed to truthfully disclose.

881.    The Enterprise's violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Plaintiff, its community, and the public, and Plaintiff is entitled to bring this action for three times its actual damages, as well as for injunctive/equitable relief, costs, and reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

///

///

1

2.    **Violations of 18 U.S.C. § 1962(d)**

2        882.    Plaintiff hereby incorporates by reference the allegations contained in the

3    preceding paragraphs of this complaint.

4        883.    Section 1962(d) makes it unlawful for "any person to conspire to violate"

5    Section 1962(c), among other provisions. *See* 18 U.S.C. § 1962(d).

6        884.    The RICO Defendants have not undertaken the practices described herein in

7    isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d),

8    the RICO Defendants agreed to facilitate the operation of the Enterprise through a pattern of

9    racketeering in violation of 18 U.S.C. § 1962(c), as described herein. The conspiracy is

10    coterminous with the time period in which the Enterprise has existed, beginning before JLI was

11    officially formed in 2015 and continuing to this day (with Defendant Altria joining the

12    conspiracy by at least Spring 2017).

13        885.    The RICO Defendants' agreement is evidenced by their predicate acts and direct

14    participation in the control and operation of the Enterprise, as detailed above in relation to the

15    RICO Defendants' substantive violation of Section 1962(c). In particular, as described above,

16    Altria's agreement is shown by the fact that it was well aware of JLI's fraudulent activities in

17    marketing its products to youth but claiming that it would not do so, yet Altria nonetheless

18    secretly collaborated with JLI to continue those unlawful activities, and it eventually made a

19    multi-billion dollar investment in JLI and continued the deception by directing the affairs of

20    JLI.

21        886.    The acts in furtherance of the conspiracy attributable to the RICO Defendants

22    include each of the predicate acts underlying the RICO Defendants' use of the JLI Enterprise to,

23    directly or indirectly, engage in a pattern of racketeering activity in violation of Section 1962(c),

24    as described above. Various other persons, firms, and corporations, including third-party entities

25    and individuals not named as Defendants in this Complaint, have participated as co-conspirators

26    with the members of the Enterprise in these offenses and have performed acts in furtherance of

27    the conspiracy to increase or maintain revenue, maintain or increase market share, and/or

28    minimize losses for the Defendants and their named and unnamed co-conspirators throughout

COMPLAINT
Case No. 19-md-02913-WHO

the illegal scheme and common course of conduct. Where a RICO Defendant did not commit a predicate act itself, it agreed to the commission of the predicate act.

887.    Plaintiff has been injured by the RICO Defendants' conduct, and such injury would not have occurred but for the predicate acts of those defendants which also constitute the acts taken by the RICO Defendants in furtherance of their conspiracy pursuant to Section 1962(d). The combined effect of the RICO Defendants' acts of mail and wire fraud in furtherance of their conspiracy, including working to preserve and expand the market of underage JUUL customers, fraudulently denying JLI's youth-focused marketing, and deceiving regulators and the public in order to allow JUUL products and mint-flavored JUUL pods to remain on the market, was to cause e caused the expansion of an illicit e-cigarette market for youth in Plaintiff's schools and cause a large number of youth in Plaintiff's schools to become addicted to nicotine, thus forcing Plaintiff to expend time, money, and resources to address the epidemic Defendants created through their conduct. Indeed, the Enterprise Defendants intentionally sought to reach into schools and deceive public health officials in order to continue growing JLI's youth customer base. The repeated fraudulent misstatements by the Enterprise Defendants denying that JLI marketed to youth have served to preserve JUUL's market share— a market share that is based upon children purchasing JLI's tobacco products. The harm to Plaintiff would not have occurred absent the RICO Defendants' conspiracy to engage in a pattern of racketeering activity through a RICO Enterprise, the common purpose of which was maintaining and expanding the number of nicotine-addicted e-cigarette users, and youth in particular, in order to ensure a steady and growing customer base, including by preserving and growing JLI's ill-gotten market share.

888.    Plaintiff was a direct victim of Defendants' misconduct. The Enterprise Defendants' acts in furtherance of their RICO conspiracy displayed a wanton disregard for public health and safety by intentionally addicting youth, including youth in Plaintiff's schools, to nicotine and then attempting to cover up their scheme in order to maintain and expand JUUL's market share. Defendants actively concealed that they marketed to youth in order to avoid public condemnation and to keep their products on the market and continue youth sales.

This forced Plaintiff to shoulder the responsibility for this youth e-cigarette crisis created by Defendants' misconduct. The harm from the illicit youth e-cigarette market created by Defendants required Plaintiff to expend its limited financial and other resources to mitigate the health crisis of youth e-cigarette. The expansion of this youth e-cigarette market was the goal of the Enterprise and is critical to its success. Therefore, the harm suffered by Plaintiff because it must address and mitigate the youth e-cigarette crisis was directly foreseeable and, in fact, an intentional result of Defendants' misconduct.

889.    The creation and maintenance of this youth e-cigarette market, and Defendants actions in furtherance of their RICO conspiracy, directly harms Plaintiff by imposing costs on its business and property. Plaintiff's injuries were not solely the result of routine government expenses. Instead, as a result of Defendants' misconduct, Plaintiff has been and will be forced to go far beyond what a governmental entity might ordinarily be expected to pay to enforce the laws and to promote the general welfare in order to combat the youth e-cigarette crisis. This includes providing new programs and new services as a direct result and in direct response to Defendants' misconduct. As a result of the conduct of the Enterprise Defendants, Plaintiff has incurred and will incur costs that far exceed the norm.

890.    There are no intervening acts or parties that could interrupt the causal chain between the RICO Defendants' mail and wire fraud acts in furtherance of their RICO conspiracy and Plaintiff's injuries. The RICO Defendants, in furtherance of their conspiracy to form the Enterprise and advance its common purpose, made false and misleading statements directly to the public, including Plaintiff, its employees, and its students. And in the case of fraud on third parties (i.e., FDA and Congress), causation is not defeated merely because the RICO Defendants deceived a third party into not taking action where the FDA's and Congress's failure to regulate directly allowed youth in Plaintiff's schools to purchase products that should not have been on the market and/or that should not have been marketed to minors.

891.    As to predicate acts undertaken in furtherance of the conspiracy which occurred prior to May 8, 2016, Plaintiff did not discover, and could not have been aware despite the exercise of reasonable diligence, until shortly before the initiation of the instant litigation that

the RICO Defendants transmitted fraudulent statements via the mails and wires regarding the topics described above including, inter alia, the true nicotine content in and delivered by JUUL products, such information the RICO Defendants concealed and failed to truthfully disclose.

892.    The Enterprise's violations of 18 U.S.C. § 1962(d) have directly and proximately caused injuries and damages to Plaintiff, its community, and the public, and Plaintiff is entitled to bring this action for three times its actual damages, as well as for injunctive/equitable relief, costs, and reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

## COUNT THREE — NEGLIGENCE

893.    Plaintiff incorporates by reference all preceding paragraphs.

894.    Defendants owed Plaintiff a duty to not expose Plaintiff to an unreasonable risk of harm, and to act with reasonable care as a reasonably careful person and/or company would act under the circumstances so as to prevent harm to others.

895.    At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Defendants' e-cigarette products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

896.    At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of e-cigarette products. Defendants' duty of care owed to consumers and the general public, including Plaintiff, included providing accurate, true, and correct information concerning the risks of using Defendants' products and appropriate, complete, and accurate warnings concerning the potential adverse effects of e-cigarette and nicotine use and, in particular, JLI's patented nicotine salts and the chemical makeup of JUUL pods liquids.

897.    At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Defendants' e-cigarette products and specifically, the health hazards posed by using JUUL pods and other

1  e-cigarette products and continued use of nicotine, particularly among adolescents.

2      898.    Accordingly, at all times relevant to this litigation, Defendants knew or, in

3  the exercise of reasonable care, should have known that use of Defendants' products

4  students could cause Plaintiff's injuries and thus created a dangerous and unreasonable risk

5  of injury to Plaintiff.

6      899.    Defendants also knew or, in the exercise of reasonable care, should have

7  known that users and consumers of Defendants' products were unaware of the risks and the

8  magnitude of the risks associated with the use of Defendants' products including but not limited

9  to the risks of continued nicotine use and nicotine addiction.

10     900.    As such, Defendants, by action and inaction, representation and omission,

11 breached their duty of reasonable care, failed to exercise ordinary care, and failed to act as a

12 reasonably careful person and/or company would act under the circumstances in the design,

13 research, development, manufacture, testing, marketing, supply, promotion, advertisement,

14 packaging, sale, and distribution of their e-cigarette products, in that Defendants manufactured

15 and produced defective products containing nicotine and other chemicals known to cause harm

16 to consumers, knew or had reason to know of the defects inherent in their products, knew or

17 had reason to know that a consumer's use of the products created a significant risk of

18 harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of

19 these risks and injuries.

20     901.    Despite their ability and means to investigate, study, and test their products

21 and to provide adequate warnings, Defendants have failed to do so.  Indeed, Defendants

22 have wrongfully concealed information and have made false and/or misleading statements

23 concerning the safety and/or use of Defendants' products and nicotine e-cigarette use.

24     902.    Defendants' negligence included:

25         a.    Researching, designing, manufacturing, assembling, inspecting, testing,
                packaging, labeling, marketing, advertising, promoting, supplying,
26              distributing, and/or selling their products, without thorough and adequate
                pre- and post-market testing;
27

28         b.    Failing to undertake sufficient studies and conduct necessary tests to
                determine whether or not their products were safe for their intended use;

c.      Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of their products so as to avoid the risk of serious harm associated with the prevalent use of e-cigarettes and nicotine products;

d.      Designing and manufacturing their products to cause nicotine addiction, including by maximizing nicotine delivery while minimizing "throat hit" or "harshness";

e.      Failing to utilize proper materials, ingredients, additives and components in the design of their products to ensure they would not deliver unsafe doses of nicotine;

f.      Designing and manufacturing their products to appeal to minors and young people, including through the use of flavors and an easily concealable, tech-inspired design;

g.      Advertising, marketing, and promoting their products to minors, including through the use of viral social media campaigns;

h.      Failing to take steps to prevent their products from being sold to, distributed to, or used by minors;

i.      Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendants could reasonably foresee would use their products;

j.      Affirmatively encouraging new JUUL users through an instructional starter pack insert to disregard any initial discomfort and to continue e-cigarette use by instructing users to "keep trying even if the JUUL feels too harsh," and telling them, "[d]on't give up, you'll find your perfect puff";

k.      Failing to disclose to, or warn, Plaintiff, users, consumers, and the general public of negative health consequences associated with exposure to nicotine and other harmful and toxic ingredients contained in Defendants' products;

l.      Misrepresenting to Plaintiff, users, consumers, and the general public the actual nicotine content of Defendants' products;

m.      Failing to disclose to Plaintiff, users, consumers, and the general public that Defendants' products deliver more nicotine than represented;

n.      Misrepresenting Defendants' products as non-addictive, less addictive, and/or safer nicotine delivery systems than traditional cigarettes;

o.      Representing that Defendants' products were safe for their intended use when, in fact, Defendants knew or should have known that the products were not safe for their intended use;

---

COMPLAINT
Case No. 19-md-02913-WHO

p.    Declining to make or propose any changes to the labeling or other promotional materials for Defendants' e-cigarette and nicotine products that would alert consumers and the general public, including minors in Plaintiff's schools of the true risks of using Defendants' products;

q.    Advertising, marketing, and recommending Defendants' products while concealing and failing to disclose or warn of the dangers known by Defendants to be associated with, or caused by, the use of Defendants' products;

r.    Continuing to disseminate information to consumers, which indicates or implies that Defendants' products are not unsafe for their intended use;

s.    Continuing the manufacture and sale of Defendants' products with knowledge that the products were unreasonably unsafe, addictive, and dangerous;

t.    Failing to recall Defendants' products; and

u.    Committing other failures, acts, and omissions set forth herein.

903.   Defendants knew and/or should have known that it was foreseeable that Plaintiff would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of e-cigarette products, particularly when Defendants' products were made and marketed so as to be attractive and addictive to youth who spend many hours each week on Plaintiff's property and under Plaintiff's supervision.

904.   Plaintiff did not know the nature and extent of the injuries that could result from the intended use of e-cigarette products including, but not limited to JLI's patented JUUL pods liquids by Plaintiff's students.

905.   Defendants' negligence helped to and did produce, and was a substantial factor in and the proximate cause of, the injuries, harm, and economic losses that Plaintiff suffered, and will continue to suffer, and such injuries, harm and economic losses would not have happened without Defendants' negligence as described herein.

906.   In 2017-2018, 72% of 11th graders in Plaintiff's schools and 67% of 9th graders in Plaintiff's schools reported that it was very easy or fairly easy to obtain e-cigarettes or vaping devices and 29% of 11th graders and 19% of 9th graders admitted to having used e-cigarettes

or other e-cigarette devices;

907.    As a foreseeable consequence of Defendants' breaches of their duties, Plaintiff has suffered and will continue to suffer direct and consequential economic and other injuries as a result of dealing with the e-cigarette epidemic in Plaintiff's schools, including but not limited to:

a.    Discipline and suspensions related to incidents of e-cigarette use in Plaintiff's schools have increased at alarming rates;

b.    Because of the alarming rise of discipline and suspensions associated with student e-cigarette use, Plaintiff has devoted and diverted staff resources to develop a diversion program so as to allow students who are caught using e-cigarettes to remain in school and in class where possible;

c.    Plaintiff has had to close certain school restrooms to deter use of e-cigarette devices;

d.    Because many students who do not engage in e-cigarette activities do not wish to use the school restrooms even to wash their hands, Plaintiff has rented multiple portable hand-washing stations that have been placed outside of restrooms in an effort to maintain student hygiene and prevent the spread of disease;

e.    Students in Plaintiff's schools have openly charged e-cigarette devices in classrooms, causing disruption and diverting staff resources away from classroom instruction;

f.    Students in Plaintiff's schools, addicted to nicotine, have demonstrated anxious, distracted and acting out behaviors, causing disruption and diverting staff resources away from classroom instruction and requiring additional time and attention for addicted students;

g.    Plaintiff has had to devote and divert staff resources to intervening in student e-cigarette activities and coordinating necessary follow-up;

h.    Plaintiff has had to devote and divert staff resources to conduct staff training on e-cigarette use;

i.    Plaintiff has had to devote and divert staff resources to deploying student, family and parent-teacher education regarding the dangers of e-cigarette products;

j.    Plaintiff has had to add an additional high-school vice principal to address issues related to student e-cigarette use;

k.    Plaintiff has had to add additional school resource officer ("SRO") personnel to focus on deterring and preventing student e-cigarette use.

l.     Plaintiff has had to devote additional middle school guidance counseling resources to address issues related to student e-cigarette use;

m.    Plaintiff has had to acquire and install numerous additional security cameras on its premises to deter e-cigarette activity;

n.     Plaintiff has had to install additional signage on district premises to deter e-cigarette activity; and

o.     Expending, diverting and increasing resources to make physical changes to schools and/or address property damage in schools.

908.    Defendants engaged in conduct, as described above, that constituted malice, oppression, or fraud, with intent to cause injury and/or with willful and knowing disregard of the rights or safety of another, being fully aware of the probable dangerous consequences of the conduct and deliberately failing to avoid those consequences.

909.    Defendants' conduct constituting malice, oppression or fraud was committed by one or more officers, directors, or managing agents of Defendants, who acted on behalf of Defendants; and/or

910.    Defendants' conduct constituting malice, oppression or fraud was authorized by one or more officers, directors, or managing agents of Defendants; and/or

911.    One or more officers, directors, or managing agents of Defendants knew of the conduct constituting malice, oppression, or fraud and adopted or approved that conduct after it occurred.

912.    Defendants regularly risks the lives and health of consumers and users of its products with full knowledge of the dangers of its products.  Defendants made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff's students or Plaintiff.  Defendants' willful, knowing and reckless conduct, constituting malice, oppression or fraud therefore warrants an award of aggravated or punitive damages.

## COUNT FOUR — GROSS NEGLIGENCE

913.    Plaintiff incorporates by reference all preceding paragraphs.

914.    Defendants owed a duty of care to Plaintiff to conduct their business of

manufacturing, promoting, marketing, and/or distributing e-cigarette products in compliance with applicable state law and in an appropriate manner.

915.    Specifically, Defendants had a duty and owed a duty to Plaintiff to exercise a degree of reasonable care including, but not limited to: ensuring that Defendants' marketing does not target minors; ensuring that Defendants' products including, but not limited to, JUUL e-cigarettes and JUULpods are not sold and/or distributed to minors and are not designed in a manner that makes them unduly attractive to minors; designing a product that will not addict youth or other users to nicotine; and adequately warning of any reasonably foreseeable adverse events with respect to using the product.  Defendants designed, produced, manufactured, assembled, packaged, labeled, advertised, promoted, marketed, sold, supplied and/or otherwise placed Defendants' products into the stream of commerce, and therefore owed a duty of reasonable care to those, including Plaintiff, who would be impacted by their use.

916.    Defendants' products were the types of products that could endanger others if negligently made, promoted, or distributed.  Defendants knew the risks that young people would be attracted to their e-cigarette products and knew or should have known the importance of ensuring that the products were not sold and/or distributed to anyone under age 26, but especially to minors.

917.    Defendants knew or should have known that their marketing, distribution, and sales practices did not adequately safeguard minors from the sale and/or distribution of Defendants' products and, in fact, induced minors to purchase their products.

918.    Defendants were grossly negligent in designing, manufacturing, supplying, distributing, inspecting, testing (or not testing), marketing, promoting, advertising, packaging, and/or labeling Defendants' products.

919.    As powerfully addictive and dangerous nicotine-delivery devices, Defendants knew or should have known that their e-cigarette products needed to be researched, tested, designed, advertised, marketed, promoted, produced, packaged, labeled, manufactured, inspected, sold, supplied and distributed properly, without defects and with due care to avoid needlessly causing harm.  Defendants knew or should have known that their products

could cause serious risk of harm, particularly to young persons like students in Plaintiff's schools.

920. Defendants engaged in willful and/or wanton conduct that lacked any care and amounted to an extreme departure from what a reasonably careful person would do in the same situation to prevent harm to others. Defendants' willful and wanton conduct caused Plaintiff to suffer harm.

921. The willful and wanton conduct of Defendants includes, but is not limited to, the following:

a. Researching, designing, manufacturing, assembling, inspecting, testing, packaging, labeling, marketing, advertising, promoting, supplying, distributing, and/or selling their products, without thorough and adequate pre- and post-market testing;

b. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not their products were safe for their intended use;

c. Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of their products so as to avoid the risk of serious harm associated with the prevalent use of e-cigarette and nicotine products;

d. Designing and manufacturing their products to cause nicotine addiction, including by maximizing nicotine delivery while minimizing "throat hit" or "harshness";

e. Failing to utilize proper materials, ingredients, additives and components in the design of their products to ensure they would not deliver unsafe doses of nicotine;

f. Designing and manufacturing their products to appeal to minors and young people, including through the use of flavors and an easily concealable, tech-inspired design;

g. Advertising, marketing, and promoting their products to minors, including through the use of viral social media campaigns;

h. Failing to take steps to prevent their products from being sold to, distributed to, or used by minors;

i. Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendants could reasonably foresee would use their products;

j.      Affirmatively encouraging new JUUL users through an instructional starter pack insert to disregard any initial discomfort and to continue e-cigarette use by instructing users to "keep trying even if the JUUL feels too harsh," and telling them, "[d]on't give up, you'll find your perfect puff";

k.      Failing to disclose to, or warn, Plaintiff, users, consumers, and the general public of negative health consequences associated with exposure to nicotine and other harmful and toxic ingredients contained in Defendants' products;

l.      Misrepresenting to Plaintiff, users, consumers, and the general public the actual nicotine content of Defendants' products;

m.      Failing to disclose to Plaintiff, users, consumers, and the general public that Defendants' products deliver more nicotine than represented;

n.      Misrepresenting Defendants' products as non-addictive, less addictive, and/or safer nicotine delivery systems than traditional cigarettes;

o.      Representing that Defendants' products were safe for their intended use when, in fact, Defendants knew or should have known that the products were not safe for their intended use;

p.      Declining to make or propose any changes to the labeling or other promotional materials for Defendants' e-cigarette and nicotine products that would alert consumers and the general public, including minors in Plaintiff's schools of the true risks of using Defendants' products;

q.      Advertising, marketing, and recommending Defendants' products while concealing and failing to disclose or warn of the dangers known by Defendants to be associated with, or caused by, the use of Defendants' products;

r.      Continuing to disseminate information to consumers, which indicates or implies that Defendants' products are not unsafe for their intended use;

s.      Continuing the manufacture and sale of Defendants' products with knowledge that the products were unreasonably unsafe, addictive, and dangerous;

t.      Failing to recall Defendants' products; and

u.      Committing other failures, acts, and omissions set forth herein.

922.    Defendants breached the duties they owed to Plaintiff and in doing so, were wholly unreasonable.  A responsible company, whose primary purpose is to help adult smokers, would not design a product to appeal to minors and nonsmokers nor market their products to

minors and nonsmokers. If they are aware of the dangers of smoking and nicotine ingestion enough to create a device to help people stop smoking, then they are aware of the dangers enough to know that it would be harmful for young people and nonsmokers to use.

923. Defendants breached their duties through their false and misleading statements and omissions in the course of the manufacture, distribution, sale, and/or marketing of Defendants' nicotine products.

924. As a foreseeable consequence of Defendants' breaches of their duties, Plaintiff has suffered and will continue to suffer direct and consequential economic and other injuries as a result of dealing with the vaping epidemic in Plaintiff's schools, including but not limited to:

    a.    Discipline and suspensions related to incidents of e-cigarette use in Plaintiff's schools have increased at alarming rates;

    b.    Because of the alarming rise of discipline and suspensions associated with student e-cigarette use, Plaintiff has devoted and diverted staff resources to develop a diversion program so as to allow students who are caught using e-cigarettes to remain in school and in class where possible;

    c.    Plaintiff has had to close certain school restrooms to deter use of e-cigarette devices;

    d.    Because many students who do not engage in e-cigarette activities do not wish to use the school restrooms even to wash their hands, Plaintiff has rented multiple portable hand-washing stations that have been placed outside of restrooms in an effort to maintain student hygiene and prevent the spread of disease;

    e.    Students in Plaintiff's schools have openly charged e-cigarette devices in classrooms, causing disruption and diverting staff resources away from classroom instruction;

    f.    Students in Plaintiff's schools, addicted to nicotine, have demonstrated anxious, distracted and acting out behaviors, causing disruption and diverting staff resources away from classroom instruction and requiring additional time and attention for addicted students;

    g.    Plaintiff has had to devote and divert staff resources to intervening in student e-cigarette activities and coordinating necessary follow-up;

    h.    Plaintiff has had to devote and divert staff resources to conduct staff training on e-cigarette use;

i.    Plaintiff has had to devote and divert staff resources to deploying student, family and parent-teacher education regarding the dangers of e-cigarette products;

j.    Plaintiff has had to add an additional high-school vice principal to address issues related to student e-cigarette use;

k.    Plaintiff has had to add additional school resource officer (SRO) personnel to focus on deterring and preventing student e-cigarette use;

l.    Plaintiff has had to devote additional middle school guidance counseling resources to address issues related to student e-cigarette use;

m.    Plaintiff has had to acquire and install numerous additional security cameras on its premises to deter e-cigarette activity;

n.    Plaintiff has had to install additional signage on district premises to deter e-cigarette activity;

o.    Expending, diverting and increasing resources to make physical changes to schools and/or address property damage in schools.

925.    Defendants engaged in conduct, as described above, that constituted malice, oppression, or fraud, with intent to cause injury and/or with willful and knowing disregard of the rights or safety of another, being fully aware of the probable dangerous consequences of the conduct and deliberately failing to avoid those consequences.

926.    Defendants' conduct constituting malice, oppression or fraud was committed by one or more officers, directors, or managing agents of Defendants, who acted on behalf of Defendants; and/or

927.    Defendants' conduct constituting malice, oppression or fraud was authorized by one or more officers, directors, or managing agents of Defendants; and/or

928.    One or more officers, directors, or managing agents of Defendants knew of the conduct constituting malice, oppression, or fraud and adopted or approved that conduct after it occurred.

929.    Defendants regularly risks the lives and health of consumers and users of its products with full knowledge of the dangers of its products.  Defendants made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff's students or Plaintiff.  Defendants' willful, knowing and reckless conduct

1    conduct therefore warrants an award of aggravated or punitive damages.

2                         **VII.    PRAYER FOR RELIEF**

3           WHEREFORE, Plaintiff prays for judgment as follows:

4           930.    Entering an Order that the conduct alleged herein constitutes a public nuisance

5    under California law;

6           931.    Entering an Order that Defendants are jointly and severally liable;

7           932.    Entering an Order requiring Defendants to abate the public nuisance described

8    herein and to deter and/or prevent the resumption of such nuisance;

9           933.    Enjoining Defendants from engaging in further actions causing or contributing to

10   the public nuisance as described herein;

11          934.    Awarding equitable relief to fund prevention education and addiction treatment;

12          935.    Awarding actual and compensatory damages;

13          936.    Awarding punitive damages;

14          937.    Awarding statutory damages in the maximum amount permitted by law;

15          938.    Awarding reasonable attorneys' fees and costs of suit;

16          939.    Awarding pre-judgment and post-judgment interest; and

17          940.    Such other and further relief as the Court deems just and proper under the

18   circumstances.

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

## VIII.   JURY TRIAL DEMANDED

941.    Plaintiff hereby demands a trial by jury.


DATED:  February 3, 2022                    Respectfully Submitted,

/s/James Frantz, Esq.
CA Bar # 87492;
jpf@frantzlawgroup.com

/s/William B. Shinoff, Esq.
CA Bar # 280020;
wshinoff@frantzlawgroup.com

FRANTZ LAW GROUP, APLC
402 W. Broadway, Ste. 860
San Diego, CA 92101
P: (619) 233-5945
F: (619) 525-7672

**_Attorneys for Plaintiff_**
_MSAD 15_

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 3, 2022, I electronically filed the foregoing document using the CM/ECF system, which will send notification of such filing to all counsel of record registered in the CM/ECF system.

/s/ <u>*James P. Frantz*</u>
James P. Frantz
